The Honorable James L. Robart

1
2
3
4
5
6
7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
8

9   John Doe, Jack Doe, Jason Doe, Joseph Doe
    James Doe, Jeffrey Doe, individually, and on
10  behalf of all others similarly situated; the
    Episcopal Diocese of Olympia, and the Council
11  on American Islamic Relations-Washington,

12                          Plaintiffs,

13          v.

14
    Donald Trump, President of The United States;
15  U.S. Department of State; Rex Tillerson,
    Secretary of State; U.S. Department of
16  Homeland Security; Elaine Duke, Acting
    Secretary of Homeland Security; U.S. Customs
17  and Border Protection; Kevin McAleenan,
    Acting Commissioner of U.S. Customs and
18  Border Protection; Michele James, Field
    Director of the Seattle Field Office of U.S.
19  Customs and Border Protection; Office of the
    Director of National Intelligence; and Daniel
20  Coats, Director of the Office of the Director of
    National Intelligence
21

22                          Defendants.

23

No. 2:17-cv-00178-JLR

**THIRD AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

24
25
26

THIRD AMENDED CLASS
ACTION COMPLAINT

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

`

# TABLE OF CONTENTS

| | | | Page |
|---|---|---|---|
| I. | INTRODUCTION | | 1 |
| II. | JURISDICTION AND VENUE | | 5 |
| III. | PARTIES | | 6 |
| | A. | Plaintiffs | 6 |
| | | 1. Plaintiff John Doe | 6 |
| | | 2. Plaintiff Jack Doe | 8 |
| | | 3. Plaintiff Jason Doe | 10 |
| | | 4. Plaintiff Joseph Doe | 12 |
| | | 5. Plaintiff James Doe | 15 |
| | | 6. Plaintiff Jeffrey Doe | 17 |
| | | 7. Plaintiff the Episcopal Diocese of Olympia | 20 |
| | | 8. Plaintiff the Council on American-Islamic Relations-Washington | 23 |
| | B. | Defendants | 27 |
| IV. | FACTUAL BACKGROUND | | 28 |
| | A. | President Trump's January 27, 2017 Original Executive Order | 28 |
| | | 1. Chaos, Confusion, and Whiplash in the Implementation of EO-1 | 29 |
| | | 2. The Discriminatory Intent Behind EO-1 | 33 |
| | B. | President Trump's March 6, 2017 Executive Order | 37 |
| | C. | President Trump's September 27, 2017 Proclamation | 44 |
| | D. | President Trump's October 24, 2017 Executive Order and Agency Implementation of the Order | 47 |
| | E. | The Arbitrariness of the Orders | 51 |

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

`

1.     Arbitrariness of the Travel Ban ............................................................ 52

     a.    The Faulty Logic Behind Invoking the 9/11 Attacks
          to Justify the Travel Ban ........................................................ 52

     b.    The Faulty Logic Behind Invoking 2015 Data to
          Justify the Travel Ban ............................................................ 56

2.     Arbitrariness of the Suspension of the USRAP ................................... 62

F.    President Trump's Continuing Defiance of Court Orders
     Regarding the Executive Orders and Insistence on His Muslim
     Travel Ban .................................................................................................. 74

V.     CLASS ACTION ALLEGATIONS ................................................................ 82

VI.    CAUSES OF ACTION ................................................................................... 84

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

# I. INTRODUCTION

1.      Just as "the world is not made brand new every morning," *McCreary Cty. v. ACLU*, 545 U.S. 844, 866 (2005), "a person is not made brand new simply by taking the oath of office." *Aziz v. Trump*, 234 F. Supp. 3d 724, 734 (E.D. Va. 2017). Impermissible animus cannot be cleansed with a few "mostly minor technical differences":[1] a Muslim ban is a Muslim ban. Ten months into this Administration, Defendants have issued a third set of orders and memos that causes the same harms as Defendants' prior actions, imposes an indefinite suspension on the admission of the spouses and children of former refugees, and continues to effectuate an unlawful Muslim ban. The order and memos cannot be separated from the context in which they arose.

2.      One week after taking the oath of office as President of the United States, on January 27, 2017, Defendant Trump carried out a promise he made repeatedly and explicitly on the campaign trail, launching "a total and complete shutdown of Muslims entering the United States"[2] with his signature on Executive Order 13769 "Protecting the Nation from Foreign Terrorist Entry into the United States." 82 Fed. Reg. 8977 (Jan. 27, 2017) ("EO-1").

3.      With the stroke of a pen, he threw into chaotic uncertainty the lives of tens of thousands of individuals who had been granted valid student and work visas and disrupted the passage to safety for refugees and their families, including women and children who had been victimized by actual terrorists, all of whom had already been subjected to an exhaustive and thorough screening by the United States government.

4.      Multiple courts—including this Court and the Ninth Circuit Court of Appeals— recognized the ban for the affront to our Constitution it was and promptly stayed it. While continuing to insist "nothing was wrong" with EO-1, Defendants openly advertised that the

---

[1] Martha McCallum, *Miller: New Order Will Be Responsive to the Judicial Ruling; Rep. Ron DeSantis: Congress has Gotten off to a Slow Start*, Fox (Feb. 21, 2017), http://fxn.ws/2lSaxl2 (last visited Nov. 4, 2017).

[2] Donald J. Trump Statement on Preventing Muslim Immigration, DonaldJTrump.com (Dec. 7, 2015), https://www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventing-muslim-immigration (last visited May 8, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 1

**AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION**
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

revised order would have "mostly minor technical differences" from EO-1 and "fundamentally" would be "the same basic policy outcome for the country."[3] Defendants then spent more than a month publicly struggling to figure out how to do exactly what they repeatedly said they wanted to do: ban Muslims.

5.      On March 6, 2017, Defendant Trump signed Executive Order 13780, also titled "Protecting the Nation from Foreign Terrorist Entry into the United Sates." 82 Fed. Reg. 13209 (Mar. 6, 2017) ("EO-2"). As Defendant Trump admitted, other than a few cosmetic changes to address some of the most obvious facial legal deficiencies, EO-2 was just a "watered-down version" of his first travel ban.[4]

6.      Multiple courts again enjoined key provisions of EO-2, the Fourth and Ninth Circuits largely upheld those injunctions, and the Supreme Court declined to stay the injunctions except as to foreign nationals who lacked any credible claim to a bona fide relationship with a person or entity in the United States.

7.      On September 24, 2017, Defendant Trump issued a Presidential Proclamation titled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats." 82 Fed. Reg. 45,161 (Sept. 24, 2017) ("EO-3"). EO-3 imposes an indefinite ban on the issuance of immigrant and non-immigrant visas to nationals of six Muslim-majority countries. For a third time, multiple courts have issued injunctions, blocking key provisions of EO-3 from going into effect.

8.      EO-3 did not address the issue of refugee admissions. On October 23, 2017, Defendants Tillerson, Duke, and Coates issued a Memorandum to the President titled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities" ("October

---

[3] *See supra* note 1.

[4] Matt Zapotosky, Kalani Takase & Maria Sacchetti, *Federal Judge in Hawaii Freezes President Trump's New Entry Ban*, Wash. Post (Mar. 16, 2017), http://wapo.st/2zm2Zfy (last visited Nov. 6, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 2

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

2017 Agency Memo").[5] The next day, on October 24, 2017, Defendant Trump signed Executive Order 13815 titled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities." 82 Fed. Reg. 50,055 (Oct. 24, 2017) ("EO-4"). EO-4 purports to resume the U.S. Refugee Admissions Program ("USRAP") when in fact the October 2017 Agency Memo indefinitely bans many of the same refugees that courts already told Defendants they could not ban in EO-2.

9.     The Constitution is not so easily fooled. Changes made openly and explicitly to evade judicial scrutiny fail to mask the discriminatory animus that pervades Defendants' actions. Even if the discriminatory intent of EO-2, EO-3, and the October 2017 Agency Memo is not as plain on its face as with EO-1, the current set of orders remain in contravention of "[t]he clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982).

10.     Although the list of countries changed slightly from EO-1 and EO-2, EO-3 indefinitely bans or severely restricts the entry into this country of nationals from six Muslim-majority countries: Chad, Iran, Libya, Somalia, Syria, and Yemen (the "Designated Countries").

11.     And although EO-4 purports to reinstate USRAP, the October 2017 Agency Memo makes clear Defendants will do no such thing: the October 2017 Agency Memo continues a de facto Muslim ban on refugees by banning refugees from eleven countries on the Security Advisory Opinion ("SAO") list ("SAO List Countries"), *see infra* ¶ 215, and all I-730 following-to-join derivative ("I-730 follow to-join" or "follow-to-join") refugees (the spouses and children of former refugees).

12.     Far from eliminating the need for judicial scrutiny, EOs 1-3 and the October 2017 Agency Memo (collectively "the Orders") underscore the need for it. The Orders have created an unstable, unpredictable, and uncertain situation.

---

[5] Memorandum from Rex W. Tillerson, Elaine Duke, and Daniel Coats to the President (Oct. 23, 2017), http://bit.ly/2z36fdw (last visited Nov. 2, 2017), attached to this Complaint as Exhibit J.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

13.     Plaintiffs are Washington residents from the Designated Countries with lawful non-immigrant status but without re-entry visas (e.g., expired multiple-entry visas or used single-entry visas) who are trapped inside the United States—unable to have their families (including grandparents and parents) visit them and unable to leave the United States to visit their families in their home countries or carry out education-related travel for fear they will be unable to return to their lives here ("the Non-Immigrant Visa Class"). Unlike similarly situated people from the non-Designated Countries, once members of the Non-Immigrant Visa class leave the country, they know they will be singled out: the default for them is denial of a new visa unless they are fortunate enough to procure a waiver from the general ban.

14.     Plaintiffs are also refugees and asylees who reside in Washington and have filed petitions to reunify with their family members who have completed and cleared their final security screenings ("the Refugee Class"). They have fled war-torn countries, survived brutal conditions in refugee camps, and finally made it into the United States—some, after years of uncertainty and fear. They anxiously await reunification with dearly loved family members who were cleared for travel prior to the issuance of the Orders and now reasonably fear those family members will never make it into the United States. Plaintiffs seek to directly represent themselves and others similarly situated.

15.     Also harmed by Orders is Plaintiff the Episcopal Diocese of Olympia (the "Episcopal Diocese" or "Diocese"), a religious entity organized in the State of Washington to do charitable works, including to support the resettlement of refugees in Washington. The Diocese has had its refugee resettlement activities completely upended as a result of the Orders which barred and continue to bar the arrival of persons admitted through the USRAP. As of the filing of the Third Amended Complaint, nearly thirty families from the SAO List Countries whom the Episcopal Diocese was supporting in resettlement, were granted refugee status, and approved for travel to the United States will have their trips canceled as a result of the Orders, wasting precious resources and frustrating the activities of the Diocese. In addition, several clients whom

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 4

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

the Diocese has helped file I-730 follow-to-join petitions—and whose families the Diocese had assured—are now stuck in limbo.

16.     The Council on American-Islamic Relations-Washington ("CAIR-WA") is harmed by the Orders. CAIR-WA is a non-profit organization based in Seattle that works to promote an understanding of Islam through dialogue, education, protection of civil liberties, and coalition-building. As a result of the Orders, CAIR-WA has received numerous inquiries from its constituents about American-Muslim travelers who have become the target of unconstitutional ideological questioning by Transportation Security Administration and Customs and Border Protection agents about their personal beliefs. CAIR-WA has had to devote substantial, unplanned-for resources to respond to this new spike.

17.     The Episcopal Diocese, CAIR-WA, and the individual Plaintiffs—on behalf of themselves and three classes of similarly situated people in Washington State—(collectively, "Plaintiffs") bring this suit to challenge the provisions and implementation of the Orders that violate the First Amendment, the Fifth Amendment, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*

18.     Plaintiffs currently suffer serious irreparable harm and will continue to suffer such harm until and unless this Court preliminarily and permanently enjoins the Orders. Plaintiffs have no adequate remedy at law.

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims under the U.S. Constitution and federal statutes, as well as under the APA, 5 U.S.C. § 706.

20.     The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

21.     Venue is proper under 28 U.S.C. § 1391(b)(2) and (e)(1). A substantial part of the events or omissions giving rise to the claims occurred in this district, and all individual Plaintiffs reside in this District. Further, Defendants are officers or employees of the United States acting in their official capacities, and agencies of the United States.

22.     Plaintiff the Episcopal Diocese, also known as the Episcopal Church in Western Washington, is a diocese of the Episcopal Church in Washington State, west of the Cascade Range. The Episcopal Diocese is headquartered in Seattle and is a registered 501(c)(3) corporation.

23.     The CAIR-WA is a 501(c)(3) non-profit organization that operates from its offices in downtown Seattle.

## III.     PARTIES

### A.     Plaintiffs

#### 1.     Plaintiff John Doe

24.     Plaintiff John Doe is an Iranian national who resides in Seattle, Washington. John Doe has F-1 status as a fifth-year Ph.D. candidate in Aeronautic and Astronautic Engineering at the University of Washington. John Doe simultaneously studied for a master's degree in applied mathematics at the University of Washington and graduated in April 2017. John Doe has a provisional patent, "patent pending," in the United States pertaining to battery function. He also was a graduate fellow with the Clean Energy Institute of Washington State.

25.     John Doe holds a multiple-entry visa that expired on August 31, 2017. This was his second such visa that allowed him to pursue full-time educational study in the United States. John Doe received his F-1 status and both multiple-entry visas after an intensive vetting and screening process abroad that included an in-person interview and proof of his admission status at the University of Washington as a full-time doctoral student.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

26.     John Doe first arrived in the United States in 2012. Before that he studied for a master's degree in civil engineering in the Netherlands, and then worked for a year in the Netherlands for an international offshore oil and gas company. John Doe has also served as a visiting researcher at ETH Zurich in Switzerland studying nonlinear solitary waves, and at the University of South Carolina studying nonlinear wave propagation. John Doe received his undergraduate bachelors of science degree in civil engineering in Iran.

27.     John Doe's immediate and extended family, including maternal grandparents, all live in Iran.

28.     John Doe is engaged in collaborative research with the Chinese Academy of Science. He co-authors publications with Chinese researchers and is actively advising and directing joint research with students in the United States and China on these projects. As part of this collaboration, John Doe conducted research in China for three months in 2016. John Doe has missed several opportunities to attend conferences abroad, including one where he was invited as the keynote speaker, because he was and continues to be fearful of what position Defendants may take next that might potentially leave him stranded outside the country if he travels.

29.     As part of his doctorate studies, it is anticipated and expected that John Doe will participate in international conferences, because such endeavors are essential to his training and his ability to be fully active in the scientific and research community. There are numerous upcoming academic conferences that John Doe was planning to attend. However, as the submission deadline for the conferences are often several months before the event, and given the multiple times Defendants changed their mind while implementing EO-1 and EO-2, John Doe has not submitted proposals for several of the conferences to which he otherwise would have applied to make presentations as a result of Defendants' actions. In addition, given the uncertainty surrounding the enhanced screening and vetting (in addition to what he has already been through) and the uncertainty that remains with the waiver process required by EO-3, he continues to fear that if he leaves the United States to attend an academic conference, he may be

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

prevented from reentering the United States. John Doe's inability to reenter the United States would prevent him from completing his doctorate.

30.     John Doe's research and career have suffered and will continue to suffer as long as the Orders are in place.

31.     John Doe's parents were in the process of applying for a visa to visit him when EO-3 issued. His parents have since put their plans on hold. He is now uncertain whether he will be able to see his parents any time in the near future.

32.     John Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

**2.     Plaintiff Jack Doe**

33.     Plaintiff Jack Doe is an Iranian national who resides in Seattle.

34.     Jack Doe was born and raised in a Muslim family.

35.     Jack Doe has an undergraduate degree in Electrical Engineering from Sharif University in Tehran. Jack Doe first came to the United States in 2006 with an F-1 visa to work on a Ph.D. at the University of Maryland. He obtained his first F-1 student visa from the United States embassy in Cypress. He completed his Ph.D. program in 2014.

36.     Until a few months ago, Jack Doe was a post-doctorate researcher at the University of Washington. He was working under his F-1 Optional Practical Training ("OPT") status, and subsequent extension for STEM students ("STEM OPT"), which together allowed him, after completing his degree, to work for three years in academia. OPT is temporary employment that is directly related to an F-1 student's major area of study, and the STEM OPT extension allows certain F-1 students who receive science, technology, engineering, and mathematics (STEM) degrees, and who meet other specified requirements, to apply for a 24-month extension of their post-completion OPT. Application for both OPT and STEM OPT

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

requires endorsement by the student's "designated school official" at the student's United States academic institution.

37.     The University of Washington also sponsored an academic H1-B visa for Jack Doe. A few months ago, however, Jack Doe accepted a job offer in his field, which meant he no longer had H1-B status. He is currently working pursuant to an Employment Authorization Document ("EAD"), which he obtained based on a pending application for permanent residency.

38.     Although Jack Doe is residing and working in the United States legally, the Orders have made it very difficult for him to find long-term employment. Prior to the issuance of the Orders, Jack Doe had been interviewing with employers. His future employment prospects are now in jeopardy because his EAD is temporary and, as a result of EO-3, he would be unable to get H1-B status if necessary to continue working after his EAD expires. Jack Doe fears that employers will be reluctant to hire him for this reason, and he is therefore at a significant disadvantage compared to other foreign nationals who are not from one of the Designated Countries.

39.     Most of Jack Doe's family lives in Iran, and he has not been able to see them since 2008 when he was able to return to Iran for a brief visit. Jack Doe has not seen his parents since 2012, when they came to the United States to visit him and his sister. More recently, his parents had applied for visas to visit him, and while his mother's visa was approved, his father's is still under "administrative processing," leaving Jack Doe uncertain as to what will happen with his father's visa.

40.     Since the issuance of the Orders, Jack Doe has felt marginalized, stigmatized, and less than a full member of the community. Jack Doe feels subjected to increased suspicion, scrutiny, and social and political isolation on the basis of his religion (or perceived religion) and national origin. He had plans to take some business and leisure trips within the United States but has cancelled them because he fears for his safety and the hostility he might face in places that are less exposed to immigrants and Muslims. Jack Doe is aware of recent press reports of

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

evidence targeted at Muslims and fears for his safety as a result. In particular, the widespread press coverage of the shooting of two Indian men in a Kansas bar who were asked what type of visa they held before being yelled at to "get out of my country"[6] and shot, on the mistaken belief that they were from Iran, cause Jack Doe substantial concern for his own safety and well-being.[7]

41.     Jack Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

**3.     Plaintiff Jason Doe**

42.     Plaintiff Jason Doe is a resident of Seattle.

43.     Jason Doe is Muslim.

44.     Jason Doe is an Iranian national. He first came to the United States in 2013 with F-2 status (for spouses of F-1 students), as his wife had F-1 status as a graduate student.

45.     In 2014, Jason Doe was accepted into a 5-year doctorate program at the Business School of the University of Washington to study Information Systems. He is halfway through his program and anticipates graduating in 2019. Jason Doe would like to stay in academia, as a researcher, writer, and professor in his field.

46.     After he was admitted to the University of Washington, Jason Doe changed his status to F-1 and obtained a multiple-entry visa. Currently, Jason Doe's wife is also enrolled in a doctorate program at the University of Washington, and they both have F-1 status.

47.     Jason Doe's multiple-entry visa expired in August 2016, but he is in the United States lawfully because his F-1 status is valid until 2019 pursuant to his Form I-20. His F-1 status may also be extended if it takes him longer to finish his degree.

---

[6] Alyssa Ayres, *The Kansas City Shooting Is Quickly Changing How Indians View the U.S.*, Forbes (Mar. 3, 2017), http://bit.ly/2hqQvt5 (last visited Nov. 2, 2017).

[7] Eric Levenson, *911 Calls Reveal the Kansas Suspect Thought He'd Shot 'Two Iranians,'* CNN (Feb. 28, 2017), http://cnn.it/2A4Yhkb (last visited Nov. 2, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

48.     Given Jason Doe's time horizon on graduation and the fact that he is halfway through his program, he should be starting to attend conferences to present papers, expand his contacts, and develop his expertise. Most of the conferences that would be appropriate for him to attend are international conferences, which would require travel outside of the United States in the coming months. In particular, there is an upcoming conference in December 2017 held in Seoul, Korea. This is the major conference in Jason Doe's field, and students often have their job interviews at that conference. Jason Doe has a paper accepted for presentation at the conference.

49.     However, as a result of the EO-3, Jason Doe cannot leave the country for fear he will not be permitted to return. He is particularly reluctant to leave without his wife for fear that they will be separated. As a result, he will miss this important conference, not present his paper, and will have to forego the opportunity to interview with potential employers there. His research and career will suffer as long as the Orders are in place.

50.     The majority of his family and his wife's family are in Iran.

51.     Jason Doe's in-laws have applied for visas to visit him and his wife, and they were scheduled for interviews at the time EO-3 was issued. The visit is particularly important to Jason Doe and his wife because his mother-in-law is battling cancer. Jason Doe's parents had also planned on applying for a visa to visit him. While Jason Doe and his wife have F-1 status, they would need to apply for a visa to reenter the United States if they were to travel outside of the country to see their family. He is now uncertain whether he and his wife will be able to see their parents any time in the near future.

52.     Since the issuance of the Executive Orders, Jason Doe has felt marginalized, stigmatized, and less than a full member of the community. Jason Doe has felt subjected to increased suspicion, scrutiny, and social and political isolation on the basis of his religion (or perceived religion) and national origin. He read reports of an Iranian man in Oregon who was not Muslim but who returned home from a trip to find his house vandalized, sprayed with hate-filled racist graffiti ("F*** YOU TERRORIST") and a note weighted down by bullets in the shape of a

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

cross that said "if I see you here next month, I will shoot you and burn your house."[8] When someone asks him where he is from or what his religion is, he is no longer comfortable answering that he is from Iran or that he is a Muslim because he is worried about the consequences. Jason Doe no longer feels safe walking in the streets at night because he worries someone might shoot him because of how he looks and because of hatred toward Muslims.[9]

53.     Jason Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

### 4.     Plaintiff Joseph Doe

54.     Plaintiff Joseph Doe is a Somali national who currently resides in Des Moines, Washington.

55.     Joseph Doe is a practicing Muslim.

56.     Joseph Doe is married with three children.

57.     Prior to arriving in the United States, Joseph Doe had lived in refugee camps in Kenya since 1992—for nearly twenty-two years. Joseph Doe's family fled Somalia during that country's violent civil war to escape persecution and the risk of being killed because of their clan membership. While trying to reach safety on foot, Joseph Doe's family spent weeks hiding in the forest without food. Fighters from one of the warring factions found them in the forest and raped Joseph Doe's older sister in front of him and his family. His mother tried to stop the rape of her daughter, but the men clubbed her in the head with the butt of their guns. His sister, who was pregnant, bled to death following the rape. Joseph Doe was approximately ten years old at the time and witnessed all of these events. He struggles with these memories to this day.

---

[8] Lizzy Acker, *Portland-Area Man's Home Vandalized with Death Threats and Racist Graffiti*, Oregonian (Mar. 31, 2017), http://bit.ly/2hrxA1A (last visited Nov. 2, 2017).

[9] *See supra* notes 6-7.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

58.     Joseph Doe's family eventually reached Kenya and began living in a refugee camp. Joseph Doe had his initial interview with the United Nations High Commissioner for Refugees ("UNHCR") in 2000 with his mother, two brothers, and three surviving sisters.

59.     In 2004, Joseph Doe left the camp one morning as he often did to try to earn some money for his family. But when he returned, he found out that the local Turkana people had raided the camp, and in the subsequent fighting and upheaval, his family was nowhere to be found. Until a few months ago, Joseph Doe did not know where his mother or siblings were or what happened to them. It was only a few months ago that they managed to track him down and call him. The surviving members of his family are still living in Kenya.

60.     When he was finally called for an interview with the Department of Homeland Security/U.S. Citizenship and Immigration Services in 2011, Joseph Doe had just gotten married. He went through the screening process starting in 2011 and completed it in December 2013.

61.     Joseph Doe finally arrived in the United States on January 28, 2014, as a refugee. He only had refugee status for himself, and not his wife and children, as the refugee application process was begun for him with his mother and siblings when he was still a child.

62.     As a result, when he came to the United States, Joseph Doe had to leave behind in Kenya his wife and children, the youngest of whom was just about six months old at the time. His children are now four, five, and nine years old. While his children are considered Somali nationals, they have never been to Somalia.

63.     Joseph Doe became a legal permanent resident in 2016. Joseph Doe is currently working a full-time job at a warehouse, sending money to his family in Kenya, and preparing for their arrival.

64.     Once he realized he had a right to ask for his family to join him in the United States, Joseph Doe filed a Refugee/Asylee Relative Petition, Form I-730, for his wife and three children in June 2015. His wife and children had their final interviews in November 2016, which they successfully passed; they have completed the security clearance; they completed their

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

medical clearance on January 31, 2017; and they received their final required immunizations on March 1, 2017. His family was assured by a Refugee Resettlement Office ("RRO") on June 5, 2017. They were only waiting to be scheduled for travel to the United States at the time EO-2 was issued.

65.     Joseph Doe was told that the only thing left before his family would travel to the United States was for their travel arrangements to be finalized. However, because of the delays caused by the Orders, Joseph Doe's fears that his family's medical clearances would expire has come true (their medical clearances expired on August 1, 2017), and his family has had to go through the medical examinations process all over again, further delaying the process. While two members of his family have received their new medical clearances, he now has to await the new medical clearance for two of his children, which he hopes will be issued in the very near future.

66.     Joseph Doe fears that between the indefinite suspension of admissions for I-730 follow-to-join derivative refugees mandated by the October 2017 Agency Memo and the possibility of the drastically decreased refugee cap for fiscal year 2018 being met soon, his family's travel to the United States will be delayed indefinitely, and his suffering—and that of his family—will be prolonged indefinitely.

67.     Joseph Doe speaks to his family regularly on the telephone. His wife often brings up the hardship of the long separation, which is approaching four years. Joseph Doe's youngest son is not old enough to understand that it is not by choice that his father is far away from his family, and he often cries for his dad, asks his mother where his dad is, and asks to talk to his dad. When Joseph Doe speaks with his son, his son constantly asks, "Where are you?" and "Why can't you come for us?"

68.     There isn't a day that goes by when Joseph Doe does not think of his wife and children, wish that he could just hold and hug them, and dream of being able to be a family again, all together in one place. Joseph Doe often cannot fall asleep at night because he is

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

thinking about his family and wondering if the next day will be the day that he will get the news that his family's travel has been scheduled so that he can be reunited with them.

69. Given the hardship of the extended separation, Joseph Doe has applied for an I-131 travel document to visit his wife and children in Kenya. However, he is afraid to leave the United States even with a travel document because he fears he will not be allowed to return.

70. The Orders have interfered with and delayed the arrival to the United States of Joseph Doe's family. Joseph Doe is injured each day by that interference and delay.

71. Joseph Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

**5. Plaintiff James Doe**

72. James Doe is an Eritrean national who resides in Seattle, Washington.

73. James Doe fled Eritrea in 2009 after being imprisoned because of his political beliefs. In 2009, he was working at Sawa Military Training Camp ("Sawa") as part of his mandatory national service, which is required of every Eritrean for eighteen months by law, but in practice is a system of indefinite conscription. The Eritrean government requires all Eritrean students to spend their last year of high school at Sawa, and James Doe was working as an instructor there, teaching accounting, which was his focus of study at university. While he was forced to work at Sawa, he was only able to go home to see his wife and children every three or four months. At that time, his oldest child was about a year old, and his wife was expecting their second child.

74. In or around March 2009, the Eritrean government called a meeting to ask people at Sawa what changes they would like to see implemented, and James Doe participated in this meeting and voiced his opinions. Two or three days later, government officers came to his room at Sawa and arrested him.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

75.     They took him to an underground prison and kept him there for approximately five months. The prisoners were not given enough food to eat, and they had no water for washing. Many prisoners were tortured with beatings and by being tied up for long periods of time, including one technique well known in Eritrean prisons called the "helicopter," in which the hands and feet of a prisoner are tied behind his back and he is made to lie on the ground, face down, or suspended in the air. Sometimes the guards would remove prisoners and not bring them back, and the other prisoners did not know what became of them. James Doe knew not to speak out to the prison guards and was able to avoid being tortured, and eventually, he escaped the prison.

76.     He fled first to Sudan, then through Egypt, and made it to Israel. Once he had made it to Israel, he was finally able to contact his wife and let her know what had happened to him.

77.     James Doe stayed in Israel for a significant time, but he could not get permanent status in Israel as a refugee. He was able to get a visa for travel to Sri Lanka as a refugee, but after he arrived there, the Sri Lankan government began detaining Eritrean refugees. He was detained and kept in prison again for almost two years.

78.     The United Nations, investigating the Sri Lankan detention centers, became aware of him and worked with James Doe to help him obtain refugee status in the United States. In April 2015, nearly six years after he escaped prison in Eritrea, he made it to the United States.

79.     In July 2015, James Doe filed a Refugee/Asylee Relative Petition, Form I-730, for his wife and children, including a daughter whom he had never met as he was arrested and taken away while his wife was pregnant.

80.     James Doe became a lawful permanent resident of the United States in 2016. He currently works two jobs, one full-time and one part-time, to support his family. He provided financial support for his wife and children while they were waiting for the I-730 refugee relative screening process to be completed.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

81.     On June 13, 2017, James Doe was at last able to meet his eight-year-old daughter for the first time when his wife, son, and daughter finally arrived in the United States.

82.      Since the issuance of the Orders, James Doe has felt subjected to increased suspicion, scrutiny, and social and political questioning on the basis of his religion (or perceived religion) and national origin. Because of his features, coloring, and accent, James Doe is frequently asked by customers at his workplace where he is from and if he is Muslim. He has also had Muslim customers confide in him that they do not feel comfortable speaking in Arabic in public because they are afraid of being discriminated against and that, as a result, they consciously try to speak English in public to avoid being targeted as Muslim. A Somali Muslim taxi driver also confided in him that when he arrived to pick up a customer, the passengers refused his service when they realized he was Muslim. The number and frequency of questions about his national origin and religion that James Doe has received have increased since the issuance of the Executive Orders. When he responds that he is Christian, some customers have confided in him that they "don't like Muslims," that they "think all Muslims are bad," or that they "think that Muslims are terrorists."

83.     James Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

**6.     Plaintiff Jeffrey Doe**

84.     Plaintiff Jeffrey Doe is a Somali national who resides in Federal Way, Washington. He and his family are members of a minority tribe in Somalia. They are practicing Muslims.

85.     Jeffrey Doe, his mother, father, and siblings fled Somalia in 1993 when he was four years old. One day, men dressed in military uniforms forced their way into their home to demand money. His father ran for his life, knowing that the soldiers almost always kill the men. The soldiers raped his aunt in the room next to where the family was being held, and he could

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

hear her screaming for help. The soldiers demanded money of his mother while holding his one-and-a-half-year-old sister at gunpoint. His family had no money to give, and when his aunt went to pick up his sister, the soldiers shot his sister. His aunt was holding his sister, and the bullet passed through his sister, killing both her and his aunt.

86.     The family ran from the house and were able to find their father before fleeing the country that night. They traveled by sea for three days to arrive in Kenya.

87.     Jeffrey Doe grew up in Kenyan refugee camps. He never had electricity in his home until he came to the United States. The camp had a de facto curfew of 7:30 pm because it was too dangerous to be out later. Jeffrey Doe's parents and his siblings still live in a Kenyan refugee camp.

88.     Jeffrey Doe met his wife while living at the refugee camp, and they were married in 2008. They had three daughters while they were in the refugee camp. They also have one son who was born in the United States.

89.     Jeffrey Doe's family's case was registered in July 2000, and they applied for refugee status through the U.S. Refugee Admissions/UNHCR program in December 2005. They started the paperwork with RSC (JVA) in March 2006. In June 2006, they had a USCIS interview, and in July 2006, they received an initial approval letter from USCIS. They received their first medical clearance shortly thereafter, and the family has since had numerous medical examinations—including DNA testing. Their most recent medical examination in March 2017 has now, yet again, expired. His family has passed all the security and medical clearances required of refugees so that they can be assigned to a resettlement agency to prepare for their arrival in the United States. Jeffrey Doe's family has been assured by the Episcopal Diocese of Olympia since September 8, 2015. His family has been classified as Priority 1 refugees who are survivors of violence and torture.

90.     Jeffrey Doe filed his own case in 2013 with USCIS, hoping to improve his chances of creating a better life for his wife and children. His case was separated from his

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

family's and combined with his wife's case, who had also received approval from the United States. They received UN approval in 2013, and they received final approval from USCIS in February 2015. They underwent medical examinations in June 2015. After 22 years of living in refugee camps, Jeffrey Doe arrived in the United States with his wife and children in December 2015.

91.     Jeffrey Doe has been continuously employed since he found his first job in February 2016, including at jobs that have required him to take multiple buses as well as a train to get to work.

92.     Despite his joy in building his life in the United States with his wife and children, Jeffrey Doe misses his parents and siblings deeply. He texts with his family regularly, and they are able to speak on the phone several times a week. He speaks the most with his mother, his elder brother, and his younger sister. Jeffrey Doe's daughters ask him almost every day when they are going to get to see their grandmother again and cry because they miss her. Jeffrey Doe often wakes in the middle of the night thinking of his family and missing them.

93.     Jeffrey Doe and his family are Muslim. There is a mosque not far from their home and they go every week on Saturdays and Sundays. They always pray for their family members still in the refugee camp, and that they will be reunited soon.

94.     Jeffrey Doe, his wife, and his children applied for their green cards to become legal permanent residents. While Jeffrey Doe's wife and children have received their green cards, his application remains pending.

95.     Jeffrey Doe is pursuing his claims anonymously because he is afraid of retaliation from the United States government or others for asserting his rights.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

## 7. Plaintiff the Episcopal Diocese of Olympia

96.     The Episcopal Diocese of Olympia, also known as the Episcopal Church in Western Washington, is a diocese of The Episcopal Church located in western Washington. It is headquartered in Seattle's Capitol Hill neighborhood.

97.     The Episcopal Diocese is a local affiliate of the Episcopal Migration Ministries, a voluntary agency that welcomes refugees through a Cooperative Agreement with the Department of State. The Episcopal Diocese has operated a refugee resettlement program since 1978 and has sponsored more than 15,000 refugees of all religions and nationalities to resettle in the Seattle area. The Episcopal Diocese's Refugee Resettlement Office ("RRO") is located in South Seattle and receives and assists refugees from all over the world, including from each of the countries targeted by EO-1, without regard to race, religion, or country of origin. The RRO is one of eleven ministries offered and provided for by the Episcopal Diocese. The Episcopal Diocese's refugee resettlement program stems from the moral obligation of the Episcopal faith to welcome and assist strangers, especially those who are poor, sick, and most in need of help.

98.     The RRO provides a multitude of services to refugees, including coordinating the arrival of refugees to the United States, housing assistance, job training, providing for basic household needs, advocacy, language tutoring, business training and microenterprise loans, and a savings program to help refugees purchase homes, vehicles, education, or businesses. The RRO has 9.5 full time employees, with four full-time equivalent staff working directly to support new arrivals and their survival needs during their first 90 days in the United States. Approximately two dozen volunteers assist the RRO in providing these services.

99.     Before a refugee arrives in the United States, the RRO is notified by the Department of State that a family has been approved for refugee status and that the RRO should "assure" the case. The RRO is required to make contact with friends or relatives of the arriving refugees living in the United States (known as the "U.S. tie") who were listed on the refugee's application. The RRO expends significant time making phone calls, sending mail, and making

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

in-person visits to meet with the U.S. tie to evaluate his or her capacity to help the RRO during the resettlement process. The evaluation process includes a home visit to view and evaluate the living space. If there is no possibility that the arriving refugee can live with a U.S. tie, the RRO further interviews the U.S. tie to determine if the relative or friend can assist with transportation, job searching, enrollment of kids in school, or any of the other daily tasks with which newly arriving refugees need assistance.

100. If the U.S. tie cannot perform these tasks, the RRO invests its own resources to perform this pre-arrival legwork for the incoming refugees. These tasks include, among other things, searching for and obtaining safe housing, furnishing the residence, and stocking it with food and household items prior to the arrival of the refugees. If the refugee family or U.S. tie rejects the apartment or house, RRO staff begin a process of evaluating alternative locations. The RRO undertakes housing inspections that consume significant RRO staff time to ensure that the neighborhood is safe, that there is no bare wiring visible in the living space, no peeling or flaking interior paint or plaster, no visible mold or unsanitary odors, that all windows and doors have working locks, that heat, ventilation, lighting, and running water are adequate, that kitchen appliances and bathroom fixtures are in good repair, and that there are easily accessible storage or disposal facilities for garbage.

101. The RRO's pre-arrival services can also involve cultivation of community groups or churches to help refugees during the first months of their adjustment to life in America. The RRO staff spend time visiting churches and community groups to describe the refugee resettlement process, ask for assistance with specific families that are still en route, and organize committees to help refugee newcomers with specific tasks like searching for employment.

102. When EO-1 was issued on January 27, 2017, the RRO was expecting to welcome over twenty refugee families—including families from Syria, Iraq, and Somalia—into the community in the coming days, weeks, and months, and had been actively preparing for their arrival and resettlement in the greater Seattle area by carrying out on their behalves the activities

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

described above. As a result of the RRO's efforts, these refugee families already had domestic arrangements supporting their arrival in the United States and were approved for travel. Yet, these families had their dreams dashed when they had to abruptly cancel their travel plans as a result of EO-1.

103.    Since EO-1, the RRO's work has been completely disrupted. The chaos surrounding the implementation of the Orders has also required the RRO to expend additional, unplanned-for resources. RRO staff are working around-the-clock to address the immediate needs of these families in crisis and to respond to questions and concerns from their families and loved ones already in the United States who had been planning for the arrival of these already-approved refugees. In addition, many of the RRO's resources devoted to these refugee families over the past months have now been wasted.

104.    The October 2017 Agency Memo exacerbates the harm to the Diocese and the population it serves. A few of the refugees the Diocese was expecting have arrived between the time EO-1 was halted by court orders and the effective date of EO-2. However, as of the filing of this Third Amended Complaint, approximately thirty families from the SAO List Countries the Diocese was expecting (including the family of Plaintiff Jeffrey Doe, *see supra* Section III.A.6) have not arrived and will not be able to complete their trips because of the October 2017 Agency Memo. The Diocese also assists its clients to file I-730 petitions for their spouses and children, several of whom have already secured all required clearances; however, because of the October 2017 Agency Memo, those clients and their families who were already approved to come to the United States through the I-730 process—and whom the Diocese had assured—are now stuck in an indefinite limbo.

105.    The Diocese serves refugees and displaced persons of all faiths, but many of its clients are Muslim.

106.    The Diocese and its RRO believe that the Orders convey an official message of disapproval and hostility by the Defendants—and, more broadly, this country—toward the

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

Muslim refugees and their families with whom the RRO works, sending the message that the government deems them to be outsiders who are not and should not become full members of the political community. The Diocese and its RRO believe that the Orders thus serve to marginalize these refugees and their families, subjecting them to suspicion, scrutiny, and social and political isolation on the basis of their religion or national origin, and inflicting other stigmatic and dignitary injuries on them.

107. The Orders have caused and continue to cause significant additional harm to the most vulnerable population that the RRO and Episcopal Diocese are focused on serving. These refugees are fleeing persecution in their country of origin, and are now facing persecution in the safe haven they had been promised in the United States. The dramatic reduction in the overall number of refugees allowed this year will not only rob families of hope and a future but may also cost some of them their lives. The mission and efficacy of the RRO, and through it the Episcopal Diocese, has been thwarted by Orders, and these injuries will continue.

### 8.    Plaintiff the Council on American-Islamic Relations-Washington

108. The Council on American-Islamic Relations-Washington (CAIR-WA) is a grassroots civil rights and advocacy group. CAIR-WA is a 501(c)(3) non-profit organization that was incorporated in 2004 and operates from its offices in downtown Seattle.

109. The mission of CAIR-WA is to enhance the understanding of Islam in Washington state and throughout the United States by encouraging dialogue, protecting civil liberties, empowering American Muslims, and building coalitions that promote justice and mutual understanding. CAIR-WA also provides direct service to its Muslim constituents in the form of information, training, and access to a network of over fifty pro bono attorneys.

110. Since January 27, 2017, and the issuance of EO-1, CAIR-WA has received several inquiries from American-Muslim travelers in Washington who have become the target of unconstitutional and systematic ideological questioning by Transportation Security

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

Administration and Customs and Border Patrol agents about their religious values and political views. The number of such inquiries has increased dramatically since January 27, 2016, and CAIR-WA has devoted and continues to devote considerable, previously unplanned-for resources to respond to these inquiries and to educate the community about its rights in the face of the Executive Orders.

111.    Since January 27, 2017, CAIR-WA has also been flooded with inquiries from affected persons about the impact of the Executive Orders on their ability or the ability of their families to travel, cross borders, or with respect to visa or immigration status. CAIR-WA has received over 100 such requests for help from United States citizens and others between January 27, 2017, and October 31, 2017. In all of 2016, CAIR-WA opened a total of about 250 cases—but in just the first four months of 2017, it had already received over 250 requests for assistance, and opened as many cases in the first third of the year as it did in all of 2016.

112.    In addition to its direct staff, CAIR-WA also works with a network of over 20 pro bono attorneys in Washington who provide direct services to its constituents on civil rights, immigration, and visa issues.

113.    CAIR-WA has provided referrals and advice to many United States citizens originally from the Affected Countries who are trying to reunite with their immediate families. For example, a Somali national has contacted CAIR-WA regarding his petition to be reunited with his wife and two children who remain in Djibouti. On January 23, 2017, the U.S. Embassy in Djibouti scheduled screening interviews for his family. The Embassy canceled these interviews on January 29, 2017. Despite the injunction preventing the implementation of EO-1, the U.S. Embassy has refused to reschedule the interviews, and his family is now subject to the restrictions and delays of subsequent Orders.

114.    Another United States citizen originally from Sudan has contacted CAIR-WA regarding her petition for her Sudanese father to receive an IR-5 visa. Her father was scheduled for a screening interview at the U.S. Embassy in the United Arab Emirates on February 15, 2017.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

The Embassy canceled the interview when EO-1 issued. The interview was rescheduled after EO-1 was enjoined, and her father received his visa on February 20, 2017. Unfortunately, however, her father's efforts to book travel to the United States have been thwarted, due to the issuance of EO-2. The airlines have required him to return to the U.S. Embassy to ensure that his recently issued visa is still valid. Her father is now afraid to book his airline travel only to be detained or deported at the border when he tries to enter the United States.

115.    CAIR-WA assists and advises American Muslims such as those described above and provides education, advocacy, and referrals so they may navigate both the stated and implied ramifications of the Defendants' Orders.

116.    CAIR-WA has also experienced a dramatic increase in the number of inquiries from the Muslim community regarding the Orders since January 27, 2017, in addition to inquiries about bullying, hate crimes, and other injuries suffered by those it serves as a direct result of Defendants' open antipathy for those observing the Muslim faith.

117.    The Orders convey an official message of disapproval and hostility toward CAIR-WA as well as its Muslim members and clients, making clear that the government deems them outsiders, not full members of the political community. CAIR-WA's Muslim clients in the United States have been marginalized as a result of this anti-Muslim message, have been subjected to baseless suspicion, scrutiny, and social and political isolation on the basis of religion and national origin, and have suffered other dignitary and stigmatic injuries.

118.    CAIR-WA has had to hire a part-time civil rights team member to handle the extra work. This additional part-time position was not in CAIR's 2017 budget, but was deemed a necessary expenditure as part of CAIR-WA's commitment to providing a rapid response to the number of questions and reports of disruption in travel experienced by CAIR-WA constituents. CAIR-WA has also taken on the task of printing and distributing 10,000 business cards, depicted below, that have legal assistance contact information for immigrants and travelers stranded at United States airports as a result of the Executive Orders. CAIR-WA had not budgeted for this

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

expense or forecasted its need prior to January 27, 2017, but CAIR-WA decided to do so in direct response to the turmoil caused by the Executive Orders. The printing costs for these business cards was yet another off-budget expenditure necessitated by Defendants' conduct.





119. In direct response to the Orders, CAIR-WA has also organized several informational presentations for the Washington Muslim community to address the confusion, concern, and fear the Orders have stimulated.

120. In 2015 and prior years, at least 98% of CAIR-WA's funding was from individual donors, almost all of whom reside in the state of Washington, or from matching funds from companies that employ its individual donors and volunteers. The remaining 2% of CAIR-WA's funding comes from sponsorship from locally-based non-profits, mosques, and businesses that serve Washington communities.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

121.    The mission and efficacy of CAIR-WA has been thwarted by Orders, and its injuries will continue once the new Orders takes effect.

**B.    Defendants**

122.    Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

123.    Defendant U.S. Department of State ("DOS") is a cabinet department of the United States federal government that is responsible for issuing visas.

124.    Defendant Rex W. Tillerson is the Secretary of State and has responsibility for overseeing the enforcement and implementation of the Orders by all DOS staff. He is sued in his official capacity.

125.    Defendant U.S. Department of Homeland Security ("DHS") is a cabinet department of the United States federal government with the primary mission of securing the United States. Its sub-agencies include U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection, and Immigration and Customs Enforcement ("ICE").

126.    Defendant Elaine Duke is the Acting Secretary of DHS and has responsibility for overseeing the enforcement and implementation of the Orders by all DHS staff. She is sued in her official capacity.

127.    Defendant U.S. Customs and Border Protection ("CBP") is an agency within DHS with the primary mission of detecting and preventing the unlawful entry of persons and goods into the United States.

128.    Defendant Kevin K. McAleenan is the Acting Commissioner of CBP has responsibility for overseeing the enforcement and implementation of the Orders by all CBP staff. He is sued in his official capacity.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

129.     Defendant Michele James is the Field Director of the Seattle Field Office of CBP and has responsibility for overseeing the enforcement and implementation of the Orders by all DHS staff in her area, which covers Washington State. She is sued in her official capacity.

130.     Defendant Office of the Director of National Intelligence is a cabinet department of the United States federal government that serves as the head of the U.S. Intelligence Community, overseeing and directing the implementation of the National Intelligence Program and acting as the principal advisor to the President, the National Security Council, and the Homeland Security Council for intelligence matters related to national security.

131.     Defendant Daniel Coats is the Director of the Office of the Director of National Intelligence and has responsibility for overseeing the enforcement and implementation of the Orders. He is sued in his official capacity.

## IV.     FACTUAL BACKGROUND

### A.     President Trump's January 27, 2017 Original Executive Order

132.     On January 27, 2017, Defendant Trump signed EO-1 entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States." A copy of EO-1 is attached to this Complaint as Exhibit A.

133.     EO-1 cited the threat of domestic terrorism committed by foreign nationals and purported to direct a variety of changes to the manner and extent to which non-citizens may seek and obtain admission to the United States.

134.     Section 3(c) of EO-1 suspended immigrant and nonimmigrant entry into the country for 90 days for all people from countries referred to in section 217(a)(12) of the INA, 8 U.S.C. § 1187(a)(12), with narrow exceptions not relevant here. EO-1 applied only to nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen (the "Original Targeted Countries").[10]

---

[10] Fact Sheet: Protecting the Nation from Foreign Terrorist Entry to the United States, U.S. Dep't of Homeland Sec. (Jan. 29, 2017), http://bit.ly/2kII8MQ (last visited Nov. 2, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

The ban applied regardless of whether such persons held valid visas and regardless of whether their visas were immigration or non-immigration related.

135.    Section 5(a) suspended the USRAP for 120 days.

136.    Section 5(b) stated that "refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality" will be prioritized.

137.    Section 5(c) contained as its statement of government interest a proclamation that "the entry of nationals of Syria as refugees is detrimental to the interests of the United States," and suspends the entry of Syrian refugees into the country.

138.    Section 5(e) provided for nearly unfettered individual discretion by the Secretaries of State and Homeland Security to "jointly determine to admit individuals . . . as refugees on a case-by-case basis, in their discretion, but only so long as they determine that the admission of such individuals as refugees is in the national interest—including when the person is a religious minority in his country of nationality facing religious persecution."

139.    EO-1 stated that "the United States should not admit those who engage in acts of bigotry or hatred (including . . . the persecution of those who practice religions different from their own)" and yet it singled out practitioners of a single religion for exclusion.

### 1.    Chaos, Confusion, and Whiplash in the Implementation of EO-1

140.    The disastrous effects of EO-1 were immediately apparent. Countless news reports document the chaotic scene at airports across the country as those who were legally entitled to entry when they boarded airplanes heading to the United States—refugees, immigrants, and those traveling on non-immigrant visas alike—were designated deportable by the time they landed. For example, 109 travelers from the Original Targeted Countries on non-immigrant visas were in transit to the country at the time EO-1 was signed.[11] Up to thirteen

---

[11] Jeremy Diamond & Steve Almasy, *Trump's Immigration Ban Sends Shockwaves*, CNN (Jan. 30, 2017), http://cnn.it/2kyKYRb (last visited Nov. 2, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

people were detained at the Seattle-Tacoma International Airport on January 28, 2017, pursuant to EO-1.[12]

141.    Application of EO-1 was inconsistent and confusing, with contradictory official statements issued within days of one another—further heightening Plaintiffs' reasonable and on-going fear that if they left the country, they would not be permitted to return to their work and studies.

142.    For example, the Secretary of Homeland Security reportedly received his first full briefing on EO-1 as the President signed it,[13] resulting in DHS's position on the application of EO-1 to lawful permanent residents, or green card holders, changing three times over the course of six days following the issuance of EO-1:

- On January 28, 2017, a spokesperson for DHS stated that lawful permanent residents, or green card holders, would be barred from entry pursuant to EO-1.[14]

- Secretary Kelly reversed course the next day on January 29, 2017, issuing a statement that: "In applying the provisions of the president's [EO-1], I hereby deem the entry of lawful permanent residents to be in the national interest. Accordingly, absent the receipt of significant derogatory information indicating a serious threat to public safety and welfare, lawful permanent resident status will be a dispositive factor in our case-by-case determinations."[15]

- Two days later on January 31, 2017, CBP issued a statement that, while repeating Secretary Kelly's January 29, 2017 statement, then stated in the "Questions and

---

[12] Liz Jones & Isolde Raftery, *Roller Coaster of Heartbreak and Fury at Sea-Tac in Wake of Trump Order*, KUOW (Jan. 28, 2017), http://bit.ly/2kH44It (last visited Nov. 2, 2017).

[13] Michael D. Shear & Ron Nixon, *How Trump's Rush to Enact an Immigration Ban Unleashed Global Chaos*, N.Y. Times (Jan. 29, 2017), http://nyti.ms/2k7mNtx (last visited Nov. 2, 2017).

[14] Doina Chiacu, *Green Card Holders Will Need Additional Screening: White House*, Reuters (Jan. 28, 2017), http://reut.rs/2lQlWSC (last visited Nov. 3, 2017).

[15] Statement by Secretary John Kelly on the Entry of Lawful Permanent Residents into the United States, U.S. Dep't of Homeland Sec. (Jan. 29, 2017), http://bit.ly/2khyiRz (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

Answers" section that the entry of lawful permanent residents would depend on receipt of a "national interest waiver[] consistent with the provisions of [EO-1]."[16]

- DHS changed its position yet again two days later. This time, the February 2, 2017 version of the "Questions and Answers" stated that "[u]nder the recent guidance from the White House . . . [EO-1] issued January 27, 2017, does not apply to their [lawful permanent residents] entry to the United States."[17]

143. CBP officers were caught unaware and were blindsided, with even managers not seeming to have clear guidance.[18] The chief of passenger operations for CBP at John F. Kennedy International Airport admitted, "[w]e are as much in the dark as everybody else."[19]

144. In addition, according to two State Department officials, most officials at the department first heard of EO-1 through the media.[20] On the day Defendant Trump issued EO-1, Deputy Assistant Secretary for Visa Services at the DOS, Edward J. Ramotowski, issued a letter ("Provisional Revocation Letter") that "provisionally revoke[d] all valid nonimmigrant and immigrant visas of nationals of Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen." A copy of the Provisional Revocation Letter is attached to this Complaint as Exhibit B.[21] But then on February 1, 2017, White House Counsel Donald F. McGahn II—who is not in the chain of command for any of the Executive Departments—issued "Authoritative Guidance," admitting

---

[16] Protecting the Nation from Foreign Terrorist Entry into the United States, U.S. Dep't of Homeland Sec. (Jan. 31, 2017), https://www.cbp.gov/border-security/protecting-nation-foreign-terrorist-entry-united-states (last visited Feb. 1, 2017).

[17] Q&A for Executive Order: Protecting the Nation from Foreign Terrorist Entry into the United States, U.S. Dep't of Homeland Sec. (Feb. 2, 2017), http://bit.ly/2fWBmBX (last visited Nov. 3, 2017).

[18] See supra note 11.

[19] Jonathan Allen & Brendan O'Brien, *How Trump's Abrupt Immigration Ban Sowed Confusion at Airports, Agencies,* Reuters (Jan. 28, 2017), http://reut.rs/2ykbmc7 (last visited Nov. 2, 2017).

[20] See supra note 13.

[21] The letter was filed in *Louhghalam v. Trump,* No. 17-10154 (D. Mass. Jan. 31, 2017), Dkt. # 23-1.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

there was "reasonable uncertainty" surrounding provisions of EO-1 such that he needed to clarify that Sections 3(c) and 3(e) of the Executive Order did not apply to lawful permanent residents.[22]

145.    Provisions of EO-1 relating to refugees also were inconsistently interpreted and applied by Defendants, further heightening the need for judicial intervention.

146.    For example, although Section 5(a) of EO-1 unequivocally stated that "[t]he Secretary of State shall suspend the U.S. Refugee Admissions Program (USRAP) for 120 days," four business days later, on February 2, 2017, and in a reversal of the clear mandate in EO-1, Ms. Lori L. Scialabba, Acting Director of the USCIS, issued a memorandum ("Scialabba Memo") regarding guidance concerning EO-1 to all USCIS employees that "USCIS will adjudicate Refugee/Asylee Relative Petitions . . . for all beneficiaries, from any country of nationality, currently in the United States . . . ." A copy of the Scialabba Memo is attached to this Complaint as Exhibit C.

147.    In further contradiction of the clear language of unequivocal suspension of USRAP, DHS instructed that "[a]dditionally, USCIS will continue refugee interviews in jurisdictions where there is a preexisting international agreement related to refugee processing."

148.    The Scialabba Memo to USCIS employees also stated that "USCIS will continue refugee interviews when the person is a religious minority in his or her country of nationality facing religious persecution."

149.    As summed up by ten former national security, foreign policy, and intelligence officials at the highest levels of the United States government, including John F. Kerry (former Secretary of State), Avril D. Haines (former Deputy National Security Advisor), Lisa O. Monaco (former Assistant to the President for Homeland Security and Counterterrorism and Deputy

---

[22] Memorandum from Donald F. McGahn II - Counsel to the President, to the Acting Secretary of State, the Acting Attorney General, and the Secretary of Homeland Security (Feb. 1, 2017), http://politi.co/2ioohPF (last visited Nov. 2, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

National Security Advisor), and Susan E. Rice (former National Security Advisor) (collectively referred to as the "Ten National Security Experts"):

> [T]he repeated need for the Administration to clarify confusion after the Order issued suggest that that Order received little, if any advance scrutiny by the Departments of State, Justice, Homeland Security or the Intelligence Community. Nor have we seen any evidence that the Order resulted from experienced intelligence and security professionals recommending changes in response to identified threats.

Joint Declaration ¶ 7, *State v. Trump*, No. 17-35105 (9th Cir. Feb. 6, 2017), Dkt. # 28-2 (a copy of the Joint Declaration is attached to this Complaint as Exhibit D).

### 2. The Discriminatory Intent Behind EO-1

150. EO-1 and the Provisional Revocation Letter applied only to nationals of seven countries, all of which are majority-Muslim: Iraq, Iran, Libya, Somalia, Sudan, Syria, and Yemen.

151. EO-1, by its express terms, suspended immigrant and nonimmigrant entry into the United States based on nationality, place of birth, or place of residence.

152. The Provisional Revocation Letter similarly revoked "all valid nonimmigrant and immigrant visas of nationals" based on nationality, place of birth, or place of residence.

153. EO-1 was Defendant Trump's fulfillment of a clearly stated campaign promise to ban Muslims from entering the United States. In a December 7, 2015 written statement, "Donald J. Trump Statement on Preventing Muslim Immigration," then-candidate Trump said that he was "calling for a total and complete shutdown of Muslims entering the United States." While the statement was briefly removed due to a glitch post-election, the statement was returned to the

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

website and displayed on the official Trump-Pence website through the morning of May 8, 2017.[23]

154.    When questioned about the "shutdown," and asked whether a customs agent would ask a person his or her religion, then candidate Trump responded, "They would say, are you Muslim?" The interviewer then asked, "And if they said yes, they would not be allowed in the country?" "That's correct," Mr. Trump responded.[24]

155.    Defendant Trump repeatedly referred to a ban on Muslim immigration on the campaign trail.[25] Defendant Trump stoked fears regarding Muslims to justify the ban, making claims like, "I think Islam hates us. . . . There's a tremendous hatred. . . . There's an unbelievable hatred of us" and "we can't allow people coming into this country who have this hatred of the United States, and of people that are not Muslim."[26]

156.    Defendant Trump also indicated that he knew that he would need to find an alternative way to describe the Muslim ban. In response to a question on the July 17, 2016 episode of 60 Minutes about the evolution of his earlier rhetoric of an outright ban on Muslim immigration to a ban on persons from territories that have a Muslim majority, the following exchange took place:

> Stahl: [I]n December, you [i.e., Pence] tweeted, and I quote you, "Calls to ban Muslims from entering the U.S. are offensive and unconstitutional."

---

[23] *See supra* note 2; Emily Flitter, *Glitch Briefly Removes 'Muslim Ban' Proposal from Trump Website*, Reuters (Nov. 10, 2016), http://reut.rs/2z4DQ77 (last visited Nov. 2, 2017); Ann E. Marimow & Robert Barnes, *President Trump's Lawyers on Revised Travel Ban Repeatedly Asked About Campaign Promises,* Wash. Post (May 8, 2017), http://wapo.st/2z10rUr (last visited Nov. 2, 2017).

[24] Nick Gass, *Trump Not Bothered by Comparisons to Hitler*, Politico (Dec. 8, 2015), http://politi.co/1XYTrc8 (last visited Nov. 2, 2017).

[25] Donald J. Trump (@realDonaldTrump), Twitter (Dec. 7, 2015, 2:32 PM), http://bit.ly/2zlS4n1 (last visited Nov. 2, 2017); Jenna Johnson, *Trump Calls for 'Total and Complete Shutdown of Muslims Entering the United States,'* Wash. Post (Dec. 7, 2015), http://wpo.st/O0uY2 (last visited Nov. 2, 2017).

[26] David Sherfinski, *Donald Trump: 'I Think Islam Hates Us,'* Wash. Post (Mar. 10, 2016), http://bit.ly/1R99PJn (last visited Nov. 2, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

Trump: So you call it territories. OK? We're gonna do territories. We're gonna not let people come in from Syria that nobody knows who they are.

. . .

Stahl: [S]o you're changing . . . your position.

Trump: —No, I—call it whatever you want. We'll call it territories, OK?

Stahl: So not Muslims?

Trump: You know—the Constitution—there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country.[27]

157.    Seven days later in response to a question on NBC's Meet the Press about whether his acceptance speech at the Republican National Convention was a rollback on his position, Defendant Trump reiterated the point when he replied:

I don't think so. I actually don't think it's a rollback. In fact, you could say it's an expansion. I'm looking now at territory. People were so upset when I used the word Muslim. Oh, you can't use the word 'Muslim.' Remember this. And I'm okay with that, because I'm talking territory instead of Muslim . . . .[28]

158.    After the election, on December 22, 2016, a reporter asked Defendant Trump whether his "plans to create a Muslim register or ban Muslim immigration to the United States" had changed. Defendant Trump responded "[y]ou known my plans" and that he was "100% correct" in his position.[29]

---

[27] Lesley Stahl, *The Republican Ticket: Trump and Pence*, CBS News (July 17, 2016), http://cbsn.ws/29NrLqj (last visited Nov. 3, 2017).

[28] Rebecca Shabad, *Donald Trump Says He's Expanding His Muslim Ban,* CBS News (July 25, 2016), http://cbsn.ws/2zU3pXG (last visited Nov. 3, 2017).

[29] Katie Reilly, *Donald Trump on Proposed Muslim Ban: 'You Know My Plans,'* Time (Dec. 21, 2016), http://ti.me/2hsjgWD (last visited Nov. 3, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 35

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

159.	After reading the title of EO-1 when signing it, Defendant Trump said, "[w]e all know what that means."[30]

160.	On the day Defendant Trump issued EO-1, he gave an interview to the Christian Broadcasting Network during which he confirmed his intent to prioritize non-Muslims nationals over Muslim nationals of those countries:

> They've been horribly treated. Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair.[31]

161.	Consistent with Defendant Trump's expressed intent to favor Christians, Section 5(e) of EO-1 authorized the Secretaries of the Departments of State and Homeland Security to admit individuals who are members of "a religious minority in [their] count[ries] of nationality facing religious persecution." This provision directly grants Christians preference over Muslim refugees.

162.	During a signing ceremony for EO-1 on January 27, 2017, Defendant Trump stated that the purpose of EO-1 was to "establish[] new vetting measures to keep radical Islamic terrorists out of the United States of America."[32]

163.	Senior advisors to Defendant Trump have engaged in anti-Muslim rhetoric that provide additional support for the notion that EO-1 was prompted by animus toward Islam and Muslims.

---

[30] Transcript of ceremonial swearing in of James Mattis as Secretary of Defense, CNN (Jan. 27, 2017), http://cnn.it/2lAhK9l (last visited Nov. 3, 2017).

[31] David Brody, *Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority as Refugees*, CBN News (Jan. 27, 2017), http://bit.ly/2kCqG8M (last visited Nov. 3, 2017).

[32] Dan Merica, *Trump Signs Executive Order to Keep out 'Radical Islamic Terrorists,'* CNN (Jan. 30, 2017), http://cnn.it/2jeLXsW (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

164.    In an interview on January 28, 2017, one of Defendant Trump's senior advisors, Rudolph Giuliani, left no doubt that the ban on entry from nationals of the Original Targeted Countries was intended to carry out a ban on Muslims, and that EO-1 was crafted to create a pretextual cover for a Muslim ban. Mr. Giuliani stated: "I'll tell you the whole history of it . . . . So, when [Defendant Trump] first announced it, he said, 'Muslim ban.' He called me up. He said, 'Put a commission together. Show me the right way to do it legally.'"[33]

165.    On January 29, 2017, an anonymous "senior administration official" briefed a staffer of Breitbart on the intended purpose of EO-1: "The reality, though, is that the situation [of large Islamic populations] that exists today in parts of France, in parts of Germany, in Belgium, etcetera, is not a situation we want replicated inside the United States."[34]

166.    Defendant Trump subsequently tried to deny that EO-1 was "a Muslim ban, as the media [was] falsely reporting."[35] However, his own prior conflicting, recorded statements as well as those of his senior advisors make clear that EO-1 was, in fact, to ban Muslims from entering the United States.

## B.    President Trump's March 6, 2017 Executive Order

167.    During a February 16, 2017 news conference, Donald Trump twice declared that he would follow through on his campaign promise of a Muslim ban, albeit changing his terminology to "radical Islamic terrorists":

- "Some of the things I'm doing probably aren't popular but they're necessary for security and for other reasons. . . . I'm here following through on what I pledged to do."

---

[33] Amy B. Wang, *Trump Asked for a 'Muslim Ban,' Giuliani Says – and Ordered a Commission to Do It 'Legally,'* Wash. Post (Jan. 29, 2017), http://wpo.st/xzuY2 (last visited Nov. 3, 2017).

[34] Neil Munro, *Left Protests While Trump Junks Obama's Global Immigration Plan*, Breitbart (Jan. 30, 2017), http://bit.ly/2jvJZEA (last visited Nov. 3, 2017).

[35] Press Release, *President Donald J. Trump Statement Regarding Recent Executive Order Concerning Extreme Vetting* (Jan. 29, 2017), http://bit.ly/2ku5mWI (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

- "We have taken decisive action to keep radical Islamic terrorists out of our country. No parts are necessary and constitutional actions were blocked by judges, in my opinion, incorrect, and unsafe ruling [sic]. . . . I got elected on defense of our country. I keep my campaign promises, and our citizens will be very happy when they see the result. They already are, I can tell you that. Extreme vetting will be put in place and it already is in place in many places.[36]

168. Defendant Trump also announced during the news conference that he would be "issuing a new executive action next week that will comprehensively protect our country. . . . That will be done sometime next week, toward the beginning or middle at the latest part."[37] Defendant Trump did not issue a new order that following week.

169. On February 21, 2017, Stephen Miller, Senior Advisor to the President, described the administration's plans with regard to EO-2: "Fundamentally, you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed. But in terms of protecting the country, those basic policies are still going to be in effect."[38]

170. While the White House indicated that the new order would be signed on March 1, 2017—the day after Defendant Trump's first address to Congress on February 28, 2017[39]—the signing of the new order was delayed yet again.

171. On February 28, 2017, an administration official told a news outlet that the delay was due to the busy news cycle, that Defendant Trump wanted it to get plenty of attention, and "[w]e need [the executive order] to have its own time to breathe."[40]

---

[36] *Full Transcript: President Donald Trump's News Conference*, CNN (Feb. 17, 2017), http://cnn.it/2loVltG (last visited Nov. 3, 2017).

[37] *Id.*

[38] *See supra* note 1.

[39] Justin Fishel, *New Trump Order on Travel and Immigration Expected Wednesday*, ABC News (Feb. 28, 2017), http://abcn.ws/2m5tpvy (last visited on Nov. 3, 2017).

[40] Shane Goldmacher & Nahal Toosi, *Trump Delays Signing New Travel Ban Order, Officials Say*, Politico (Feb. 28, 2017), http://politi.co/2zdFZgR (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

172.    On March 1, 2017, another senior administration official told a different news outlet that Defendant Trump delayed plans to sign a reworked travel ban in the wake of positive reaction to his first address to Congress, explaining that "[w]e want the (executive order) to have its own 'moment.'"[41]

173.    Five days later, on March 6, 2017, Defendant Trump signed EO-2 that has the exact same title as EO-1, "Protecting the Nation from Foreign Terrorist Entry into the United States." A copy of EO-2 is attached to this Complaint as Exhibit E.

174.    Although EO-2 was designed to appear facially neutral, Defendants cannot erase the history or facts preceding its issuance, *see supra* Section IV.A.2., the taint of the discriminatory motivation behind it, *id.*, or the complete arbitrariness of its requirements. *See infra* Section IV.E.

175.    Indeed, Defendant Trump has openly promoted that EO-2 was his continued fulfillment of his campaign promises. For example, on the day Defendant Trump signed EO-2, he sent a fundraising email requesting support for EO-2 because he was "implement[ing] the policies you—and millions of American like you—voted for."[42] And at a press conference the next day on March 7, 2017, White House Press Secretary Sean Spicer confirmed that with the issuance of EO-2, Defendant Trump was "deliver[ing]" on one of his "most significant campaign promises: protecting the country against radical Islamic terrorism."[43]

176.    At a March 15, 2017 rally, Defendant Trump admitted that EO-2 is just a "watered-down version" of his first travel ban that had been "tailor[ed]" by lawyers in response

---

[41] Laura Jarrett, Ariane de Vogue & Jeremy Diamond, *Trump Delays New Travel Ban After Well-Reviewed Speech*, CNN (Mar. 1, 2017), http://cnn.it/2xWv1ur (last visited Nov. 3, 2017); Marina Feng, *Pence Says Trump's Revised Immigration and Travel Ban Coming 'In a Few Days,'* Huffington Post (Mar. 1, 2017), http://bit.ly/2zi6jsb (last visited Nov. 3, 2017).

[42] Matt Zapotosky, David Nakamura, & Abigail Hauslohner, *Revised Executive Order Bans Travelers from Six Muslim-Majority Countries from Getting New Visas*, Wash. Post (Mar. 6, 2017), http://wapo.st/2AhQqju (last visited Nov. 3, 2017).

[43] Press Briefing by Press Secretary Sean Spicer, 3/7/2017, #18, White House (Mar. 7, 2017), http://bit.ly/2mW39oB (last visited Nov. 3, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 39

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: ('206) 623-3384

to prior legal challenges but that he thought "we ought to go back to the first one and go all the way, which is what I wanted to do in the first place."[44]

177.    And as recently as April 24, 2017, Defendant Trump once again revealed his true motivation for EO-2. During a White House reception for conservative media guests, Defendant Trump stated "I'm Christian,"[45] noted that "he had done very well with Christian voters in the election,"[46] reiterated that "[n]obody's been treated worse, it seems to me, than Christians in the Middle East,"[47] and once again argued that that it was easier for Muslims to come into the United States as refugees than Christians while it was far more dangerous for Christians there.[48] He then declared, "[w]e're going to be helping the Christians big league."[49]

178.    Section 13 of EO-2, revoked EO-1 as of the effective date of EO-2, which was set to take effect on March 16, 2017.[50]

179.    EO-2 shares two fundamental features with EO-1: (1) it continues to violate the rights of non-immigrants who need to renew their visas, and (2) it continues to violate the rights of refugees and asylees seeking to reunite with family members who have already cleared all security hurdles.

---

[44] Cathleen Decker, *Trump Embraces the Blame Game, While Brushing Aside Some Inconvenient Realities*, L.A. Times (Mar. 16, 2017), http://lat.ms/2h25461 (last visited Nov. 3, 2017).

[45] Scott Johnson, *At the White House with Trump*, Power Line (Apr. 25, 2017), http://bit.ly/2ziHMTJ (last visited Nov. 3, 2017).

[46] *Id.*

[47] Charlie Spiering, *Donald Trump Invites Conservative Media to White House for Exclusive Briefing*, Breitbart (Apr. 24, 2017), http://bit.ly/2pcB4Ys (last visited Nov. 3, 2017).

[48] *Id.*

[49] *Id.*

[50] On March 15, 2017, the Honorable Derrick Watson of the United States District Court for the District of Hawai'i temporarily enjoined the implementation of Sections 2 and 6 of EO-2, Order Granting Motion for Temporary Restraining Order, *Hawai'i v. Trump*, No. 17-50 (D. Haw. Mar. 15, 2017), Dkt. # 219, and converted the temporary injunction into a preliminary injunction on March 29, 2017. Order Granting Motion to Convert Temporary Restraining Order to a Preliminary Injunction, *Hawai'i* (Mar. 29, 2017), Dkt. # 270. Section 2(c) of EO-2 was also enjoined by the Honorable Theodore D. Chuang of the United States District Court for the District of Maryland on March 15, 2017. Memorandum Opinion, *IRAP v. Trump*, No. 17-361 (D. Md. Mar. 16, 2017), Dkt. # 149.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

180.    Six of the seven countries targeted in EO-1 are still targeted by EO-2. Sections 1(f) and 2(c) of EO-2 suspend entry into the United States by the nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen for ninety days from the effective date of EO-2.

181.    All six banned countries have overwhelmingly Muslim populations.

182.    Section 2(c) of EO-2 suspends for ninety days the entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen.

183.    Pursuant to Section 2(e) of EO-2, at the end of the ninety-day ban, the Secretary of Homeland Security shall submit to the President a list of countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of categories of foreign nationals of countries that have not provided the requested information until they do so or until the Secretary of Homeland Security certifies that the country has an adequate plan to do so, or has adequately shared information through other means. The names of additional countries may also be submitted to the President.

184.    Section 3 of EO-2 explains the scope of the order and provides for certain "exceptions" and potential "waivers" to the travel ban. This waiver provision is of little solace in light of statements and actions taken by Defendants in support of a Muslim ban, such as Defendant Trump's prior statement that a person who admitted being a Muslim should be denied entry into the country. *See supra* ¶ 154.

185.    Defendant Trump's message and intent of the travel ban has clearly been heard by those with the discretion to admit people into this country and already used to harass Muslims or those perceived to be Muslim at our borders. For example:

- On February 4, 2017, a woman from the Montreal suburb of Brossard was "denied entry into the U.S. after being fingerprinted, photographed and questioned in detail about her religion and her views on U.S. President Donald Trump."[51]

---

[51] Steve Rukavina, *Canadian Woman Turned Away from U.S. Border After Questions About Religion, Trump*, CBC News (Feb. 8, 2017), http://bit.ly/2kU80ES (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

- On February 7, 2017, the CBP held Muhammad Ali Jr., the son of the late legendary boxer, as well as his mother for questioning in a Florida airport because of their Arabic-sounding names, repeatedly asking them, "[w]here did you get your name from?" and "[a]re you a Muslim?"[52]

- On or about February 27, 2017, a Canadian doctor originally from Afghanistan was held for over five hours at the United States border and questioned about his "tribal chief," "his life in Afghanistan, the family he had left behind and whether he had seen 'a lot of gunmen' while growing up there."[53]

- On April 23, 2017, Dr. Osman "Ozzie" Ahmed, a former NASA shuttle mission physician and a United States citizen since 1991, who is an approved "low-risk" traveler, had his passport taken from him and was detained for about an hour by CBP officers upon his arrival at Tampa International Airport due to his Muslim name and birthplace (Egypt).[54]

- On April 24, 2017, American composer Mohammed Fairouz was detained for nearly four hours at John F. Kennedy International Airport with the only reason given to him for his detention being his Muslim name.[55]

These examples demonstrate that any waiver process is in grave danger of being administered in a discriminatory fashion.

186.    Neither EO-1 nor EO-2 single out any countries for disfavored treatment that are not majority-Muslim.

187.    Section 6(a) of EO-2 suspends all decisions on applications for refugee status as well as travel of refugees into the United States for 120 days. The suspension required in Section 6 does not apply to refugee applicants who, before the effective date of EO-2, have been formally scheduled for transit by the DOS.

---

[52] Jennie Jarvie, *Muhammed Ali's Son May Sue After Being Detained at Florida Airport and Questioned About His Religion*, L.A. Times (Feb. 25, 2017), http://lat.ms/2lVV9Ts (last visited Nov. 3, 2017).

[53] Ashifa Kassam, *Afghan-Canadian Doctor Detained at US Border and Asked About 'Tribal Chief,'* Guardian (Mar. 1, 2017), http://bit.ly/2iYrnxK (last visited Nov. 3, 2017).

[54] Christopher O'Donnell, *Former NASA Doctor Says He Was Detained at TIA Because of His Muslim Name*, Tampa Bay Times (Apr. 29, 2017), http://bit.ly/2xYzs82 (last visited Nov. 3, 2017).

[55] Kristine Phillips, *American Composer Says He Was Detained at JFK Because of His 'Super Common' Muslim Name*, Wash. Post (May 2, 2017), http://wapo.st/2j0Fgvn (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

188.     Section 6(c) allows the Secretary of State and the Secretary of Homeland Security to jointly determine to admit individuals to the United States as refugees on a case-by-case basis. Like the waiver provision in Section 3 of the EO-2, the procedure set forth in section 6(e) is of little comfort as Defendant Trump continues to make it clear that his intent is "'to be helping the Christians big league.'"[56]

189.     Refugees or asylees who seek to have a family member(s) join them in the United States must file Refugee/Asylee Relative Petitions (Form I-730). However, EO-2 will suspend all decisions on these petitions as well as travel for these family members.

190.     On March 6, 2017, the DHS issued a "Q&A: Protecting the Nation from Foreign Terrorist Entry to The United States." A copy of the Q&A is attached to this Complaint as Exhibit F. The Q&A provides:

> Q27. Can the exception for refugee admission be used for Refugee/Asylee Relative Petitions (Form I-730) cases where a family member is requesting a beneficiary follow to join?
>
> No. Individuals who already have valid visas or travel documents that permit them to travel to the United States are exempt from the Executive Order. To the extent that an individual does not yet have such documents, please contact the Department of State.

191.     Defendant Tillerson issued a series of diplomatic cables implementing EO-2,[57] including a March 10, 2017 State Department Cable, 17 STATE 23338, with the subject, "New Executive Order 13780: Protecting the Nation from Foreign Terrorist Entry Into the United States - Guidance to Visa-Issuing Posts" ("Cable 23338"). A copy of Cable 23338 is attached to this Complaint as Exhibit G. The "guidance" in these cables include mandatory orders regarding implementation of EO-2 and thus constitute final agency action.

---

[56] See supra note 47.

[57] Yeganeh Torbati, Mica Rosenberg & Arshad Mohammed, *Exclusive: U.S. Embassies Ordered to Identify Population Groups for Tougher Visa Screening*, Reuters (Mar. 23, 2017), http://reut.rs/2j1wdtR (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

192.     For example, Section 16 of Cable 23338 orders agency employees to suspend the processing of V93 cases:

> 16. (SBU) The U.S. Refugee Admissions Program (USRAP) is suspended for 120 days. This includes the processing of boarding foils for any V93 cases, regardless of nationality, since those follow-to-join cases are admitted to the United States as refugees. After receiving cable instructions to implement the new E.O., posts should halt the issuance of these cases immediately and cancel any scheduled V93 appointments. [The National Visa Center] will halt the processing of all V93 cases and will not forward these cases to posts. The Department will notify posts when the suspension is lifted.

193.     "V93 cases" refers to the follow-to-join I-730 petitions filed by refugees such as Plaintiffs James Doe and Joseph Doe for their spouses and unmarried children.

194.     While EO-1 suspended USRAP for 120 days, EO-2 contains slightly different language, specifically suspending travel of refugees into the United States under USRAP as well as decisions on applications for refugee status. However, the cable states that USRAP "is suspended for 120 days."

195.     In ordering agency employees to halt the processing of V93 cases and cancel any scheduled V93 appointments, Defendant Tillerson exceeded his authority under the law and failed to fulfill the requirements of the APA.

## C.     President Trump's September 27, 2017 Proclamation

196.     On September 24, 2017, Defendant Trump issued EO-3 titled, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats." A copy of EO-3 is attached to this Complaint as Exhibit H.

197.     EO-3 states that a worldwide review of what additional information would be needed from each foreign country to assess adequately whether their nationals seeking to enter the United States pose a security or safety threat resulted in a determination that "a small number

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 44

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

of countries…remain deficient at this time with respect to their identity-management and information-sharing capabilities, protocols, and practices." Unlike EO-1 and EO-2, EO-3 removes most of the prior emphasis on terrorism, instead focusing on identity management and information sharing.

198.     According to Section 1(e), the identity-management protocols, information sharing practices, and risk factors of sixteen countries were identified as "inadequate" and thirty-one additional countries were classified as "at risk" of becoming "inadequate" based upon these same criteria. EO-3 does not identify the sixteen countries that were identified as "inadequate" or the thirty-one countries that were classified as "at risk" of becoming "inadequate."

199.     However, according to Section 1(g), "Iraq did not meet the baseline" for the kinds of information required from foreign governments to support the United States government's ability to confirm the identity of individuals seeking entry into the country ("Baseline Requirements"). Yet, no blanket ban is being imposed upon nationals from Iraq seeking immigrant or non-immigrant visas; rather, nationals of Iraq will "be subject to additional scrutiny to determine if they pose risks to the national security or public safety of the United States."

200.     On the other hand, according to Section 2(h)(i), Somalia was determined to satisfy the Baseline Requirements, yet nationals of Somalia seeking immigration visas continue to be indefinitely and categorically banned, per Section 2(h)(ii).

201.     As stated by 49 former national security, foreign policy, and intelligence officials at the highest levels of the United States government, EO-3 does not impose any categorical restrictions on nationals of non-Muslim majority countries such as Belgium, a country with "widely-documented problems with information sharing, and whose nationals have carried out terrorist attacks on Europe." Joint Declaration of Former National Security Officials ("Statement of 49 Former National Security Officials") ¶ 12, *State v. Trump*, No. 17-141 (W.D. Wash. Oct. 11, 2017), Dkt. # 194-18 (a copy of the Statement of 49 Former National Security Officials is attached to this Complaint as Exhibit I).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 45

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

202.    Sections (2)(a)-(c), (e), and (g)-(h) of EO-3 indefinitely suspends the entry of immigrants from Chad, Iran, Lybia, Syria, Yemen, and Somalia. All six of these countries have Muslim-majority populations.[58]

203.    Sections (2)(a)-(c), (e), and (g)-(h) of EO-3 impose restrictions on the issuance of nonimmigrant visas to nationals of the Muslim-majority countries Chad, Iran, Lybia, Syria, Yemen, and Somalia: It bans the issuance of all nonimmigrant visas to nationals of Syria; bans the issuance of all nonimmigrant visas except student (F and M) and exchange (J) visas to nationals of Iran; and bans the issuance of business (B-1), tourist (B-2), and business/tourist (B-1/B-2) visas to nationals of Chad, Libya, and Yemen. While nationals of Somalia seeking non-immigrant visas are not banned, they will be subject to additional scrutiny. The non-immigrant visas that have been banned are the most frequently used non-immigrant visas from these nations. Ex. I, Statement of 49 Former National Security Officials ¶ 12.

204.    Section 2(d) of EO-3 restricts entry into the United States of nationals of North Korea who are not permitted to emigrate outside of their country, particularly to the United States. This provision will affect very few people. In 2016, the United States only issued one hundred visas to North Koreans, forty-two of which were diplomatic visas that are exempt from EO-4.[59]

205.    Section 2(f)(ii) of EO-3 suspends the entry of a very small number of nationals of Venezuela, only affecting "officials of government agencies of Venezuela involved in screening and vetting procedures . . . and their immediate family members" as nonimmigrants on business and tourist visas.

---

[58] *See* Pew-Templeton Global Religious Futures Project, Religious Demography: Affiliation (2010), http://bit.ly/2zcED5U (search country profiles for Chad, Iran, Lybia, Syria, Yemen, and Somalia) (last visited Nov. 3, 2017).

[59] Emily Rauhala, *Almost No North Koreans Travel to the U.S., so Why Ban Them?*, Wash. Post (Sept. 25, 2017), http://wapo.st/2hbNvUO (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

206.     Section 7(b) mandates that the restrictions will apply to nationals of Iran, Libya, Syria, Yemen, and Somalia including those who have a bona fide relationship with a person or entity in the United States as of 12:01 a.m. eastern daylight time on October 18, 2017.

207.     Section 3 of EO-3 explains the scope of the order and provides for certain "exceptions" and potential "waivers" to the travel ban. For the reasons previously explained in this Complaint, Plaintiffs have little reason to believe the waivers will be applied in a fair and non-discriminatory manner to them. Further on October 23, 2017, USCIS of Defendant DHS issued a Policy Memorandum rescinding a prior Policy Memorandum that had been in place since August 17, 2015, that gave deference to prior determinations for extension of nonimmigrant status except where there had been a prior material error, a substantial change in circumstances, or there was new material information impacting the individual's eligibility.[60]

208.     The bans on the nationals of these Muslim-majority countries is categorical without regard to the individual's age, health, or connection with the designated country. For example, EO-3 does not take into consideration if a national of a banned country has *never* resided in or visited their country of origin.

**D.     President Trump's October 24, 2017 Executive Order and Agency Implementation of the Order**

209.     On October 23, 2017, Defendants Tillerson, Duke, and Coats issued a Memorandum to the President titled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities" ("October 2017 Agency Memo"); the next day, Defendant Trump signed EO-4, Executive Order 13815 titled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities." A copy of the October 2017 Agency Memo and EO-4 are attached to this Complaint as Exhibits J and K.

---

[60] Policy Memorandum, U.S. Dep't of Homeland Sec. (Oct. 23, 2017), http://bit.ly/2zicwnN (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

210.    Pursuant to Section 1(g) of EO-4, the restrictions and limitations of EO-3 "do not apply to those who seek to enter the United States through the USRAP."

211.    Sections 2(a)-(b) explain that, after the Administration's 120-day review of the USRAP application and adjudication process, the heads of three administrative agencies advised the President that the refugee screening process was "generally adequate to ensure the security and welfare of the United States":

> The Secretary of State, the Secretary of Homeland Security, and the Director of National Intelligence have advised that the improvements to the USRAP vetting process are generally adequate to ensure the security and welfare of the United States, that the Secretary of State and Secretary of Homeland Security may resume that program, and that they will apply special measures to certain categories of refugees whose entry continues to pose potential threats to the security and welfare of the United States.
>
> . . .
>
> With the improvements identified by the section 6(a) working group and implemented by the participating agencies, the refugee screening and vetting process generally meets the uniform baseline for immigration screening and vetting established by the section 5 working group. Accordingly, a general resumption of the USRAP, subject to the conditions set forth in section 3 of this order, is consistent with the security and welfare of the United States.

212.    Accordingly, Section 2(c) declares that the suspension of USRAP and other processes specified in EO-2 are no longer in effect. EO-4 authorized "the Secretary of State to resume travel of qualified and appropriately vetted refugees into the United States, and the Secretary of Homeland Security to resume adjudicating applications for refugee resettlement."

213.    Section 3(a) of EO-4 states that "Presidential action to suspend the entry of refugees under the USRAP is not needed at this time to protect the security and interests of the United States and its people."

214.    Despite the conclusion in EO-4 that the suspension of the USRAP program is not needed at this time and already having had at least 120 days to conduct a review of the USRAP

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 48

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

process, the October 2017 Agency Memo asserts a need for up to an additional 90 days to conduct a threat analysis and review for nationals and stateless persons who last habitually resided in eleven countries on the Security Advisory Opinion ("SAO") list. The SAO list was established after the September 11th terrorist attacks, and the current list of countries was established in 2015.

215.     Upon information and belief, SAO List Countries are "Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria and Yemen, as well as Palestinians who lived in those countries."[61] Most adult male refugees from these countries are already required to undergo higher-level security screening known as SAO's under previously existing protocols.[62] All but two of these countries, i.e., North Korea and South Sudan, are Muslim-majority countries.[63]

216.     During this review, refugee applicants from other non-SAO countries will be prioritized. Individuals from SAO List Countries may be considered during the review period but only if the person's "will admit on a case-by-case basis only refugees whose admission is deemed to be in the national interest and poses no threat to the security of welfare of the United States." Ex. J, October 2017 Agency Memo at 2. In other words, there will be a continued de facto Muslim refugee ban during this additional review period.

217.     In addition, the October 2017 Agency Memo indefinitely suspends I-730 follow-to-join admission for the spouse and unmarried children under twenty-one of former refugees residing in the United States until additional security enhancements are in place. According to the addendum to the October 2017 Agency Memo, the additional security enhancements are:

---

[61] Yeganeh Torbati & Mica Rosenberg, *Under Trump Plan, Refugees from 11 Countries Face Additional U.S. Barriers*, Reuters (Oct. 24, 2017), http://reut.rs/2zBqfmA (last visited Nov. 3, 2017).

[62] *Id.*

[63] *Id.*

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

(1) ensuring that all following-to-join refugees receive the full baseline interagency checks that principal refugees receive; (2) requesting submission of the beneficiary's 1-590 application in support of the Form 1-730 petition earlier in the process to provide for more thorough screening; (3) vetting certain nationals or stateless persons against classified databases; and (4) expanding SAO requirements for this population in keeping with the agreed-to expansion for 1-590 refugee applicants.

218.    The October 2017 Agency Memo neither clarifies who "certain nationals" are nor makes any distinction between processing follow-to-join applications for women and minor children versus spouses who are adult males.

219.    Defendant Trump lowered the refugee cap in Fiscal Year 2018, which began on October 1, 2017, to 45,000 refugees,[64] the lowest number since the program began in 1975.[65]

220.    The October 2017 Agency Memo effectively eviscerates any chance refugees from the eleven SAO List Countries—including those who already have fulfilled all the rigorous eligibility requirements—have to get into the queue for the severely limited number of available spots left for refugees.

221.    The October 2017 Agency Memo also establishes an indefinite ban on derivative refugees seeking non-discretionary admission pursuant to the Immigration & Nationality Act, 8 U.S.C. § 1157(c)(2)(A) and who have otherwise fulfilled all requirements, including their medical and security clearances. Even if the ban is eventually lifted, there will necessarily be far fewer spaces left for them as other refugees will be prioritized and using up the severely limited allotment of spots in the interim, leaving Joseph Doe, his wife and children, and others like them hoping for one of the few remaining spots there may be, if any, for before the refugee cap is met.

222.    The October 2017 Agency Memo is a final agency action from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted).

---

[64] Statement, President Donald J. Trump is Taking a Responsible and Humanitarian Approach on Refugees, White House (Sept. 29, 2017), http://bit.ly/2xEHB4x (last visited Nov. 3, 2017).

[65] Geneva Sands & Conor Finnegan, *Trump Administration to Announce Decision on Refugee Program After 120-Day Ban*, ABC News, http://abcn.ws/2i1ijnJ (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

223. The Agency Memo purports to deprive Plaintiffs of an entitlement, not a benefit.

224. The Orders and the manner in which they are being been implemented, in effect, continue the unlawful Muslim Ban.

225. Further, the Orders cause individual Plaintiffs and members of the proposed classes direct, ongoing, and immediate harm by causing them to suffer "[t]he indignity of being singled out [by a government] for special burdens'" on the basis of religion or assumed religion. *Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015), as amended Feb. 2, 2016 (quoting *Locke v. Davey*, 540 U.S. 712, 731 (2004) (Scalia, J., dissenting)).

226. The Orders also cause Plaintiffs and members of the Refugee Class direct, ongoing, and immediate harm by preventing them from being reunited with their family members.

## E.     The Arbitrariness of the Orders

227. Despite repeated claims by Defendants regarding the immediate national security need for the Orders, Defendant Trump took thirty-one days after the time this Court issued the first injunction against EO-1 on February 3, 2017, to issue EO-2. At least five of those days were due purely to timing of press coverage desired by Defendant Trump and had nothing to do with national security.[66] Having now had months to review its screening and vetting protocols as well as the refugee admissions process while, in the interim, wreaking havoc on the lives of millions of people, Defendants now attempt to indefinitely bar the issuance of immigrant and non-immigrant visas to nationals of six Muslim-majority countries and continue the suspension of admission to follow-to-join refugees with the closest of familial ties to residents of this country—all without any genuine national security purpose,

---

[66] *See supra* note 41.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

### 1. Arbitrariness of the Travel Ban

#### a. The Faulty Logic Behind Invoking the 9/11 Attacks to Justify the Travel Ban

228. Section 1 of EO-1, entitled "Purpose," stated that at the time of the September 11, 2001 ("9/11") terrorist attacks, "State Department policy prevented consular officers from properly scrutinizing the visa applications of several of the 19 foreign nationals" involved in those attacks. Further, DHS's Fact Sheet on EO-1 stated that "[t]he Executive Order protects the United States from countries compromised by terrorism . . . ."[67] EO-2 continues to justify the actions of Defendants based on events from 2001. *See* Ex. E, EO-2 § 1(h).

229. Yet, none of the Orders impose any restrictions on nationals of Egypt, Lebanon, Saudi Arabia, or the United Arab Emirates—the countries of which the 9/11 attackers were citizens. A March 9, 2017 Breitbart article stated that ISIS boasted that Saudi Arabia is the top provider of terrorists for its group, citing a high-ranking Iraqi intelligence officer as saying, "The Saudi presence in ISIS is very large. What we have left are mainly Iraqis and Saudis."[68]

230. According to an article published on CNN, "[i]n financial disclosure forms during the presidential campaign, [Defendant Trump] listed two companies with dealings in Egypt and eight with business in Saudi Arabia. And in the UAE, the Trump Organization is partnering with a local billionaire to develop two golf courses in Dubai."[69]

231. Ten National Security Experts—all of whom were serving in their official capacities and four of whom "were current on active intelligence regarding all credible terrorist threat streams directed against the U.S," Ex. D, Joint Declaration ¶ 2, up until January 20, 2017, just seven days prior to the issuance of EO-1 —stating that they were "unaware of any specific

---

[67] *See supra* note 10.

[68] Edwin Mora, *Report: More Citizens of Saudi Arabia Have Joined Islamic State Than Any Other Country*, Breitbart (Mar. 9, 2017), http://bit.ly/2nmTHGQ (last visited Nov. 3, 2017).

[69] Kyle Blaine & Julia Horowitz, *How the Trump Administration Chose the 7 Countries in the Immigration Executive Order*, CNN (Jan. 30, 2017), http://cnn.it/2jkjiCC (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

threat that would justify the travel ban established by [EO-1]" and that "[t]here is no national security purpose for a total bar on entry for aliens from the seven named countries. *Id.* ¶¶ 3-4.

232.    These officials who were in office a mere seven days before EO-1 issued "kn[e]w of no interagency process underway before January 20, 2017 to change current vetting procedures, and the repeated need for the Administration to clarify confusion after the Order issued suggest that that Order received little, if any advance scrutiny by the Departments of State, Justice, Homeland Security or the Intelligence Community." *Id.* ¶ 7. Nor had the officials seen "any evidence that the Order resulted from experienced intelligence and security professionals recommending changes in response to identified threats." *Id.*

233.    Therefore, in their opinion, EO-1 "c[ould] not be justified on national security or foreign policy grounds." *Id.* ¶ 3. They explained that:

> Since September 11, 2001, not a single terrorist attack in the United States has been perpetrated by aliens from the countries named in the Order. Very few attacks on U.S. soil since September 11, 2001 have been traced to foreign nationals at all. The overwhelming majority of attacks have been committed by U.S. citizens. The Administration has identified no information or basis for believing there is now a heightened or particularized future threat from the seven named countries. Nor is there any rational basis for exempting from the ban particular religious minorities (e.g., Christians), suggesting that the real target of the ban remains one religious group (Muslims). In short, *the Administration offers no reason why it abruptly shifted to group-based bans when we have a tested individualized vetting system developed and implemented by national security professionals across the government to guard the homeland, which is continually re-evaluated to ensure that it is effective.*

*Id.* ¶ 4 (emphasis added).

234.    These respected civil servants, who have collectively "devoted decades to combatting the various terrorist threats that the United States faces in a dynamic and dangerous world" declared, in their professional opinions, that EO-1 "does not perform its declared task" of "protecting the nation from foreign terrorist entry into the United States," and instead actually undermined the national security of the United States. *Id.* ¶¶ 2-3.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

235.     Specifically, the Joint Declaration stated that EO-1: (1) will endanger U.S. troops in the field; (2) will disrupt key counterterrorism, foreign policy, and national security partnerships that are critical to addressing the threat posed by terrorist groups such as ISIL; (3) will endanger intelligence sources in the field; (4) will likely feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam; (5) will disrupt ongoing law enforcement efforts; (6) will have a devastating humanitarian impact; and (7) will cause economic damage to American citizens and residents. *Id.* ¶ 5.

236.     The Joint Declaration also described pre-existing national security-based immigration restrictions as "consistently [] tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review." *Id.* ¶ 6. The document further described:

> Since the 9/11 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities. This vetting is applied to travelers not once, but multiple times. Refugees receive the most thorough vetting of any traveler to the United States, taking on the average more than a year. Successive administrations have continually worked to improve this vetting through robust information sharing and data integration to identify potential terrorists without resorting to a blanket ban on all aliens and refugees. Because various threat streams are constantly mutating, as government officials, we sought continually to improve that vetting, as was done in response to particular threats identified by U.S. intelligence in 2011 and 2015. Placing additional restrictions on individuals from certain countries in the visa waiver program—as has been done on occasion in the past—merely allows for more individualized vettings before individuals with particular passports are permitted to travel to the United States.

*Id.*

237.     While EO-1 allowed for the Secretaries of State and Homeland Security to agree to admit travelers from these countries on a case-by-case basis, these experts concluded that "in our experience it would be unrealistic for these overburdened agencies to apply such procedures

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 54

235.     Specifically, the Joint Declaration stated that EO-1: (1) will endanger U.S. troops in the field; (2) will disrupt key counterterrorism, foreign policy, and national security partnerships that are critical to addressing the threat posed by terrorist groups such as ISIL; (3) will endanger intelligence sources in the field; (4) will likely feed the recruitment narrative of ISIL and other extremists that portray the United States as at war with Islam; (5) will disrupt ongoing law enforcement efforts; (6) will have a devastating humanitarian impact; and (7) will cause economic damage to American citizens and residents. *Id.* ¶ 5.

236.     The Joint Declaration also described pre-existing national security-based immigration restrictions as "consistently [] tailored to respond to: (1) specific, credible threats based on individualized information, (2) the best available intelligence and (3) thorough interagency legal and policy review." *Id.* ¶ 6. The document further described:

> Since the 9/11 attacks, the United States has developed a rigorous system of security vetting, leveraging the full capabilities of the law enforcement and intelligence communities. This vetting is applied to travelers not once, but multiple times. Refugees receive the most thorough vetting of any traveler to the United States, taking on the average more than a year. Successive administrations have continually worked to improve this vetting through robust information sharing and data integration to identify potential terrorists without resorting to a blanket ban on all aliens and refugees. Because various threat streams are constantly mutating, as government officials, we sought continually to improve that vetting, as was done in response to particular threats identified by U.S. intelligence in 2011 and 2015. Placing additional restrictions on individuals from certain countries in the visa waiver program—as has been done on occasion in the past—merely allows for more individualized vettings before individuals with particular passports are permitted to travel to the United States.

*Id.*

237.     While EO-1 allowed for the Secretaries of State and Homeland Security to agree to admit travelers from these countries on a case-by-case basis, these experts concluded that "in our experience it would be unrealistic for these overburdened agencies to apply such procedures

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 54

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

to every one of the thousands of affected individuals with urgent and compelling needs to travel." *Id.* ¶ 5.f.

238.    On the unprecedented scope of EO-1, these experts wrote:

> We know of no case where a President has invoked his statutory authority to suspend admission for such a broad class of people. Even after 9/11, the U.S. Government did not invoke the provisions of law cited by the Administration to broadly bar entrants based on nationality, national origin, or religious affiliation. In past cases, suspensions were limited to particular individuals or subclasses of nationals who posed a specific, articulable threat based on their known actions and affiliations. In adopting this Order, the Administration alleges no specific derogatory factual information about any particular recipient of a visa or green card or any vetting step omitted by current procedures.

*Id.* ¶ 8.

239.    Nearly 1,000 current State Department officials formally registered their dissent to EO-1.[70] These career diplomats explained:

> A policy which closes our doors to over 200 million legitimate travelers in the hopes of preventing a small number of travelers who intend to harm Americans from using the visa system to enter the United States will not achieve its aim of making our country safer. Moreover, such a policy runs counter to core American values of nondiscrimination, fair play, and extending a warm welcome to foreign visitors and immigrants. Alternative solutions are available to address the risk of terror attacks which are both more effective and in line with Department of State and American values.

> . . .

> This ban, which can only be lifted under conditions which will be difficult or impossible for countries to meet, will not achieve its stated aim of to protect the American people from terrorist attacks by foreign nationals admitted to the United States. Despite the Executive Order's focus on them, a vanishingly small number of terror attacks on U.S. soil have been committed by foreign nationals who recently entered the United States on an immigrant or nonimmigrant visa. Rather, the overwhelming majority of attacks have been committed by native-born or

---

[70] Steve Herman & Nike Ching, *Sources: Nearly 1,000 at State Department Officially Dissent on Immigration Order*, VOA News (Jan. 31, 2017), http://bit.ly/2kOEUHR (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

naturalized U.S. citizens--individuals who have been living in the United States for decades, if not since birth. In the isolated incidents of foreign nationals entering the U.S. on a visa to commit acts of terror, the nationals have come from a range of countries, including many (such as Pakistan or Saudi Arabia) which are not covered by the Executive Order.

. . .

Given the near-absence of terror attacks committed in recent years by Syrian, Iraqi, Irani, Libyan, Somalia, Sudanese, and Yemeni citizens who are in the U.S. in after entering on a visa, this ban will have little practical effect in improving public safety.

. . .

The end result of this ban will not be a drop in terror attacks in the United States; rather, it will be a drop in international good will towards Americans and a threat towards our economy.

Memorandum, Dissent Channel: Alternatives to Closing Doors in Order to Secure Our Borders (Jan. 27, 2017) (a copy of the Dissent Channel is attached to this Complaint as Exhibit L).

240.    EO-1 failed to cite a scintilla of evidence supporting the need for the travel ban of nationals from the seven originally banned countries. Nor did or could Defendants provide any such support in any of their briefings in the numerous courts where EO-1 was challenged in the weeks following its signing or the time leading up to the issuance of EO-2. This is because Defendants simply do not have the facts to do so.

    b.    The Faulty Logic Behind Invoking 2015 Data to Justify the Travel Ban

241.    The best Defendants could do to try and justify EO-2 was to cite to a June 2016 DOS *Country Report on Terrorism 2015*. Ex. E, EO-2 § 1(e). However, according to the report, the majority (i.e., over 55%) of all terrorist attacks took place in five countries *that are not*

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

*subject to the travel ban*—Iraq, Afghanistan, Pakistan, India, and Nigeria.[71] In addition, 74% of all deaths due to terrorist attacks took place in five countries—Iraq, Afghanistan, Nigeria, Syria, and Pakistan.[72]

242. Section 1(e) of EO-2 cites facts purportedly demonstrating why the Targeted Countries continue to present heightened risks to security. However, the facts are based on the June 2015 data that is nearly two years old and which were specifically addressed by changes made to the Visa Waiver Program at that time to respond to the specific information.[73]

243. Further, in relying on information for data from two years ago (or more), Defendants ignore more recent data from not only respected research organizations sources but also the United States government's own national security experts.

244. According to a September 2016 report from the Cato Institute, "[i]ncluding those murdered in the terrorist attacks of September 11, 2001 (9/11), the chance of an American perishing in a terrorist attack on U.S. soil that was committed by a foreigner over the 41-year period studied here is 1 in 3.6 million per year."[74] Similarly, the Boston Globe reported in 2016 that "a person living in the United States is more than over 100 times more likely to be killed by falling objects than by a jihadi terrorist."[75] Indeed, it appears that in 2016, "Americans were less likely to be killed by Muslim extremists (1 in six million) than for being Muslim (one in one million)."[76]

---

[71] *Country Reports on Terrorism 2015* at 3, Dep't of Homeland Sec. (June 2016), http://bit.ly/2rtr2lW (last visited Nov. 3, 2017).

[72] *Id.*

[73] 8 U.S.C. § 1187; Visa Waiver Program, U.S. Dep't of State, http://bit.ly/1V9XIeB (last visited Nov. 3, 2017).

[74] Alex Nowrasteh, *Terrorism and Immigration: A Risk Analysis*, 798 Pol'y Analysis Cato Inst. 1 (Sept. 13, 2016), http://bit.ly/2hKSGKh (last visited Nov. 3, 2017).

[75] Graham Allison, *Fear Death from Tree Limbs, Not Terrorists*, Boston Globe (Feb. 19, 2016), http://bit.ly/2h4u24A (last visited Nov. 3, 2017).

[76] Charles Kurzman, *Muslim-American Involvement with Violent Extremism, 2016* (Jan. 26, 2017), http://unc.live/1irAzzi (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

245.     In the process of creating EO-2, the Office of Intelligence and Analysis within the DHS that is charged with equipping the Homeland Security Enterprise with timely intelligence and information,[77] developed a report assessing the international terrorist threat to the United States and worldwide posed by citizens of the seven Original Targeted Countries. Although the report did not assess the risk of domestic terrorism, included in the key findings were:

- citizens of the seven Original Targeted Countries were rarely implicated in US-based terrorism;

-  "country of citizenship is unlikely to be a reliable indicator of potential terrorist activity"; and

- Of the at least 82 primarily US-based individuals who died in the pursuit of or were convicted of any terrorism-related federal offense inspired by a foreign terrorist organization since the beginning of the Syrian conflict in March 2011, of the seven Original Targeted Countries, Iran, Sudan, and Yemen had 1 each, and there were no individuals from Syria.

Report, Citizenship Likely an Unreliable Indicator of Terrorist Threat to the United States, U.S. Dep't of Homeland Sec. (Feb. 2017) (a copy of the Report is attached to this Complaint as Exhibit M).

246.     A second, March 1, 2017, Intelligence Assessment announced in its title that "Most Foreign-born, US-based Violent Extremists Radicalized after Entering Homeland . . . " ("March 1 Intelligence Assessment")[78] also negates the necessity of EO-2's travel ban. A copy of the March 1 Intelligence Assessment, as it appeared in the MSNBC article, is attached to this Complaint as Exhibit N.

247.     The March 1 Intelligence Assessment was based on information available as of December 31, 2016. One of the key judgments of the March 1 Intelligence Assessment was that:

---

[77] Office of Intelligence and Analysis, U.S. Dep't of Homeland Sec. (last published date June 22, 2017), http://bit.ly/2iZVWCU (last visited Nov. 3, 2017).

[78] Rachel Maddow, *TRMS Exclusive: DHS Document Undermines Trump Case for Travel Ban*, MSNBC (Mar. 2, 2017), http://on.msnbc.com/2mRo5ZF (last visited Nov. 3, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

> [M]ost foreign-born, US-based violent extremists likely radicalized several years
> after their entry to the United States, limiting the ability of screening and vetting
> officials to prevent their entry because of national security concerns. We base this
> assessment on our findings that nearly half of the foreign-born, US-based violent
> extremists examined in our dataset were less than 16 years old when they entered
> the country and that the majority of foreign-born individuals resided in the United
> States for more than 10 years before their indictment or death. A separate DHS
> study that found recent foreign-born US violent extremists began radicalizing, on
> average, 13 years after their entry to the United States further supports our
> assessment.

*Id.* at 2.

248.     The examples of terrorist activity cited in Section 1(h) of EO-2 only underscore the points raised in all of these reports and statements by national security experts that the travel ban is unnecessary and will be ineffective. The first example cited relates to two Iraqi nationals; yet, EO-2 removed Iraq from the list of targeted countries. The second example was of a native of Somali who had been brought to the United States as a child but then committed the act in question after he had been naturalized as a United States citizen and when he was an adult.

249.     On March 10, 2017, more than 130 foreign policy and national security experts wrote an open letter to President Trump ("Open Letter") concluding that EO-2 "suffers from the same core substantive defects as the previous version." The experts raise the concern that EO-2 will "weaken U.S. national security" because it "jeopardize[s] our relationships with allies and partners on whom we rely for vital counterterrorism cooperation and information sharing. To Muslims—including those victimized by or fighting against ISIS—it will send a message that reinforces the propaganda of ISIS and other extremist groups, that falsely claim the United States is at war with Islam." Open Letter to the Honorable Donald J. Trump (Mar. 10, 2017) at 1 (a copy of the Open Letter is attached to this Complaint as Exhibit O).

250.     The experts explain in the Open Letter: "Following the 9/11 attacks, the United States developed a rigorous system of security vetting for travelers to our homeland, leveraging the full capabilities of the intelligence and law enforcement communities. Since then, the U.S.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

has added enhanced vetting procedures for travelers and has revised them continuously. Our government applies this process to travelers not once, but multiple times." *Id.*

251.    In addition, EO-2 now allows automatic entry for nationals of the affected countries with valid visas, an admission by Defendants that the current screening and vetting process for the admission of non-immigrant visa holders is adequate and effective to protect this country's national security interests.

252.    Adding to the evidence of the arbitrariness of the travel ban, on March 20, 2017, the Transportation Security Administration—a component of Defendant DHS— issued what was, at first, a confidential directive banning laptops, iPads and other electronics "larger than a cellphone" on flights from 10 airports because "'evaluated intelligence' emerged that terrorists favored 'smuggling explosive devices in various consumer items'".[79] The countries covered by the electronics ban are Jordan, Egypt, Turkey, Saudi Arabia, Morocco, Qatar, Kuwait and the United Arab Emirates[80]—none of which are covered by any of the Orders.

253.    The supposed national security justification for EO-3 fare no better than for EO-1 and EO-2. According to 49 Former Nationals Security Officials, EO-3 "preserves the basic approach of the original two Orders, without providing any persuasive evidence that these measures are necessary to enhance our national security or foreign policy interests." Ex. I, Statement of 49 Former National Security Officials ¶ 3. They further point out:

> As a national security measure, this Ban is unnecessary. . . . [EO-3] rests not on []
> tailored grounds, but rather, on (1) general bans (2) that are not responsive to an
> actual national security threat informed by intelligence, and (3) that emerged from
> a January Order that was not vetted through the kind of careful interagency legal
> and policy review that we would expect from a serious national security process.
>
> The Ban is of unprecedented scope. . . . Even after the 9/11 attacks, the U.S.
> Government did not invoke the provisions of law cited by the Administration to

---

[79] Sam Thielman & Sam Levin, *Experts Criticize US Electronic Devices Ban on Some Flights from Middle East, Guardian* (Mar. 21, 2017), http://bit.ly/2mPTuMC (last visited Nov. 3, 2017).

[80] *Id.*

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 60

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

broadly bar entrants based on nationality, national origin, or religious affiliation. Suspensions were limited to particular individuals or subclasses of nationals who posed a specific, articulable threat based on their known actions and affiliations. In adopting Travel Ban 3.0, the Administration alleges no derogatory factual information about any particular recipient of a visa or green card or any credible threat from nationals of the countries banned.

. . .

The current individualized vetting system places the burden of proof on the traveler to prove her identity and eligibility for travel. If the traveler is unable to make this showing, the U.S. Government can deny her a visa based on an individualized review. This has been the policy of the U.S. Government across multiple administrations.

. . .

Removing most of the emphasis on terrorism, the new Ban is purportedly necessary "to elicit improved identity-management and information-sharing protocols and practices from foreign governments." We have seen no evidence, however, that such a sweeping, country-based ban on travel is necessary for this objective.

In fact, the only concrete evidence to emerge from this administration on this point to date has shown just the opposite, that country-based bans are ineffective.

. . .

[EO-3] does not further—but instead harms—sound U.S. national security and foreign policy.

*Id.* ¶¶ 5-6, 8-10, 14.

254.    Rather than wasting the resources of our security agencies banning millions of individuals who are already being thoroughly analyzed through current procedures put in place by national security experts, Defendants should be focusing on the small but very dangerous individuals for whom they have specific information that will lead to actually stopping attacks in this country.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

**2.	Arbitrariness of the Suspension of the USRAP**

255.	In priming the country for suspending the USRAP, Defendant Trump relies upon arbitrary and irrational animus towards refugees with no factual basis. For example, in discussing refugees at a February 18, 2017 rally in Melbourne, Florida, he claimed: "We've allowed thousands and thousands of people into our country and there was no way to vet those people. There was no documentation. There was no nothing. . . . So we're going to keep our country safe."[81]

256.	However, according to the State Department's January 20, 2017 Bureau of Population, Refugees, and Migration Fact Sheet:

> All refugees undergo the most intensive security screening of any traveler to the
> United States. This screening includes multiple federal intelligence, security, and
> law enforcement agencies, including the National Counterterrorism Center, the
> FBI Terrorist Screening Center, and the Departments of Homeland Security,
> State, and Defense. Syrian refugees go through yet additional forms of security
> screening. A refugee applicant cannot be approved for travel until all required
> security checks have been completed and cleared.[82]

257.	The United States government has a great deal of experience screening and admitting large numbers of refugees from chaotic environments, including where intelligence holdings are limited.

258.	According to the USCIS, the government agency that oversees lawful immigration to the United States:[83]

---

[81] Jacob Gardenswartz, *Transcript: President Donald Trump's Rally in Melborne, Florida*, Vox (Feb. 18, 2017), http://bit.ly/2y1Tnmv (last visited Nov. 4, 2017).

[82] Fact Sheet: U.S. Refugee Admissions Program FAQ's, U.S. Dep't of State (Jan. 20, 2017), http://bit.ly/2jCcsqP (last visited Nov. 4, 2017).

[83] Refugee Processing and Security Screening, Dep't of Homeland Sec. (last reviewed/updated: Dec. 3, 2015), http://bit.ly/1YodRyW (last visited Nov. 4, 2017).

THIRD AMENDED CLASS ACTION COMPLAINT PAGE 62

AMERICAN CIVIL LIBERTIES UNION OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

> ▼ **Refugee Processing**
>
> Refugee applicants are subject to intensive biographic and biometric security checks. Through close coordination with the federal law enforcement and intelligence communities, these checks are continually reviewed and enhanced to address specific populations that may pose particular threats.
>
> The United Nations High Commissioner for Refugees (UNHCR) identifies and refers many refugees to the USRAP for resettlement consideration. UNHCR also provides important information about the worldwide refugee situation.
>
> The Department of State (State) coordinates and manages the USRAP. Resettlement Support Centers (RSCs) work with State to carry out administrative and processing functions, such as file preparation, data collection, and out-processing activities during the refugee admissions process.
>
> USCIS conducts interviews with applicants to determine their eligibility for refugee status, including whether they are credible, meet the refugee definition, and are otherwise admissible to the United States under U.S. law.

259.    The general refugee process encompasses the following: [84]



- UNHCR registration and resettlement referral, based on vulnerability and eligibility assessment
- RSC conducts prescreening interview and initiates biographic checks
- USCIS reviews biographic check results; conducts the eligibility interview; collects biometrics and initiates biometric checks; requests additional biographic checks, if needed
- USCIS adjudicates Form I-590, no case is approved until security check results are received and cleared
- RSC processes approved cases for travel, including medical exams and sponsorship by a domestic resettlement agency
- All refugee travel information collected on flight manifests is screened prior to boarding via CBP/TSA (NTC-P and Secure Flight)
- CBP determines if the applicant is admissible to the United States and admits applicant to the U.S. as a refugee

[84] *Id.*

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 63

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

260. The non-existent vetting process claimed by Defendant Trump actually consists of the following numerous steps:[85]

## USRAP Screening

USRAP screening is a shared responsibility. It includes both biometric and biographic checks at multiple stages during the process, including immediately before a refugee's departure to the United States and upon his or her arrival in the United States.

The screening of refugee applicants involves numerous biographic checks that are initiated by the RSCs and reviewed and/or resolved by USCIS. These include:

- **The Department of State's Consular Lookout and Support System (CLASS)**
  State initiates CLASS name checks for all refugee applicants when they are being prescreened by an RSC. Name checks are conducted on the applicant's primary names as well as any variations used by the applicant. Responses are received before the USCIS interview, and possible matches are reviewed and adjudicated by USCIS headquarters. Evidence of the response is included in the case file. If a new name or variation is identified at the interview, USCIS requests another CLASS name check on the new name and places the case on hold until that response is received.

  CLASS is owned by State. The name-check database provides access to critical information for adjudicating immigration applications. The system contains records provided by numerous agencies and includes information on individuals who have been denied visas, immigration violations, criminal histories, and terrorism concerns, as well as intelligence information and child support enforcement data.

  In addition to containing information from State sources, CLASS also includes information from:

  - National Counterterrorism Center/Terrorist Screening Center (terrorist watch lists),
  - TECS,
  - Interpol,
  - Drug Enforcement Administration,
  - Health and Human Services, and
  - FBI (extracts of the National Crime Information Center's Wanted Persons File, Immigration Violator File, Foreign Fugitive File, Violent Gang and Terrorist Organization File (and the Interstate Identification Index)).

---

[85] *Id.*

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

- **Security Advisory Opinion (SAO)**
  State initiates SAO name checks for certain refugee applicants when they are being prescreened by an RSC. The SAO biographic check is conducted by the FBI and intelligence community partners. SAOs are conducted for an applicant who is a member of a group or nationality that the U.S. government has designated as requiring this higher level check. SAOs are processed, and a response must be received before finalizing the decision. If there is a new name or variation identified at the interview, USCIS requests another SAO for the new name and places the case on hold until that response is received.

  The SAO process was implemented after Sept. 11, 2001, to provide an additional security mechanism to screen individuals in certain higher-risk categories who are seeking to enter the United States through a variety of means, including refugee applicants.

- **Interagency Check (IAC)**
  The IAC screens biographic data, including names, dates of birth, and other additional data of all refugee applicants within designated age ranges. This information is captured at the time the applicant is prescreened and is provided to intelligence community partners. This screening procedure began in 2008 and has expanded over time to include a broader range of applicants and records. These checks occur throughout the process.

At the time of USCIS interview, USCIS staff collects fingerprints and begins biometric checks. These checks include:

- **FBI Fingerprint Check through Next Generation Identification (NGI)**
  Recurring biometric record checks pertaining to criminal history and previous immigration data.

- **DHS Automated Biometric Identification System (IDENT - f/n/a US-VISIT)**
  A biometric record check related to travel and immigration history as well as immigration violations, and law enforcement and national security concerns. Enrollment in IDENT also allows U.S. Customs and Border Protection (CBP) to confirm the applicant's identity at U.S. ports of entry.

- **DOD Defense Forensics and Biometrics Agency (DFBA)'s Automated Biometric Identification System (ABIS)**
  A biometric record check of the Department of Defense's (DOD) records collected in areas of conflict (predominantly Iraq and Afghanistan). DOD screening began in 2007 for Iraqi applicants and has now been expanded to all nationalities. CBP's National Targeting Center-Passenger (NTC-P) conducts biographic vetting of all ABIS biometric matches against various classified and unclassified U.S. government databases.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

### ▾ USCIS Interview

The USCIS refugee interview is an important part of the refugee screening process. Highly trained USCIS officers conduct extensive interviews with each refugee applicant to learn more about the applicant's claim for refugee status and admissibility. These officers have undergone specialized and extensive training on:

- Refugee law,
- Grounds of inadmissibility,
- Fraud detection and prevention,
- Security protocols,
- Interviewing techniques,
- Credibility analysis, and
- Country conditions research.

Before deploying overseas, officers also receive additional training on the specific population that they will be interviewing, detailed country of origin information, and updates on any fraud trends or security issues that have been identified.

Officers conducting interviews of Syrian applicants undergo an expanded 1-week training focusing on Syria-specific topics, including a classified intelligence briefing. During the interview, the officer develops lines of questioning to obtain information on whether the applicant has been involved in terrorist activity, criminal activity, or the persecution/torture of others. The officer will also conduct a credibility assessment on each applicant

### ▾ Controlled Application Review and Resolution Process (CARRP)

During the process of adjudicating any USCIS benefit, if any national security concerns are raised, either based on security and background checks or personal interviews or testimony, USCIS conducts an additional review through the internal CARRP process. CARRP is an internal USCIS process that a case can go through to ensure that immigration benefits or services are not granted to individuals who pose a threat to national security and/or public safety, or who seek to defraud our immigration system.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

**▼ Enhanced Review for Syrian Applicants**

USCIS' Refugee, Asylum, and International Operations Directorate and Fraud Detection and National Security Directorate (FDNS) work together to provide enhanced review of certain Syrian cases. This review involves FDNS providing intelligence-driven support to refugee adjudicators, including identifying threats and suggesting topics for questioning. FDNS also monitors terrorist watch lists and disseminates intelligence information reports on any applicants who are determined to present a national security threat.

**▼ CBP Vetting**

CBP inspects all applicants who are approved for refugee resettlement to the United States to determine their admissibility before they are admitted as refugees. CBP receives a manifest of all approved individuals who have been booked for travel to the United States. CBP receives this manifest 8 days before the scheduled travel. CBP begins vetting the individuals before they arrive at a U.S. airport and then conducts an inspection and additional background checks of these individuals upon their arrival at a U.S. airport.

261.    Defendant Trump has misrepresented that "there was no way to vet those people"[86] in an attempt to justify his arbitrary and unjustified suspension of the USRAP. However, USCIS Director León Rodriguez's explained in his September 28, 2016 written testimony for a Senate Committee on the Judiciary, Subcommittee on Immigration and the National Interest hearing that "[a]ll refugees entering our country are subject to the highest level of security check of any category of any traveler to the United States and admitted only after successfully completing a stringent security screening process."[87] He further detailed:

> Recognizing that a well-trained cadre of officers is critical to protecting the integrity of the refugee process, we have focused our efforts on providing the highest quality training to our officers. In addition to the basic training required of

---

[86] *See supra* note 81.

[87] Written Testimony of USCIS Director León Rodriguez for a Senate Committee on the Judiciary, Subcommittee on Immigration and the National Interest Hearing titled "Oversight of the Administration's FY 2017 Refugee Resettlement Program," Dep't of Homeland Sec. (Sep. 28, 2016), http://bit.ly/2h5A7Oo (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

all USCIS officers, refugee officers receive nine weeks of specialized training that includes comprehensive instruction on all aspects of the job, including refugee law, grounds of inadmissibility, fraud detection and prevention, security protocols, interviewing techniques, credibility analysis, and country conditions research. Before deploying overseas, officers also receive pre-departure training, which focuses on the specific population that they will be interviewing. This includes information on the types of refugee claims that they are likely to encounter, detailed country of origin information, and updates on any fraud trends or security issues that have been identified. With the advent of large-scale processing of Iraqi applicants in 2007, USCIS officers who adjudicate Iraqi refugee applications began receiving an additional two-day training on country-specific issues, including briefings from outside experts from the law enforcement, intelligence, policy, and academic communities. This training has since expanded to a one-week training in order to include Syria-specific topics in addition to Iraqi ones.

In order to fully explore refugee claims and to identify any possible grounds of ineligibility, specially-trained USCIS officers conduct an in-person, in-depth interview of every principal refugee applicant. The officer assesses the credibility of the applicant and evaluates whether the applicant's testimony is consistent with known country conditions. These officers also interview each accompanying family member age 14 and older. All applicants must establish admissibility to the United States before the case (i.e., the collection of applicants) is approved. In addition, refugee applicants are subject to robust security screening protocols to identify potential fraud, criminal or national security issues. All refugee status determinations made by interviewing officers undergo supervisory review before a final decision is made. Refugee Affairs Division policy requires officers to submit certain categories of sensitive cases – including certain national security-related cases – to Refugee Affairs Division Headquarters to obtain concurrence prior to the issuance of a decision. This allows for Headquarters staff to conduct additional research, liaise with law enforcement or intelligence agencies, or consult with an outside expert before finalizing the decision.[88]

262.    In addition, as recently as January 20, 2017, the DOS issued a Fact Sheet that makes clear that the reality of the refugee screening process was, is, and continues to be the complete opposite of what Defendant Trump has claimed:

*No traveler to the United States is subject to more rigorous security screening than the refugees the U.S. Government considers for admission.* Only after the U.S. Government's rigorous and lengthy security screening process has been

---

[88] *Id.*

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

completed and an applicant is not found to pose a threat does the U.S. Government grant that individual refugee admission to the U.S. Security screening of all refugees involves multiple U.S. agencies, including the Departments of State, Homeland Security (DHS), and Defense, the Federal Bureau of Investigation, The National Counterterrorism Center, the Terrorist Screening Center, and two federal intelligence agencies.[89]

263. Finally, the Open Letter from the more than 130 foreign policy and national security experts affirms:

Refugees are vetted more intensively than any other category of traveler. They are screened by national intelligence agencies and INTERPOL, their fingerprints and other biometric data are checked against terrorist and criminal databases, and they are interviewed several times. These processes undergo review on an ongoing basis to ensure that the most updated and rigorous measures are applied, and any additional enhancements can be added without halting refugee resettlement or banning people from certain countries.[90]

264. A person who is granted refugee status in the United States can petition to have their spouse and children join them. However, the family members are subject to a lengthy screening process that includes, *inter alia*,[91] confirming the beneficiary's identity and relationship to the petitioner in the United States, the collection of fingerprint scans, medical examinations, and interviews. *See infra* ¶ 274. The required medical clearances have a limited shelf life and expire after six months, so if travel is not scheduled within six months of receiving medical clearance, medical clearance must be obtained again.[92]

265. The existing refugee admissions process is stringent, robust, lengthy, and rigorous. Extreme vetting is already in place.

266. Flailing for additional support for the misguided suspension of refugee travel into the United States, Section 1(h) of EO-2 includes two curious anecdotes from 2013 and 2014. The

---

[89] *See supra* note 82 (emphasis added).

[90] Ex. O, Open Letter at 1.

[91] Follow-to-Join Refugees and Asylees, U.S. Dep't of State, http://bit.ly/2ivGXwP (last visited Nov. 4, 2017).

[92] 9 FAM 302.2-3(C) (U) Validity Period of an Applicant's Medical Examination for Immigrant Visa Applicants, U.S. Dep't of State (Aug. 4, 2017), http://bit.ly/2A75hfA (last visited Nov. 4, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 69

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

first situation was one that was specifically addressed by the previous administration.[93] The second situation involved a refugee brought to this country as a child refugee and radicalized years after he had arrived, only amplifying the finding in the March 1, 2017 Intelligence Assessment that most foreign-born, US-based violent extremists are radicalized years after entering the United States, calling into question the effectiveness of the refugee travel ban in EO-2.[94]

267.     Section 1(h) of EO-2 also claims that more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation. But according to a Washington Post article:

> [O]fficials familiar with the list say that at least 70 percent of the people under review are from countries not targeted by the new travel ban. More than half are or were at one time Iraqi nationals. Officials familiar with the data said roughly two-thirds of the people on the administration's tally also arrived seven or more years ago, before the government significantly tightened its vetting procedures for Iraqis entering the United States.

> Roughly 20 percent of the individuals came to the United States from Somalia, which is covered by the ban. Others hail from a range of countries, including several that the Trump administration has never indicated as a national security threat. For example, there are more nationals from Ethiopia, Uzbekistan and Bosnia that are subjects in counterterrorism investigation than there are from some of the banned countries, such as Yemen, Iran and Libya.

> The list refers to people who are under some form of investigation, but officials familiar with the data cautioned that the classification of those people varies widely from individuals who have aroused serious suspicion to those who might have a relative who is a convicted or suspected terrorist. None of the individuals on the list have been charged with a -terrorism-related crime, and the number of people under investigation by the FBI at any given time fluctuates regularly as investigations are started and concluded.[95]

---

[93] *See supra* note 73.

[94] *See supra* note 78.

[95] Devlin Barrett, Abigail Hauslohner & David Nakamura, *Internal Trump Administration Data Undercuts Travel Ban*, Wash. Post (Mar. 16, 2017), http://wapo.st/2zeYAvm (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

268. Defendant Trump repeatedly demonized Syrian refugees,[96] and made clear his intention to ban them from the country. For example, while on the campaign trail in the fall of 2015, Defendant Trump told a crowd in New Hampshire that Syrian refugees could be a terrorist army in disguise. "Did you ever see a migration like that?" he asked the crowd. "They're all men, and they're all strong-looking guys . . . There are so many men; there aren't that many women."[97] In fact, of the Syrian refugees admitted to the United States since the beginning of that country's conflict, 72% are women and children under age fourteen.[98] Not one to be deterred by facts, Defendant Trump told the crowd that a proposal to accept 200,000 refugees could amount to accepting a "'200,000-man army,'" which "'could be one of the great tactical ploys of all time.'"[99] Of all refugees resettled in the United States in fiscal year 2016, over 72 percent of were women and children.[100]

269. At another campaign event in November 2015, Defendant Trump again brought up Syrian refugees, saying "[w]e don't even know who they are. There's no paperwork. There's no anything. . . . We have no documentation on these people. . . . [Y]ou look at this migration . . . they seem like so many men. They're so strong. They're strong-looking guys. . . . Is this a Trojan Horse?"[101]

---

[96] Jesselyn Cook, *7 Lies Donald Trump Has Spread About Syrian Refugees Entering the U.S.*, Huffington Post (Oct. 20, 2016), http://bit.ly/2lP8FcG (last visited Nov. 4, 2017); Donald J. Trump (@realDonaldTrump), Twitter (Apr. 7, 2016, 7:48 PM), http://bit.ly/29176lp (last visited Nov. 4, 2017).

[97] Jenna Johnson, *Donald Trump: Syrian Refugees Might be a Terrorist Army in Disguise*, Wash. Post (Sept. 30, 2015), http://wapo.st/2yZY0RZ (last visited Nov. 4, 2017).

[98] Jie Zong & Jeanne Batalova, *Syrian Refugees in the United States*, MPI (Jan. 12, 2017), http://bit.ly/2zwm7Zh (last visited Nov. 4, 2017).

[99] *See supra* note 97.

[100] Fact Sheet: Fiscal Year 2016 Refugee Admissions, U.S. Dep't of State (Jan. 20, 2017), http://bit.ly/2j5ZQdy (last visited Nov. 6, 2017).

[101] Michael Patrick Leahy, *Donald Trump Again Vows to 'Bomb the S*** out of ISIS'; Ridicules Weakness of Obama and Clinton*, Breitbart (Nov. 17, 2015), http://bit.ly/2j1zvNI (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

270.     On April 7, 2016, Defendant Trump re-tweeted a graphic from a supporter

showing him stopping and turning away Syrian refugees, telling them "Saudi Arabia has plenty

of room for you."[102]



271.     In line with his rhetoric and on the list of goals of his then-chief strategist,[103]

Section 5(c) of EO-1 indefinitely suspended the admission of Syrian refugees because the "entry

of nationals of Syria as refugees is detrimental to the interests of the United States."

272.     EO-2 removed the provision suspending the admission of Syrian refugees

indefinitely, further demonstrating the farce behind the assertion in EO-1 that their entry was

detrimental to the national interests of the country and highlighting the arbitrary nature in which

Defendants have gone about developing and implementing the Orders.

---

[102] *See supra* note 96.

[103] Z. Byron Wolf, *Steve Bannon's White House Whiteboard Revealed*, CNN (May 3, 2017), http://cnn.it/2pZcUnB (listed and checked off on the whiteboard of Steve Bannon, Trump's chief strategist, is "[s]uspend the Syrian refugee program") (last visited Nov. 4, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 72

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

273.   The October 2017 Agency Memo asserts that additional security measures must be implemented for I-730 follow-to-join spouses and children with no explanation of why the current security measures these family members are already subjected to are inadequate and even though Section 3(a) of EO-4 concluded that "Presidential action to suspend the entry of refugees under the USRAP is not needed at this time to protect the security and interests of the United States and its people."

274.   Admission through the I-730 process requires numerous steps. For example,[104]

1.   **Petition Filing:** An individual (petitioner) who was granted asylum in the United States as a principal asylee or who was resettled to the United States as a principal refugee can file an I-730, Refugee/Asylee Relative Petition, within the first two years of arrival, with the Department of Homeland Security (DHS), U.S. Citizenship and Immigration Services (USCIS), on behalf of his or her spouse and unmarried child(ren) (beneficiary).

2.   **National Visa Center (NVC) Pre-Processing Case Assignment:** If the beneficiary of an approved petition is located overseas, USCIS sends the approved Form I-730 petition to the National Visa Center (NVC).

3.   **Beneficiary Interview:** The beneficiary will be interviewed by either a Department of State consular officer or USCIS officer at a U.S. Embassy or Consulate overseas. This interview will confirm the beneficiary's identity, claimed relationship to the petitioner, and eligibility to travel to the United States. During the interview process, the beneficiary must provide ink-free, digital fingerprint scans. The beneficiary interview requires careful preparation, including having all required original documents available for the interview (*e.g.*, marriage certificate; birth certificate; certified adoption decree; documentation of any legal name change; six photographs of the beneficiary; one or more travel document(s), such as a passport, with a validity date at least six months beyond the beneficiary's intended date of entry into the United States and/or picture identity card; other evidence of relationship between the beneficiary and petitioner such as photographs, available school records, family correspondence, phone bills, documentation demonstrating financial support; other proof that the relationship is genuine).

---

[104] *See supra* note 91.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

4. **Approval to Travel as a Follow-to-Join Refugee or Follow-to-Join Asylee:** The interviewing officer will tell the beneficiary if he or she has been found eligible to travel to the United States.

5. **After Interview Processing:** Some cases require further administrative processing, which takes additional time after the beneficiary's interview. Follow-to-join refugee beneficiaries, for example, undergo post-approval processing to arrange for sponsorship by a voluntary resettlement agency in the United States upon arrival. (NOTE: All follow-to-join refugee beneficiaries are required to have a sponsorship assurance from a resettlement agency before travel to the United States in order to receive refugee benefits.)

6. **Medical Clearance:** Before the issuance of a follow-to-join refugee or asylee boarding foil, every beneficiary, regardless of age, must undergo a medical examination, which must be performed by an authorized panel physician.

7. **Issuance of Boarding Foil and Travel Packet:** An officer will place a boarding foil in the approved beneficiary's passport or other travel document. The beneficiary also will receive a sealed envelope – called a "travel packet" – containing the documents for review by a DHS immigration official when the beneficiary enters the United States.

275.    Finally, Congress enacted section 207 of the INA to require that "[a] spouse or child . . . of any refugee who qualifies for admission under paragraph (1) *shall* . . . be entitled to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible . . . as an immigrant under this chapter." 8 U.S.C. § 1157(c)(2)(A) (emphasis added). The October 2017 Agency Memo is contrary to law.

**F.    President Trump's Continuing Defiance of Court Orders Regarding the Executive Orders and Insistence on His Muslim Travel Ban**

276.    Both this Court and other courts around the country have granted writs of habeas, multiple temporary restraining orders and preliminary injunctions (some nationwide) regarding EO-1 and EO-2. EO-1 has now been rescinded, and EO-2 has expired. But EO-3 and the October 2017 Agency Memo accompanying EO-4 perpetuate the violations: Washington residents who are former refugees still await the arrival of their families who have completed the rigorous

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 74

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

refugee security clearance process and Washington residents who entered the country on single-entry or now expired multiple-entry non-immigrant visas are now stuck inside the country.

277. In addition, Defendants' repeated actions and statements make it far from clear that Defendant Trump will not revert to his original position.

278. Immediately after the first nationwide stay was granted, *see Darweesh v. Trump*, No. 17-480, 2017 WL 388504, at *1 (E.D.N.Y. Jan. 28, 2017), Defendant DHS issued a statement that "President Trump's Executive Orders remain in place—prohibited travel will remain prohibited, and the U.S. government retains its right to revoke visas at any time if required for national security or public safety."[105] And Defendant Trump claimed, "[i]f the ban were announced with a one week notice, the 'bad' would rush into our country during that week. A lot of bad 'dudes' out there!"[106]

279. On January 30, 2017, acting United States Attorney General Sally Yates issued a statement to top lawyers at the U.S. Department of Justice instructing them to not act to enforce EO-1 because she was "not convinced . . . that [EO-1] is lawful."[107] Ms. Yates wrote:

> My responsibility is to ensure that the position of the Department of Justice is not only legally defensible, but is informed by our best view of what the law is after consideration of all the facts. In addition, I am responsible for ensuring that the positions we take in court remain consistent with this institution's solemn obligation to always seek justice and stand for what is right. At present, I am not convinced that the defense of [EO-1] is consistent with these responsibilities nor am I convinced that [EO-1] is lawful.[108]

---

[105] Department of Homeland Security Response to Recent Litigation, Dep't of Homeland Sec. (Jan. 29, 2017), http://bit.ly/2kGuv0R (last visited Nov. 4, 2017).

[106] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 30, 2017, 5:31 AM), http://bit.ly/2iYOW9r (last visited Nov. 4, 2017).

[107] Statement from Sally Yates to the U.S. Department of Justice, N.Y. Times (Jan. 30, 2017), http://nyti.ms/2ivS5d2 (last visited Nov. 4, 2017).

[108] *Id.*

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

280.     Within hours of her issuance of this statement, and its hand-delivery to Defendant Trump, Defendant Trump fired Ms. Yates, calling her statement a "betray[al]."[109]

281.     After this Court issued a Temporary Restraining Order ("TRO") on February 3, 2017, and the Ninth Circuit issued a unanimous decision upholding the TRO on February 9, 2017, Defendants vowed to keep fighting the court orders.

282.     Even more unusual were Defendant Trump's statements on Twitter, which should be "'considered official statements by the President of the United States,'"[110] that followed the District Court and Ninth Circuit's Orders:

- "The opinion of this so-called judge, which essentially takes law-enforcement away from our country, is ridiculous and will be overturned!"[111]

- "What is our country coming to when a judge can halt a Homeland Security travel ban and anyone, even with bad intentions, can come into U.S.?"[112]

- "Because the ban was lifted by a judge, many very bad and dangerous people may be pouring into our country. A terrible decision"[113]

- "Why aren't the lawyers looking at and using the Federal Court decision in Boston, which is at conflict with ridiculous lift ban decision?"[114]

---

[109] Statement on the Appointment of Dana Boente as Acting Attorney General, White House (Jan. 30, 2017), http://bit.ly/2khR7Rp (last visited Nov. 4, 2017).

[110] Aric Jenkins, *Sean Spicer Says President Trump Considers His Tweets 'Official' White House Statements*, Time (June 6, 2017), http://ti.me/2rT57aO (last visited Nov. 4, 2017).

[111] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 5:12 AM), http://bit.ly/2j07iqN (last visited Nov. 4, 2017).

[112] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 12:44 PM), http://bit.ly/2eGVHYb (last visited Nov. 4, 2017).

[113] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 1:44 PM), http://bit.ly/2f3F9tQ (last visited Nov. 4, 2017).

[114] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 3:37 PM), http://bit.ly/2zi9a4m (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

- "The judge opens up our country to potential terrorists and others that do not have our best interests at heart. Bad people are very happy!"[115]

- "Just cannot believe a judge would put our country in such peril. If something happens blame him and court system. People pouring in. Bad!"[116]

- "I have instructed Homeland Security to check people coming into our country VERY CAREFULLY. The courts are making the job very difficult!"[117]

- "SEE YOU IN COURT, THE SECURITY OF OUR NATION IS AT STAKE!"[118]

- "Our legal system is broken! '77% of refugees allowed into U.S. since travel reprieve hail from seven suspect countries.' (WT) [sic] SO DANGEROUS!"[119]

283. The day before the Ninth Circuit issued its ruling, Defendant Trump declared that EO-1 was "'so simple and so beautifully written and so perfectly written'" and cast further aspersions this country's judicial system, stating, "'I don't ever want to call a court biased, so I won't call it biased. And we haven't had a decision yet. But courts seem to be so political and it would be so great for our justice system if they would be able to read a statement and do what's right.'"[120]

284. On February 16, 2017, Defendants filed a supplemental brief regarding review of the Ninth Circuit's decision to deny Defendant's request for a stay of the TRO by the entire panel. Defendants represented that "[r]ather than continuing this litigation, the President intends

[115] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 4, 2017, 4:48 PM), http://bit.ly/2ziNpBo (last visited Nov. 4, 2017).

[116] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 5, 2017, 12:39 PM), http://bit.ly/2kGCibm (last visited Nov. 4, 2017).

[117] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 5, 2017, 12:42 PM), http://bit.ly/2iuW49S (last visited Nov. 4, 2017).

[118] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 9, 2017, 3:35 PM), http://bit.ly/2ks6vKR (last visited Nov. 4, 2017).

[119] Donald J. Trump (@realDonaldTrump), Twitter (Feb. 11, 2017, 4:12 AM), http://bit.ly/2h3Xnfs (last visited Nov. 4, 2017).

[120] Matt Zapotosky & Robert Barnes, *As Judges Weigh Travel Ban, Trump Asserts That Courts Are 'so Political,'* Chi. Trib. (Feb. 8, 2017), http://trib.in/2ivLbEx (last visited Nov. 4, 2017).

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 77

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

in the near future to rescind the Order and replace it with a new, substantially revised Executive Order . . . ."[121]

285.    Yet on that very same day, Defendant Trump directly contradicted the representations made to the Ninth Circuit in the supplemental briefing filed by the United States government on his behalf. During a news conference, Defendant Trump stated: "We're issuing a new executive action next week that will comprehensively protect our country. So we'll be going along the one path and hopefully winning that, at the same time we will be issuing a new and very comprehensive order to protect our people."[122]

286.    Further, on February 21, 2017, senior policy adviser Stephen Miller not only claimed "nothing was wrong with the first executive order" but also revealed that the revised travel ban will have "mostly minor technical differences" from EO-1 and "fundamentally" would be "the same basic policy outcome for the country."[123]

287.    In addition, during White House press briefings on February 21, 22, and 23, 2017, press secretary Sean Spicer stated that Defendant Trump will continue to pursue the case in the Ninth Circuit. In particular, Mr. Spicer stated:

- On February 21, 2017: The President has "made very clear" that there will be a "dual-track system" and is "confident that we're still going to prevail on the case—the merits of the case."[124]

- On February 22, 2017: The President is "fighting this on both fronts, making sure that we keep evolving through the court system on the existing EO," while drafting an additional executive order.[125]

---

[121] Supplemental Brief on *En Banc* Consideration at 4, *State* (9th Cir. Feb. 16, 2017), Dkt. # 154.

[122] Full Transcript: President Donald Trump's News Conference, CNN (Feb. 17, 2017), http://cnn.it/2lY8uHh (last visited Nov. 4, 2017).

[123] *See supra* note 1.

[124] Press Briefing by Press Secretary Sean Spicer, 2/21/17, #13, White House (Feb. 21, 2017), http://bit.ly/2iuhCmM (last visited Nov. 4, 2017).

[125] Press Briefing by Press Secretary Sean Spicer, 2/22/17, #14, White House (Feb. 22, 2017), http://bit.ly/2l0RrDI (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

- On February 23, 2017: "So with respect to the executive order, there are several courts that this is being fought in—10 or so—and we continue to deal with that in all of those venues. And then again, I guess, the only way to say this is, then obviously on the dual-track side we have the additional executive order that we've talked about earlier that will come out and further address the problems. We continue to believe that the issues that we face specifically in the 9th district—9th Circuit, rather, that we will prevail on, on the merits of that. But on the other challenges that have come and the other venues and the others—that we feel equally confident, as we did in Massachusetts and other venues. So it's not a single-track system."[126]

288.    On February 27, 2017, press secretary Spicer reiterated that as to EO-2, "the goal is obviously to maintain the way that we did it the first time."[127]

289.    On March 1, 2017, Vice President Pence stated during an interview on CBS This Morning that "[t]he president is just determined to not only defend the first executive order in the courts, which we continue to believe is fully within his purview and in his presidential authority, but also to take that authority that is undisputed in the law within the executive order."[128]

290.    On June 3, 2017, Defendant Trump repeated his message of the "need to be smart vigilant and tough" and that "[w]e need the Travel Ban as an extra level of safety!"[129]

291.    Two days later, in referencing court decisions regarding EO-1 and EO-2, Defendant Trump again openly and repeatedly emphasized that his orders were, in fact, his travel ban: "the lawyers and the courts can call it whatever they want, but I am calling it what we need and what it is, a TRAVEL BAN!"[130] He also stated, "[t]he Justice Dept. should have stayed with

---

[126] Press Briefing by Press Secretary Sean Spicer, 2/23/17, #15, White House (Feb. 23, 2017), http://bit.ly/2nzNfN4 (last visited Nov. 4, 2017).

[127] Press Briefing by Press Secretary Sean Spicer, 2/27/17, #17, White House (Feb. 27, 2017), http://bit.ly/2ziSd9U (last visited Nov. 4, 2017).

[128] *See supra* note 41.

[129] Donald J. Trump (@realDonaldTrump), Twitter (June 3, 2017, 4:17 PM), http://bit.ly/2lRgyhU (last visited Nov. 4, 2017).

[130] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:25 AM), http://bit.ly/2Ak8f1e (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

the original Travel Ban, not the watered down, politically correct version they submitted to S.C."[131] He then tweeted, "[t]he Justice Dept. should ask for an expedited hearing of the watered down Travel Ban before the Supreme Court - & seek much tougher version!"[132] Defendant Trump concluded with another attack on any court that might dare to disagree with him, claiming "[i]n any event we are EXTREME VETTING people coming into the U.S. in order to help keep our country safe. The courts are slow and political!"[133]

292.  Defendant Trump continued to give life to his campaign of hostility towards Muslims as recently as August 17, 2017. Hours after a deadly terrorist attack in Barcelona, President Trump tweeted, "[s]tudy what General Pershing of the United States did to terrorists when caught. There was no more Radical Islamic Terror for 35 years!"[134] This statement refers to the widely debunked story of General Pershing executing forty-nine out of fifty terrorists with bullets dipped in pigs' blood, leaving the fiftieth person alive to tell the tale.

293.  On September 15, 2017, less than two weeks before issuing EO-3, Defendant Trump tweeted, "[t]he travel ban into the United States should be far larger, tougher and more specific-but stupidly, that would not be politically correct!"[135]

---

[131] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:29 AM), http://bit.ly/2y2nbiW (last visited Nov. 4, 2017).

[132] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:37 AM), http://bit.ly/2hGHz2Z (last visited Nov. 4, 2017).

[133] Donald J. Trump (@realDonaldTrump), Twitter (June 5, 2017, 3:44 AM), http://bit.ly/2yvGGVG (last visited Nov. 4, 2017).

[134] Donald J. Trump (@realDonaldTrump), Twitter (Aug. 17, 2017, 11:45 AM), http://bit.ly/2fO75Fi (last visited Nov. 4, 2017).

[135] Donald J. Trump (@realDonaldTrump), Twitter (Sept. 15, 2017, 3:54 AM), http://bit.ly/2zjLHzQ (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

294.    On the day EO-3 was issued, Defendant Trump stated, "[t]he travel ban: The tougher, the better."[136] He repeated this theme a few days later on September 27, 2017: "I want the toughest travel ban you can have."[137]

295.    Defendants' statements appear to be designed to inflame and incite further animus against persons affected by the ban, and grossly distort and misrepresent the actual process through which Plaintiffs were screened and reviewed before their admittance to the United States was allowed.

296.    Defendants' statements underscore the continued discriminatory motive behind the Orders. And Defendants' statements make it abundantly clear that there is no guarantee that Defendants will not revert to EO-1 at some point in time.

297.    Given the numerous, inconsistent positions Defendants have taken with regard to the Orders over time, individual Plaintiffs and members of the Non-Immigrant Visa Class reasonably fear that, if they attempt to enter or re-enter the United States, they will be denied permission to do so, notwithstanding their previously established lawful presence in the United States and the fact that they have otherwise been deemed appropriate by the United States government for admission.

298.    Because the October 2017 Agency Memo continues the suspension of the USRAP for I-730 follow-to-join derivative refugees and essentially continues to ban refuges from the SAO List Countries, Joseph Doe, Jeffrey Doe, and others similarly situated are left in the exact same purgatory they were in with EO-1 and EO-2.

299.    EO-3 and the October 2017 Agency Memo effectively trap individual plaintiffs and members of the Non-Immigrant Visa Class in the United States, interfere with the relationships of the Non-Immigrant Visa Class as well as the Refugee Class and their family

---

[136] Jeremy Redmon & Kelly Yamanouchi, *Trump Administration Announces New Travel Ban: "The Tougher, the Better,"* AJC, http://on-ajc.com/2zgIZJ9 (last visited Nov. 4, 2017).

[137] Press Briefing: Press Gaggle by President Trump, White House (Sept. 27, 2017), http://bit.ly/2fsswbB (last visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

members, and impose arbitrary and irrational burdens on them that do not serve any valid

governmental interest.

## V. CLASS ACTION ALLEGATIONS

300. Plaintiffs John Doe and Jason Doe bring this action as a class action pursuant to

Fed. R. Civ. P. 23(b)(1) and (b)(2), on their own behalf and on behalf of all other Washington

residents who are nationals of the Designated Countries with non-immigrant visas and who do

not have unexpired multiple-entry visas ("the Non-Immigrant Visa Class").

301. Plaintiffs Joseph Doe and James Doe bring this action as a class action pursuant to

Fed. R. Civ. P. 23(b)(1) and (b)(2), on their own behalf and on behalf of all other refugees,

including those who have since adjusted their status to Lawful Permanent Resident, who now

reside in Washington, and who have filed I-730 applications for their family members ("the I-

730 Follow-To-Join Refugee Class").

302. Plaintiff Jeffrey Doe brings this action as a class action pursuant to Fed. R. Civ. P.

23(b)(1) and (b)(2), on his own behalf and on behalf of all other refugees from the Muslim-

majority countries on the SAO List, including those who have since adjusted their status, who

now reside in Washington, and who await the arrival of their family members who have

completed and cleared their final security screenings ("the SAO List Refugee Class")

(collectively with the I-730 Follow-to-Join Refugee Class, "the Refugee Classes").

303. Upon information and belief, all three Plaintiff Classes are so numerous that

joinder is impracticable. According to the Annual Report of the Visa Office of the DOS, in 2016,

the last year for which data is available, the United States issued over 47,816 non-immigrant

visas to nationals from the Designated Countries.[138] In FY 2016, 84,994 individuals arrived in

the United States as refugees, with 35,237 of those refugees coming from just five of Muslim-

---

[138] Table XVII: Nonimmigrant Visas Issued Fiscal Year 2016, U.S. Dep't of State, http://bit.ly/2h4bAco (last
visited Nov. 4, 2017).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (206) 623-3384

majority countries on the SAO List (*i.e.*, Iran, Iraq, Somalia, and Syria).[139] In fiscal year 2015, 2,035 follow-to-join refugees arrived in the United States.[140] On information and belief, a large number of such persons reside in Washington.[141]

304.    The claims of the Non-Immigrant Visa Class members address common issues of law, including but not limited to whether EO-3 violates their associational, religious exercise, and due process rights under the First and Fifth Amendments; the RFRA; the INA, and the APA. Likewise, the claims of the I-730 Refugee Class as well as the SAO List Refugee Class members address common issues of law, including but not limited to whether the October 2017 Agency Memo violates their associational, religious exercise, and due process rights under the First and Fifth Amendments; the RFRA; the INA, and the APA.

305.    The claims of the Plaintiff Class members concern common issues of fact, including but not limited to the Defendants' alleged animus and whether EO-3 or the October 2017 Agency Memo is being or will be enforced so as to prevent them or their family members from entering the United States from abroad or from re-entering the United States should they choose to leave the United States briefly, even though they would otherwise be admissible.

306.    The claims or defenses of the named Plaintiffs are typical of the claims or defenses of members of each of the Plaintiff Classes.

307.    John Doe and Jason Doe will fairly and adequately protect the interests of the Non-Immigrant Visa Class, Joseph Doe and James Doe will fairly and adequately protect the interests of the I-730 Refugee Class, and Jeffrey Doe will fairly and adequately protect the interests of the SAO List Refugee Class. None of the named Plaintiffs have any interest that is now or may be potentially antagonistic to the interests of the Plaintiff Class they seek to

---

[139] *See supra* note 98.

[140] Annual Flow Report, Refugees and Asylees: 2015 at 3, U.S. Dep't of Homeland Sec. (Nov. 2016), http://bit.ly/2k9eX2u (last visited Nov. 4, 2017).

[141] *Id.* at 4. *See also supra* note 98.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

represent. The attorneys representing the named Plaintiffs include experienced civil rights attorneys and are considered able practitioners in the federal courts and in federal constitutional litigation. These attorneys should be appointed as class counsel.

308.     Defendants have acted, have threatened to act, and will act on grounds generally applicable to all three Plaintiff Classes, thereby making final injunctive and declaratory relief appropriate to the class as a whole. All three Plaintiff Classes may therefore be properly certified under Fed. R. Civ. P. 23(b)(2).

309.     Prosecution of separate actions by individual members of any of the Plaintiff Classes would create the risk of inconsistent or varying adjudications and would establish incompatible standards of conduct for individual members of each Plaintiff Class. All three Plaintiff Classes may therefore be properly certified under Fed. R. Civ. P. 23(b)(1).

## VI.     CAUSES OF ACTION

### COUNT ONE
### FIRST AMENDMENT – ESTABLISHMENT, FREE EXERCISE, SPEECH AND ASSEMBLY CLAUSES
#### (Against All Defendants, Asserted by All Plaintiffs)

310.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

311.     The First Amendment prohibits the establishment of a religion or the prohibition of the free exercise of religion.

312.     EO-3 and the October 2017 Agency Memo violate the Establishment Clause by singling out Muslims for disfavored treatment. They have the purpose and effect of inhibiting religion, and are neither justified by, nor closely fitted to, any compelling governmental interest.

313.     EO-3 and the October 2017 Agency Memo discriminate on the basis of religion and national origin, each a suspect classification, and are not narrowly tailored to serve a compelling governmental interest, and thereby violate the equal protection component of the Due Process Clause.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

314.     EO-3 and the October 2017 Agency Memo constitute an unlawful attempt to discriminate against Muslims and to establish a preference for one religion over another. References in EO-3 and the October 2017 Agency Memo to the Designated and SAO List Countries are transparently a pretext to establish this preference. And the removal of the language prioritizing the admission of refugees of the minority religion of their countries that was in Section 5 of EO-1 from subsequent Orders can erase neither the taint nor the true motivation behind any of the Orders. Singling out Muslims for disfavored treatment and granting special preferences to non-Muslims is neither justified by, nor closely fitted to, any compelling governmental interest.

315.     EO-3 and the October 2017 Agency Memo also violate the rights of Plaintiffs the Episcopal Diocese and CAIR-WA to receive information and speech from, and to associate freely with, refugees who are Muslim or who are from the majority-Muslim Designated and SAO List Countries.

**COUNT TWO**
**RELIGIOUS FREEDOM RESTORATION ACT**
**(Against All Defendants, Asserted by All Plaintiffs except James Doe)**

316.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

317.     Pursuant to the RFRA, 42 U.S.C. § 2000bb-1 *et seq.*, the government "shall not substantially burden a person's exercise of religion" unless it "(1) is in furtherance of a compelling government interest; *and* (2) is the least restrictive means of furthering that compelling governmental interest." *Id.* (emphasis added).

318.     EO-3 and the October 2017 Agency Memo have the effect of imposing a special disability on the basis of religious views or religious status, by withdrawing important immigration benefits principally from Muslims on account of their religion. In doing so, EO-3 and the October 2017 Agency Memo place a substantial burden on Muslims' exercise of religion in a way that is not the least restrictive means of furthering a compelling governmental interest.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

1    319.    Defendants' actions therefore constitute a violation of the RFRA, 42 U.S.C. §

2    2000bb-1 *et seq.*

## COUNT THREE
### FIFTH AMENDMENT – EQUAL PROTECTION
**(Against All Defendants, Asserted by John Doe, Jack Doe, Jason Doe, the Non-Immigrant Visa Class, Jeffrey Doe, and the SAO List Refugee Class)**

320.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

321.    EO-3 and the October 2017 Agency Memo discriminate against Plaintiffs John Doe, Jack Doe, Jason Doe, Jeffrey Doe, and the members of the Non-Immigrant Visa and SAO List Refugee Classes on the basis of their country of origin without sufficient justification and therefore violate the equal protection component of the Due Process Clause of the Fifth Amendment.

322.    EO-3 bars John Doe, Jack Doe, Jason Doe, Jeffrey Doe, and the members of the Non-Immigrant Visa Class from traveling and imposes additional burdens such as requiring them to seek a waiver.

323.    The October 2017 Agency Memo imposes, in effect, yet another ban and additional conditions on refugees like the relatives of Jeffrey Doe and the members of the SAO List Refugee Class.

324.    Additionally, EO-3 and the October 2017 Agency Memo were substantially motivated by animus towards—and have a disparate effect on—Muslims, which also violates the equal protection component of the Due Process Clause of the Fifth Amendment.

## COUNT FOUR
### FIFTH AMENDMENT – PROCEDURAL DUE PROCESS
**(Against All Defendants, Asserted by All Plaintiffs)**

325.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

326.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."

327.    Procedural due process requires that the government be constrained before it acts in a way that deprives individuals of liberty or property interests protected under the Due Process Clause of the Fifth Amendment.

328.    Defendants' actions, as described above, have deprived Plaintiffs of their liberty and/or property interests without notice or opportunity to be heard.

## COUNT FIVE
## FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS
### (Against All Defendants, Asserted by John Doe, Jack Doe, Jason Doe, and the Non-Immigrant Visa Class)

329.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

330.    Plaintiffs John Doe, Jack Doe, Jason Doe, and members of the Non-Immigrant Visa Class have a constitutionally protected, fundamental liberty interest in freedom of movement that encompasses their right to travel abroad.

331.    Plaintiffs John Doe, Jack Doe, Jason Doe, and members of the Non-Immigrant Visa Class have a constitutionally protected, fundamental liberty interest in their family lives.

332.    Defendants' actions, as described above, have denied Plaintiffs John Doe, Jack Doe, Jason Doe, and members of the Non-Immigrant Visa Class the opportunity to travel outside the United States for fear that they will be denied re-entry. Nor can their parents or other close family members visit them here. Such actions, taken pursuant to EO-3 are not justified by a compelling government interest and therefore violate the substantive due process rights guaranteed by the Fifth Amendment to Plaintiffs Jack Doe, Jason Doe, and members of the Non-Immigrant Visa Class.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

**COUNT SIX**
**FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS**
**(Against All Defendants, Asserted by Joseph Doe, James Doe, Jeffrey Doe, the Refugee Classes)**

333.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

334.     Plaintiff Joseph Doe, Jeffrey Doe and members of the I-730 and SAO List Refugee Classes have a constitutionally protected, fundamental liberty interest in their marriage and their family lives.

335.     Defendants' arbitrary suspension of the travel of I-730 follow-to-join and SAO List Countries refugees into the United States violates the substantive due process rights guaranteed by the Fifth Amendment. Defendants' arbitrary suspension of the admissions of I-730 follow-to-join and SAO List Countries refugees has deprived Plaintiffs Joseph Doe, Jeffrey Doe and members of the I-730 and SAO List Refugee Classes of their fundamental right to be with their families and is not justified by a compelling government interest.

**COUNT SEVEN**
**VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT**
**(Against all Defendants, Asserted by John Doe, Jack Doe, Jason Doe, and the Non-Immigrant Visa Class)**

336.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

337.     The formulation of policies pertaining to the entry of aliens is entrusted exclusively to Congress. *Galvan v. Press*, 347 U.S. 522, 531 (1954). Through the enactment of and amendments to the INA, 8 U.S.C. § 1101 *et seq.*, Congress has established an extensive statutory scheme governing the admission and exclusion of aliens. Where Congress has delegated authority to the Executive, that authority remains constrained by the parameters of the INA. Defendants have exceeded the scope of their delegated authority because their actions are contrary to the INA.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

338.     Specifically, INA section 212(a) establishes, in detail, the classes of aliens who are ineligible for visas or admission into the United States, including under "[s]ecurity and related grounds," 8 U.S.C. § 1182(a)(3). INA section 212(a)(3)(C)(iii) prohibits ideological exclusions like those embodied in Defendants' Orders. Namely, an alien may not be excludable or subject to restrictions or conditions on entry "because of the alien's past, current, or expected beliefs, statements, or associations." 8 U.S.C. § 1182(a)(3)(C)(iii).

339.     In enacting this provision of the INA, Congress specifically sought to end a practice of excluding or denying entry to aliens based on their beliefs.

340.     Defendants, in issuing EO-3 have directly contradicted the expressed will of Congress and violated the INA. To the extent that the delegation of authority in INA section 212(f) is viewed as encompassing the authority to violate the expressed will of Congress, it is an unconstitutional delegation of authority.

## COUNT EIGHT
## VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT
### (Against all Defendants, except Defendant Trump, Asserted by Joseph Doe, James Doe, and the I-730 Refugee Class)

341.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

342.     Congress established a statutory entitlement to the admission of spouses and unmarried children under twenty-one years old of refugees in INA section 207(c)(2)(A). 8 U.S.C. § 1157(c)(2)(A).

343.     That statutory provision requires that "[a] spouse or child . . . of any refugee who qualifies for admission under paragraph (1) *shall . . . be entitled* to the same admission status as such refugee if accompanying, or following to join, such refugee and if the spouse or child is admissible . . . as an immigrant under this chapter." *Id.* (emphasis added).

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

344.     Plaintiff Joseph Doe's wife and children, as well as the spouses and children of members of the Refugee Class, have met every requirement to be admitted as immigrants under the INA.

345.     In implementing the October 2017 Agency Memo, which changes the rules after Plaintiffs had met all the requirements of the INA and continues the indefinite suspension of the admissions process for this group of I-730 refugees, Defendants violated the INA.

### COUNT NINE
### ADMINISTRATIVE PROCEDURE ACT—SUBSTANTIVE VIOLATION
#### (Against all Defendants, except Defendant Trump, Asserted by all Plaintiffs)

346.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

347.     Defendants U.S. Department of State, U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Office of the Director of National Intelligence are "agencies" under the APA. *See* 5 U.S.C. § 551(1).

348.     The APA prohibits federal agency action that is "contrary to constitutional right, power, privilege, or immunity," *id.* § 706(2)(B), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." *Id.* § 706(2)(A).

349.     The creation of the administrative rules contained in Sections 1(g) and 2 of EO-3 and the October 2017 Agency Memo was a final agency action subject to the APA.

350.     Additionally, in implementing the aforementioned sections of EO-3 and the October 2017 Agency Memo, Defendants federal agencies and Defendant secretaries and/or directors of those agencies have taken unconstitutional and unlawful action, as alleged in this Complaint, in violation of the APA.

351.     In implementing the aforementioned sections of EO-3 and issuing the October 2017 Agency Memo, Defendants federal agencies and Defendant secretaries and/or directors of those agencies have arbitrarily and capriciously exercised their discretion.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

352.     In implementing the aforementioned sections of EO-3 and issuing the October 2017 Agency Memo, Defendants federal agencies and Defendant secretaries and/or directors of those agencies exceeded their statutory authority.

353.     In implementing the aforementioned sections of EO-3, Defendants federal agencies and Defendant secretaries and/or directors of those agencies engaged in nationality and religion-based discrimination in violation of RFRA.

354.     In addition, the issuance of the October 2017 Agency Memo, an agency action under the APA, is arbitrary and capricious and violated the INA. *See supra* Count Eight.

355.     Finally, in implementing the aforementioned sections of EO-3 and the October 2017 Agency Memo, Defendants' actions as set forth above were arbitrary, capricious, or discriminatory. Defendants have offered no satisfactory explanation for the countries that are or are not included within the scope of EO-3, Nor have Defendants offered any satisfactory explanation for the need for yet another 90-day ban for the SAO List Countries or the suspension of the I-730 admissions process. Meanwhile Defendants are banning millions of people with no connection whatsoever to terrorism and causing harm to Plaintiffs. Accordingly, Defendants have violated the substantive requirements of the APA.

## COUNT TEN
## ADMINISTRATIVE PROCEDURE ACT— PROCEDURAL VIOLATION
### (Against all Defendants, except Defendant Trump, Asserted by All Plaintiffs)

356.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

357.     Defendants U.S. Department of State, U.S. Department of Homeland Security, U.S. Customs and Border Protection, and Office of the Director of National Intelligence are "agencies" under the APA. *See* 5 U.S.C. § 551(1).

358.     Section 553 of the APA, 5 U.S.C. § 553, requires that federal agencies provide notice and comment before issuing substantive rules.

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 91

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

359.   The APA further requires courts to hold unlawful and set aside any agency action taken "without observance of procedure required by law." *Id.* § 706(2)(D).

360.   In implementing the aforementioned sections of EO-3 and the October 2017 Agency Memo, Defendants federal agencies and Defendant secretaries and/or directors of those agencies have altered a substantive rule because they have changed the criteria by which individuals from the Designated Countries and SAO List Countries may enter the United States and entirely banned some refugees altogether, both of which impact substantive rights. Defendants did so without fulfilling the procedural requirements of the APA.

361.   By failing to follow the rulemaking procedures required of them prior to changing the substantive criteria by which individuals from the Designated Countries, SAO List Countries, and I-730 follow-to-join refugees may enter the United States, Defendants federal agencies and Defendant secretaries and/or directors of those agencies violated the APA.

362.   These violations continue to cause ongoing harm to Plaintiffs.

**PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners pray that this Court grant the following relief:

1.   A determination that the Individual Plaintiffs' claims may properly be maintained as a class action pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2);

2.   A declaration that Sections 3(c), 5(a)-(c), and 5(e) of EO-1, Sections 1(f), 2(c), and 6(a) of EO-2, Sections 2(a)-(c), (e), and (g)-(h) of EO-3, and the October 2017 Agency Memo implementing EO-4 violate the rights of all Plaintiffs as well as members of the Non-Immigrant Visa Class and the Refugee Classes for the reasons set forth above.

3.   A declaration that Sections 2(a)-(c), (e), and (g)-(h) of EO-3 and the manner in which they as well as EO-4 will be implemented are in violation of the rights of all Plaintiffs as well as members of the Non-Immigrant Visa Class and the Refugee Classes for the reasons set forth above.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (˙206) 623-3384

1

        4.      An injunction that the Orders may not be enforced as against Plaintiffs or

2

members of the Non-Immigrant Visa Class or the Refugee Classes in connection with their entry

3

or re-entry into the United States;

4

        5.       A permanent injunction of the Orders as contrary to the Constitution;

5

        6.      An award to the Plaintiffs as well as members of the Non-Immigrant Visa Class

6

and the Refugee Classes of reasonable costs and attorneys' fees; and,

7

        7.      Such other and further relief that this Court may deem fit and proper.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (`206) 623-3384

DATED this 6th day of November, 2017.

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION

By: /s/ Emily Chiang
    /s/ Lisa Nowlin
    EMILY CHIANG, WSBA # 50517
    Lisa Nowlin, WSBA # 51512
    901 Fifth Avenue, Suite 630
    Seattle, WA 98164
    Telephone: (206) 624-2184
    Email: echiang@aclu-wa.org
           lnowlin@aclu-wa.org

***Attorney for Plaintiffs***

KELLER ROHRBACK L.L.P.

By: /s/ Lynn Lincoln Sarko
By: /s/ Tana Lin
By: /s/ Amy Williams-Derry
By: /s/ Derek W. Loeser
By: /s/ Alison S. Gaffney

    Lynn Lincoln Sarko, WSBA # 16569
    Tana Lin, WSBA # 35271
    Amy Williams-Derry, WSBA # 28711
    Derek W. Loeser, WSBA # 24274
    Alison S. Gaffney, WSBA # 45565
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101
    Telephone: (206) 623-1900
    Facsimile: (206) 623-3384
    Email: lsarko@kellerrohrback.com
          tlin@kellerrohrback.com
          awilliams-derry@kellerrohrback.com
          dloeser@kellerrohrback.com
          agaffney@kellerrohrback.com

By: /s/ Laurie B. Ashton

    Laurie B. Ashton (admitted *pro hac vice*)
    3101 North Central Avenue, Suite 1400
    Phoenix, AZ 85012-2600
    Telephone: (602) 248-0088
    Facsimile: (602) 248-2822
    Email: lashton@kellerrohrback.com

By: /s/ Alison Chase

    Alison Chase (admitted *pro hac vice*)
    1129 State Street, Suite 8
    Santa Barbara, CA 93101
    Telephone: (805) 456-1496
    Facsimile: (805) 456-1497
    Email: achase@kellerrohrback.com

***Attorneys for Plaintiffs/Cooperating
Attorneys for the American Civil Liberties
Union Of Washington Foundation***

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 94

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2017, I electronically filed the foregoing Third Amended Class Action Complaint for Declaratory and Injunctive Relief with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses on the Court's Electronic Mail Notice List.

DATED this 6th day of November, 2017.

KELLER ROHRBACK L.L.P.


By: /s/ Tana Lin

Tana Lin, WSBA # 35271
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email: tlin@kellerrohrback.com

***Attorney for Plaintiffs/Cooperating Attorney for the American Civil Liberties Union Of Washington Foundation***

THIRD AMENDED CLASS
ACTION COMPLAINT
PAGE 95

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION
901 Fifth Avenue, Suite 630
Seattle, Washington 98164
TELEPHONE: (206) 624-2184

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
TELEPHONE: (206) 623-1900
FACSIMILE: (´206) 623-3384