The Honorable James L. Robart

1
2
3
4
5
6
7          UNITED STATES DISTRICT COURT
8          WESTERN DISTRICT OF WASHINGTON
                    AT SEATTLE
9
10   JOHN DOE, et al.,                        **Civil Action No. 2:17-cv-00178JLR**
11                  Plaintiffs,
12          v.
13   DONALD TRUMP, et al.,
14                  Defendants.
15   JEWISH FAMILY SERVICE OF              **Civil Action No. 2:17-cv-01707JLR**
16   SEATTLE, et al.,
17                  Plaintiffs,            **DEFENDANTS' OPPOSITION TO**
                                           ***JEWISH FAMILY SERVICE***
18          v.                             **PLAINTIFFS' MOTION FOR**
                                           **PRELIMINARY INJUNCTION AND**
19   DONALD TRUMP, et al.,                 **RESPONSE TO SUPPLEMENTAL**
                                           **STATEMENTS FILED IN BOTH**
20                  Defendants.            **CASES**
21
22
23
24
25
26

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 3

STANDARD OF REVIEW ............................................................................................ 5

ARGUMENT ................................................................................................................. 5

I.      PLAINTIFFS' CHALLENGES ARE NOT JUSTICIABLE ................................ 5

      A.     The Individual Plaintiffs Lack Article III Standing .............................. 5

      B.     The Organizational Plaintiffs Lack Article III Standing ....................... 8

      C.     Plaintiffs' Claims Are Barred By Principles Of Nonreviewability ................... 10

           1.     Plaintiffs' Statutory Claims Are Not Reviewable ................................ 10

           2.     Plaintiffs' Establishment Clause Claim Is Likewise Not Reviewable ........................................................................................ 12

      D.     Plaintiffs Cannot Otherwise Proceed Under The APA ........................ 14

II.     PLAINTIFFS' CLAIMS ARE NOT LIKELY TO SUCCEED ON THE MERITS ..... 15

      A.     The Joint Memorandum's SAO Provision Does Not Violate The APA Or INA ............................................................................................ 16

           1.     The Government May Temporarily Prioritize Admission Resources While Conducting A Threat Analysis ................................ 16

           2.     Plaintiffs Cannot Show An APA Procedural Violation ........................ 18

           3.     The Joint Memorandum's SAO Provision Is Neither Arbitrary Nor Capricious ........................................................................................ 20

           4.     The Joint Memorandum's SAO Provision Is Consistent With The INA ............................................................................................... 22

      B.     The Joint Memorandum Does Not Violate the Establishment Clause ............. 24

           1.     The Joint Memorandum Is Valid Under *Mandel* ................................ 24

           2.     Plaintiffs' Claims Fail Even Apart From The *Mandel* Standard ........... 25

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - i
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

III.   THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF ............. 27

IV.   A GLOBAL INJUNCTION WOULD BE INAPPROPRIATE ..................................... 28

CONCLUSION .................................................................................................................... 29

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - ii
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

**INTRODUCTION**

Plaintiffs ask the Court to preliminarily enjoin two provisions of a Joint Memorandum issued by multiple Cabinet Secretaries regarding the operation of the U.S. Refugee Admissions Program (USRAP).[1]  First, Plaintiffs challenge the joint determination by the Secretaries of State and Homeland Security and Director of National Intelligence that a further review is needed of eleven countries of origin for which certain refugee applicants are currently subject to Security Advisory Opinions (SAOs).  During this review (scheduled to last 90 days), the agencies will "temporarily prioritize refugee applications from other non-SAO countries," but will also consider for admission those from SAO countries on a case-by-case basis.  Joint Mem. at 2; Joint Mem. Addendum at 3-4.  Second, Plaintiffs seek to enjoin a provision regarding following-to-join refugees.  Such refugee applicants are not currently subject to the same screening and vetting procedures as other refugee applicants.  To ensure the security and welfare of the United States, the Secretaries directed their agencies to implement screening procedures for following-to-join refugees that are similar to those already used for principal refugees.  During this implementation period, while the Departments of Homeland Security and State and their vetting partners make the necessary operational changes, following-to-join refugees processed at most locations will not be admitted to the United States.  Admissions will resume once the procedures are in place.

As a preliminary matter, the Court should not even consider Plaintiffs' motion at this time. In two orders issued simultaneously on December 4, 2017, the Supreme Court stayed injunctions against enforcement of the "Presidential Proclamation Enhancing Vetting Capabilities for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats" (hereafter "Proclamation").[2]  Lower courts had enjoined enforcement of the Proclamation based

---

[1] *See* Joint Memorandum to the President from the Secretary of State, Acting Secretary of Homeland Security, and Director of National Intelligence (Oct. 23, 2017) (ECF No. 43-1 (Exhibit B)) [hereafter "Joint Mem."].  Except where otherwise noted, docket numbers refer to pre-consolidation filings in the *Jewish Family Service* case, No. 2:17-cv-1707 (JLR).

[2] *See* Order, *Trump v. IRAP*, No. 17A560, 2017 WL 5987435 (U.S. Dec. 4, 2017); Order, *Trump v. Hawaii*, No. 17A550, 2017 WL 5987406 (U.S. Dec. 4, 2017).

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 1
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

on some of the same claims that Plaintiffs raise with respect to the Joint Memorandum. As the Government will explain more fully in a supplemental brief to be filed on December 11, 2017 (pursuant to this Court's Order), just as the Supreme Court concluded that the Government may enforce the Proclamation, the Court would very likely conclude that the Government may enforce the challenged provisions of the Joint Memorandum as well.

Apart from this recent Supreme Court guidance, Plaintiffs' claims fail because they are not justiciable. Plaintiffs fail to satisfy threshold Article III requirements. Further, based on fundamental principles of non-reviewability, Plaintiffs cannot pursue their statutory claims. The Plaintiffs who are aliens outside the United States lack constitutional rights under the Establishment Clause, whereas the Plaintiffs located in the United States have not alleged cognizable violations of their individual constitutional rights. Moreover, Plaintiffs cannot proceed under the Administrative Procedure Act (APA) because the Joint Memorandum is not final agency action, and the decision to admit refugees is committed to agency discretion.

Even if Plaintiffs could overcome these jurisdictional hurdles, their claims fail on the merits. With respect to the SAO provision (and not the following-to-join provision), Plaintiffs argue that the Government lacks authority to implement that provision, that the provision violates the APA because it needed to undergo notice-and-comment rulemaking and is arbitrary and capricious, and that the provision conflicts with the Immigration and Nationality Act (INA). But Plaintiffs ignore the wide discretion Congress vested in the Government over admission of refugees and misunderstand the INA. Also, notice-and-comment rulemaking was not necessary because the SAO provision is a procedural rule and falls within the APA's foreign affairs exception, and Plaintiffs cannot show that the Cabinet Secretaries acted arbitrarily and capriciously in deciding to temporarily prioritize resources for non-SAO countries while they "conduct a detailed threat analysis" of SAO countries for 90 days "to determine what additional safeguards, if any, are necessary" to protect national security and the welfare of the United States. Joint Mem. at 2. Plaintiffs also bring an Establishment Clause claim, arguing that both the SAO

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 2
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

provision and following-to-join provision are unconstitutional. But that constitutional claim is governed by, and fails under, *Kleindienst v. Mandel*, 408 U.S. 753 (1972), as the Joint Memorandum's national-security foundation is plainly "facially legitimate and bona fide." *Id.* at 770. And because the operative policy here is the Joint Memorandum, the relevant decisionmakers are the Secretaries of State and Homeland Security and the Director of National Intelligence. Plaintiffs have not alleged—much less demonstrated—that these decisionmakers were motivated by animus in deciding to implement the Joint Memorandum.

## BACKGROUND

Section 6(a) of Executive Order No. 13,780, titled *Protecting the Nation from Foreign Terrorist Entry into the United States* ("EO-2"), directed the Secretaries of State and Homeland Security to suspend travel of refugees and decisions on refugee applications under the USRAP, pending a review of existing procedures. *See* 82 Fed. Reg. 13,209, 13,215 (Mar. 6, 2017). This suspension was necessary to allow the Secretaries, in consultation with the Director of National Intelligence, to "determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States." EO-2 § 6(a). During this suspension period, the agencies identified multiple ways to enhance the refugee vetting process, and began implementing some of those improvements. This review and implementation process proceeded in parallel with, and drew upon, a broader review of the visa admission process also prescribed by EO-2. *See* Joint Mem. at 1.

Section 6(a) also provided that, at the conclusion of the review period, refugee travel and USRAP adjudications would resume for stateless persons and nationals of countries for which the officials "determined that the additional procedures implemented . . . are adequate to ensure" national security and the welfare of the United States. On October 23, 2017, the Secretaries advised the President, through a Joint Memorandum, that the improvements to the USRAP vetting process were sufficient to allow the general resumption of that program, subject to conditions.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 3
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Plaintiffs seek to enjoin two conditions here. They first challenge the Secretaries' determination that further review is needed for eleven countries of origin for which certain refugee applicants are subject to SAOs because those countries were found, as of 2015, to pose an elevated national-security risk to the United States. *See* Joint Mem. at 2; Joint Mem. Addendum at 3-4. During this 90-day review period, the agencies will "temporarily prioritize refugee applications from other non-SAO countries," for whom processing may not require as many resources. Joint Mem. at 2; Joint Mem. Addendum at 3-4. Applicants from the eleven countries may still be considered for admission on a case-by-case basis. Joint Mem. at 2; Joint Mem. Addendum at 3.

Plaintiffs also challenge the Joint Memorandum's provision that addresses the different screening procedures currently applied to most "following-to-join" refugee applicants, eligible family members of a "principal" refugee who has already resettled in the United States. *See* Joint Mem. at 2-3. As the Joint Memorandum explains, most following-to-join refugee applicants do not currently undergo the same security procedures as principal refugees or accompanying derivative refugees (who are typically processed at the same time and location as the principal). *See* Joint Mem. at 2-3 & n.1 (explaining these divergent procedures); *see also Doe v. Trump*, No. 2:17-cv-00178 (W.D. Wash.), ECF Nos. 51 at 6, 51–1 ¶¶ 3, 12-15. The Secretaries determined that it is necessary to "implement adequate screening mechanisms for following-to-join refugees that are similar to the processes employed for principal refugees, in order to ensure the security and welfare of the United States." Joint Mem. at 3; *see also* Joint Mem. Addendum at 4 (describing some of the additional security measures to be implemented). These officials further determined that following-to-join refugees should not be admitted to the United States until the additional screening procedures are in place. Joint Mem. at 3. The agencies are working expeditiously to implement the additional screening procedures. *See* Joint Mem. Addendum at 4.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 4
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Once these procedures are in place, admissions of following-to-join refugees will resume worldwide. *See* Joint Mem. at 3.[3]

Following receipt of the Joint Memorandum, on October 24 the President issued Executive Order No. 13,815, *Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities*, 82 Fed. Reg. 50,055 (Oct. 24, 2017). The President acknowledged the Secretaries' joint determination that the USRAP may resume and that they will apply "special measures" to certain categories of refugee applicants, and therefore the worldwide suspension directed by EO-2 is no longer required. *See id.* §§ 2(a), (c). Going forward, the President directed the Secretaries of State and Homeland Security to exercise their statutory authority to "continue to assess and address any risks posed by particular refugees," *id.* § 3(a), including by terminating actions taken to address these risks when appropriate, *id.* § 3(a)(ii).

Plaintiffs now move to enjoin enforcement of the Joint Memorandum, claiming that the SAO provision violates the APA and is *ultra vires*, and that the SAO and following-to-join provisions violate the First Amendment's Establishment Clause.

## STANDARD OF REVIEW

Plaintiffs must show that they are "likely to succeed on the merits," that they are likely to "suffer irreparable harm in the absence of preliminary relief," that the "balance of equities" tips in their favor, and that "an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

## I. PLAINTIFFS' CHALLENGES ARE NOT JUSTICIABLE

### A. The Individual Plaintiffs Lack Article III Standing

To satisfy Article III's standing requirements, "a plaintiff must show (1) it has suffered an 'injury in fact'[;] . . . (2) the injury is fairly traceable to the challenged action of the defendant;

---

[3] As noted below, following-to-join refugee applicants processed at resettlement support centers in Kenya and Thailand are unaffected by the implementation period, as adequate review mechanisms are already in place in those countries.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 5
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). The related doctrine of ripeness rejects as nonjusticiable claims that "rest[] upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Plaintiffs' challenges to the Joint Memorandum are premature. With respect to the following-to-join provision, only two of the individual Plaintiffs—Afkab Hussein and John Doe 7—describe family members who are awaiting travel as following-to-join refugees. But Hussein's challenge fails at the outset, because his family members appear to be located in Kenya. *See* Decl. of Afkab Mohamed Hussein in Support of Pls.' Mot., ECF No. 48 ¶¶ 3, 10-11. As the Government explained in *Doe v. Trump*, Kenya is one of two countries in which screening procedures are already in place to ensure that following-to-join and principal refugees receive comparable scrutiny. *See* Decl. of Jennifer B. Higgins, No. 2:17-cv-00178 (W.D. Wash.), ECF No. 51–1 ¶ 11 (explaining that the Government is issuing travel authorizations for following-to-join refugees who have been processed by resettlement support centers in Kenya and Thailand, subject to other restrictions on refugee admissions). Hussein's family members are apparently unaffected by the following-to-join implementation period, and Hussein thus lacks standing to challenge it. As for John Doe 7, his son has been waiting to travel since November 2016, months before the first refugee-related executive order took effect. Decl. of John Doe #7, ECF No. 58 ¶ 4. It would be speculative to infer that the following-to-join implementation period is the source of any further delay in John Doe 7's son's travel, and "speculation is not enough to sustain Article III standing," *Finkelman v. NFL*, 810 F.3d 187, 200 (3d Cir. 2016).

With respect to the SAO provision, Plaintiffs' claims are again speculative. Even if one or more of the identified refugee applicants were on the brink of traveling to the United States, it is not obvious that the SAO provision would stand in their way, given its allowance for case-by-

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 6
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

case admission.  *See* Joint Mem. at 2.[4]  Moreover, it is doubtful that these applicants are on the brink of travel such that the 90-day SAO review period will have any concrete impact on them. Afkab Hussein, for example, merely states that his wife and son have completed "several stages" of the following-to-join screening process.  ECF No. 48 ¶ 17.  John Doe 1 applied for admission through the Direct Access Program in 2014 and claims he is in the "end stage of processing," but he recently had problems with his passport.  Decl. of John Doe #1 in Supp. of Pls.' Mot., ECF No. 52 ¶¶ 2, 15-16.  John Doe 2 was still awaiting security checks as of earlier this year, while Jane Doe 5 has been awaiting such checks since 2016.  *Compare* Decl. of John Doe #2 in Supp. of Pls.' Mot., ECF No. 53 ¶ 9, *with* Decl. of Jane Doe #5 in Supp. of Pls.' Mot., ECF No. 56 ¶ 7. Jane Doe 4 only completed her International Organization for Migration and U.S. Citizenship and Immigration Services ("USCIS") interviews in September.  Decl. of Jane Doe #4 in Supp. of Pls.' Mot., ECF No. 55 ¶ 5.  And as noted above, John Doe 7's son has been waiting to travel since November 2016.  ECF No. 58 ¶ 4.[5]  With nothing more than speculation that the SAO provision may adversely affect them (as opposed to the many known and incommensurable delays that are

---

[4] For instance, Joseph Doe's contention that his children should be exempt from the SAO provision misses the mark.  *See Doe* Pls.' Notice Joining the Mot. for Prelim. Inj. in *Jewish Family Service of Seattle v. Trump*, *Doe v. Trump*, No. 2:17-cv-00178JLR (W.D. Wash.), ECF No. 62 ("*Doe* Notice").  The Joint Memorandum continues to allow admission of SAO nationals during the 90-day review period on a case-by-case basis.  Joint Mem. at 2.  Joseph Doe has not shown that his children cannot qualify for this exception.

[5] The *Doe* Plaintiffs have named an additional party, Jeffrey Doe, who joins the *Jewish Family Service* Plaintiffs in challenging the SAO provision.  *See Doe* Notice at 4.  Jeffrey Doe has not submitted a declaration, but the *Doe* Plaintiffs allege that Jeffrey's parents and siblings applied for refugee status back in 2005 and received an initial approval letter from USCIS in 2006. *See* Third Am. Compl. ¶ 89, *Doe v. Trump*, No. 2:17-cv-00178JLR (W.D. Wash.), ECF No. 42. The family members have been assured by the Episcopal Diocese of Olympia since September 2015, and their most recent medical examinations have expired.  In light of these allegations, there is no reason to believe Jeffrey Doe's family members are on the brink of travel.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 7
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

part and parcel of the ordinary refugee admissions process), Plaintiffs have not alleged an injury that is fairly traceable to the Joint Memorandum and ripe for judicial redress.[6]

**B.      The Organizational Plaintiffs Lack Article III Standing**

The organizational Plaintiffs, Jewish Family Service of Seattle (JFS-S) and Jewish Family Services of Silicon Valley (JFS-SV), allege that they have been injured by the Joint Memorandum because the challenged provisions force them to "divert significant resources away from [their] core mission" and may lead to a loss of funding should the organizations fail to resettle as many clients as they had anticipated.  Mot. for Prelim. Inj. at 12, ECF No. 42 ("Pls.' Br."); *see also* Pls.' Notice Joining the Mot. for Prelim. Inj. in *Doe v. Trump* at 3, ECF No. 70 ("*JFS* Notice") (similar).

In support of these allegations, Plaintiffs cite *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).  But *Havens Realty* involved a narrow type of injury in which the plaintiff organization itself had a statutory right to truthful housing information, *see id.* at 373, and the defendants' "racially discriminatory steering practices" made it impossible for the organization to fulfill its mission, *id.* at 379.  By its own terms, *Havens Realty* does not satisfy Article III's requirement of an injury in fact any time there is "a setback to the organization's abstract social interests," *id. See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) ("An organization suing on its own behalf can establish injury when it suffered 'both a diversion of its resources and a frustration of its mission.'  It cannot manufacture the injury by . . . simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." (citations omitted)); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (rejecting plaintiff's theory of organizational standing based on allocation of resources to regulatory comments, congressional testimony, and litigation).

The organizational Plaintiffs' allegations concerning diversion of resources are the types of abstract or self-inflicted harms that do not suffice for standing under *Havens Realty* and its

---

[6] Several of the Plaintiffs describe a kind of stigmatic injury associated with what they perceive as anti-Muslim sentiment.  This misguided theory is discussed in Part I.C.2, *infra*.

progeny or Article III. Plaintiffs have not shown that the Joint Memorandum impairs their core mission. The challenged provisions do not suspend refugee admissions; on the contrary, Executive Order No. 13,815 largely *resumed* the USRAP, subject to conditions for applicants of special concern. Although those conditions may temporarily alter which individuals are resettled as refugees, those conditions do not limit or otherwise restrict the overall *number* of individuals who may be resettled as refugees. Moreover, the Government has long used nationality-based distinctions in implementing the USRAP and prioritizing certain applicants. *See* Part II.A.1, *infra*.

Thus, nothing in the Joint Memorandum prevents JFS-S and JFS-SV from fulfilling their missions. Rather, they may continue to do so by aiding the resettlement of refugees. Indeed, these organizations already fulfill their missions by representing such clients who are unaffected by the challenged provisions. *See* Decl. of Rabbi Will Berkovitz, ECF No. 50 ¶¶ 24, 26 (79 of 133 JFS-S clients are from non-SAO countries, and only 2% of JFS-S resettlements in fiscal year 2016 were following-to-join refugees); Decl. of Mindy Berkowitz, ECF No. 51 ¶ 32 (19 of 42 JFS-SV clients are from non-SAO countries). These organizations do not explain how policies that may temporally alter which individuals are resettled as refugees—but do not suspend the USRAP—impair the organizations' missions in any meaningful way. Nor do they explain why they are likely to suffer financial losses when nothing in the Joint Memorandum prevents them from assisting with resettling refugees who are unaffected by the Joint Memorandum. Assuming *arguendo* that the organizations have a protected interest in the admission of refugees generally, they cite nothing giving them an interest in the admission of particular refugees, and they therefore do not plausibly allege that the Joint Memorandum has injured them.[7]

---

[7] Apart from their defective claims of injury in their own right, JFS-S and JFS-SV purport to represent the interests of their third-party clients. Pls.' Br. at 13. But third-party standing is unavailable where, as here, the third party has itself suffered no injury.

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

**C.      Plaintiffs' Claims Are Barred By Principles Of Nonreviewability**

**1.      Plaintiffs' Statutory Claims Are Not Reviewable**

Plaintiffs' statutory claims, which concern only the Joint Memorandum's SAO provision (not the following-to-join provision), are not subject to judicial review.  The Supreme Court has long recognized that "the power to . . . exclude aliens" is a "fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted).  "[I]t is not within the province of any court, *unless expressly authorized by law*, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (emphasis added)).  Courts have distilled from these longstanding principles that the denial or revocation of a visa for an alien abroad "is not subject to judicial review . . . unless Congress says otherwise."  *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999); *see also Doan v. INS*, 160 F.3d 508, 509 (8th Cir. 1998) ("Administrative decisions excluding aliens are not subject to judicial review unless there is a clear grant of authority by statute.").  Courts refer to this rule as the "doctrine of consular nonreviewability," *Saavedra Bruno*, 197 F.3d at 1159, but the short-hand label merely reflects the context in which the principle most often arises—in challenges to decisions by consular officials adjudicating visa applications.   The principle underlying the doctrine applies regardless of the manner in which the Executive Branch denies entry to an alien abroad, including a refugee applicant.  *See Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1506 (11th Cir. 1992) (per curiam).  It would make no sense to bar review of consular or immigration officers' case-specific determinations while permitting review of Cabinet Secretaries' determinations (such as the Joint Memorandum's SAO and following-to-join provisions) that are grounded in sensitive national-security judgments and that are applied by lower-level officials in reviewing individual visa or refugee applications.

Plaintiffs have identified no statute that authorizes judicial review here.  The statute authorizing refugee admissions—8 U.S.C. § 1157—says nothing about judicial review.  It simply

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 10
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

provides, in relevant part, that the "Attorney General may, in the Attorney General's discretion . . . admit any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible . . . as an immigrant."  8 U.S.C. § 1157(c)(1);[8] *see also Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1506 (11th Cir. 1992) (per curiam) ("Contrary to the extensive procedures provided for with regard to aliens within the United States, 8 U.S.C. § 1157, which applies to refugees seeking admission from outside the United States, makes no provision for judicial review.").

Nor is the APA any help to Plaintiffs here.  The APA does not apply "to the extent that . . . statutes preclude judicial review," 5 U.S.C. § 701(a)(1), a determination that turns not only on the statute's express language but also on the "structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984).  Moreover, Section 702 of the APA includes a proviso that preserves "other limitations on judicial review" that predated the APA.  *See Saavedra Bruno*, 197 F.3d at 1158.  Here, the conclusion is "unmistakable" from history that "the immigration laws 'preclude judicial review' of [] consular visa decisions," *id*. at 1160, and the same is true of refugee determinations, *see Haitian Refugee Ctr.*, 953 F.2d at 1506.  At a minimum, the general rule of "nonreviewability . . . represents one of the 'limitations on judicial review' unaffected by § 702's opening clause[.]" *Saavedra Bruno*, 197 F.3d at 1160.

Indeed, when the Supreme Court held that aliens physically present in the United States— but not aliens abroad—could seek review of their exclusion orders under the APA, *see Brownell v. Tom We Shung*, 352 U.S. 180, 184-86 (1956), Congress responded by abrogating that ruling. *See* Act of Sept. 26, 1961, Pub. L. No. 87-301, § 5(a), 75 Stat. 650, 651-53; *Saavedra Bruno*, 197 F.3d at 1157-62 (recounting history).  The House Report accompanying the abrogating statute explained that APA suits would "give recognition to a fallacious doctrine that an alien has a 'right' to enter this country which he may litigate in the courts of the United States against the U.S.

---

[8] This discretion now rests with the Secretary of Homeland Security.  *See* 6 U.S.C. § 557.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 11
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

Government as a defendant." H.R. Rep. No. 87-1086, at 33 (1961). Because an alien present in the United States cannot invoke the APA to obtain review of an exclusion order, then *a fortiori* neither can aliens abroad or U.S. persons acting on their behalf. And because Congress has generally foreclosed judicial review of visa revocations, *see* 8 U.S.C. § 1201(i), it is implausible that Congress would permit review of Executive decisions to restrict entry in the first instance. Significantly, Plaintiffs have identified no precedent holding that policies excluding or prioritizing admission for particular categories of refugees are judicially reviewable.

### 2. Plaintiffs' Establishment Clause Claim Is Likewise Not Reviewable

The Supreme Court has twice engaged in limited review of constitutional claims involving the exclusion of an alien abroad, but only when a U.S. citizen alleged a violation of that citizen's own constitutional rights. In *Kleindienst v. Mandel*, the Court reviewed a claim that the denial of a waiver of visa-ineligibility to a Belgian national violated U.S. citizens' First Amendment rights to receive information. 408 U.S. at 756-59, 762-70. As the Court explained, the alien could not seek review because he "had no constitutional right of entry to this country." *Id*. at 762. The Court addressed only the claim of U.S. citizens that the alien's exclusion violated their own rights, and then concluded that when the Executive exercises its authority to exclude an alien "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion" nor balance it against constitutional claims of others. *Id*. at 770. In *Kerry v. Din*, the Court rejected a claim by a U.S. citizen that the refusal of a visa to her husband violated her own due-process rights. 135 S. Ct. 2128, 2131 (2015) (opinion of Scalia, J.); *id*. at 2139 (Kennedy, J., concurring in the judgment). Limited review was available in each case only because the plaintiffs asserted violations of their own constitutional rights as U.S. citizens.[9]

The individual Plaintiffs' claimed constitutional injuries are not cognizable. Of the eleven named Plaintiffs here, four (John Does 1–2, Jane Does 4–5) are prospective refugees located

---

[9] Although the Ninth Circuit previously suggested in dicta that states might have standing to assert "potential claims regarding possible due process rights" of various groups including refugees, *Washington v. Trump*, 847 F.3d 1151, 1166 (9th Cir. 2017) (per curiam), *cert. denied*

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 12

*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

overseas who cannot assert constitutional claims. *Mandel*, 408 U.S. at 762 ("It is clear that . . . an unadmitted and nonresident alien[] ha[s] no constitutional right of entry to this country as a nonimmigrant or otherwise."). Though the remaining Plaintiffs may reside stateside, the Joint Memorandum concerns the processing of refugees located abroad, not U.S. persons. In *McGowan v. Maryland*, 366 U.S. 420, 429-30 (1961), the Supreme Court held that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own rights. The Court concluded that the plaintiffs, employees of a store subject to a State's Sunday-closing law, lacked standing to challenge that law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms." *Id.* at 429. Similarly, in *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 15-18 & n.8 (2004), *abrogated in part on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Court held that a non-custodial parent could not challenge recitation of the Pledge of Allegiance at his daughter's school because his "standing derive[d] entirely from his relationship with his daughter," not from a violation of his own rights. Likewise here, in challenging the application of the Joint Memorandum to family members overseas, Plaintiffs are not asserting violations of their own rights. They are instead seeking to advance the interests of third parties who have not entered the United States and who themselves have no right to entry under our Constitution. Because Plaintiffs are not asserting any violations of their own constitutional rights, Plaintiffs cannot benefit from the limited review afforded in *Mandel* and the *Din* concurrence.

The stateside Plaintiffs also claim that the Joint Memorandum contains an anti-Muslim sentiment that results in stigmatization. But the Joint Memorandum says nothing about religion,

---

*sub nom. Golden v. Washington*, No. 17-5424, 2017 WL 3224674 (Nov. 13, 2017) (mem.), that passing observation cannot be squared with *Mandel*'s demarcation between a constitutional claim by an alien abroad (unreviewable) and a constitutional claim by a U.S. person (potentially reviewable, provided the person alleges a violation of his/her individual rights). *See also Trump v. IRAP*, 137 S. Ct. 2080, 2088 (2017) ("An unadmitted and nonresident alien has no constitutional right of entry to this country." (alterations omitted) (quoting *Mandel*, 408 U.S. at 762)).

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 13
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

and it certainly does not single out Plaintiffs or other U.S. persons similarly situated to them. While a plaintiff may suffer a "spiritual" injury from the violation of his or her own rights when he or she is "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them," *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 n.22 (1982), Plaintiffs allege no such requirements or pressures here. In analogous cases arising under the Equal Protection Clause, the Supreme Court has "ma[de] clear" that "the stigmatizing injury often caused by [invidious] discrimination . . . accords a basis for standing *only* to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984) (emphasis added) (citation omitted), *abrogated in part on other grounds by Lexmark Int'l*, 134 S. Ct. 1377. The same rule applies to Establishment Clause claims: "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not the type of "personal injury" that supports standing to sue, "even though the disagreement is phrased in [Establishment Clause] terms." *Valley Forge*, 454 U.S. at 485-86; *see also In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008) (an Establishment Clause plaintiff may not "re-characterize[]" an abstract injury flowing from "government *action*" directed against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff). Since no Plaintiff has alleged a cognizable violation of his or her own constitutional rights, the doctrine of nonreviewability controls, and the Court should decline to consider Plaintiffs' claims.

## D.     Plaintiffs Cannot Otherwise Proceed Under The APA

Plaintiffs also cannot proceed under the APA because the challenged provisions are not final agency action. Finality is a prerequisite to judicial review under the APA. *See* 5 U.S.C. § 704. Two conditions must be satisfied before agency action will be deemed sufficiently final: "First, the action must mark the consummation of the agency's decisionmaking process . . . . And second, the action must be one by which rights or obligations have been determined, or from

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 14
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

1    which legal consequences will flow." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,

2    543 F.3d 586, 591 (9th Cir. 2008) (citation omitted).

3           Even if Plaintiffs could show that the Joint Memorandum satisfies the first requirement

4    for finality, they cannot establish the second requirement because neither the SAO provision nor

5    the following-to-join implementation period determine rights or obligations or prescribe legal

6    consequences.  The provisions do not deprive Plaintiffs or their family members of the opportunity

7    to obtain refugee status.  At most, the provisions may delay their admission if they are otherwise

8    eligible.  But a processing delay by itself does not alter a refugee's "legal situation," and thus

9    these provisions are not final agency action.  *See Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*,

10   861 F.3d 944, 952 (9th Cir. 2017) (issuance of pilot program report was not final agency action;

11   though it was the "final step in completing the pilot program," clearing the way for permitting of

12   certain carriers, it "did not change the legal situation," as agency retained discretion over

13   whether/when to issue permits).

14          Finally, the admission of refugees is committed to agency discretion by law.  *See* 8 U.S.C.

15   § 1157(c)(1) ("[T]he [Secretary of Homeland Security] *may*, *in the [Secretary's] discretion* and

16   pursuant to such regulations as the [Secretary] may prescribe, admit any refugee . . . ." (emphasis

17   added)); *Haig v. Agee,* 453 U.S. 280, 294 n.26 (1981) ("'may' expressly recognizes substantial

18   discretion"); *see also* Part II.A.1, *infra*.  For that separate reason, Plaintiffs' APA claims are

19   foreclosed.  *See* 5 U.S.C. § 701(a) ("This chapter applies . . . except to the extent that . . . (2)

20   agency action is committed to agency discretion by law.").

21   **II.      PLAINTIFFS' CLAIMS ARE NOT LIKELY TO SUCCEED ON THE MERITS**

22          While Plaintiffs' motion challenges both provisions of the Joint Memorandum, they press

23   four claims against only the SAO provision, and not the following-to-join provision.  Specifically,

24   they argue that the Government lacks authority to implement the SAO provision, that the

25   provision violates the APA because it needed to undergo notice-and-comment rulemaking and is

26   arbitrary and capricious, and that the provision conflicts with the INA.  Plaintiffs also bring an

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 15
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Establishment Clause claim, arguing that both the SAO provision and following-to-join provision are unconstitutional. Each argument fails on the merits.[10]

### A. The Joint Memorandum's SAO Provision Does Not Violate The APA Or INA

#### 1. The Government May Temporarily Prioritize Admission Resources While Conducting A Threat Analysis

Contrary to Plaintiffs' suggestion, the SAO provision plainly lies within the Government's discretion over refugee processing and prioritization. DHS is responsible for "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States." 6 U.S.C. § 202(4). Authority over entry into the United States necessarily encompasses authority to restrict entry. *See Stephenson v. Shalala*, 87 F.3d 350, 354 (9th Cir. 1996) ("Normally, we defer to an executive agency's expert interpretation of its enabling legislation when the agency's view is reasonable and consistent with the statute's plain language, whether or not we would have made the same decision were we standing in the agency's shoes."). Further, the INA expressly provides that the Secretary of Homeland Security "*may, in the [Secretary's] discretion* and pursuant to such regulations as the [Secretary] may prescribe, admit any refugee." 8 U.S.C. § 1157(c)(1) (emphasis added). Congress plainly vested "discretion" in the Secretary to admit refugees. *See Alaka v. Attorney Gen. of U.S.*, 456 F.3d 88, 97 (3d Cir. 2006) ("Congress knows how to specify discretion and has done so repeatedly in other provisions of the INA.") (citation omitted). And the statute provides that refugees "may" be admitted—not that they must—and does not demand that the Government make a decision on a specific timeframe. *See Haig*, 453 U.S. at 294 n.26 ("'may' expressly recognizes substantial discretion"). Refugee resettlement is thus an act of discretion, not an entitlement. *See I.N.S. v. Stevic*, 467 U.S. 407, 426 (1984) (recounting legislative history of Refugee Act of 1980,

---

[10] To the extent Plaintiffs cross-reference statutory and due process arguments concerning the following-to-join provision as raised by plaintiffs in the related case of *Doe, et al. v. Trump, et al.*, No. 2:17-cv-00178 (W.D. Wash.), the Government likewise incorporates by reference its prior response to those arguments, *see* ECF No. 51 at 12-21.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 16
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

explaining "[i]t was plainly recognized, however, that merely because an individual or group of refugees comes within the definition will not guarantee resettlement in the United States." (citation omitted)); *cf.* 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States, if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law."). The discretion to decide who "may" be admitted logically includes the ability to temporarily prioritize processing of applications from non-SAO countries while assessing, for "the security and welfare of the United States," whether additional safeguards are necessary for applicants from SAO countries. Joint Mem. at 2.

Indeed, the Government routinely grants *preferences* on the basis of nationality. The refugee program employs a priority system to determine which individuals are of special humanitarian concern for purposes of access to the program. The Government regularly relies on nationality to make priority designations, such as when it created a program for at-risk children from certain Central American countries.[11] Indeed, the Priority 2 and Priority 3 designations illustrate the many ways in which nationality is considered in refugee processing and prioritization.[12] Plaintiffs' argument would mean that the Government lacks the discretion to make such distinctions, contrary to the agencies' longstanding implementation of the USRAP.[13]

---

[11] *See* USCIS, *In-Country Refugee/Parole Processing for Minors in Honduras, El Salvador and Guatemala (Central American Minors – CAM)* (Aug. 16, 2017), https://www.uscis.gov/CAM.

[12] *See* Report to Congress from the President, *Proposed Refugee Admissions for Fiscal Year 2018*, at 10-11, 13 (2017), https://www.state.gov/documents/organization/274857.pdf.

[13] Plaintiffs apparently read Section 1157(c)(1) to require the agency to promulgate a regulation each time it exercises its discretion. *See* Pls.' Br. at 19. But the INA simply says that the Government *may* prescribe regulations, not that it *must* do so each time it exercises its discretion. Indeed, the preferences reflected in the Central America Minors program and Priority 2 and Priority 3 designations are not memorialized in regulations. The notion that an agency must exercise its congressionally delegated powers through APA rulemaking is belied by the vast body of agency guidance that is promulgated informally. *See* Andrew J. Wistrich, *The Evolving Temporality of Lawmaking*, 44 Conn. L. Rev. 737, 788-89 (2012) ("The volume of formal legislative rules promulgated by administrative agencies is dwarfed by the even larger amount of

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 17

*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

### 2. Plaintiffs Cannot Show An APA Procedural Violation

The notice-and-comment procedures of the APA do not apply to the Joint Memorandum's SAO provision for two separate reasons. First, the APA explicitly exempts "rules of agency organization, procedure, or practice" from its procedural requirements. 5 U.S.C. § 553(b)(3)(A). Unlike legislative (or substantive) rules, which "create law" by, for example, establishing or altering substantive standards, procedural rules involve "technical regulation of the form of agency action and proceedings." *S. Cal. Edison Co. v. FERC*, 770 F.2d 779, 783 (9th Cir. 1985). The procedural rule exemption "covers agency actions that do not themselves alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994) (citation omitted). In addition, "[a] procedural rule does not become substantive merely because it has a substantive impact," such as "by denying parties the opportunity to appeal if they fail to comply with certain procedures." *United States v. Gonzales & Gonzales Bonds & Ins. Agency, Inc.*, 728 F. Supp. 2d 1077, 1084 (N.D. Cal. 2010) (citing *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 (9th Cir. 1992)). As long as a rule does not change substantive standards, it may qualify as procedural. *See, e.g.*, *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 317 (D.C. Cir. 2000) (concluding rule was procedural where it "did not alter the substantive criteria by which [the agency] would approve or deny proposed labels," but rather, "simply changed the procedures [the agency] would follow in applying those substantive standards"); *Gonzales*, 728 F. Supp. 2d at 1084 ("[C]hanges in the timing, requirements or manner in which an application or petition is made are generally considered procedural changes.").

The SAO provision is a procedural rule. It does not change the substantive criteria for determining whether an applicant can be admitted to the United States as a refugee. Instead, it prioritizes on a temporary basis applications from non-SAO countries while the agencies "conduct a detailed threat analysis" "to determine what additional safeguards, if any, are necessary to ensure

informal regulations, guidelines, policy statements, letter rulings, and the like. Most agencies issue such materials, and their quantity is staggering." (footnotes omitted)).

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 18
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

that the admission of refugees from these countries of concern does not pose a threat to the security and welfare of the United States."  Joint Mem. at 2.  Even after the review is complete, the same *substantive* criteria for refugee admissions will apply as before, but potentially subject to additional *procedures* identified during the review.  *See* 8 U.S.C. §§ 1157(c), 1182(a).

Similar agency decisions to suspend the processing of applications while the agency considers or implements changes to rules or processes have been held to be procedural in nature and thus exempt from notice-and-comment rulemaking.  *E.g.*, *Waste Mgmt., Inc. v. U.S. EPA.*, 669 F. Supp. 536, 538-40 (D.D.C. 1987) (deferring consideration of applications for ocean incineration permits until the agency promulgated new rules on the topic); *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 636-38 (D.D.C. 1984) (deciding to "freeze" processing of certain applications for television translator licenses).  As in those cases, the Joint Memorandum does not change the substantive criteria by which applications would ultimately be assessed but at most merely alters the agencies' "method of operations" or "change[s their] procedures."  *Waste Mgmt.*, 669 F. Supp. at 540; *see also Buckeye Cablevision, Inc. v. United States*, 438 F.2d 948, 953 (6th Cir. 1971) (upholding processing freeze adopted without notice and comment as a procedural rule); *Kessler v. FCC*, 326 F.2d 673, 681-82 (D.C. Cir. 1963) (same).  As such, the SAO provision is a procedural rule exempt from notice-and-comment rulemaking.

Second, the SAO provision is exempt from notice-and-comment rulemaking because it falls within the APA's foreign affairs exception.  The APA provides that notice-and-comment procedures do not apply to regulations involving "a military or foreign affairs function of the United States."  5 U.S.C. § 553(a)(1).  "For the exception to apply, the public rulemaking provisions should provoke definitely undesirable international consequences."  *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980).

The consequences that would follow from notice-and-comment procedures here have already been held to trigger the exception in an analogous case.  In *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008), the Second Circuit reviewed the National Security Entry-Exit

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 19
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Registration System, a program devised after September 11th that required registration for certain individuals from specific countries. In doing so, that court held that the Government's notices that designated the countries whose nationals were subject to the program fell within the APA's foreign affairs exception, explaining that the "relevance to international relations [was] facially plain" and "at least three definitely undesirable international consequences" were "evident." *Id.* The same consequences would result here. First, in "explaining why some of a particular nation's citizens are regarded as a threat," notice-and-comment rulemaking "might" result in "sensitive foreign intelligence. . . be[ing] revealed." *Id.* Second, "relations with other countries might be impaired" if the Government "were to conduct and resolve a public debate over why some citizens of particular countries were a potential danger." *Id.* And third, "the process would be slow and cumbersome, diminishing" the Government's ability to understand and protect against "a potential attack by foreign terrorists." *Id.* Thus, the foreign affairs exception applies. *See also Yassini*, 618 F.2d at 1361 (holding that INS regulation directed at Iranian nationals "fell within the foreign affairs . . . exception[] to the notice and comment requirements of the APA").

### 3. The Joint Memorandum's SAO Provision Is Neither Arbitrary Nor Capricious

Plaintiffs' argument that the SAO provision is arbitrary and capricious likewise fails. Review under the APA's arbitrary and capricious standard is "narrow," *Arrington v. Daniels*, 516 F.3d 1106, 1112-13 (9th Cir. 2008), and "highly deferential," *Crickon v. Thomas*, 579 F.3d 978, 982 (9th Cir. 2009). A court must "presum[e] the agency action to be valid and affirm[] . . . if a reasonable basis exists for [the agency's] decision." *Id.* (citation omitted). A reasonable basis exists so long as "the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Id.* (citation omitted). The agency's decision "need only be a reasonable, not the best or most reasonable, decision." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted). A court, moreover, may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 20
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

Recognizing that "more than 300 persons who entered the United States as refugees are currently the subjects of counterterrorism investigations by the Federal Bureau of Investigation," EO-2 § 1(h), the agencies conducted an interagency review to identify multiple ways to enhance the refugee vetting process and began implementing those improvements. Joint Mem. Addendum at 1. In the Joint Memorandum, the officials advised the President that the improvements to the USRAP vetting process are sufficient to allow the general resumption of that program, but that they "continue to have concerns" about the admission of refugees from SAO countries, which were "previously identified as posing a higher risk to the United States." Joint Mem. at 2. To address these concerns, the officials decided to "conduct a detailed threat analysis" of the SAO countries "to determine what additional safeguards, if any, are necessary to ensure that the admission of refugees from these countries of concern does not pose a threat to the security and welfare of the United States." *Id.* "This review will be tailored to each SAO country, and decisions may be made for each country independently." Joint Mem. Addendum at 3. While performing this review, the agencies will temporarily prioritize refugee applications from non-SAO countries, but will also consider for admission those from SAO countries on a case-by-case basis. Joint Mem. at 2; Joint Mem. Addendum at 3-4.

Plaintiffs challenge the decision to temporarily prioritize non-SAO countries by characterizing the Joint Memorandum as raising "unspecified concerns" and suggesting that the Cabinet Secretaries have had enough time to conduct a review. Pls.' Br. at 18 (citation omitted). But their argument ignores that the Cabinet Secretaries' national security judgment is entitled to extreme deference, *see Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) (judicial review "in an area at the intersection of national security, foreign policy, and administrative law[] is extremely deferential"); that the agencies performed a worldwide review of the USRAP and implemented improvements to the vetting process; and that this review was the basis for the SAO provision. Joint Mem. Addendum at 1. Moreover, the Joint Memorandum provides at least as much specificity as the SAO list, and thus finding the SAO provision to be

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 21
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

arbitrary and capricious could cast doubt on the SAO list itself, despite that the Government has used such a list since the September 11th attacks. The Cabinet Secretaries' decision to temporarily prioritize refugee applications from non-SAO countries while they conduct this review is neither arbitrary nor capricious. Joint Mem. at 2; Addendum at 3-4; *see Neighborhood TV Co.*, 742 F.2d at 639 (concluding agency's decision to "freeze" processing of certain applications for licenses while it engaged in rulemaking was reasonable because it "ensure[d] that . . . interim licensing did not frustrate the ends of the rules ultimately adopted"); *Waste Mgmt., Inc.*, 669 F. Supp. at 542-43 ("An agency in the process of writing new regulations on a topic as sensitive as ocean incineration of hazardous waste cannot be faulted for maintaining the *status quo* [by not issuing new operating permits] until it is satisfied that the incineration can proceed as safely as possible.").

### 4.    The Joint Memorandum's SAO Provision Is Consistent With The INA

Plaintiffs argue that the SAO provision "fundamentally conflicts" with the INA because it "rewrite[s]" the definition of "refugee" found in 8 U.S.C. § 1101(a)(42), and "impermissibly alters admissibility standards" set out in 8 U.S.C. § 1182(a). Pls.' Br. at 21. Section 1101(a)(42) simply defines the term "refugee," and Section 1182(a) states, in relevant part, that "aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States," 8 U.S.C. § 1182(a). There is no conflict: Congress has set the *minimum* required to gain entry as a refugee, but has still vested the Secretary with complete "discretion" in deciding whether "any refugee" "may" be admitted. 8 U.S.C. § 1157(c)(1); *see also* Part II.A.1, *supra*. There is nothing improper about the Cabinet Secretaries exercising that discretion to temporarily prioritize admissions from non-SAO countries while reviewing whether additional safeguards are necessary for those from countries found to "pose elevated potential risks to national security." Joint Mem. Addendum at 1. And though Plaintiffs apparently fault the SAO provision for allowing admission of refugees from SAO countries on a case-by-case basis, Pls.' Br. at 21, the Government's use of its discretion to provide such a waiver is a *virtue* of the Joint Memorandum. If the agencies have the greater authority to temporarily prioritize

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 22
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

admissions from non-SAO countries (and they do), *see* Part II.A.1, *supra*, that necessarily includes the lesser authority to provide for case-by-case exceptions.  Indeed, waiver provisions are routinely included in Presidential entry restrictions.  *See, e.g.*, Proclamation No. 8693, § 4, 76 Fed. Reg. 44,751 (July 24, 2011); Proclamation No. 8342, § 2, 74 Fed. Reg. 4093 (Jan. 21, 2009); Proclamation No. 6958, § 2, 61 Fed. Reg. 60,007 (Nov. 22, 1996).

Plaintiffs' contrary theory—that the Executive Branch is *precluded* from acting whenever an INA provision addresses the same topic—is ill-suited to the arena of national security and foreign affairs, which involve delicate balancing in the face of changing circumstances, such that the Executive must be permitted to act quickly and flexibly.  *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (discussing the "changeable and explosive nature of contemporary international relations"); *Jama v. ICE*, 543 U.S. 335, 348 (2005).  In this setting, courts typically apply the *opposite* presumption:  courts will not assume Congress's intent to foreclose the President's authority over national security and foreign affairs unless Congress has specifically expressed that intent.  *See Jama*, 543 U.S. at 348 ("To infer an absolute rule . . . where Congress has not clearly set it forth would run counter to our customary policy of deference to the President in matters of foreign affairs."); *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.").  Plaintiffs' interpretation of the INA effectively eliminates the discretion Congress expressly provided the Executive Branch.

### B.    The Joint Memorandum Does Not Violate the Establishment Clause

The Court should not even consider Plaintiffs' Establishment Clause challenge at this time given the Supreme Court's December 4, 2017, orders allowing the Proclamation to take full effect.  As the Government will explain in its forthcoming supplemental brief, the Supreme Court has determined that plaintiffs are not likely to succeed on their Establishment Clause challenge to the Proclamation, and Plaintiffs' Establishment Clause claims here are even weaker because they challenge decisions by the Secretaries, whose integrity has not been questioned.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 23
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

However, if this Court is inclined to reach Plaintiffs' Establishment Clause claims now, then it should deny their request for injunctive relief.

### 1.    The Joint Memorandum Is Valid Under *Mandel*

The Supreme Court has made clear that, "when the Executive exercises" its authority to exclude aliens from the country "on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens. *Mandel*, 408 U.S. at 770. *Mandel* involved a First Amendment speech claim, but courts have applied its test to other constitutional claims as well. *See, e.g.*, *Fiallo*, 430 U.S. at 792-96 (equal protection); *Rajah*, 544 F.3d at 438 (claims alleging discrimination based on "religion, ethnicity, gender, and race"); *Washington v. Trump*, 858 F.3d 1168, 1179-82 (9th Cir. 2017) (Bybee, J., dissenting from denial of reconsideration en banc) (collecting cases). *Mandel*'s rule reflects that the Constitution "exclusively" allocates power over the admission of aliens to the "political branches," *Mandel*, 408 U.S. at 765 (citation omitted), and that aliens abroad have no constitutional rights at all regarding entry into the country. *See Fiallo*, 430 U.S. at 792-96.[14]

*Mandel* compels rejecting Plaintiffs' Establishment Clause claim because the Joint Memorandum provides "facially legitimate and bona fide reason[s]." 408 U.S. at 770. For the following-to-join provision, the Secretaries of State and Homeland Security and the Director of National Intelligence determined that implementation of "adequate screening mechanisms for following-to-join refugees that are similar to the processes employed for principal refugees" is necessary "to ensure the security and welfare of the United States." Joint Mem. at 3. And for the

---

[14] Contrary to Plaintiffs' assertion (Pls.' Br. at 14 n.16), the Ninth Circuit has not rejected *Mandel*'s application to Plaintiffs' Establishment Clause claim. *See Washington*, 847 F.3d at 1168 (per curiam) (expressly "reserv[ing] consideration" of Establishment Clause challenge). Moreover, the Supreme Court applied *Mandel* in *Fiallo v. Bell*, 430 U.S. 787, 792-96 (1977), where it rejected a claim that a statute unconstitutionally discriminated against certain aliens based on their sex and the legitimacy of their children. In doing so, the Court held that it could "see no reason to review the broad congressional policy choice at issue [there] under a more exacting standard than was applied in *Kleindienst v. Mandel*." *Id.* at 795. *Mandel* likewise applies here.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 24

*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

U.S. DEPARTMENT OF JUSTICE
20 Massachusetts Ave., NW
Washington, DC 20530
Tel: (202) 514-3259

SAO provision, the Joint Memorandum explained that after review of the USRAP's vetting procedures, the Cabinet Secretaries "continue to have concerns" about the admission of refugees from SAO countries, which were "previously identified as posing a higher risk to the United States." Joint Mem. at 2. Accordingly, those officials decided to "conduct a detailed threat analysis" of the SAO countries "to determine what additional safeguards, if any, are necessary to ensure that the admission of refugees from these countries of concern does not pose a threat to the security and welfare of the United States." *Id*.

Under *Mandel*'s rational-basis test, *see Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), it is not for Plaintiffs or the Court to second-guess the national-security determinations of these Executive Branch officials. *See, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999) (courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's "reasons for deeming nationals of a particular country a special threat"). Because the Joint Memorandum provides a facially legitimate and bona fide reason for imposing the conditions Plaintiffs challenge, Plaintiffs' constitutional claims fail.

## 2. Plaintiffs' Claims Fail Even Apart From The *Mandel* Standard

Plaintiffs' claims also fail without regard to *Mandel* because the Joint Memorandum is valid under domestic Establishment Clause precedent. The Establishment Clause requires the government to "'pursue a course of neutrality toward religion,' favoring neither one religion over others nor religious adherents collectively over nonadherents." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 696 (1994) (internal citation omitted); *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993). The Joint Memorandum fully comports with that principle. It does not draw "explicit and deliberate distinctions" based on religion. *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982). To the contrary, it is entirely neutral in terms of religion. The Joint Memorandum also was not motivated by a religious purpose. Even in the domestic context, a court deciding whether official action violates the

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 25
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Establishment Clause because of an improper religious purpose looks only to "the 'text, legislative history, and implementation of the statute,' or comparable official act." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 862 (2005). The court is not to engage in "judicial psychoanalysis of a drafter's heart of hearts." *Id.* Rather, it is only an "official objective" of favoring or disfavoring religion that implicates the Clause. *Id.* There is no basis for invalidating the Joint Memorandum under that standard either. The Joint Memorandum's text does not refer to or draw any distinction based on religion. And its "operation," *Lukumi*, 508 U.S. at 535, confirms that it is religion-neutral: it applies regardless of one's religion.

Plaintiffs nevertheless argue that the Joint Memorandum "target[s] . . . primarily majority-Muslim countries." Pls.' Br. at 14, 17. But the following-to-join provision applies worldwide, without regard to nationality or religion. And the list of eleven current SAO countries was not selected based on the religious beliefs of the countries' nationals; rather, the countries were identified in 2015 through interagency consultations as countries that "pose elevated potential risks to national security." Joint Mem. Addendum at 1; *cf. Rajah*, 544 F.3d at 439 (holding that a program regulating aliens from certain countries survived rational-basis review and was not motivated by an improper animus toward Muslims even though all of the selected countries, except North Korea, were predominantly Muslim).

Plaintiffs also rely on past judicial determinations regarding previous Executive Orders that are not at issue here, as well as campaign-trail statements or other remarks that do not address the Joint Memorandum. *See* Pls.' Br. at 14-15. Because none of those decisions or statements address the Joint Memorandum, they are not relevant to the Government's purpose in issuing the Joint Memorandum. Moreover, the relevant decision here is set forth in the Joint Memorandum, which was issued by the Secretaries of State and Homeland Security and the Director of National Intelligence. As the relevant decisionmakers, therefore, it is those officials' purpose and intent that are relevant to the Establishment Clause analysis. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (examining the "decisionmaker's purposes"

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 26
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

in assessing equal protection claim); *Modrovich v. Allegheny County*, 385 F.3d 397, 411-12 (3d Cir. 2004) (concluding that "statements made by other County officials" who were not "the decision-maker for the County with respect to the Plaque" were not relevant to the Establishment Clause purpose analysis). Plaintiffs have not alleged, let alone demonstrated, that the relevant officials here were motivated by a religious purpose or harbored anti-Muslim animus.[15]

Even if the Court were to associate the Cabinet Secretaries' actions here with past decisions or statements by other officials (and it should not), the conclusion is the same: the Joint Memorandum rests on sound constitutional footing. In the context of EO-2's temporary suspension of the refugee program, the district court in *IRAP v. Trump*, 241 F. Supp. 3d 539, 565 (D. Md. 2017), *aff'd in part and vacated in part*, 857 F.3d 554 (4th Cir. 2017), declined to enjoin that provision, holding that there was insufficient evidence of animus connected to the refugee program specifically.[16] Plaintiffs fail to point to anything in the interim to change that conclusion. Moreover, the President in EO-2 expressly disavowed any intent to benefit one religion over another, *see* EO-2 § 1(b)(iv). Plaintiffs' Establishment Clause claim fails.[17]

## III. THE REMAINING FACTORS WEIGH AGAINST INJUNCTIVE RELIEF

Apart from their inability to demonstrate a likelihood of success on the merits, Plaintiffs have not shown that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). They have not established that the Joint Memorandum has caused them an injury *at all*, let alone an irreparable one. Refugees from SAO countries may still qualify

---

[15] Past actions cannot "forever taint" future government efforts. *McCreary*, 545 U.S. at 874. The "specific sequence of events" leading to the issuance of the Joint Memorandum—especially the extensive, multi-agency process and decisions by the Secretaries of State and Homeland Security and Director of National Intelligence—severs any connection between past executive orders' supposed religious purpose and the Joint Memorandum. *Id.* at 866.

[16] *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *vacated as moot*, 874 F.3d 1112 (9th Cir. 2017), did not address whether EO-2's refugee provision violated the Establishment Clause.

[17] Plaintiffs add that the Joint Memorandum "violates the equal protection component of the Due Process Clause." Pls.' Br. at 17 n.17. Issues averred in a perfunctory manner are waived, *see, e.g.*, *Daily v. Astrue*, No. CV-12-00389-JLQ, 2013 WL 5372897, at *5 (E.D. Wash. Sept. 25, 2013). In any event, Plaintiffs cannot show an equal protection violation, *see* Part I.C.2, *supra*.

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION - 27

*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

for admission on a case-by-case basis during the review period, while the following-to-join provision simply prescribes an implementation period to bring screening procedures for following-to-join and principal refugees into parity. At most these provisions *might* delay the entry of *some* refugee applicants, but such delay does not constitute irreparable harm. After all, processing times for refugees can vary widely and on average are quite lengthy. *See* U.S. Dep't of State, *U.S. Refugee Admissions Program*, https://www.state.gov/j/prm/ra/admissions /index.htm. Because Plaintiffs have not shown that the challenged provisions will irreparably harm them, they are not entitled to the extraordinary remedy of preliminary injunctive relief.

Conversely, an injunction would cause direct, irreparable harm to the Government and the public interest. "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (citation omitted). This principle extends naturally to the national-security judgments of Cabinet Secretaries. "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307 (citations omitted). These officials have jointly determined that, with certain exceptions, admitting refugees from SAO countries without conducting a further review of those countries and admitting following-to-join refugee applicants who have not been vetted through screening processes similar to those employed for principal refugees would not be in the nation's best interest. This Court should not second-guess the Secretaries' judgment, particularly in light of the Supreme Court's orders staying injunctions against the Proclamation. These stay orders suggest that a majority of the Justices have concluded that, in this immigration and national-security context, the balance of equities favors the Government.

## IV.     A GLOBAL INJUNCTION WOULD BE INAPPROPRIATE

Even if some relief were appropriate (and it is not), the Court should tailor any remedy to address only the alleged injuries of Plaintiffs who have made an adequate showing to satisfy Article III's justiciability requirements. Article III requires that "a plaintiff must demonstrate

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 28
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). The remedy sought therefore must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Equitable principles likewise require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). Any injunction the Court enters should be limited to relieving whatever irreparable injury the Court concludes one or more named Plaintiffs have suffered or imminently will suffer as a consequence of the challenged provisions.[18]

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.


DATED: December 7, 2017        Respectfully submitted,

       CHAD A. READLER
       Principal Deputy Assistant Attorney General

       JENNIFER D. RICKETTS
       Director, Federal Programs Branch

       JOHN R. TYLER
       Assistant Director, Federal Programs Branch

       */s/ Joseph C. Dugan*
       MICHELLE R. BENNETT
       DANIEL SCHWEI
       KEVIN SNELL
       JOSEPH C. DUGAN
       Trial Attorneys
       U.S. Department of Justice
       Civil Division, Federal Programs Branch
       20 Massachusetts Avenue, NW

---

[18] The *Jewish Family Service* Plaintiffs attempt to justify a "nationwide injunction" by contending that they "hail from all over the country." *JFS* Notice at 3. But Plaintiffs collectively reside in just five states. In any event, Plaintiffs' proposed nationwide injunction is tantamount to an award of classwide injunctive relief, but no class has been certified here. An "injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

Washington, DC 20530
Tel: (202) 514-3259
Fax: (202) 616-8470
Email: joseph.dugan@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 30
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**

## CERTIFICATE OF SERVICE

I certify that on December 7, 2017, a copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

DATED this 7th day of December, 2017.

/s/ Joseph C. Dugan
JOSEPH C. DUGAN

DEFENDANTS' OPPOSITION TO *JEWISH FAMILY SERVICE* PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION - 31
*Jewish Family Service of Seattle, et al. v. Trump, et al.*, No. 2:17-cv-1707 (JLR)

**U.S. DEPARTMENT OF JUSTICE**
**20 Massachusetts Ave., NW**
**Washington, DC 20530**
**Tel: (202) 514-3259**