1

2

3

4

5

6

7        UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF WASHINGTON
8                  AT SEATTLE

9

10   JOHN DOE, et al.,                    CASE NO. C17-0178JLR
                        Plaintiffs,
                                          FINDINGS OF FACT,
11       v.                               CONCLUSIONS OF LAW, AND
                                          ORDER ISSUING A
12   DONALD TRUMP, et al.,                PRELIMINARY INJUNCTION

13                      Defendants.       (RELATING TO BOTH CASES)

14   JEWISH FAMILY SERVICES, et
     al.,                                 CASE NO. C17-1707JLR
15                      Plaintiffs,

16       v.

17   DONALD TRUMP, et al.,
                        Defendants.
18

19              **I.    INTRODUCTION**

20          The work of this court, and more broadly of the federal Judiciary, is to resolve

21   disputes between parties; that is what the court endeavors to do today in ruling on the two

22   motions before it.  Plaintiffs in both cases are refugees, who find themselves in dire

1    circumstances, their family members who yearn to be reunited with them, and

2    humanitarian organizations whose fundamental mission is to help these vulnerable

3    refugees resettle in the United States.  Plaintiffs in both cases present compelling

4    circumstances of irreparable harm inflicted by the federal agencies' action at issue here.

5    Nevertheless, the fundamental question the court must resolve is did the federal agencies

6    act within their legal authority?  If so, the court does not intervene, but leaves the

7    decision to the other two branches of government—Congress and the Executive.  Today,

8    however, the court intervenes and preliminarily enjoins the federal agencies' action.  It

9    does so because, at this early stage in the proceedings, Plaintiffs show that they are likely

10   to succeed on their claims that the agencies exceeded their statutory authority and also

11   that they meet the other qualifying factors necessary for preliminary injunctive relief.

12        One further note:  This is an area of rapidly developing law with related cases

13   presently on appeal and decisions anticipated shortly.[1]  Plaintiffs, however, seek a

14   decision now and are entitled to one given the facts in this case.  In deciding these

15   motions, the court must rely on the precedent currently available to it.  The court

16   understands that appellate courts may issue additional guidance in the days to come.  If

17   the parties believe that the court should revisit any portion of today's decision on the

18   basis of subsequent authority, they should raise this to the court's attention through

19   appropriate motions.  The court now turns to the motions at hand.

20   //

21        [1] Indeed, one such decision was issued last night.  *See Hawaii v. Trump*, No. 17-17168,

22   2017 WL 6547095 (9th Cir. Dec. 22, 2017) ("*Hawaii III*").  The court has reviewed that opinion
     and incorporated it into this decision.

ORDER - 2

1    Before the court are two motions seeking to preliminarily enjoin certain aspects of

2    Executive Order No. 13,815 ("EO-4"), § 3(a), 82 Fed. Reg. 50,055 (Oct. 27, 2017), and

3    its accompanying memorandum to Defendant Donald Trump, President of the United

4    States, from Defendants Rex Tillerson, Secretary of the Department of State ("DOS"),

5    Elaine Duke, Acting Secretary of the Department of Homeland Security ("DHS"), and

6    Daniel Coats, Director of National Intelligence ("DNI") (Lin Decl. (Dkt. # 46) ¶ 3, Ex. B

7    (attaching a copy of the memorandum) (hereinafter, "Agency Memo")).  Plaintiffs John

8    Doe, Jack Doe, Jason Doe, Joseph Doe, James Doe, Jeffrey Doe, the Episcopal Diocese

9    of Olympia, and the Council on American Islamic Relations-Washington (collectively,

10   "Doe Plaintiffs") filed the first motion for a preliminary injunction in *Doe, et al. v.*

11   *Trump, et al.*, No. C17-0178JLR (W.D. Wash.) ("the Doe Case").  (*See* Doe PI Mot.

12   (Dkt. # 45).)  Shortly after Doe Plaintiffs filed their motion, Plaintiffs Jewish Family

13   Service of Seattle ("JFS-S"), Jewish Family Services of Silicon Valley ("JFS-SV"), Allen

14   Vaught, Afkab Mohamed Hussein, John Does 1-3 and 7, and Jane Does 4-6 (collectively,

15   "JFS Plaintiffs") filed a separate action in *JFS-S, et al. v. Trump, et al.*, No. C17-

16   1707JLR (W.D. Wash.) ("the JFS Case") and a second motion for a preliminary

17   injunction.  (*See* JFS Compl. (17-1707 Dkt. # 1); JFS PI Mot. (17-1707 Dkt. # 42).)[2]

18   Recognizing that both cases and motions for preliminary injunction concerned EO-4 and

19   the Agency Memo, the court consolidated the cases.  (*See* OSC re: Consol. (Dkt. # 52);

20

21   ────────────────

       [2] References to docket numbers in this order refer to filings the Doe Case, unless the
22   docket number is preceded by "17-1707."  Docket numbers preceded by "17-1707" refer to
     entries in the JFS Case.

1    Stip. Re: Consol. (Dkt. # 60); Consol. Order (Dkt. # 61).)  Following consolidation, Doe

2    Plaintiffs joined JFS Plaintiffs' motion, and JFS Plaintiffs joined Doe Plaintiffs' motion.

3    (Doe Joinder (Dkt. #62); JFS Joinder (17-1707 Dkt. # 70).)

4            In addition to the parties' briefing (*see* Doe PI Mot.; JFS PI Mot.; Doe Resp. (Dkt.

5    # 51); JFS Resp. (Dkt. # 77); Doe Reply (Dkt. # 54); JFS Reply (Dkt. # 79); Doe Joinder;

6    JFS Joinder ; Doe Supp. Br. (Dkt. # 76); JFS Supp. Br. (Dkt. # 73); Def. Supp. Br. (Dkt.

7    # 78)), the court has considered the relevant portions of the record, and the applicable

8    law.  Further, the court heard oral argument on December 21, 2017.  Being fully advised,

9    the court (1) GRANTS Doe Plaintiffs' motion for a preliminary injunction, and (2)

10   GRANTS JFS Plaintiffs' motion for a preliminary injunction except for those refugees

11   who lack a bona fide relationship with a person or entity in the United States.[3]  *See*

12   *Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080, 2089 (2017)

13   ("*IRAP*").

14   //

15   //

16

17            [3] In accordance with Federal Rules of Civil Procedure 52(a) and 65(d), this order shall
     constitute the court's findings of fact and conclusions of law setting forth the grounds for issuing

18   the preliminary injunction contained herein.  *See* Fed. R. Civ. P. 52(a); Fed. R. Civ. P. 65(d); *see
     also A.H.R. v. Wash. State Health Care Auth.*, No. C15-5701JLR, 2016 WL 98513, at *1 n.4

19   (W.D. Wash. Jan. 7, 2016).  Although the court has not labeled paragraphs specifically as
     findings of fact or conclusions of law, such labels are not necessary.  The nature of the findings

20   and conclusions that follow is apparent.  *See Tri–Tron Int'l v. A.A. Velto*, 525 F.2d 432, 435-36
     (9th Cir. 1975) ("We look at a finding or a conclusion in its true light, regardless of the label that

21   the district court may have placed on it. . . . [T]he findings are sufficient if they permit a clear
     understanding of the basis for the decision of the trial court, irrespective of their mere form or
     arrangement.") (internal citations omitted); *In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th

22   Cir. 1982) ("The fact that a court labels determinations 'Findings of Fact' does not make them so
     if they are in reality conclusions of law.").

## II.    BACKGROUND

**A.    The President's Executive Orders on Immigration and Refugees**

1. EO-1

One week after his inauguration, President Trump issued Executive Order No. 13,769, 82 Fed. Reg. 8,977 (Feb. 1, 2017) ("EO-1"). In addition to suspending the entry of aliens from seven majority-Muslim countries for 90 days, EO-1 suspended the United States Refugee Admission Program ("USRAP") for 120 days and banned the entry of Syrian refugees indefinitely. *Id.* §§ 3(c), 5(a), 5(c). During the 120-day suspension of USRAP, EO-1 directed the Secretaries of DOS and DHS and the DNI to conduct a security review of USRAP. *Id.* § 5(a). In this period, refugees could be admitted on a case-by-case basis only if their admission was "in the national interest," which was defined to include when a person is "a religious minority in his country of nationality facing religious persecution." *Id.* § 5(e). EO-1 further directed that when USRAP resumed, DOS was to "prioritize refugee claims made by individuals on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." *Id.* § 5(b).

On February 3, 2017, this court issued a nationwide temporary restraining order ("TRO") enjoining EO-1, including the suspension of USRAP. *Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *1 (W.D. Wash. Feb. 3, 2017), *stay pending appeal denied*, 847 F.3d 1151 (9th Cir. 2017), *appeal dismissed*, No. 17-35105, 2017 WL 3774041 (9th Cir. Mar. 8, 2017). On appeal, the Ninth Circuit interpreted the court's TRO to be a preliminary injunction and declined the Government's request to stay this

court's order.  *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), *appeal dismissed*, No. 17-35105, 2017 WL 3774041 (9th Cir. Mar. 8, 2017).

 2.  EO-2

 After the Ninth Circuit's ruling, President Trump abandoned his efforts to defend EO-1, and issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (Mar. 9, 2017) ("EO-2").  EO-2 expressly revoked EO-1.  EO-2 § 13.  EO-2 was similar to EO-1 except that it omitted the explicit preference for religious minorities and the indefinite suspension of Syrian refugees.  EO-2 directed another review of USRAP and restarted the 120-day suspension of USRAP during the new review period, subject to case-by-case waivers.  *Id.* §§ 6(a), (c).  EO-2 stated that the suspension of USRAP was necessary to allow the agencies to "determine what additional procedures should be used to ensure that individuals seeking admission as refugees do not pose a threat to the security and welfare of the United States."  *Id.* § 6(a).  EO-2 also stated that at the conclusion of the review period, USRAP adjudications would resume for stateless persons and nationals of countries for which the agencies "determined that the additional procedures implemented . . . [we]re adequate to ensure the security and welfare of the United States."  *Id.*

 Before EO-2 could take effect, a federal district court in Hawaii issued a TRO, holding that EO-2 violated the Establishment Clause.  *See, e.g.*, *Hawaii v. Trump*, 245 F. Supp. 3d 1227, 1230 (D. Haw. 2017), *hearing en banc denied sub nom. Hawaii v. Trump*, 864 F.3d 994 (9th Cir. 2017), *aff'd in part, vacated in part, remanded sub nom. Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, --- U.S. ---, 137 S. Ct. 2080 (2017), *and cert. granted, judgment*

1    *vacated*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017), *and vacated*, 874 F.3d

2    1112 (9th Cir. 2017), *and appeal dismissed as moot sub nom. Hawaii v. Trump*, 874 F.3d

3    1112 (9th Cir. 2017).  The Ninth Circuit upheld the district court's decision on the ground

4    that President Trump failed to invoke the proper authority to suspend refugee admissions.

5    *Hawaii v. Trump*, 859 F.3d 741, 776 (9th Cir. 2017), *cert. granted sub nom. Trump v.*

6    *Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017), *and cert. granted, judgment*

7    *vacated*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017), *and vacated*, 874 F.3d

8    1112 (9th Cir. 2017) ("*Hawaii I*").  In addition, a federal district court in Maryland and

9    the Fourth Circuit Court of Appeals both concluded that EO-2 likely violated the

10   Establishment Clause.  *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539,

11   544 (D. Md. 2017), *aff'd in part, vacated in part*, 857 F.3d 554 (4th Cir. 2017) (en banc),

12   *as amended* (May 31, 2017), *as amended* (June 15, 2017), *cert. granted*, --- U.S. ---, 137

13   S. Ct. 2080 (2017), *and vacated and remanded sub nom. Trump v. Int'l Refugee*

14   *Assistance Project*, --- U.S. ---, 138 S. Ct. 353 (2017).  Pending appeals from both the

15   Ninth and Fourth Circuit Courts of Appeal, the Supreme Court stayed the preliminary

16   injunctions issued by the Maryland and Hawaii district courts—except for foreign

17   nationals and refugees who had a "credible claim of a bona fide relationship with a

18   person or entity in the United States."  *IRAP*, 137 S. Ct. at 2088-89.

19           3.  EO-3

20           While review of EO-2 was pending before the Supreme Court, President Trump

21   replaced those portions of EO-2 that relate to immigrants (and not refugees), with a

22   Presidential Proclamation.  *See* Proclamation No 9,645, 82 Fed. Reg. 45,161 (Sept. 27,

1  2017) ("EO-3").  EO-2's refugee ban was still in effect at the time President Trump

2  issued EO-3.  Federal district judges in Hawaii and Maryland issued preliminarily

3  injunctions blocking implementation of portions of EO-3.  *See Int'l Refugee Assistance*

4  *Project v. Trump*, No. CV TDC-17-0361, 2017 WL 4674314, at *1 (D. Md. Oct. 17,

5  2017), *appeal docketed*, No. 17-2231 (4th Cir. Oct. 20, 2017), *and appeal docketed*, No.

6  17-2240 (4th Cir. Oct. 23, 2017); *Hawaii v. Trump*, No. CV 17-00050 DKW-KSC, 2017

7  WL 4639560, at *1 (D. Haw. Oct. 17, 2017), *appeal docketed*, No. 17168 (9th Cir. Oct.

8  24, 2017).  The Ninth Circuit affirmed the Hawaii district court's ruling in large part, but

9  narrowed the scope of the injunction to give relief only to those with a credible bona fide

10  relationship with the United States, pursuant to the Supreme Court's decision in *IRAP*,

11  137 S. Ct. at 2088.  *See Hawaii III*, 2017 WL 6547095 at * 26.  The ruling from the

12  Maryland federal district court remains on appeal.  The Supreme Court has stayed both

13  preliminary injunctions pending further appeals.  *See Trump v. Int'l Refugee Assistance*

14  *Project*, No. 17A560, 2017 WL 5987435, at *1 (U.S. Dec. 4, 2017); *Trump v. Hawaii*,

15  No. 17A550, 2017 WL 5987406, at *1 (U.S. Dec. 4, 2017).

16         4.  EO-4 and the Agency Memo

17         On October 24, 2017, the same day that EO-2's 120-day refugee ban expired,

18  President Trump issued Executive Order 13,815, 82 Fed. Reg. 50,055 (Oct. 27, 2017)

19  ("EO-4").  EO-4 stated that continued suspension of refugee admission was not

20  necessary, EO-4 § 3(a), and that the Administration had improved USRAP vetting

21  processes so that they were "generally adequate to ensure the security and welfare of the

22  United States," *id*. § 2(a).  Nevertheless, EO-4 directed a continuing risk assessment as to

"[c]ertain [c]ategories of [r]efugees." *Id.* §§ 3(a)(i)-(ii).  The Secretaries of DOS and

DHS and the DNI outlined the risk assessment and the EO-4 categories of refugees in the

Agency Memo, which was dated October 23, 2017, but released on October 24, 2017.[4]

(*See* Lin Decl. ¶ 3, Ex. B (attaching Agency Memo); *see also* Burman Decl. ¶ 3, Ex. B

(attaching Agency Memo).)

Plaintiffs seek to preliminarily enjoin certain provisions of the Agency Memo that

(1) indefinitely suspend "following-to-join" ("FTJ") derivative refugees from entering the

United States, and (2) suspend for at least 90-days the entry of refugees who are

"nationals of, and stateless persons who last habitually resided in, 11 particular countries

previously identified as posing a higher risk to the United States through their designation

on the Security Advisory Opinion ("SAO") list."  (Agency Memo at 2-3; *see generally*

Doe PI Mot.; JFS PI Mot.)

a.   *The FTJ Provisions*

The Agency Memo indefinitely suspends the FTJ process for refugees.[5]  (Agency

Memo at 2-3.)  Approximately 2,500 refugees in the United States are able to reunite

---

[4] An addendum is attached to the Agency Memo, entitled "Addendum to Section 6(a) Memorandum," which refers to the review of USRAP directed by Section 6(a) of EO-2 ("Agency Memo Addendum").  (*See* Burman Decl. (17-1707 Dkt. # 43) ¶ 3, Ex. B.)

[5] Under the INA, subject to numerical limits set annually by the President, the Secretary of DHS may admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under ([8 U.S.C. § 1157(c)(3)]) as an immigrant."  8 U.S.C. § 1157(c)(1).  Refugees admitted under this provision are referred to as "principal refugees."  *See* 8 C.F.R. § 207.7(a).  "Derivative refugees" are the spouses and unmarried minor children of an admitted principal refugee.  *See id.*  When derivative refugees travel to join the principal refugee more than four months after the principal refugee's admission, they are FTJ derivative refugees, rather than "accompanying" derivative refugees.  *See id.*

1    with their immediate family members annually through the FTJ process.  (*Id.* at 2 n.1.)

2    The Agency Memo states that most FTJ refugee applicants do not currently undergo the

3    same security procedures as the principal refugee who has already resettled in the United

4    States.  (*Id.* at 2-3.)  The Secretaries of DOS and DHS and the DNI determined that FTJ

5    refugees should not be admitted to the United States until additional screening procedures

6    are in place.  (*Id.* at 3.)  Although the Agency Memo does not exempt Kenya and

7    Thailand from its application, Defendants state that FTJ refugees processed at

8    resettlement centers in those two countries are not affected by the Agency Memo because

9    "adequate review mechanisms are already in place in those countries."  (JFS Resp. at 5,

10   n.3; *see also* Doe Resp. at 5; Higgins Decl. (Dkt. # 51-1) ¶ 11).)  At oral argument,

11   Defendants clarified that during the Agency Memo's indefinite FTJ suspension, the

12   Government was not just barring entry of FTJ refugees, but had completely stopped

13   processing FTJ refugee applications—except for FTJ refugees who are processed in

14   Thailand or Kenya.

15           *b.  The SAO Provisions*

16           The Agency Memo also suspends for at least 90 days refugee admission of

17   nationals of 11 countries on the SAO list, as well as stateless persons who last resided in

18   those countries.  (*See* Agency Memo at 2.)  The Agency Memo does not identify the

19   countries, but Plaintiffs assert that the countries are Egypt, Iran, Iraq, Libya, Mali,

20   Somalia, Sudan, Syria, and Yemen, as well as North Korea and South Sudan.[6]  (*See* JFS

21   _____

22           [6] At oral argument, Defendants declined to confirm this list of the 11 SAO countries on
     the basis that it was "law enforcement sensitive information."  However, Defendants conceded

1   PI Mot. at 7; *see also* Smith Decl. (17-1707 Dkt. # 44) ¶ 5.)  Countries on the SAO list

2   "have been assessed by the U.S. government to pose elevated potential risks to national

3   security." (Agency Memo Addendum at 1.)  The SAO list for refugees was established

4   after September 11, 2001, and has changed over the years.  (*Id.*)  The most recent list was

5   updated in 2015.  (*Id.*)  USRAP already requires additional screening and procedures for

6   refugees from countries on the SAO list.  (*Id.*)  USRAP subjects these refugees to

7   additional vetting through SAOs, which are "DOS-initiated biographic check[s]

8   conducted by the Federal Bureau of Investigation and intelligence community partners."

9   (*Id.* at 1 n.1.)

10          The Agency Memo requires the agencies to "conduct a review and analysis" of

11   USRAP for refugees from SAO countries for an additional 90 days—notwithstanding the

12   agencies' review of USRAP pursuant to EO-1 and EO-2.  (*See* Agency Memo at 2.)  Like

13   President Trump's prior EOs, the Agency Memo suspends refugee admission from SAO

14   countries unless resettlement "would fulfill critical foreign policy interests, without

15   compromising national security and the welfare of the United States," a determination

16   made on a "case-by-case basis"  (*Id.*)  In addition, the Agency Memo diverts resources

17   dedicated to processing refugees who are citizens of (or stateless persons who last resided

18   in) SAO countries and reallocates those resources to processing refugee applicants from

19   non-SAO countries.  (*Id.*)  During oral argument, Defendants acknowledged that this

20   would impact the pace of processing for SAO refugees.  Thus, even if the SAO

21   _____

22   that the court could "rely on Plaintiffs' allegations for purposes of addressing the issues"
     presented in these motions.

1   suspension is lifted after 90-days, it will have a long-term effect.  "Refugees have only a

2   narrow window of time to complete their travel, as certain security and medical checks

3   expire and must then be re-initiated."  *Hawaii v. Trump*, 871 F.3d 646, 664 (9th Cir.

4   2017) ("*Hawaii II*").  "Even short delays may prolong a refugee's admittance."  *Id.*

5   **B.    Facts Pertaining to Specific Plaintiffs**

6          1.    Joseph Doe

7          Joseph Doe is a plaintiff in the Doe Case.  (*See* Doe TAC (Dkt. # 42) ¶¶ 54-71.)

8   He is from Somalia, was first admitted to the United States in 2014 as a refugee, and

9   became a lawful permanent resident in 2016.  (Joseph Decl. (Dkt. # 47) ¶¶ 2, 9, 11.)

10  Joseph fled Somalia with his family as a young child; he and his family eventually ended

11  up in a refugee camp in Kenya, where Joseph grew up, married, and began his own

12  family.  (*Id.* ¶¶ 3-8.)  Joseph's wife and children were unable to come to the United States

13  with Joseph, remaining in Kenya.  (*Id.* ¶¶ 8-9.)  Joseph filed an I-730 petition to bring his

14  wife and children to the United States as FTJ refugees.  (*Id.* ¶ 10.)  Joseph's wife and

15  children have completed their final interviews, security and medical clearances, received

16  a formal assurance from a refugee resettlement agency, and are on the brink of travel.

17  (*Id.* ¶ 12; Joseph Supp. Decl. (Dkt. # 56) ¶¶ 3-5.)  Yet, Joseph's family has not received

18  permission from DHS to travel.  (Joseph Supp. Decl. ¶ 7.)  Joseph's two youngest

19  children were born in Kenya and have never been to Somalia.  (*Id.* ¶ 9.)  Nevertheless,

20  they are considered to be Somali citizens due to Joseph's nationality.  (*Id.*)  Somalia is an

21  SAO country.  (Smith Decl. ¶ 5.)  Thus, the United States embassy in Somalia informed

22  Joseph that although his wife and oldest step-son, who are both Kenyan citizens, could

obtain permission to travel to the United States, his 4-year-old and 5-year-old sons cannot

because they are considered Somali citizens.  (*See* Joseph Supp. Decl. ¶ 10.)

2.  John Doe 7

John Doe 7 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 20.)  JFS Plaintiffs

base their joinder in the Doe motion for preliminary injunction on facts pertaining to Doe

7.  (JFS Joinder at 1-2.)  Doe 7 is an Iraqi national, who was admitted as a refugee to the

United States in 2014, along with his wife and two children.  (Doe 7 Decl. (17-1707 Dkt.

# 58) ¶ 2.)  He filed an I-720 petition for his 19-year-old son from his first marriage to

join him as an FTJ refugee, which the Government approved.  (*Id.* ¶¶ 3-4.)  His son has

completed his interview and fingerprinting and received a formal assurance from JFS-S

in November 2016.  (*Id.* ¶ 4.)  Since that time, Doe 7's son has been waiting to travel to

the United States.  (*Id.*)

3.  Afkab Mohamed Hussein

Afkab Mohamed Hussein is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 12.)

He is a Somali national, who was admitted to the United States as a refugee in September

2015.  (Hussein Decl. (17-1707 Dkt. # 48) ¶ 1.)  His wife, who was pregnant with their

son at the time, did not travel with Mr. Hussein to the United States.  (*See id.* ¶ 6.)  Mr.

Hussein filed I-720 petitions for his wife and son to join him in the United States as FTJ

refugees, which the Government approved in June 2016.  (*Id.* ¶¶ 10, 16.)  His wife and

son were both born in Kenya but are considered Somali citizens.  (*See id.* ¶¶ 11-12.)

//

//

1     4.  <u>John Doe 1</u>

2         John Doe 1 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 13.)  Doe 1 is an Iraqi

3   former interpreter for the United States military.  (Doe 1 Decl. (17-1707 Dkt. # 52) ¶¶ 1,

4   3.)[7]  Doe 1 and his family were in extreme danger in Iraq due to his work for the United

5   States military.  (*See id.* ¶¶ 3-8.)  As a result, in 2014, he fled Iraq for Cairo, Egypt

6   without his family.  (*Id.* ¶¶ 8-9.)  In September 2014, he applied for refugee status in the

7   United States.  (*Id.* ¶ 12.)  He is currently "in the end stage of processing for refugee

8   admissions."  (*Id.* ¶ 15.)  He was conditionally approved for resettlement in the United

9   States in December 2015, and has received an assurance of sponsorship from a

10  resettlement agency.  (*Id.*)  In early October 2017, the International Organization for

11  Migration ("IOM") told Doe 1 to "get ready to travel to the United States."  (*Id.* ¶ 16.)

12  While he was updating his passport to travel, EO-4 and the Agency Memo went into

13  effect, preventing him from traveling.  (*See id.*)

14    5.  <u>John Does 2 and 3</u>

15        John Doe 2 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 15.)  John Doe 2 is an

16  Iraqi former interpreter for the United States Army.  (Doe 2 Decl. (17-1707 Dkt. # 53)

17  ¶¶ 1, 3.)  In 2010, he came to the United States to complete his PhD.  (*Id.* ¶ 5.)  Upon

18  graduation, he travelled back to Mosul, Iraq without his wife and children who remained

19  in the United States.  (*Id.*)  While he was in Mosul, ISIS seized control of the city, and he

20
21        [7] (*See also* Vaught Decl. (17-1707 Dkt. # 49) ¶¶ 1-24 (describing the declarant's work
    with Doe 1 as an interpreter while the declarant was serving in Falluja, Iraq with the United
    States Army Reserve's Civil Affairs and Psychological Operations Command, his distress in
22  having to leave Doe 1 behind in Iraq, his efforts to assist Doe 1 to resettle in the United States,
    and his objections to EO-4 and the Agency Memo).)

ORDER - 14

1    has been unable to rejoin his family in the United States ever since.  (*Id.* ¶ 6.)  In 2015, he

2    applied for admission to the United States as a refugee.  (*Id.* ¶¶ 7-8.)  He is currently "in

3    the end stage of processing for refugee admissions."  (*Id.* ¶ 9; *see also id.* ¶ 12.)  He was

4    "awaiting security checks and travel booking" when he was informed of the restrictions

5    on refugees that apply to Iraqi nationals in EO-1, EO-2, and EO-4.  (*Id.*)  He has been

6    stranded in Iraq and separated from his family for three years.  (*Id.* ¶ 11.)  One of his

7    children is now married to a lawful permanent resident, and he has two granddaughters

8    who are United States citizens.  (*Id.* ¶ 5.)

9         John Doe 3 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 16.)  He is a lawful

10   permanent resident of the United States and the son-in-law of Doe 2.  (Doe 3 Decl.

11   (17-1707 Dkt. # 54) ¶ 1.)  He is worried about Doe 2's safety.  Doe 2's family in the

12   United States, which consists of his wife, five children, two sons-in-law, and two

13   granddaughters, miss him dearly, rely on him, and want to be reunited with him.  (*Id.*

14   ¶¶ 2, 4-5.)

15        6.   Jane Doe 4

16        Jane Doe 4 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 17.)  Doe 4 is an

17   Egyptian, who has applied for refugee status in the United States.  (Doe 4 Decl. (17-1707

18   Dkt. # 55) ¶¶ 1-2.)  She is a transgender woman who faces extreme harassment and

19   persecution in Egypt because of her gender identity.  (*Id.* ¶ 3; *see also id.* ¶ 6.)  Until the

20   recent restrictions on refugee admissions to the United States, USRAP was processing

21   her refugee application on an expedited basis.  (*Id.* ¶ 5.)

22   *//*

ORDER - 15

7. <u>Jane Does 5 and 6</u>

Jane Doe 5 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 18.)  She is an Iraqi national and waiting to travel to the United States as a refugee.  (Doe 5 Decl. (17-1707 Dkt. # 56) ¶¶ 2-3.)  She hopes to live with her sister who resides in Castle Creek, Utah.  (*Id.* ¶ 2.)  Her mother, father, another sister, and a brother also live in the United States.  (*Id.* ¶ 8.)  In Iraq, Doe 5 works as an interpreter and administrator for American companies.  (*Id.* ¶ 3.)  As a result of her work, she faces danger, threats, and harassment in Iraq.  (*Id.* ¶¶ 3-5)  In November 2015, Doe 5 was kidnapped by Iraqi militants who raped her multiple times and held her for about a month.  (*Id.* ¶ 4.)  When they released her, they told her they would kill her if she continued to work with the Americans.  (*Id.*)  She applied for refugee status in 2012.  (*Id.* ¶ 7.)  She has completed multiple stages of the refugee admissions process and has been awaiting security checks and travel booking since 2016.  (*Id.*)

Jane Doe 6 is a plaintiff in the JFS Case.  (*See* JFS Compl. ¶ 19.)  She is a United States citizen and the sister of Doe 5.  (Doe 6 Decl. (17-1707 Dkt. # 57) ¶ 1.)  She fears for her sister's safety in Iraq and misses her deeply.  (*See id.* ¶¶ 2, 4-6.)

All of the individual Plaintiffs have been injured by prolonged separation from their family members.  (*See, e.g.*, Hussein Decl. ¶¶ 6, 18; Doe 2 Decl. ¶¶ 5, 10; Doe 3 Decl. ¶ 4; Doe 5 Decl. ¶ 8; Doe 6 Decl. ¶¶ 6-7; Doe 7 Decl. ¶¶ 5-7.)  Those individual Plaintiffs stranded abroad in perilous circumstances are injured by their inability to travel to safety in the United States.  (*See, e.g.*, Doe 1 Decl. ¶¶ 3-11; Doe 2 Decl. ¶¶ 5-10; Doe 4 Decl. ¶ 7; Doe 5 Decl. ¶ 9.)

8.   The Organizational Plaintiffs

JFS Plaintiffs argue in conjunction with their motion for preliminary injunction that EO-4 and the Agency Memo also harm the organizational Plaintiffs—JFS-S and JFS-SV.[8]  (JFS PI Mot. at 12-13.)  These agencies provide services to and help resettle refugees in response to the moral, religious, and cultural commands of their religion. (JFS-S Decl. (17-1707 Dkt. # 50) ¶¶ 2-8, 15-16; JFS-SV Decl. (17-1707 Dkt. # 51) ¶¶ 11-18.)  Due to the anticipated reduction in refugees from Muslim countries as a result of EO-4 and the Agency Memo, these organizations anticipate that they will need to lay-off employees, reduce services, divert resources to address fears raised by EO-4 and the Agency Memo, cancel established programs, and lose relationships and goodwill with volunteers and community partners who these organizations have cultivated relationships with over the years.  (*See* JFS-S Decl. ¶¶ 30-34; JFS-SV Decl. ¶¶ 27-35.)  Further, the agencies state that because they hire staff and volunteers and design programs to be culturally and linguistically relevant to the communities they serve, they cannot simply divert the lost resources to refugees who hail from other parts of the world and who are unaffected by EO-4 and the Agency Memo.  (JFS-SV Supp. Decl. (Dkt. # 82) ¶¶ 2-4; JFS-S Supp. Decl. (Dkt. # 81) ¶¶ 3-6.)  Indeed, the agencies will be forced to replace staff, build new community relationships, and redesign programs.  (JFS-SV Supp. Decl. ¶ 4; JFS-S Supp. Decl. ¶¶ 6-7.)

//

---

[8] Doe Plaintiffs did not assert harm to organizational Plaintiffs Episcopal Diocese of Olympia or the Council on American-Islamic Relations-Washington in support of their motion for a preliminary injunction.  (*See generally* Doe PI Mot.)

1        ### III.    ANALYSIS

2            Doe Plaintiffs assert that they are entitled to a preliminary injunction because they

3        are likely to succeed on four claims: (1) the Agency Memo's indefinite ban on FTJ

4        refugees is contrary to the INA (Doe PI Mot. at 9-12); (2) the Agency Memo's indefinite

5        ban on FTJ refugees deprives Plaintiffs of due process under the Fifth Amendment (*id*. at

6        12-14); (3) the Agency Memo violates the Administrative Procedures Act's ("APA"), 5

7        U.S.C. § 553(b), requirement for notice and comment rulemaking (*id*. at 14-15); and (4)

8        the Agency Memo violates the APA, 5 U.S.C. § 706(2)(A), because it is arbitrary and

9        capricious (*id* at 14-18).

10           JFS Plaintiffs assert that they are entitled to a preliminary injunction because they

11       are likely to succeed on four claims:  (1) the Agency Memo's SOA provisions violate the

12       Establishment Clause (JFS PI Mot. at 13-17); (2) the Agency Memo's SAO provisions

13       violate the APA, 5 U.S.C. § 706(2)(A), because they are arbitrary and capricious (*id.* at

14       17-18); (3) the Agency Memo violates the APA, 5 U.S.C. § 706(2)(C), because it is ultra

15       vires and contrary to the INA (*id*. at 19-22); and (4) the Agency Memo violates the APA

16       because the agency failed to engage in required notice and comment rulemaking (*id.* at

17       20).[9]

18           Defendants oppose both Doe Plaintiffs' and JFS Plaintiffs' substantive arguments

19       that they are likely to prevail on these claims.  (Doe Resp. at 12-21; JFS Resp. at 15-28.)

20

21           [9] JFS Plaintiffs also assert that the FTJ provisions of the Agency Memo violate the APA,

22       the INA, and the Due Process Clause of the Fifth Amendment (JFS PI Mot. at 22-23), and they
         filed a formal notice of joinder in Doe Plaintiffs' motion (*see* JFS Joinder.)

1  In addition, Defendants oppose both motions on a variety of justiciability grounds.  (Doe

2  Resp. at 7-12; JFS Resp. at 5-15.)  The court addresses Defendants' justicaibility issues

3  first, and then addresses the substance of the Doe and JFS motions for preliminary

4  injunctions.  In addressing the substance of Plaintiffs' motions, the court turns to the

5  statutory issues first.  *See Lyng v. Nw. Indian Cemetery Protective Ass'n,* 485 U.S. 439,

6  445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that

7  courts avoid reaching constitutional questions in advance of the necessity of deciding

8  them.").  Because the court ultimately concludes that Plaintiffs show a likelihood of

9  success on the merits of their statutory claims, the court does not reach either JFS

10  Plaintiffs' Establishment Clause claim or Doe Plaintiffs' due process claim.  *See*

11  *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring)

12  ("[I]f a case can be decided on either of two grounds, one involving a constitutional

13  question, the other a question of statutory construction or general law, the Court will

14  decide only the latter.").

15  **A.    Justiciability**

16         Defendants challenge the justiciability of both motions for preliminary injunction

17  on four grounds:  (1) Plaintiffs lack Article III standing (Doe Resp. at 7-8; JFS Resp. at

18  5-9); (2) Plaintiffs' claims are barred by principles of nonreviewability (Doe Resp. at 8-

19  11; JFS Resp. at 10-14); (3) Plaintiffs fail to identify any final agency action (Doe Resp.

20  at 11-12; JFS Resp. at 14-15), and (4) Plaintiffs' claims concerning the SAO provisions

21  are unreviewable under 5 U.S.C. § 701(a) (JFS Resp. at 15).  In addition to these issues,

22  *//*

1   the court also addresses statutory standing because both Doe Plaintiffs and JFS Plaintiffs

2   raise statutory claims.[10]

3      1. Article III Standing

4      To satisfy Article III standing, "a plaintiff must show (1) [he or she] has suffered

5   an 'injury in fact'[;] . . . (2) the injury is fairly traceable to the challenged action of the

6   defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be

7   redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

8   *(TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal citation omitted).  At this preliminary

9   stage of the litigation, Plaintiffs may rely on the allegations in their complaint and

10  whatever other evidence they submit in support of their preliminary injunction motions to

11  meet their burden.  *Hawaii I*, 859 F.3d at 762; *Washington*, 847 F.3d at 1159.  Defendants

12  challenge the standing of both the individual and organizational Plaintiffs.  (JFS Resp. at

13  6-7; Doe Resp. at 7.)

14         a. *Individual Plaintiffs*

15     Plaintiffs allege in their complaints that the SAO and FTJ provisions of the

16  Agency Memo extend the separation of citizens and lawful residents in the United States

17  from their family members abroad.  (*See generally* Doe TAC; JFS Compl.)  Plaintiffs

18  provide numerous declarations supporting those allegations, which the court has detailed

19  above.  *See supra* § II.B.1-7.  Prolonged separation from a family member is an injury in

20

21          _____

        [10] The court does not reach Doe Plaintiffs' due process claim or JFS Plaintiffs'
22  Establishment Clause claim.  Thus, the court addresses only whether Plaintiffs have standing to
    challenge the Agency Memo based on their APA and INA claims.

1    fact sufficient to establish Article III standing.[11]  *See Hawaii I*, 859 F.3d at 763 (holding

2    that a citizen had Article III standing to challenge EO-2 because EO-2 prolonged the

3    separation of the citizen and his family from reunification with his mother-in-law by

4    stalling her visa application); *see also Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir.

5    2013) ("The right to live with and not be separated from one's immediate family is 'a

6    right that ranks high among the interests of the individual.'") (quoting *Landon v.*

7    *Plascencia*, 459 U.S. 21, 34-35 (1982)); *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th

8    Cir. 2011) (recognizing that "important [irreparable harm] factors include separation

9    from family members" (internal quotation marks omitted)); *Legal Assistance for*

10   *Vietnamese Asylum Seekers v. Dep't of State*, 45 F.3d 469, 471-73 (D.C. Cir. 1995),

11   *vacated on other grounds*, 519 U.S. 1 (1996) (holding that U.S. resident sponsors had

12   standing to challenge DOS's refusal to process visa applications because the prolonged

13   separation of immediate family members resulted in injury to the sponsors); *IRAP*, 137 S.

14   Ct. at 2089 ("An American individual . . . that has a bone fide relationship with a

15   particular person seeking to enter the country as a refugee can legitimately claim concrete

16   hardship if that person is excluded."); *Int'l Refugee Assistance Project v. Trump*, No. CV

17   TDC-17-0361, 2017 WL 4674314, at *12 (D. Md. Oct. 17, 2017) (citizens and lawful

18   permanent residents established "injury in fact" for purposes of Article III standing

19   because EO-3's "indefinite ban on the issuance of immigrant and nonimmigrant visas for

20   //

21

22   _____

     [11] At oral argument, Defendants conceded that separation from "one's loved ones" can
     constitute such harm.

1   nationals of the Designated Countries has imposed an actual, imminent injury on [the

2   plaintiffs] by prolonging their separation from family members.").

3        Nevertheless, Defendants argue that none of the individual Plaintiffs have

4   demonstrated that suspension of FTJ refugee processing has caused them harm.  First,

5   Defendants argue that Joseph fails to show any injury because his wife and children are

6   from Kenya, and Kenya is one of two countries in which the Government is continuing to

7   process FTJ refugee applications because screening procedures are already in place to

8   ensure appropriate FTJ scrutiny.  (Doe Resp. at 2, 6-7; Higgins Decl. ¶ 11 (explaining

9   that in Kenya and Thailand "the security vetting received for a Form I-730 beneficiary is

10  the same as the screening received for principal refugee applicants," and therefore the

11  Government is continuing to issue travel authorization to approve FTJ refugees who are

12  processed in those locations).)  However, as noted above, two of Joseph's children are

13  considered Somali citizens and are, therefore, subject to the Agency Memo's SAO

14  provisions.  (*See* Joseph Supp. Decl. ¶ 9.)  Accordingly, the processing of their FTJ

15  refugee applications remain on hold.  (*See id.* ¶ 10.)

16       Defendants also argue that Mr. Hussein's family is in Kenya, and thus he has no

17  standing to challenge the FTJ provisions of the Agency Memo.  (JFS Resp. at 6 (citing

18  Higgins Decl. ¶ 11).)  However, Mr. Hussein's family members are also Somali

19  nationals, and therefore subject to the SAO provisions.  (*See* Hussein Decl. ¶¶ 10-11.)

20  Because both Joseph's and Mr. Hussein's FTJ refugee applications for their family

21  members are subject to the Agency Memo's SAO provisions, Joseph and Mr. Hussein

22  have standing to challenge the Agency Memo.  Indeed, during the December 21, 2017,

1   hearing on Plaintiffs' motions, Defendants withdrew their argument that Joseph lacked

2   standing.

3           In any event, Doe 7 also has an approved FTJ refugee application for his 19-year

4   old son to come to the United States.  (Doe 7 Decl. ¶ 4)  Doe 7's son is an Iraqi national

5   (*id.* ¶ 3), and so Doe 7's FTJ application and the processing of his son's FTJ refugee

6   status are subject to both the FTJ and SAO provisions of the Agency Memo (*id.* ¶¶ 3-10).

7   Accordingly, the court concludes that Doe 7 has standing.  One party with standing is

8   sufficient to fulfill Article III's case-or-controversy requirement.  *Rumsfeld v. Forum for*

9   *Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006).

10          Nevertheless, Defendants argue that it is speculative to infer that the Agency

11  Memo's FTJ and SAO provisions are the source of any delay in the processing of Doe 7's

12  FTJ refugee application as opposed to any other number of factors that might delay a

13  refugee's application.  (JFS Resp. at 6.)  Whether Doe 7's son's application has other

14  hurdles to cross, however, does not diminish the fact that the SAO and FTJ provisions of

15  the Agency Memo add two more.  Removing these hurdles would speed the resolution of

16  any others that may exist since processing of these applications is not presently

17  proceeding at all.  (*See* Agency Memo.)  In any event, the evidence before the court is

18  that Doe 7's FTJ application for his son has been approved, his son has completed his

19  interview and fingerprinting, has received an assurance from a refugee resettlement

20  agency in the United States, and is waiting to travel.  (Doe 7 Decl. ¶ 4.)  At this stage of

21  the proceedings, this is sufficient to establish harm for purposes of Article III standing

22  with respect to both the SAO and FTJ provisions.

1    Defendants also argue that the individual Plaintiffs have no standing to challenge

2    the SAO provisions because the Agency Memo provides for exceptions on a case-by-case

3    basis.  (JFS Resp. at 6-7.)  Defendants argue that Plaintiffs cannot demonstrate harm until

4    they demonstrate that they "cannot qualify for this exemption."  (*See id.* at 7 n.4.)  In

5    *Hawaii I*, the Ninth Circuit rejected a virtually identical argument when it concluded that

6    EO-2's discretionary waiver did not undermine Article III standing.  859 F.3d at 768.

7    Indeed, the Ninth Circuit stated that the plaintiffs would "face substantial hardship if [the

8    court] were to first require that they try to obtain a waiver before [the court] . . .

9    consider[ed] their case."  *Id.*; *see also Hawaii III*, 2017 WL 6547095, at *6 ("[EO-3's]

10   waiver provisions are not a sufficient safety valve and do not mitigate the substantial

11   hardships Plaintiffs have already suffered and will continue to suffer due to [EO-3].")

12   (internal quotation marks omitted);  *Int'l Refugee Assistance Project v. Trump*, 2017 WL

13   4674314, at *16 (stating in the context of analyzing the ripeness of challenges to EO-3

14   that "the waiver process itself presents an additional hurdle not faced by other visa

15   applicants which would delay reunification, thus creating a harm not contingent on future

16   events").

17          Finally, Defendants parse the various individual Plaintiffs' declarations and argue

18   "it is doubtful that these applicants are on the brink of travel such that the 90-day SAO

19   review period will have any concrete impact on them."  (JFS Resp. at 7.)  Whether

20   Defendants are on the brink of travel or not, however, their separation from their family

21   members will be prolonged as a result of the SAO provisions.  The Agency Memo

22   specifically states that, during the 90-day review, DOS and DHS will "take resources that

1    may have been dedicated to processing nationals of, or stateless persons who last

2    habitually resided in, SAO countries and . . . reallocate them to process applicants from

3    non-SAO countries for whom the processing may not be as resource intensive." (Agency

4    Memo at 2.) Indeed, Defendants conceded that during the suspension the Government is

5    redirecting "processing resources" away from SAO countries and that refugee

6    applications will not be processed at the same pace. Thus, even assuming refugee

7    applications from SAO countries are processed at all during the review period, they will

8    undoubtedly be slowed by this resource diversion, prolonging the individual Plaintiffs'

9    separation from their family members.

10         In sum, the court concludes that the individual Plaintiffs have sufficiently

11   demonstrated harm due to the SAO provisions and that at least one individual Plaintiff—

12   Doe 7—has sufficiently alleged harm due to the FTJ provisions. The court concludes

13   that the final two aspects of Article III standing—causation and redressability—are also

14   satisfied. These Plaintiffs' injuries are traceable to EO-4 and its accompanying Agency

15   Memo, and, if Plaintiffs prevail, a decision enjoining portions of the Agency Memo

16   would redress those injuries.

17         *b.  Organizational Plaintiffs*

18         Plaintiffs assert that JFS-S and JFS-SV have standing as organizational Plaintiffs

19   because the Agency Memo has caused them to divert resources away from their core

20   mission of resettling refugees. (*See* JFS PI Mot. at 12; *see generally* JFS-S Decl.;

21   JFS-SV Decl.) This is ordinarily sufficient to demonstrate harm underpinning Article III

22   standing. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (diversion of

1    resources confers Article III standing); *Fair Hous. Council of San Fernando Valley v.*

2    *Roomate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) ("[A]n organization has 'direct

3    standing to sue [when] it showed a drain on its resources from both a diversion of its

4    resources and frustration of its mission.'") (second alteration in original) (quoting *Fair

5    *Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)).

6         Defendants argue that JFS-S and JFS-SV have not shown that the Agency Memo

7    impairs their core mission because EO-4 largely resumes USRAP, "subject to conditions

8    for applicants of special concern." (JFS Resp. at 9.) Further, Defendants contend that,

9    although the Agency Memo may temporarily alter the composition of refugees entering

10   the country, it does not alter the overall number of refugees entering the country. (*Id.*)

11   Thus, according to Defendants, the organizational mission of the agencies is not

12   impaired. (*Id.*)

13        JFS-S and JFS-SV, however, cannot make up the deficits in the arrival of FTJ

14   refugees and refugees from SAO countries by receiving and serving other refugees. Each

15   organization devoted significant resources to serving Muslim and Arabic-speaking

16   refugees because these refugees represent a large percentage of their clients, including by

17   hiring staff and designing programs specifically devoted to serving these clients. (JFS-S

18   Supp. Decl. ¶¶ 5-7; JFS-SV Supp. Decl. ¶¶ 3-4.) Yet, the effect of the Agency Memo is

19   likely to be a significant reduction in the admission of Muslim refugees into the United

20   States. Over 40% of all refugees resettled in the United States within the last two fiscal

21   years came from one of the SAO countries. (Smith Decl. ¶ 15.) Of that group, 99%

22   came from one of the nine Muslim-majority SAO countries, and over 80% identified as

Muslim.  (*Id.* ¶¶ 15, 17.)  The Agency Memo's FTJ provisions are also likely to have a

disproportionate effect on Muslim refugees because it is generally available only to

refugees admitted in the last two years, 8 C.F.R. § 207.7(d), which is the period of time

when the admission of Muslim refugees reached a record high.  (Burman Decl. ¶ 41, Ex.

NN.)  The resources JFS-S and JFS-SV devoted to Muslim and Arabic-speaking refugees

cannot simply be shifted to serving other refugees from other parts of the world; instead

these resources are wasted, and the agencies' organizational purpose is thereby frustrated.

(*See* JFS-S Supp. Decl. ¶¶ 6-7; JFS-SV Supp. Decl. ¶ 4); *see, e.g.*, *El Rescate Legal*

*Servs., Inc. v. Exec. Office of Immigration Rev.*, 959 F.2d 742, 748 (9th Cir.1992) (legal

services organizations "established to assist Central American refugee clients, most of

whom [we]re unable to understand English," who were seeking asylum and the

withholding of deportation, had standing to challenge government policy of not providing

full translation of those proceedings).[12]  Accordingly, the court concludes that both JFS-S

and JFS-SV have standing as organizational plaintiffs.

JFS-S and JFS-SV also assert third-party standing because they have a close

relationship to the individual Plaintiffs whose claims they raise and these individual

Plaintiffs are unable to protect their interests on their own.  (JFS PI Mot. at 13 (citing

---

[12] The *El Rescate* court expounded on the issue of organizational standing immediately after declaring the issue moot, 959 F.2d at 748, and so this portion of the decision is arguably dicta.  However, at least one subsequent Ninth Circuit panel described this part of *El Rascate* as a holding.  *See Fair Hous. of Marin*, 285 F.3d at 904-05 ("This Court . . . *held* that "[t]he allegation that the [the government's] policy frustrates these goals [of helping refugees obtain asylum and withhold deportation] and requires the organizations to expend resources in representing clients they otherwise would spend in other ways is enough to establish standing.") (second and fourth alterations in original) (emphasis added).

1    *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991)).)  Defendants' only response is that the

2    organization's clients have suffered no injury.  (JFS Resp. at 9, n.7.)  The court, however,

3    concludes otherwise.  *See supra* § III.A.1.a.  Accordingly, the court also concludes based

4    on the record presented at this point in the proceedings that JFS-S and JFS-SV have third-

5    party standing.

6        2.  <u>Statutory Standing</u>

7        Although Defendants do not raise this issue, because the various individual

8    Plaintiffs, as well as JFS-S and JFS-SV, assert a statutory claim under the INA, the court

9    "must also determine whether they meet the requirement of having interests that 'fall

10   within the zone of interests protected by the law invoked.'"  *Hawaii I*, 859 F.3d at 766

11   (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, --- U.S. ---, 134 S. Ct.

12   1377, 1388 (2014)).  The "'zone of interests' test is 'not meant to be especially

13   demanding,' and a court should deny standing only 'if the plaintiff's interests are so

14   marginally related to or inconsistent with the purposes implicit in the statute that it cannot

15   reasonably be assumed that Congress intended to permit the suit.'"  *Cetacean Cmty. v.*

16   *Bush*, 386 F.3d 1169, 1177 (9th Cir. 2004) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S.

17   388, 399 (1987)).  The "benefit of any doubt goes to the plaintiff."  *Match-E-Be-Nash-*

18   *She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012).

19       In *Hawaii I*, the Ninth Circuit had "little trouble concluding that [the citizen

20   plaintiff] [wa]s within the zone of interests of the INA to challenge EO2 based on [his

21   INA] statutory claim," because "[h]e assert[ed] that the travel ban prevents his mother-in-

22   law from reuniting with his family."  859 F.3d at 766 (citing *Legal Assistance for*

1   *Vietnamese Asylum Seekers*, 43 F.3d at 471-72 ("The INA authorizes the immigration of

2   family members of the United States citizens and permanent resident aliens.  In originally

3   enacting the INA, Congress implemented the underlying intention of our immigration

4   laws regarding preservation of the family unit.  Given the nature and purpose of the

5   statute, the resident appellants fall well within the zone of interest Congress intended to

6   protect.") (internal quotation marks, citations, and alterations omitted)).  Does 3 and 6, a

7   lawful permanent resident and a citizen, respectively, both claim that the Agency Memo

8   prevents reuniting with their family members.  *See supra* §§ II.B.5, 7.  The court finds no

9   legitimate basis for distinguishing the present situation from that of the plaintiff in

10   *Hawaii I*.  Accordingly, the court concludes that Does 3 and 6 fall within the zone of

11   interest of the INA and the Refugee Act of 1980.

12        JFS-S and JFS-SV Plaintiffs also fall within the zone of interest of the INA and

13   the Refugee Act of 1980.  In *Hawaii I*, the Ninth Circuit held that the States' "interest in

14   effectuating its refugee resettlement policies and programs also falls within the zone of

15   interests protected by the INA."  859 F.3d at 766.  The Ninth Circuit noted that INA

16   provisions concerning refugees "were amended to provide a 'systematic procedure' for

17   the admission of refugees into the United States, as well as 'uniform provisions for the

18   effective resettlement and absorption of those refugees admitted.'"  *Id*. at 766-67 (quoting

19   Refugee Act of 1980, Pub. L. No. 96-212, § 101, 94 Stat. 102 (1980)).  Making

20   provisions for the resettlement and absorption of refugees into the United States is the

21   core mission of both JFS-S and JFS-SV.  (JFS-S Decl. ¶¶ 2-7, 15-16, 30, 34; JFS-SV

22   Decl. ¶¶ 11, 18, 36-37.)  Thus, these organizations' interests in effectuating refugee

1  resettlement and absorption falls within the zone of interest protected by the INA and the

2  Refugee Act of 1980.[13]

3      3.  <u>Nonreviewability</u>

4      Like they have in other cases involving the President's various EOs on

5  immigration, Defendants assert that the "doctrine of consular nonreviewability" applies

6  to bar the court's review of Doe and JFS Plaintiffs' statutory claims.  (*See* Doe Resp. at

7  8-10; JFS Resp. at 12-13.)  Courts have traditionally applied the doctrine of consular

8  nonreviewability to bar challenges to decisions by consular officials adjudicating

9  individual visa applications.  *See Li Hing of Hong Kong, Inc. v. Levin*, 800 F.2d 970, 971

10  (9th Cir. 1986) ("[I]t has been consistently held that the consular official's decision to

11  issue or withhold a visa is not subject either to administrative or judicial review.").

12  Defendants rely on out-of-circuit authority to argue for a significant expansion of the

13  doctrine and support their position by stating that "[t]he principle underlying that doctrine

14  applies regardless of the manner in which the Executive Branch denies entry to an alien

15  abroad, including a refugee applicant."  (*See* Doe Resp. at 8 (citing *Haitian Refugee Ctr.,*

16  *Inc. v. Baker*, 953 F.2d 1498, 1506 (11th Cir. 1992).)[14]

17

18      [13] The court does not decide if Plaintiffs who are located abroad have statutory standing

19  under the INA because "[i]f one party to an action has standing, a court need not decide the standing issue as to other parties when it makes no difference to the merits of the case."  *See Legal Assistance for Vietnamese Asylum Seekers*, 45 F.3d at 472 (declining to decide if refugees

20  in Hong Kong or the organizational plaintiff had standing because the court had already found that the family members of refugees in the United States were within the zone of interest of the

21  INA).

22      [14] In *Baker*, the Eleventh Circuit relied in part on the doctrine of consular nonreviewability to preclude review of an Executive Order and agency guidelines that were

But the Ninth Circuit has already rejected Defendants' position.  Just as in *Hawaii I*, individual Plaintiffs here "do not seek review of an individual consular officer's decision to grant or to deny a visa pursuant to valid regulations, which could implicate the consular nonreviewability doctrine," but rather the government's "promulgation of sweeping immigration policy."  859 F.3d at 768.  "Courts can and do review both constitutional and statutory 'challenges to the substance and implementation of immigration policy.'"  *Id.* (quoting *Washington*, 847 F.3d at 1163; *see Hawaii III*, 2017 WL 6547095, at *6-*7 (concluding that the doctrine of consular nonreviewability did not apply to bar the court's review of EO-3); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) (without discussing consular nonreviewabilty, but over the Government's objections that the doctrine applied and barred review, reviewing the merits of a statutory claim challenging an EO that blocked the entry of Haitians); *Sale v. Haitian Ctrs. Council, Inc.*, 1993 WL 754941 (U.S.), 16-22 (U.S. Oral. Arg., 1993) (arguing that the doctrine bars review).  Thus, the court rejects Defendants' assertion that this doctrine bars judicial review of EO-4 and the Agency Memo.[15]

_____

promulgated thereunder, which provided for the interdiction and return of Haitians on the high seas who were deemed to be economic rather than political refugees. 953 F.2d at 1507.

[15] In *Hawaii I*, the Ninth Circuit declined to apply *Mandel*'s "facially legitimate and bona fide" standard in the context of a statutory challenge to EO-2. 859 F.3d at 769 n.9.  The court recognizes that the Supreme Court vacated *Hawaii* following the expiration of EO-2.  *See Hawaii v. Trump*, 874 F.3d 1112, 1112 (9th Cir. 2017) ("In view of the Supreme Court order dated October 24, 2017, the court's opinion filed June 12, 2017, is vacated and the appeal is dismissed as moot.").  But *Hawaii I*, 859 F.3d at 769 n.9, remains persuasive authority despite the Supreme Court's vacatur.  *See Orhorhaghe v. INS*, 38 F.3d 488, 493 n.4 (9th Cir. 1994) (following as persuasive authority a decision vacated by the Supreme Court as moot).  *Hawaii I* is closely analogous and related to the issues presently before this court, and as a district court within the Ninth Circuit, this court is unwilling to ignore it or depart from its reasoning.

1    4.  Final Agency Action

2        Finality is a prerequisite to judicial review of agency action.  *See* 5 U.S.C. § 704.

3    To be final, the agency action first "must mark the consummation of the agency's

4    decisionmaking process—it must not be of a merely tentative or interlocutory nature."

5    *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 591 (9th Cir.

6    2008).  Second, the action "must be one by which rights or obligations have been

7    determined, or from which consequences will flow."  *Id*.

8        Defendants do not contest the first requirement.  (*See* JFS Resp. at 14-15; Doe

9    Resp. at 11-12.)  But Defendants contend that, even if Plaintiffs could show the first

10   requirement, they cannot show the second requirement "because the implementation

11   period does not determine any rights or obligations or prescribe any legal consequences."

12   (JFS Resp. at 14-15; Doe Resp. at 11.)  Indeed, according to Defendants, a processing

13   //

14

15   ───────────────

          Nevertheless, during oral argument, Defendants argued that the Supreme Court's decision
     in *Fiallo v. Bell*, 430 U.S. 787 (1977), trumped the Ninth Circuit's rulings in both *Hawaii I*, 859
16   F.3d at 769 n.9, and *Washington*, 847 F.3d at 1161-64, concerning the applicability of the
     *Mandel* standard.  However, *Fiallo* is distinguishable.  In *Fiallo*, the Supreme Court was not
     considering a challenge to agency action that was alleged to be ultra vires or outside of the
17   agency's statutory authority under the INA.  Rather, *Fiallo* involved an action to enjoin
     provisions of the INA itself as constitutionally invalid.  430 U.S. at 788 ("This case brings before
     us a constitutional challenge to §§ 101(b)(1)(D) and 101(b)(2) of the Immigration and
18   Nationality Act of 1952.").  In that context, the Supreme Court noted the "limited scope of
     judicial inquiry into *immigration legislation*" and emphasized "'over no conceivable subject is
19   *the legislative power of Congress* more complete than it is over' the admission of aliens."  *Id.* at
     792 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) (emphasis added)).
20   Accordingly, the Court limited its review of the statutory provision at issue to the "facially
     legitimate and bona fide" standard found in *Mandel*.  *Id.* at 795 (citing *Mandel*, 408 U.S. at 770).
21   Because the issues before this court involve a statutory challenge to agency action in the form of
     the Agency Memo, and not a constitutional challenge to any provision of the INA, *Fiallo* is not
22   applicable here.

ORDER - 32

1   delay alone does not alter the family's "legal situation," and thus the FTJ implementation

2   program is not a final agency action subject to judicial review.[16]   (*Id.*)

3        To the contrary, whether the Agency Memo produces a "suspension" or an

4   indefinite delay, the Agency Memo has significant real-world impacts on Plaintiffs'

5   various situations.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (explaining

6   that "the core question is whether . . . the result of that [challenged agency] process is one

7   that will directly affect the parties.").  Under similar circumstances involving EO-3, the

8   district court in Maryland stated:  "As for Defendants' claim that the agency action to

9   date is not 'final,' [EO-3] is already in effect as to certain individuals and is being

10  enforced by federal agencies."  *Int'l Refugee Assistance Project v. Trump*, 2017 WL

11  4674314, at *18.  The same is true here.  As discussed above, the individual Plaintiffs are

12  subject to the Agency Memo's provisions, and the effect of those provisions is to prolong

13  the separation of family members in some cases and prevent escape from perilous

14

15        [16] The cases Defendants rely upon are readily distinguishable.  In *Fairbanks*, the Ninth

16  Circuit held that the Army Corps of Engineers' determination that certain municipal property
    contained wetlands subject to regulation under the Clean Water Act was only "a bare statement
    of the agency's opinion" that neither required the municipality to do or to forebear from

17  anything.  543 F.3d at 594.  As such, the Corps' opinion did not determine any of the
    municipality's rights or obligations or result in any legal consequences.  *Id*. at 595.  Defendants'

18  reliance on *International Brotherhood of Teamsters v. U.S. Department of Transportation*, 861
    F.3d 944, 952 (9th Cir. 2017), is also misplaced.  In that case, an agency's report on a pilot

19  program involving Mexico-domiciled trucking companies' long-haul operations in the United
    States had no legal consequences, but was merely the last step in completing a pilot program to

20  clear the way for Mexico-domiciled carriers.  *Id*.  As such, the report "did not change the legal
    situation" and was not, therefore, final agency action.  *Id*.  In contrast to the opinion and report in

21  the cases cited by Defendants, the Agency Memo's FTJ and SAO provisions are presently being
    implemented by USCIS.  (*See* Higgins Decl. ¶¶ 11-16.)  Those requirements have concrete

22  impacts upon Plaintiffs by delaying the reunification of families or the departure from dangerous
    circumstances.  *See supra* §§ II.B.1-7.

1   circumstances in others.  *See supra* § IIB.1-7.  And, as the Ninth Circuit in *Hawaii II*

2   noted, even short delays can have cascading effects that prolong a refugee's processing

3   and ultimate admission.  871 F.3d at 644 ("Refugees have only a narrow window of time

4   to complete their travel, as certain security and medical checks expire and must then be

5   re-initiated.  Even short delays may prolong a refugee's admittance."); (*see also* JFS-S

6   Supp. Decl. ¶ 8 (explaining the cascading effects of even a short delay in processing).)

7   Based on the foregoing record and authorities, the court concludes that the Agency Memo

8   represents final agency action.

9          5.  <u>Agency Discretion</u>

10          Defendants argue in two conclusory sentences that the court is stripped of

11  jurisdiction to review Plaintiffs' statutory challenges to the Agency Memo's SAO

12  provisions under 5 U.S.C. § 701(a).  (*See* JFS Resp. at 15.)  Specifically, Defendants

13  argue that 8 U.S.C. § 1157(c)(1) commits the admission of refugees to the Secretary's

14  discretion, whereas 5 U.S.C. § 701(a) prohibits APA review of agency action that "is

15  committed to agency discretion by law."  The court rejects Defendants' argument.  There

16  is a "strong presumption that Congress intends judicial review of administrative action."

17  *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir. 1998).  Section

18  701(a) overcomes this presumption only in "rare instances where statutes are drawn in

19  such broad terms that in a given case there is no law to apply, thereby leaving the court

20  with no meaningful standard against which to judge the agency's exercise of discretion."

21  *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 719 (9th Cir. 2011).  "[T]he mere

22  fact that a statute contains discretionary language does not make agency action

ORDER - 34

1   unreviewable." *Id.* Indeed, section 701(a)(2) has "never been thought to put exercises of

2   discretion beyond judicial review." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th

3   Cir. 2015).

4        *ASSE International, Inc. v. Kerry* presents an analogous situation. *See* 803 F.3d. at

5   1069-72. In that case, although the authorizing statute gave the DOS complete discretion

6   in determining whether to create certain exchange programs, the Ninth Circuit found that

7   the DOS's regulations "provide more than an ample basis in law for [the court] to review

8   its decision under the APA." *Id.* at 1070. These regulations created the program, provide

9   who is eligible to become a sponsor, and "establish[ed] a comprehensive scheme for

10   administering an exchange program." *Id.* Because these regulations "have the force of

11   law" and carry "real consequences for [those] failing to abide by them," the Ninth Circuit

12   concluded that judicial review was not prevented by the discretionary language in the

13   authorizing statute. *Id.* at 1070-71.

14        Defendants have similarly failed to rebut the strong presumption of judicial

15   reviewability. Although 8 U.S.C. § 1157(c)(1) contains discretionary language, the

16   subsequent regulations promulgated by DHS provide the "meaningful standard" by which

17   the court can review Defendants' exercise of discretion. *See* 8 C.F.R. § 207; *Pinnacle*

18   *Armor, Inc.*, 648 F.3d at 719. Like the regulations in *ASSE International*, the regulations

19   governing the admission of refugees implement the Refugee Act of 1980, detail

20   eligibility to apply for refugee status, and lay out "a comprehensive scheme" for the

21   refugee program. *See* 803 F.3d at 1070; 8 C.F.R. §§ 207.1-9. These regulations are

22   binding, and failure to abide by these regulations results in "real consequences." *See* 803

1  F.3d at 1070; 8 U.S.C. § 1157(c)(1).  Thus, as in *ASSE International*, the regulations

2  provide a "meaningful standard" and "more than an ample basis in law" against which to

3  judge the Defendants' decisions under the APA.  *See also Hawaii III*, 2017 WL 6547095,

4  at *8 (concluding that  5 U.S.C. § 701(a)(2) did not apply to bar review of EO-3 "where,

5  as here, a court is tasked with reviewing whether an executive action has exceeded

6  statutory authority").

7      Nor does 8 U.S.C. § 1252(a)(2)(B)(ii) strip the court of jurisdiction over this

8  action.[17]  Section 1252(a)(2)(B)(ii) states that no court shall have jurisdiction to review:

9      Any other decisions or action of the Attorney General or Secretary of
        Homeland Security the authority for which is specified under this subchapter
10      to be in the discretion of the Attorney General or the Secretary of Homeland
        Security[.]

11
12  Section 1157(c)(1) specifies that the admission of refugees is within the Secretary's

13  discretion.  Were Plaintiffs challenging a denial of refugee admission, section

14  1252(a)(2)(B)(ii) may well bar judicial review.  Instead, Plaintiffs are challenging the

15  failure to act on refugee applications.  And while section 1157(c)(1) grants the Secretary

16  discretion in deciding the outcome of a refugee application, it does not specify that the

17  Secretary has discretion to suspend adjudicating such applications.  *See* 8 U.S.C.

18  § 1157(c)(1).  In other words, the Secretary may have discretion over what the decision

19  will be, but not over whether a decision will be made.  *See* 5 U.S.C. § 555(b) ("With due

20
21      [17] Defendants do not mention 8 U.S.C. § 1252(a)(2)(B)(ii) in their discussion of
    jurisdiction stripping, focusing instead only on 5 U.S.C. § 701(a).  (*See* JFS Resp. at 15.)
22  However, because section 1252(a)(2)(B)(ii) implicates the court's subject matter jurisdiction, the
    court addresses the issue.

1    regard for the convenience and necessity of the parties or their representatives and within

2    a reasonable time, each agency *shall* proceed to conclude a matter presented to it."

3    (emphasis added)).  Thus, neither section 1157(c)(1) nor any other statute provides the

4    "specified" discretionary authority to suspend adjudicating refugee status that would

5    trigger section 1252(a)(2)(B)(ii)'s bar on judicial review.[18]  *See Spencer Enters., Inc. v.*

6    *United States*, 345 F.3d 683, 690 (9th Cir. 2003).

7         Alternatively, section 1252(a)(2)(B)(ii) does not divest this court of jurisdiction

8    because it applies only to acts that are "matters of pure discretion, rather than discretion

9    guided by legal standards."  *See Spencer*, 345 F.3d at 690.  The decision regarding

10   refugee admission, however, is guided by a series of eligibility requirements set out in

11   sections 1157(c)(1) and 1101(a)(42).  *See* 8 U.S.C. §§ 1101(a)(42), 1157(c)(1).

12   Moreover, section 1157(c)(1) requires the Secretary to adhere to all adopted regulations,

13   and as discussed above, the Secretary has promulgated such regulations that provide

14   specific standards limiting its discretion.  For these reasons, it is not certain that the

15   Secretary's obligations with respect to processing refugee applications are discretionary

16   within the meaning of section 1252(a)(2)(B)(ii), as construed in *Spencer*.

17   //

18   //

19

20   ───────────────
         [18] Many district courts have adopted this reasoning in the analogous context of
     immigration status adjustments.  *See, e.g.*, *Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1091-92
21   (E.D. Cal. 2016); *see also Hong Wang v. Chertoff*, 550 F. Supp. 2d 1253, 1256-57 (W.D. Wash.
     2012) (collecting cases).  When the statute grants discretion only as to the ultimate decision but
22   not as to the timing of when that decision is made, jurisdiction is not barred by section
     1252(a)(2)(B)(ii).  *See, e.g.*, *Dong v. Chertoff*, 513 F. Supp. 2d 1158, 1165 (N.D. Cal. 2007).

1    In sum, neither 5 U.S.C. § 701(a) nor 8 U.S.C. § 1252(a)(2)(B)(ii) bar the court

2    from hearing this matter.  Having disposed of Defendants' justiciability arguments, the

3    court now turns to the substance of Plaintiffs' motions for preliminary injunction.

4    **B.      Motions for Preliminary Injunction**

5        Doe Plaintiffs seek to enjoin both the SAO and FTJ provisions of the Agency

6    Memo to the extent those provisions indefinitely suspend the processing of FTJ refugee

7    applications or prohibit the entry of FTJ refugees into the United States.  (*See generally*

8    Doe PI Mot.; Doe Reply; *see also* Doe TAC.)  The JFS Plaintiffs join in this motion.

9    (*See* JFS Joinder; JFS PI Mot. at 22-23.)  In the JFS Case, Plaintiffs also seek to enjoin

10   the SAO provisions of the Agency Memo to the extent those provisions suspend the

11   admission of refugees or inhibit the processing of refugee applications from those SAO

12   countries for 90 days.  (*See generally* JFS PI Mot.; JFS Reply; *see also* JFS Compl.)  Doe

13   Plaintiffs join in this motion as well.  (*See* Doe Joinder.)

14       The court also clarifies what Plaintiffs in both cases do not seek.  Plaintiffs do not

15   seek to enjoin the agencies' efforts to implement screening mechanisms for FTJ refugees

16   that are similar to or aligned with the processes employed for principal refugees.

17   Plaintiffs do not seek to enjoin the agencies from conducting their 90-day "detailed threat

18   analysis and review" of the SAO countries to determine what additional safeguards the

19   agencies believe are necessary with respect to the admission of refugees from those

20   countries.  And finally, Plaintiffs do not seek a guarantee of immediate admission into the

21   United States for the refugees at issue.  (*See* Doe Reply at 9.)  Rather, as indicated above,

22   they seek an order preliminarily enjoining those provisions of the Agency Memo that (1)

prohibit the admission of refugees from SAO countries and impede the processing of

their refugee applications for 90-days, and (2) indefinitely prohibit the admission of FTJ

refugees and indefinitely suspend the processing of their refugee applications.  With

those clarifications, the court now considers their motions.

1.  Standard

"A preliminary injunction is 'an extraordinary remedy that may only be awarded

upon a clear showing that the plaintiff is entitled to such relief.'"  *Feldman v. Ariz. Sec'y*

*of State's Office*, 843 F.3d 366, 375 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def.*

*Council*, 555 U.S. 7, 22 (2008)).  To obtain such relief, "[a] plaintiff . . . must establish

that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an

injunction is in the public interest."  *Winter*, 555 U.S. at 20.  A plaintiff must make a

clear showing as to each of these elements.[19]  *Feldman*, 843 F.3d at 375.

2.  Notice and Comment Rulemaking under the APA

Plaintiffs assert that the court should set aside the Agency Memo as it relates to

both the indefinite FTJ suspension and the 90-day SAO suspension because it represents

a "legislative rule" for which notice and comment rulemaking under the APA is required.

(Doe PI Mot. at 14-15; JFS PI Mot. at 19-20.)  "Under the APA, a federal administrative

---

[19] In the Ninth Circuit, "'if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied."  *Feldman*, 843 F.3d at 375 (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1282, 1291 (9th Cir. 2013)).  Here, because the court concludes that Plaintiffs meet the *Winter* standard for issuing a preliminary injunction, there is no need for the court to consider the alternate standard.

1   agency is required to follow prescribed notice-and-comment procedures before

2   promulgating substantive rules." *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d

3   1112, 1124 (9th Cir. 2009); *see* 5 U.S.C. § 553.  Courts require agencies to engage in

4   notice and comment rulemaking when implementing policy changes with substantive

5   consequences for refugees and other immigrants.  *See, e.g.*, *Texas v. United States*, 809

6   F.3d 134, 171-78 (5th Cir. 2015) (as revised), *aff'd by an equally divided*

7   *court*, --- U.S. ---, 136 S. Ct. 2271 (2016) (holding that plaintiffs were likely to succeed

8   on the merits of their APA claim that notice and comment rulemaking required for

9   immigration policy granting deferred action status to certain undocumented immigrants);

10  *Zhang v. Slattery*, 55 F.3d 732, 744-47 (2d Cir. 1995), *superseded by statute on other*

11  *grounds*, 8 U.S.C § 1101(a)(42) (finding notice and comment rulemaking is required for

12  the agency's interim rule recognizing fear of coercive family practices as basis for

13  refugee status).

14          Defendants do not deny that the Agency Memo represents a rule; rather, they

15  argue the Agency Memo is exempt from APA rulemaking procedures because it

16  represents a procedural—not substantive—rule for which a notice and comment period is

17  not required.  (Doe Resp. at 16; JFS Resp. at 18-19); *see* 5 U.S.C. § 553(b)(3)(A) (stating

18  that APA rulemaking "does not apply . . . to interpretive rules, general statements of

19  policy, or rules of agency organization, procedure, or practice").  Defendants argue that

20  the Agency Memo does not change the substantive criteria for determining whether a

21  refugee applicant can be admitted to the United States, it merely suspends the admission

22  of refugees from SAO countries for 90 days and the admission of FTJ refugees until such

1    time as the agencies can align the screening procedures for FTJ refugees with the

2    screening procedures employed for principal refugees.  (Doe Resp. at 17; JFS Resp. at

3    18-19.)

4         The court need not accept an agency's characterization of its own rule.  *Hemp*

5    *Indust. Ass'n v. DEA*, 333 F.3d 1082, 1087 (9th Cir. 2003); *see also Reno-Sparks Indian*

6    *Colony v. U.S. E.P.A.*, 336 F.3d 899, 909 (9th Cir. 2003) ("The agency is not entitled to

7    deference [concerning its decision not to engage in rulemaking] because complying with

8    the notice and comment provisions when required by the APA is not a matter of agency

9    choice.") (internal quotation marks omitted).  Further, the exceptions to APA rulemaking

10   must be "narrowly construed and only reluctantly countenanced." *Alcaraz v. Block*, 746

11   F.2d 593, 612 (9th Cir. 1984).  At times, distinguishing between rules that require APA

12   rulemaking and those that do not is challenging.  *Stoddard Lumber Co. v. Marshall*, 627

13   F.2d 984, 987 (9th Cir. 1980) (noting that distinguishing between such rules "has proved

14   to be quite difficult").  There are, however, guideposts as described in the authority relied

15   upon by Defendants.  (*See* JFS Resp. at 19; Does Resp. at 17-19.)  Whether a rule is

16   "substantive" or "procedural" requires a court to make "legal conclusions that depend

17   upon their settings for definition."  *Neighborhood Television, Inc. v. FCC*, 742 F.2d 629,

18   637 (D.C. Cir. 1984); *Brown Exp., Inc. v. United States*, 607 F.2d 695, 701 (5th Cir.

19   1979).  To determine the nature of a rule, the court must look at the rule's effect on those

20   interests ultimately at stake in the agency proceeding.  *Neighborhood Television*, 742

21   F.2d at 637.  If a rule does not substantially affect or jeopardize those ultimate interests,

22   //

1  then it is procedural and not substantive.  *Waste Mgmt., Inc. v. U.S.E.P.A.*, 669 F. Supp.

2  536, 539 (D.D.C. 1987).  In short, context matters.

3       In their response to Plaintiffs' motion, Defendants rely on two thirty-plus-year-old

4  decisions out of the District of Columbia—neither of which is analogous to the

5  facts-at-hand.  (Doe Resp. at 17-18.)  In *Waste Management,* 669 F. Supp. at 538-40, the

6  court held that the agency issued a procedural rule when it decided to defer consideration

7  of applications for ocean incineration permits until the agency promulgated new rules on

8  the topic.  In *Neighborhood Television*, 742 F.2d at 636-38, the court determined that an

9  agency's decision to "freeze" processing of certain applications for television translator

10  licenses was also a procedural rule.  The status sought by Plaintiffs here—refugee

11  status—is far-afield from either an ocean incineration permit or a television translator

12  license.  Further, in both cases, the courts focused on the fact that the delay caused by a

13  suspension did not by itself undermine the interests at stake, and in both situations, the

14  delay itself was related to the agencies' ongoing notice and comment rulemaking efforts.

15  *See Waste Mgmt.*, 669 F. Supp. at 539-40; *Neighborhood Television*, 742 F.2d at 636-38.

16  Unlike the challengers' interests in those cases, Plaintiffs' interests—to reunite with

17  family members or to flee perilous situations and find refuge in the United States—are

18  undermined by any delay.  *Hawaii II*, 871 F.3d at 644 ("Refugees have only a narrow

19  window of time to complete their travel, as certain security and medical checks expire

20  and must then be re-initiated. Even short delays may prolong a refugee's admittance.");

21  (*see also* JFS-S Supp. Decl. ¶ 8 (explaining the cascading effects of even a short delay in

22  processing).)

1    Further, 8 C.F.R. part 207, the regulations implementing the Refugee Act of 1980,

2    and subsequent amendments outlining procedures for the FTJ program, were subject to

3    notice and comment before they were codified.  *See* Aliens and Nationality; Refugee and

4    Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981) (to be codified at 8 C.F.R. pt.

5    207); Procedures for Filing a Derivative Petition (Form I-730) for a Spouse and

6    Unmarried Children of a Refugee/Asylee, 63 Fed. Reg. 3792 (Jan. 27, 1988) (to be

7    codified at 8 C.F.R. § 207.7).  Where the original rule was adopted after a notice and

8    comment period, courts have generally found the decision to alter those rules to be

9    substantive, and therefore subject to APA rulemaking procedures as well.  *See, e.g.*,

10   *Sequoia Orange Co. v. Yeutter*, 973 F.2d 752, 757 (9th Cir. 1992) (ruling that the

11   decision to alter voting procedures was subject to APA rulemaking requirement because

12   the original voting procedures were adopted after notice and comment); *Arlington Oil*

13   *Mills, Inc. v. Knebel*, 543 F2d 1092, 1100 (5th Cir. 1976).

14   In addition, "[w]hen a policy acts as a substantive rule and alters an existing

15   regulatory scheme," the agency "must adopt that policy according to procedures set forth

16   in the APA."  *Mt. Diablo Hosp. Dist. v. Bowen*, 860 F.2d 951, 956 (9th Cir. 1988).  The

17   Agency Memo indefinitely suspends the entire FTJ refugee program, and it suspends the

18   admission of all refugees (with limited exceptions) from the 11 SAO countries.  As

19   discussed above, the regulatory scheme for processing principal and derivative refugees,

20   such as FTJ refugees, is set forth in detail in 8 C.F.R. part 207.  The court has little

21   //

22   //

1    difficulty in concluding that such changes "alter" that "existing regulatory scheme."[20]

2    *See Mt. Diablo*, 860 F.2d at 956.

3           Defendants also assert that the SAO provisions are exempt from rulemaking

4    because they fall within the APA's foreign affairs exception.  (JFS Resp. at 19-20); *see* 5

5    U.S.C. § 553(a)(1) ("This section applies . . . except to the extent that there is involved

6    . . . a . . . foreign affairs function of the United States.").  The Ninth Circuit cautions that

7    the "foreign affairs exception would become distended if applied to INS actions

8    generally, even though immigration matters typically implicate foreign affairs." *Yassini*

9    *v. Crosland*, 618 F.2d 1356, 1360 (9th Cir. 1980).  Indeed, "[f]or the exception to apply,

10   the public rulemaking provisions should provoke definitely undesirable international

11   consequences." *Id*.  Although the Ninth Circuit cautioned that a rule of law "that would

12   inhibit the flexibility of the political branches should be adopted with only the greatest of

13   caution," nevertheless "[r]eview of decisions involving aliens . . . remains available." *Id*.

14          Defendants rely on *Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008), in which

15   the Second Circuit reviewed the National Security Entry-Exit Registration System, a

16   program devised after September 11, 2001, that required registration for certain

17   individuals from specific countries.  (*See* JFS Resp. at 19-20.)  The Second Circuit found

18   that rulemaking was not required due to the foreign affairs exception.  *Rajah*, 544 F.3d at

19   437.  The Second Circuit was concerned that in explaining why some of a particular

20

21          [20] In addition, those refugees who fall within the SAO provisions of the Agency Memo
     and who would otherwise meet the definition of "refugee" are now barred from admission for at
22   least 90 days unless they can demonstrate the additional, agency-created requirement that their
     admission would "fulfill critical foreign policy interests."  (Agency Memo at 2.)

1    nation's citizens were regarded as a threat, (1) sensitive foreign intelligence might be

2    revealed, (2) relations with other countries might be impaired, and (3) the process would

3    be slow and diminish the Government's ability to protect against a potential terrorist

4    attack. *Id.*

5         The court agrees with Plaintiffs, however, that *Rajah* is inapposite for a number of

6    reasons. (*See* JFS Reply at 9.) First, Plaintiffs do not seek rulemaking on whether

7    particular countries should be on the SAO list, but rather on whether and how the USRAP

8    should be suspended while the review is conducted. (*See id.*) Second, it is not evident

9    that such rulemaking would "provoke definitively undesirable international

10   consequences," *see Yassini*, 618 F.2d at 1360 n.4, and Defendants proffer no evidence

11   that it would (*see generally* Dkt.). The court is simply unwilling to apply the exception

12   without some evidence to support its application. *Compare Yassini*, 618 F.2d at 1360-61

13   (applying the exception only after examining the affidavits of the Attorney General and

14   Deputy Secretary of State establishing the directive's relationship to the Iran hostage

15   crisis); *with Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (holding that a rule

16   directing the detention of Haitians at the border was not within the exception given the

17   lack of evidence of any consequences), *aff'd*, 472 U.S. 846 (1985).

18        Finally, when the *Rajah* and *Yassini* courts applied the foreign affairs exception,

19   they were grappling with agency directives issued in response to dire national

20   emergencies—the September 11 attack and the Iranian hostage crisis. *See Rajah*, 544

21   F.3d at 433; *Yassini*, 618 F.2d at 1361. Although not determinative, the circumstances in

22   which the courts applied the exception provides context for their decisions. Here,

1   Defendants offer no evidence that the agencies issued the SAO suspension in response to

2   a national security or foreign affairs crisis.  Indeed, all the Agency Memo states to justify

3   the 90-day suspension of refugees from SAO countries (with limited exceptions) is that

4   the Secretaries of DOS and DHS and the DNI "continue" to have unspecified "concerns"

5   regarding their admission.  (Agency Memo at 2.)[21]  Thus, the exigent factual

6   circumstances under which the agency directives were issued in *Yassini* and *Rajah* is

7   another distinguishing factor that diminishes the applicability of those cases here.

8         For the foregoing reasons, the court agrees with Plaintiffs that the foreign affairs

9   exception to rulemaking is inapplicable to the SAO provisions and that the agencies

10  should have engaged in APA rulemaking before issuing both the SAO and FTJ

11  provisions at issue in the Agency Memo.  Accordingly, the court concludes that Plaintiffs

12  have demonstrated that they are likely to succeed on the merits of their claim that the

13  agencies violated the APA's rulemaking requirement.[22]

14  //

15  //

16  //

---

17      [21] The court notes that the only evidence in the record is to the contrary—that operating
18  USRAP in SAO countries does not pose a significant risk to the country.  (Joint Decl. Former
    Nat'l Sec. Officers (17-1707 Dkt. # 46) ¶ 12 ("During the four decades from 1975 to the end of
    2015, over three million refugees have been admitted to the United States.  Despite this number,
19  only three refugees have killed people in terrorist attacks on U.S. soil during this period.  None
    of these refugees were from the [SAO] countries.").)  Instead, the evidence before the court is
20  that the SAO provisions of the Agency Memo undermine the country's national security and
    foreign policy interests, "rather than making us safer."  (*Id.* ¶ 14.)

21      [22] Concluding that Plaintiffs are likely to succeed on the merits of this statutory claim is
    sufficient to fulfill this requirement for preliminary relief.  Nevertheless, the court also considers
22  a second statutory claim.

1          3.  INA Challenges

2          Plaintiffs also argue that the Agency Memo violates the INA.  The Doe Plaintiffs

3   argue that the FTJ provisions of the Agency Memo violate 8 U.S.C. § 1157(c)(2)(A) of

4   the INA by indefinitely suspending the processing of FTJ derivative refugee applications

5   and indefinitely barring their entry into the country.  (Doe PI Mot. at 9-12.)  The JFS

6   Plaintiffs argue that the SAO provisions of the Agency Memo are ultra vires under the

7   APA because they suspend the processing of refugee applications from SAO countries

8   and bar the entry of refugees from those countries (with limited exceptions) for at least 90

9   days in violation of 8 U.S.C. § 1157(c)(1) of the INA.  (JFS PI Mot. at 19, 21-22.)

10         The APA provides a right of action for plaintiffs who challenge administrative

11  actions that violate a federal statute.  Any "person . . . adversely affected or aggrieved by

12  agency action within the meaning of a relevant statute, is entitled to judicial review

13  thereof."  5 U.S.C. § 702; *see also Cetacean Cmty.*, 386 F.3d at 1176-77 ("[T]he end

14  result is the same whether the underlying statute grants standing directly or whether the

15  APA provides the gloss that grants standing.  In both cases, the plaintiff can bring suit to

16  challenge the administrative action in question.  In the first case, the substantive statute

17  grants statutory standing directly to the plaintiff.  In the second case, the substantive

18  statute is enforced through Section 10(a) of the APA."); *Hernandez-Avalos v. I.N.S.*, 50

19  F.3d 842, 846 (10th Cir. 1995) ("[A] plaintiff who lacks a private right of action under

20  the underlying statute can bring suit under the APA to enforce the statute.").  The court

21  has already determined that Plaintiffs in both cases fall within the zone of interest

22  protected by the Refugee Act of 1980 and the INA.  *See supra* § III.A.2.  Because 5

1    U.S.C. § 702 applies, Plaintiffs in both the Doe Case and the JFS Case can bring their

2    INA statutory challenges under the APA.  Under 5 U.S.C. § 706(2)(C), a "reviewing

3    court shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of

4    statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C.

5    § 706(2)(C); *see also Texas*, 809 F.3d at 178.  The court will address whether Plaintiffs

6    have demonstrated that they are likely to succeed on each claim.

7         *a.  FTJ Provisions*

8         Doe Plaintiffs argue that the suspension of processing FTJ refugee applications

9    and the indefinite bar on their entry into the United States violates the INA.  (*See* Doe PI

10   Mot. at 9-12.)  Specifically, Plaintiffs argue that the award of FTJ refugee status in 8

11   U.S.C. § 1157(c)(2)(A) is not up to the Secretary's discretion.  Instead, this section of the

12   INA contains indisputably mandatory language:

> A spouse or child . . . of any refugee who qualifies for admission under
> paragraph (1) **shall**, if not otherwise entitled to admission under paragraph
> (1) and if not a person described in the second sentence of section
> 1101(a)(42) of this title, **be entitled to the same admission status** as such
> refugee if accompanying, or following to join, such refugee and if the spouse
> or child is admissible . . . as an immigrant under this chapter.

13

14

15

16   8 U.S.C. § 1157(c)(2)(A) (emphasis added).  Doe Plaintiffs contrast the use of the word

17   "shall" with permissive language Congress utilized in the same section concerning

18   principal refugees, which states in pertinent part that the Secretary "may, in the

19   [Secretary's] discretion . . . admit any refugee."  8 U.S.C. § 1157(c)(1).[23]  The Supreme

20

21         ─────────────────

22         [23] The statute refers to the "Attorney General," but the statutory references to the
     Attorney General in this provision are now deemed to refer to the Secretary of DHS.  6 U.S.C.
     § 557; *see Durable Mfg. Co. v. U.S. Dep't of Labor*, 548 F.3d 497, 499 n.1 (7th Cir. 2009)

1    Court has observed that Congress's use of "may" contrasts with its use of "a mandatory

2    'shall' in the very same section" and has interpreted Congress's use of "shall" under such

3    circumstances "to impose discretionless obligations." *Lopez v. Davis*, 531 U.S. 230, 241

4    (2001).  Plaintiffs assert that the remaining language Congress used in Section

5    1157(c)(2)(A)—that FTJ refugees are "entitled to the same admission status" as the

6    principal refugee—only reinforces Congress's intent to abrogate the agency's discretion

7    in this instance.  (Doe PI Mot. at 11.)  The court agrees.

8         Defendants argue that 8 U.S.C. § 1157(c)(2)(A) does not guarantee admission into

9    the United States because FTJ refugees must still be found to be otherwise admissible

10   under the chapter.  (Doe Resp. at 12-13.)  Indeed, Defendants argue that 8 U.S.C.

11   § 1157(c)(2)(A) conditions FTJ refugee status on admissibility, which is not ultimately

12   adjudicated until an individual appears at a port to seek entry to the United States.  (*Id.* at

13   13 (citing 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any

14   alien, to whom a visa or other documentation has been issued, to be admitted [to] the

15   United States, if, upon arrival at a port of entry in the United States, he [or she] is found

16   to be inadmissible under this chapter, or any other provision of law.") and 8 C.F.R.

17   207.7(d) (explaining that approval of an I-730 Petition for a FTJ refugee can be

18   "revoked" prior to entry)).)  However, in *Spencer*, the Ninth Circuit held that the word

19   "shall" in 8 U.S.C. § 1153(b)(5) indicated a nondiscretionary statutory duty to grant a

20

21   ("Under 6 U.S.C. § 557, references in federal law to any agency or officer whose functions have
     been transferred to DHS shall be deemed to refer to the Secretary of DHS or other official or
22   component to which the functions were transferred.").

1    type of visa under the immigrant investor program.  345 F.3d at 691.  Further, the

2    application of statutory eligibility requirements did not render the agency's determination

3    a discretionary one.  *Id.*  Accordingly, the court rejects Defendants' argument.

4         Defendants also respond that Plaintiffs' argument lacks merit because the Agency

5    Memo does not "rescind" anything, but only suspends the admission of FTJ refugees

6    until such time as security or screening procedures are reinforced.  (JFS Resp. at 12.)

7    However, Defendants cite no authority for the proposition that the Secretary can

8    indefinitely suspend a nondiscretionary statutory duty, and so the court rejects this

9    argument, too.

10        Further, Defendants mischaracterize Plaintiffs' claim as "seeking to compel their

11   immediate admission" or "suggest[ing] . . . that [8 U.S.C. §] 1157(c)(2)(A) requires their

12   admission now."  (Doe Resp. at 13-14.)  As noted above, Plaintiffs do not claim that they

13   or their family members are entitled to immediate admission into the United States;

14   rather, Plaintiffs claim that Defendants are not entitled to, and do not have the statutory

15   authority to, indefinitely suspend FTJ refugee processing at will.  By using mandatory

16   language in 8 U.S.C. § 1157(c)(2)(A), Congress created an entitlement for spouses and

17   children of principal refugees to "the same refugee status" as the principal refugee—

18   assuming the spouse and children are otherwise admissible.  Nothing in the statute

19   authorizes the Secretary to stop, terminate, or suspend the ability of otherwise qualified

20   applicants from seeking and obtaining that entitlement.

21        Based on the foregoing authorities and analysis, the court concludes that Plaintiffs

22   have demonstrated that they are likely to succeed on the merits of their claim that the

1   Agency Memo's FTJ provisions of the Agency Memo at issue here violate 8 U.S.C.

2   § 1157(c)(2)(A) of the INA and, therefore, also violate 5 U.S.C. § 706(2)(C) of the APA.

3        *b. SAO Provisions*

4        JFS Plaintiffs argue that the 90-day suspension of processing for refugees

5   applications (with limited exceptions) from SAO countries and the bar to entry into the

6   United States violates the INA.  (*See* JFS PI Mot. at 19, 21-22.)  Despite suspending over

7   40 percent of all refugees currently admitted under USRAP,[24] the Agency Memo itself

8   provides no statutory basis for the 90-day SAO suspension.  (*See* Agency Memo at 2.)  In

9   their briefing and argument to the court, Defendants point to two INA provisions as

10  underpinning the suspension—6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c)(1).[25]  (*See* JFS

11  Resp. at 16.)  The court addresses each of these statutory grounds and finds neither to

12  confer the necessary authority.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374

13  (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers

14  power upon it.").

15       Section 202(4) of Title 6 states that the Secretary of DHS is responsible for

16  "[e]stablishing and administering rules . . . governing the granting of visas or other forms

17  of permission, including parole, to enter the United States to individuals who are not a

18  citizen or an alien lawfully admitted for permanent residence in the United States."  (JFS

19  Resp. at 16 (quoting 6 U.S.C. § 202(4)).)  Without citation to legal authority, Defendants

20  ───────────────

21  [24] (*See* Smith Decl. ¶ 15 ("Out of the 138,710 refugees resettled in the United States in Fiscal Years 2016 and 2017, 60,309, or 43.5%, were from one of the 11 SAO countries.").)

22  [25] Defendants rely on no other statutory grounds for the SAO provisions in the Agency Memo.  (*See* JFS Resp. at 16-17.)

1    assert that the authority granted in 6 U.S.C. § 202(4) over entry into the United States

2    "necessarily encompasses authority to restrict entry."  (JFS Resp. at 16.)  They assert that

3    this is all that the SAO provisions do—restrict entry for all refugees from SAO countries.

4           Defendants also rely on 8 U.S.C. § 1157(c)(1), which states:

5           [The Secretary] may, in the [Secretary's] discretion and pursuant to such
            regulations as the [Secretary] may prescribe, admit any refugee who is not
6           firmly resettled in any foreign country, is determined to be of special
            humanitarian concern to the United States, and is admissible . . . as an
7           immigrant under this chapter.

8    8 U.S.C. § 1157(c).[26]  Defendants argue that the permissive language in this section

9    invests the Secretary with the discretion to admit any refugee and thus implicitly also

10   confers the discretion to exclude any refugee without time limitation.

11          But taking Defendants' position to its logical end, the court would be required to

12   conclude that these two statutory provisions provide the Secretary with the authority to

13   exclude all refugees, and indeed—in the case of 6 U.S.C. § 202(4)—all immigrants from

14   admission to the country.  When the court asked in oral argument for Defendants to

15   provide some limiting principle that would avoid this result, they could not.  This cannot

16   be what Congress intended when it drafted these two provisions.

17          Congress's stated purpose in passing the Refugee Act of 1980 was as follows:

18          The objectives of this Act are to provide a permanent and systematic
            procedure for the admission to this country of refugees of special
19          humanitarian concern to the United States and to provide comprehensive and
            uniform provisions for the effective resettlement and absorption of those
20          refugees who are admitted.

21   _____

22   [26] *See supra* note 21.

ORDER - 52

1   Refugee Act of 1980, Pub. L. No. 96-212 § 101(b), 94 Stat. 102.  Defendants'

2   interpretation of 6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c) is untenable in light of this

3   stated purpose.  Defendants' interpretation would allow either provision to swallow

4   whole the remainder of the Refugee Act of 1980.  *See Abourezk v. Reagan*, 785 F.2d

5   1043, 1057-58 (D.C. Cir. 1986), *aff'd*, 484 U.S. 1 (1987) (finding "persuasive" the

6   plaintiff's argument that the government's statutory interpretation violated provisions of

7   the INA "because it effectively swallow[ed] up" another provision, thereby "nullif[ying]

8   the contours of existing inadmissibility grounds and "evad[ing] the limitations of

9   Congress").

10          Although it involved different INA provisions, the Fifth Circuit recently dealt with

11   a similar overreach of statutory interpretation by the Government.  In *Texas*, several

12   states challenged the DHS Secretary's creation of the "Deferred Action for Parents of

13   Americans and Lawful Permanent Residents" ("DAPA") program.  809 F.3d at 146.  In

14   striking down DAPA as "an unreasonable interpretation that is 'manifestly contrary' to

15   the INA," the Fifth Circuit held that the Government's "interpretation of [the INA]

16   statutory provisions that the Secretary advance[d, which] would allow him to grant lawful

17   presence and work authorization to any illegal alien in the United States," was "an

18   untenable position in light of the INA's intricate system of immigration classifications

19   and employment eligibility."  809 F.3d at 184.  Likewise, Defendants' broad

20   interpretation of both 6 U.S.C. § 202(4) and 8 U.S.C. § 1157(c)(1), which they argue

21   allows them to exclude all refugees of certain national origins, and by extension would

22   allow them to exclude all refugees, is untenable because it allows the DHS Secretary to

1    simply ignore the "permanent and systematic procedure" for refugee admission and

2    resettlement that Congress established in the Refugee Act of 1980.  *See* Refugee Act of

3    1980, Pub. L. No. 96-212 § 101, 94 Stat. 102; *see also Hawaii III*, 2017 WL 6547095, at

4    *11-13 (concluding that EO-3 "conflicts with the statutory framework of the INA by

5    indefinitely nullifying Congress's considered judgments on matters of immigration").

6           Plaintiffs also argue that the SAO provisions conflict with the INA and Refugee

7    Act of 1980 in additional ways.  First, Plaintiffs assert that the SAO provisions run

8    roughshod over the Refugee Act's definition of "refugee."  (JFS PI Mot. at 21.)  In 8

9    U.S.C. § 1101(a)(42), Congress set forth the specific statutory elements that individuals

10   must satisfy to be admitted as a refugee.[27]  *Id.*  Congress also specified criteria as to who

11   would be excluded from the definition.  *Id.*  By either prohibiting refugees from SAO

12   countries from participating in USRAP or by grafting on the additional requirement that

13   refugees from SAO countries must also "fulfill critical foreign policy interests" to

14   qualify, the agencies impermissibly redefine the term "refugee."  They either add to the

15

16          [27] In defining a refugee, Congress set forth specific criteria including that (1) the person
17   must be outside his or her country of nationality or outside any country in which he or she last
     habitually resided, (2) the person must be unable or unwilling to return to, or unable or unwilling
18   to avail himself or herself of the protection of, that country, (3) this inability or unwillingness
     must be due to persecution or a well-founded fear of persecution, and (4) the persecution must be
19   on account of race, religion, nationality, membership in a particular social group, or political
     opinion.  *Id.*  In addition, Congress has specified that a person who has been forced to abort a
20   pregnancy or to undergo involuntary sterilization, or been persecuted for their refusal to do these
     things or for other resistance to a coercive population control program, is deemed to have met
21   some of the qualifications for refugee status listed above.  *Id.*  Finally, Congress specified criteria
     that would exclude a person from refugee status.  Specifically, the term "does not include any
22   person who ordered, incited, assisted, or otherwise participated in the persecution of any person
     on account of race, religion, nationality, membership in a particular social group, or political
     opinion."  *Id.*

1    criteria that Congress delineates to exclude one from refugee status or add an element to

2    Congress's carefully-crafted definition.  Either way, the Agency Memo impermissibly

3    conflicts with this provision.

4         Second, the nation-based SAO suspension impermissibly alters the admissibility

5    standards set by Congress in 8 U.S.C. § 1182(a).  An individual refugee may enter the

6    country only if she is not subject to one of the inadmissibility bars.  *See* 8 U.S.C.

7    § 1157(c)(1) ("[The Secretary] may . . . admit any refugee who . . . is admissible . . . as

8    an immigrant under this chapter.").  Section 1182(a) contains a long list of detailed

9    inadmissibility bars, including on "criminal," "security," "terrorist," and "foreign

10   policy" grounds.  *See* 8 U.S.C. § 1182.  The INA "emphatically did not commit the

11   decision to exclude an alien to standardless agency discretion; the statute lists

12   [numerous] distinctly delineated categories that conspicuously provide standards to

13   guide the Executive in its exercise of exclusion power."  *Abourezk*, 785 F.2d at 1051.

14   Defendants cannot alter the contours of admissibility as sculpted by Congress or evade

15   these congressional limitations by creating a new and separate inadmissibility ground

16   that does not exist in the INA.[28]

17   _____

18       [28] Defendants' observation that the "Government routinely grants *preferences* on the
     basis of nationality" under the Refugee Act (JFS Resp. at 17 (italics in original)) supports rather

19   than undermines Plaintiffs.  Such preferences are granted either pursuant to a Presidential
     determination required by the Refugee Act, 8 U.S.C. § 1157(a)(3) (requiring the President to
     allocate refugee admissions after appropriate consultation with Congress), as is the case with the

20   Priority 2 designations—including the Central American Minors program—and Priority 3
     designations, *see* U.S. Dep't of State, Proposed Refugee Admissions for FY 2018, at 7 (Oct. 4,

21   2017) (report to Congress), (noting that section 207(a)(3) of the INA grants authority to
     determine the USRAP priority system), or pursuant to a duly issued regulation that permits the
     Secretary to prioritize certain refugee admissions based on appropriate criteria, including "reuniting

22   families, close association with the United States, compelling humanitarian concerns, and public

1    Based on the foregoing authorities and analysis, the court concludes that Plaintiffs

2  have demonstrated that they are likely to succeed on the merits of their claim that the

3  Agency Memo's SAO provisions at issue here violate the INA and, therefore, also 5

4  U.S.C. § 706(2)(C) of the APA.[29]

5    4.  Irreparable Harm

6    To qualify for a preliminary injunction, Plaintiffs must show that they are "likely

7  to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.

8  The individual Plaintiffs argue that the suspensions in the Agency Memo will prolong the

9  separation of their family members and that this is an irreparable harm.  They are correct.

10  This Circuit has repeatedly found that "separation from family members" is an

11  irreparable harm.  *Leiva-Perez v. Holder*, 640 F.3d 962, 969-70 (9th Cir. 2011) (quoting

12  *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc).  The related Executive

13  Order litigation has reaffirmed this holding.  *See Hawaii I*, 859 F.3d at 782-83

14  ("prolonged separation from family members" is irreparable harm); *Washington*, 847

15  F.3d at 1169 (identifying "separated families" as an irreparable harm); *see also Int'l*

16  *Refugee Assistance Project*, 857 F.3d at 583-84.

17    Defendants respond that the Agency Memo "would at most delay the entry of

18  Plaintiff's family members."  (Doe Resp. at 21; JFS Resp. at 30-31.)  According to

19  _____

20  interest factors," 8 C.F.R. § 207.5 (2017).  Although section 207.5 may permit the agency to
preference certain admissions based on these criteria, this authority—on which Defendants did not
base their actions—does not encompass the categorical suspension at issue here.

21    [29] Because the court concludes that Plaintiffs are likely to succeed on two of their
statutory claims, it does not consider Plaintiffs' third statutory claim or Plaintiffs' constitutional
22  claims.

1   Defendants, "[s]uch delay alone does not amount to irreparable harm, as processing times

2   for refugees can vary widely and on average are quite lengthy." (*Id.*)  Defendants do not

3   distinguish delayed unification from prolonged separation, nor do they cite any authority

4   that delay is not irreparable harm. (*See* Doe Resp.; JFS Resp.)  Further, the Ninth Circuit

5   has at least implicitly rejected the notion that delay is not irreparable harm. *See Hawaii I*,

6   859 F.3d at 768 (holding that the plaintiffs "will face substantial hardship if we were to

7   first require that they try to obtain a waiver before we will consider their case").  No

8   matter which synonym one uses, the court finds that the Agency Memo causes irreparable

9   harm to individual Plaintiffs whose separation from their family members is prolonged.

10          The organizational Plaintiffs also suffer irreparable harm from the Agency Memo.

11  JFS-S and JFS-SV have dedicated significant resources to helping refugees from the SAO

12  countries. (JFS PI Mot. at 12-13.)  Due to the Agency Memo's suspension of refugees,

13  the organizations claim that they will need to lay-off employees, reduce services, cancel

14  established programs, lose institutional knowledge, and ultimately lose goodwill with

15  volunteers and community partners. (*See id.*)  "Evidence of threatened loss of . . .

16  goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlberg*

17  *Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001); *see*

18  *also Rent-A-Ctr. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th

19  Cir. 1991).

20          Defendants recycle their "delay" argument to claim that the organizations have not

21  suffered irreparable harm. (*See* JFS Resp. at 30-31.)  This argument is similarly

22  unavailing here.  Moreover, the indefinite duration of the "delay" in admitting refugees

1  leaves the organizations unable to operate or plan effectively, further deteriorating

2  goodwill and adding to their harms.  Defendants also argue that the organizations are not

3  irreparably harmed because "these organizations already fulfill their missions by

4  representing such clients who are unaffected by the challenged provisions."  (*Id.* at 12.)

5  The evidence before the court, however, is that JFS-S and JFS-SV are not able to simply

6  shift resources to "unaffected" refugees.  Rather, these organizations have built programs

7  specifically to serve Muslim and Arabic-speaking refugees.  (JFS-S Supp. Decl. ¶¶ 6-7;

8  JFS-SV Supp. Decl. ¶ 4.)  Throughout the time it will take JFS-S and JFS-SV to

9  adequately build programs to service other populations, the organizations will suffer

10 irreparable harm.  *See Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718,

11 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ("Although the funding denied

12 to [the agency] could be reimbursed, [the agency] has presented evidence that, in the

13 interim, its organizational objectives would be irreparably damaged by its inability to

14 provide adequate social services to its clients."); *see also Hawaii I*, 859 F.3d at 782-83

15 (finding the "State's inability to assist in refugee resettlement" was an irreparable harm).

16 Further, as explained above, any sudden shift in the organizations' priorities will threaten

17 their relationships and goodwill with community partners.  In short, the Agency Memo

18 threatens the organizational Plaintiffs' mission, services, and goodwill, and therefore

19 causes them irreparable harm.

20        Based on the foregoing, the court concludes that Plaintiffs are likely to suffer

21 irreparable harm in the absence of preliminary relief.

22 *//*

5.  <u>Public Interest and Balancing the Equities</u>

The balancing of the equities and the public interest inquiries are distinct.  *See Winter*, 555 U.S. at 20.  In weighing equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Id.* at 24 (internal citation omitted).  Conversely, when determining the public interest, a court "primarily addresses impact on non-parties rather than parties."  *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014).  That said, "[t]hese factors may merge where the Government is a party" because the Government purports to be acting in the public interest.  *See Colo. River Indian Tribes v. Dep't of Interior*, No. ED CV14-02504 JAK (SPx), 2015 WL 12661945, at *34 (C.D. Cal. June 11, 2015); *see also Hawaii*, 241 F. Supp. 3d at 1139-40 (combining the balance of equities and public interest analyses).  Here, the Defendant's sole argument for the balancing of equities and public interest factors is the Government's weighty interest in national security.  (*See* Doe Resp. at 24; JFS Resp. at 28.)  The court, therefore, considers these factors together.

The court agrees that the Government has a "compelling" interest in national security.  *Haig v. Agee*, 453 U.S. 280, 307 (1981); *see also Hawaii I*, 859 F.3d at 78 ("National security is undoubtedly a paramount public interest.").  Defendants, however, do not point to any specific national security threat that the Agency Memo curtails.  At most, the Agency Memo expresses general "concerns" with admitting FTJ refugees and refugees from SAO countries.  (*See* Agency Memo at 2-3.)  Further, Defendants have not put forth evidence of how a preliminary injunction might cause specific injury or harm in

1   this instance or how the recent preliminary injunction of EO-1's or EO-2's suspensions of

2   all or portions of USRAP caused any harm or injury.  (*See generally* Dkt.)

3          On the other hand, former national security officials—many of whom held "the

4   most senior responsibility within the U.S. Government for overseeing the refugee

5   resettlement process"—expressed that they are "unaware of any national security threat

6   that would justify" the Agency Memo.  (Joint Decl. Former Nat'l Sec. Officers ¶¶ 4, 7.)

7   In fact, the former officials detailed concretely how the Agency Memo will harm the

8   United States' national security and foreign policy interests.  (*Id.* at ¶¶ 14-15.)  Enjoining

9   portions of the Agency Memo will simply restore refuge procedures and programs to the

10  position they were in prior to its issuance, which already includes "the most thorough

11  vetting of any travelers to the United States.  (*Id.* ¶ 8); *see Hawaii I*, 859 F.3d at 783

12  (noting this same effect of enjoining portions of EO-2).

13         In any event, national security, although undoubtedly "a paramount public

14  interest," *see Hawaii I*, 859 F.3d at 784, does not always override all other public

15  interests, *see IRAP*, 137 S. Ct. at 2088-89.  Moreover, the agencies must exercise national

16  security authority lawfully.  "[C]urtailing unlawful executive action" also serves the

17  public interest.  *Texas*, 809 F.3d at 187; *see also Hawaii I*, 859 F.3d at 784.  Further,

18  suspending the FTJ refugees program and the processing of refugee applications (with

19  limited exceptions) from SAO countries hinders Plaintiffs' ability to reunite with their

20  families while increasing refugees' exposure to perilous circumstances abroad, and its

21  also disrupts and hinders JFS-S's and JFS-SV's ability to resettle and serve refugees.  *See*

22  *supra* § II.B.  Thus, "[t]he public interest in uniting families and supporting humanitarian

1   efforts in refugee resettlement support the conclusion that the public interest is served by

2   preliminarily enjoining [portions of the agency Memo] and maintaining the status quo."

3   *See Hawaii I,* 859 F.3d at 784 (citing *Solis-Espinoza v. Gonzales,* 401 F.3d 1090, 1094

4   (9th Cir. 2005) ("Public policy supports recognition and maintenance of a family unit.

5   The [INA] was intended to keep families together.  It should be construed in favor of

6   family units and the acceptance of responsibility by family members.")).  Further, the

7   INA should be construed in accordance with its "humane purpose . . . to reunite

8   families."  *Kaliski v. Dist. Dir. of Immigration & Naturalization Serv.*, 620 F.2d 214, 217

9   (9th Cir. 1980).  In *Hawaii I,* the Ninth Circuit concluded that, because a preliminary

10   injunction of EO-2 would serve the foregoing interests, it was in the public interest.  859

11   F.3d at 784-85.  Likewise, this court concludes that Plaintiffs have demonstrated that a

12   preliminary injunction of the FTJ and SAO suspensions here is in the public interest.

13   Nevertheless, the court's analysis would not be complete without considering the

14   Supreme Court's recent decision in *IRAP,* 137 S. Ct. 2080, and the court will tailor any

15   preliminary injunction it issues to the confines of that ruling.[30]  When evaluating whether

16

---

17   [30] The court recognizes that the Supreme Court recently stayed two preliminary
      injunctions relating to EO-3, pending appeals in the Fourth Circuit and Ninth Circuit,

18   respectively. *See Trump v. Int'l Refugee Assistance Project,* No. 17A560, 2017 WL 5987435, at
      *1 (U.S. Dec. 4, 2017); *Trump v. Hawaii,* No. 17A550, 2017 WL 5987406, at *1 (U.S. Dec. 4,
      2017).  The Court's rulings, however, do not provide any analysis or explanation why it stayed

19   the injunctions.  On December 5, 2017, this court ordered the parties "to provide supplemental
      briefing concerning what impact, if any, the Supreme Court's December 4, 2017, orders have

20   concerning the two pending motions for preliminary injunction."  (Supp. Br. Order (Dkt. # 68) at
      2; *see also* Doe Supp. Brief; JFS Supp. Brief; Def. Supp. Brief.)  After considering the parties'

21   supplemental briefs and the Supreme Court's December 4, 2017, rulings, this court will still rely
      on *IRAP,* 137 S. Ct. 2080 (2017), the only reasoned opinion from the Supreme Court on a related

22   matter to date.  Nothing in the December 4, 2017, rulings expressly undermines, let alone
      mentions, *IRAP.*  Moreover, the December 4, 2017, rulings dealt exclusively with immigrants—

1    to issue a stay of the EO-2 preliminary injunctions, the Supreme Court determined that

2    the balance of equities favored "foreign nationals who have a credible claim of a bona

3    fide relationship with a person or entity in the United States." *Id*. at 2088.  The Court

4    recognized that the Government's interest in protecting national security was at its apex

5    when considering the admission of foreign nationals with no connection to the United

6    States. *Id*.  However, the Supreme Court found that the balance of equities was different

7    when considering the admission of aliens who had a credible claim of a bona fide

8    relationship with a person or entity within the United States.  *Id*.  With respect to these

9    individuals, the Supreme Court upheld the lower courts' injunctions against enforcement

10   of EO-2.  *Id*.  The Court also specifically extended this balancing of equities to refugees:

11   "[a]n American individual or entity that has a bona fide relationship with a particular

12   person seeking to enter the country as a refugee can legitimately claim concrete hardship

13   if that person is excluded."  *Id.* at 2089.

14         By statutory definition, as Defendants conceded at oral argument, all FTJ refugees

15   have a bona fide relationship with a person in the United States.  *See* 18 U.S.C. § 1157(c).

16   Thus, a preliminary injunction will be applicable to all FTJ refugees.  The same,

17   however, is not true for all refugees from SAO countries.  These refugees are not

18   necessarily in a relationship with a United States person or organization.  The *IRAP* Court

19   held that for "refugees who lack any such connection to the United States . . . the balance

20

21   ―――――――――――

     not refugees or the INA provisions currently at issue.  It is simply impossible to say how the

22   Court considered the equities in the December 4, 2017, rulings, and whether the Court's analysis
     applies here.

1    tips in favor of the Government's compelling need to provide for the Nation's security."

2    137 S. Ct. at 2089.  Thus, any preliminary injunction concerning refugees from SAO

3    countries will apply only to individuals with a bona fide relationship to a person or entity

4    within the United States.[31]  *See id*.

5           For the reasons stated above and with the noted limitations based on the Supreme

6    Court's decision in *IRAP*, the court finds that the balance of equities and the public

7    interest factors weigh in favor of enjoining the FTJ and SAO provisions in the Agency

8    Memo at issue here.

9           6.  Scope of the Injunction

10          Defendants argue that any preliminary injunction should apply to the individual

11   Plaintiffs in this action only.  (Doe Resp. at 22-23; JFS Resp. at 28-29.)  An injunction is

12   not necessarily overbroad by extending benefits or protection to persons other than the

13   prevailing parties—even in the absence of a certified class—if such breadth is necessary

14   to give the prevailing parties the relief to which they are entitled.  *Hawaii I*, 859 F.3d at

15   788.  "Narrowing the injunction to apply to only Plaintiffs would not cure the statutory

16   violation identified, which in all applications would violate provisions of the INA."  *Id.*

17   In addition, partial implementation of the challenged provisions in the Agency Memo

18

19          [31] With respect to a "bona fide relationship" with an American organization, the Supreme
     Court held that for such a relationship to exist, it "must be formal, documented, and formed in
20   the ordinary course, rather than for the purpose of evading [the Executive Order at issue]."  *See
     IRAP*, 137 S. Ct. at 2088.  The Ninth Circuit has interpreted this language to include refugee
21   applicants covered by a formal assurance from a refugee resettlement agency.  *See Hawaii II*,
     871 F.3d at 658.  Thus, those refugees from SAO countries who have a formal assurance from
22   JFS-S, JFS-SV, or some other refugee resettlement agency or humanitarian organization, would
     be covered by the preliminary injunction.

1    would undermine uniform enforcement of the nation's immigration laws.  *See Texas*, 809

2    F.3d at 155 (issuing nationwide injunction concerning the DAPA program because

3    "partial implementation of the Executive Order 'would undermine the constitutional

4    imperative of 'a uniform Rule of Naturalization' and Congress's instruction that 'the

5    immigration laws of the United States should be enforced vigorously and uniformly'")

6    (footnotes omitted) (quoting U.S. CONST, art. I, § 8, cl. 4 and Immigration and Reform

7    Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384); *see also*

8    *Hawaii III*, 2017 WL 6547095, at *25 (holding that the "the district court did not abuse

9    its discretion by granting a nationwide injunction" with respect to EO-3).

10        Accordingly, the court issues a nationwide preliminary injunction[32] as follows:

11    1.    Defendants and their officers, agents, servants, employees, attorneys, and all

12    members and persons acting in concert or participation with them from the date of this

13    Order, are enjoined and restrained from enforcing those provisions of the Agency Memo

14    that suspend the processing of FTJ refugee applications or suspend the admission of FTJ

15    refugees into the United States.  This portion of the preliminary injunction does not apply

16    to Defendants' efforts to implement "additional security measures" or align "the

17    screening mechanisms for [FTJ] refugees" with "processes employed for principal

18    refugees" as described in the Agency Memo.

19    //

---

20    [32] The preliminary injunction does not apply to the President.  *See Hawaii I*, 859 F.3d at

21    788 (holding that the court lacked jurisdiction to enjoin the President).  However, the preliminary injunction runs against all other Defendants.  *See id.* ("Injunctive relief . . . may run against all

22    other executive officials, including the Secretary of Homeland Security and the Secretary of State.").

1    2.      Defendants and their officers, agents, servants, employees, attorneys, and all

2    members and persons acting in concert or participation with them from the date of this

3    Order, are enjoined and restrained from enforcing those provisions of the Agency Memo

4    that suspend or inhibit, including through the diversion of resources, the processing of

5    refugee applications or the admission into the United States of refugees from SAO

6    countries.  However, this portion of the preliminary injunction only applies to FTJ

7    refugees or other refugees with a bona fide relationship to a person or entity within the

8    United States.  *See IRAP*, 137 S. Ct. at 2088 89.  Further, this portion of the preliminary

9    injunction does not apply to Defendants' efforts to conduct a detailed threat assessment

10   for each SAO country.

## IV.    CONCLUSION

11   

12        Based on the foregoing analysis, the court GRANTS Plaintiffs' motion in the Doe

13   Case (Dkt. # 45), and GRANTS Plaintiffs' motion in the JFS Case (17-1707 Dkt. # 42)

14   except for those refugees who lack a bona fide relationship with a person or entity in the

15   United States.

16        Dated this 23rd day of December, 2017.

17   

18   _____

19   JAMES L. ROBART
     United States District Judge

20   

21   

22