UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN DOES, et al., | CASE NO. C17-0178JLR |
| Plaintiffs, | ORDER GRANTING MOTION FOR DISCOVERY AND DENYING MOTION TO DISMISS WITHOUT PREJUDICE |
| v. | |
| DONALD TRUMP, et al., | |
| Defendants. | (RELATING TO BOTH CASES) |
| JEWISH FAMILY SERVICES, et al., | CASE NO. C17-1707JLR |
| Plaintiffs, | |
| v. | |
| DONALD TRUMP, et al., | |
| Defendants. | |

## I.   INTRODUCTION

Before the court are two motions:  (1) Consolidated Plaintiffs Jewish Family

Services of Seattle, Jewish Family Services of Silicon Valley, Allen Vaught, Afkab

Mohamed Hussein, John Does 1-3 and 7, and Jane Does 4-6's (collectively, "JFS

Plaintiffs") motion to reinstate their request for limited discovery[1] (2d MFD (Dkt.

# 131));[2] and (2) Defendants President Donald Trump, United States Department of State

("DOS"), Secretary of State Mike Pompeo, United States Department of Homeland

Security ("DHS"), DHS Secretary Kirstjen M. Nielsen, United States Customs and

Border Protection ("USCBP"), Commissioner of USCBP Kevin McAleenan, Field

Director of the Seattle Field Office of USCBP Michele James, Office of the Director of

National Intelligence, Director of National Intelligence ("DNI") Daniel Coats's

(collectively, "Defendants") motion to dismiss and dissolve the preliminary injunction as

moot (MTD (Dkt. # 145)).[3]  Plaintiffs John Doe, Episcopal Diocese of Olympia, Joseph

Doe, James Doe, Council on American Islamic Relations – Washington, Jack Doe, Jason

Doe, and Jeffrey Doe (collectively, "Doe Plaintiffs") join JFS Plaintiffs' motion.  (*See*

5/7/18 Order (Dkt. # 141) (granting Doe Plaintiffs' motion for joinder).)  The court has

considered the motions, all submissions filed in support of and in opposition to both

//

---

[1] The motion that JFS Plaintiffs seek to reinstate is Plaintiffs' cross-motion for limited expedited discovery on compliance with the preliminary injunction.  (*See* 1st MFD (Dkt. # 121).)

[2] The court consolidated this matter with cause number C17-1707JLR.  (*See* 11/29/17 Order (Dkt. # 61).)  All references in this order to the docket are to cause number C17-0178JLR unless the docket number is preceded by "17-1707."  For example, if the docket number in the citation is"17-1707 Dkt. # 1," then the docket reference is to cause number C17-1707JLR.

[3] Under Federal Rule of Civil Procedure 25(d), Secretary of State Pomeo is automatically substituted for former Secretary of State Rex Tillerson, DHS Secretary Nielsen is automatically substituted for Acting DHS Secretary Elaine Duke, and Commissioner McAleenan is now the Commissioner of USCBP rather than the Acting Commissioner.  *See* Fed. R. Civ. P. 25(d).  The court DIRECTS the Clerk to make these substitutions and corrections on the docket.

motions, the relevant portions of the record, and the applicable law.  Being fully advised,[4]

the court GRANTS JFS Plaintiffs and Doe Plaintiffs' (collectively, "Plaintiffs") motion

for limited discovery as more fully described herein and DENIES Defendants' motion to

dismiss and dissolve the preliminary injunction as moot without prejudice to refiling, if

appropriate, following the conclusion of limited jurisdictional discovery.

## II.    BACKGROUND

**A.    The President's First Three Executive Orders**

On January 27, 2017, President Trump signed Executive Order 13769 ("EO1"),

which suspended for 90 days entry into the United States for nationals of seven

Muslim-majority countries; suspended the U.S. Refugee Admissions Program

("USRAP") for 120 days; and indefinitely barred Syrian refugees from entering the

United States.[5]  Following a nationwide preliminary injunction against EO1, *see, e.g.*,

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), the President rescinded EO1 and

replaced it with Executive Order 13780 ("EO2").[6]  EO2 suspended for another 90 days

the entry of nationals from six Muslim-majority countries and suspended all refugee

admissions for 120 days.  *See* EO2 §§ 2(c), 6(a).  The Ninth Circuit enjoined EO2 before

---

[4] No party requests oral argument on either motion (*see* MTD at 1; 2d MFD at 1), and the court determines that oral argument is not necessary for its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b).

[5] *See* Executive Order 13769, "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 8,977 (Jan. 27, 2017) ("EO1").

[6] *See* Executive Order 13780, "Protecting the Nation from Foreign Terrorist Entry into the United States," 82 Fed. Reg. 13,209 (Mar. 6, 2017) ("EO2").

it took effect. *See Hawaii v. Trump*, 859 F.3d 741, 757, 760 (9th Cir. 2017) (per curiam), *vacated as moot*, --- U.S. ---, 137 S. Ct. 377 (2017). However, the Supreme Court allowed Defendants to suspend the entry into the country of immigrants from the six Muslim-majority countries and to suspend USRAP, but only for immigrants and refugees without a "bone fide relationship" to a person or entity in the United States. *See Trump v. IRAP*, --- U.S. ---, 137 S. Ct. 2080, 2087-89 (2017).

When EO2's 90-day ban on immigrants from six Muslim-majority countries expired, President Trump issued a Proclamation ("EO3") that, among other things, indefinitely banned immigrants from seven countries—six of which are Muslim-majority countries.[7] On June 26, 2018, the Supreme Court held that President Trump permissibly exercised his "broad discretion" under 8 U.S.C. 1182(f) of the Immigration and Nationality Act ("INA") in issuing EO3. *See Trump v. Hawaii*, --- U.S. ---, 138 S. Ct. 2392, 2407-10 (2018).

**B.     The Fourth Executive Order & the Agency Memo**

In the meantime, on October 24, 2017, EO2's 120-day suspension of refugee admissions expired. (*See* PI Order (Dkt. # 92) at 8.) On the same day, President Trump issued Executive Order 13815 ("EO4"), entitled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities."[8] Although EO4's title

---

[7] *See* Proclamation 9645, "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats," 82 Fed. Reg. 45,161 (Sept. 24, 2017).

[8] *See* Executive Order 13815, "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities," 82 Fed. Reg. 50,055 (Oct. 24, 2017).

indicates that refugee admissions have resumed, the accompanying memorandum—known as the "Agency Memo"—imposed another ban on certain categories of refugees. (*See* Lin Decl. (Dkt. # 46) ¶ 3, Ex. B (attaching a copy of the Agency Memo).)[9]  The Agency Memo was dated one day before EO4, but was also released on October 24, 2017.  (*See id.*)

First, the Agency Memo suspended indefinitely "following-to-join" ("FTJ") derivative refugees.[10]  Every year, approximately 2,500 refugees in the United States are able to reunite with their immediate family members through the FTJ process.  (Agency Memo at 2 n.1.)  The Agency Memo states that most FTJ refugee applicants do not currently undergo the same security procedures as the principal refugee who has already resettled in the United States.  (*Id.* at 2-3.)  The Secretaries of DOS and DHS and the DNI determined that FTJ refugees should not be admitted to the United States until additional screening procedures were in place.  (*Id.* at 3.)

---

[9]An addendum attached to the Agency Memo, entitled "Addendum to Section 6(a) Memorandum," refers to the review of USRAP directed by Section 6(a) of EO2.  (*See* Burman Decl. (17-1707 Dkt. # 43) ¶ 3, Ex. B (attaching "Agency Memo Addendum").)

[10] Under the INA, subject to numerical limits that the President sets annually, the Secretary of DHS may admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under ([8 U.S.C. § 1157(c)(3)]) as an immigrant."  8 U.S.C. § 1157(c)(1).  Refugees admitted under this provision are "principal refugees."  *See* 8 C.F.R. § 207.7(a).  "Derivative refugees" are the spouses and unmarried minor children of an admitted principal refugee.  *See id.*  When derivative refugees travel to join a principal refugee more than four months after the principal refugee's admission, they are FTJ derivative refugees, rather than "accompanying" derivative refugees.  *See id.*

Second, the Agency Memo suspended for at least 90-days the entry of refugees who are "nationals of, and stateless persons who last habitually resided in, 11 particular countries previously identified as posing a higher risk to the United States through their designation on the Security Advisory Opinion (SAO) list." (*Id.* at 2-3; *see also* Agency Memo Addendum at 1.) The Agency Memo does not identify the countries designated on the SAO list, but they are believed to be Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria, and Yemen. (*See* PI Order at 10-11 n.6; 11/16/17 Smith Decl. (17-1707 Dkt. # 44) ¶ 3.) The Agency Memo required DOS and DHS to "conduct a review and analysis" of USRAP for refugees from SAO countries for an additional 90 days—notwithstanding the agencies' previous review of USRAP pursuant to EO1 and EO2. (*See id.*) In addition, the Agency Memo diverted resources dedicated to processing refugees who are citizens of (or stateless persons who last resided in) SAO countries and reallocated those resources to processing refugee applicants from non-SAO countries. (*Id.*) Although the review was to last for 90 days, Defendants conceded in oral argument that the Agency Memo does not direct the government to resume processing and admitting SAO refuges after the 90-day review is complete. (*See* Tr. of 12/21/17 Hr'g (Dkt. # 113) at 38:1-5 ("I mean, perhaps the government will conclude at the end of the 90 days that refugee admissions may resume in March, or perhaps the

//

//

//

//

government will decide that further security measures are needed for certain countries. We just don't know.").)[11]

## C. The Preliminary Injunction

JFS Plaintiffs filed suit and Doe Plaintiffs amended their complaint to challenge the Agency Memo's suspension of FTJ and SAO refugee admissions (*see* TAC (Dkt. # 42); Compl. (17-1707 Dkt. # 1)); and Plaintiffs moved for a preliminary injunction blocking those provisions of the Agency Memo (*see* Doe PI Mot. (Dkt. # 45); JFS PI Mot. (17-1707 Dkt. # 42)). On November 29, 2017, the court consolidated the two actions. (*See* 11/29/17 Order.) On December 23, 2017, the court granted both JFS Plaintiffs' and Doe Plaintiffs' motions and enjoined Defendants from enforcing (1) "those provisions of the Agency Memo that suspend the processing of FTJ refugee applications or suspend the admission of FTJ refugees into the United States," and (2) "those provisions . . . that suspend or inhibit, including through the diversion of resources, the processing of applications or the admission into the United States of refugees from SAO countries." (PI Order at 64-65.) The court, however, limited its preliminary injunction to refugees "with a bona fide relationship to a person or entity within the United States." (*Id.* at 65.)

---

[11] In response to Plaintiffs citing this portion of the record, Defendants contend that they "have never suggested that there was any suspension apart from the 90-day SAO de[-]prioritization that the [c]ourt enjoined." (Def. MTD Reply (Dkt. # 150) at 9 n.3.) This statement misses the mark. The salient point is not whether the suspension was initially linked to the 90-day review, but rather whether there is any direction in the Agency Memo to resume processing and admitting SAO refugees at the end of the 90-day review. Defendants' admission confirms that there was not.

Within a few days, Defendants moved for an "emergency" stay of the injunction pending appeal. (MFS (Dkt. # 95).) In that motion, Defendants narrowly interpreted the court's injunction. (*See id.* at 4-6.) Defendants asserted that they were not required to undo any actions taken or decisions made prior to December 23, 2017, to implement the SAO or FTJ suspensions. *See id.* On January 9, 2018, the court denied Defendants' motion (1/9/18 Order (Dkt. # 106) at 7-16) and rejected their cramped interpretation of the court's preliminary injunction (*id.* at 5-7). The court admonished Defendants for attempting "to unilaterally modify the preliminary injunction" and ordered them to "restore the status quo prior to the issuance of the Agency Memo with respect to the processing of applications from FTJ refugees and refugees from SAO countries." (*Id.* at 5-6.) On January 4, 2018, Defendants filed a notice of appeal concerning the court's preliminary injunction. (NOA (Dkt. # 99).)

**D.      Defendants' Notices of Compliance with the Preliminary Injunction**

On January 19, 2018, Defendants filed a notice of compliance with the court's preliminary injunction. (*See* 1/19/18 Notice (Dkt. # 114).) The notice described certain steps Defendants had taken in response to the court's orders. (*See generally id.*) The notice referenced guidance that Defendants had sent to DOS and USCIS personnel in late December 2017 and early January 2018 "directing their personnel to comply with the injunction." (*Id.* at 2-3.) However, Defendants have not produced copies of the guidance they sent (*see* JFS MTD Resp. (Dkt. # 146) at 4), and Defendants sent all of the guidance referenced in their January 19, 2018, notice prior to the court's January 9, 2018, order, in which the court rejected Defendants' narrow interpretation of the preliminary

injunction.[12]  (*See id.*; *see also* 1/9/18 Order at 5-6).  Finally, the notice described

Defendants' efforts to comply with the preliminary injunction in the scheduling of

"circuit rides" through which USCIS officers travel to locations worldwide to interview

refugee applicants.[13]  (1/19/18 Notice at 3-5.)

On January 31, 2018, Defendants filed a second notice announcing that they had

completed the 90-day SAO refugee review on January 22, 2018, and they expected to

finish implementing the additional procedures for FTJ refugees referenced in the Agency

Memo on or about February 1, 2018.  (*See* 1/31/18 Notice (Dkt. #119) at 1-2.)  In the

notice, Defendants stated that they "do not understand the preliminary injunction . . . to

prohibit [them] from implementing these enhancements and recommendations."  (*Id.* at

1.)  Defendants also asserted that as a result of these two events—the completion of the

SAO refugee review and the near-completion of enhanced procedures for FTJ refugee

//

---

[12] The guidance Defendants sent included:  (1) guidance issued on December 23, 2017, by the Bureau of Consular Affairs to consular posts overseas (1/19/18 Gauger Decl. (Dkt. # 114-1) ¶ 3); (2) guidance issued on December 24, 2017, by the Office of Admissions at the Bureau of Population, Refugees, and Migration ("PRM") to implementing partners at Resettlement Support Centers ("RSCs") overseas (*id.* ¶ 2); (3) instructions issued on December 24, 2017, by the Refugee, Asylum and International Operations ("RAIO") Directorate at USCIS to RAIO officers ordering them to release all FTJ cases previously on hold and process those cases under procedures in effect prior to the Agency Memo (1/19/18 Higgins Decl. (Dkt. # 114-2) ¶ 2); and (4) a January 4, 2018, DOS cable with guidance on FTJ refugees sent to all diplomatic and consular posts (1/19/18 Gauger Decl. ¶ 3).

[13] The efforts related to circuit rides included:  (1) an inquiry on December 26, 2017, from the Office of Admissions at PRM to the RSCs, which led to additional interviews of SAO nationals during second-quarter circuit rides (1/19/18 Higgins Decl. ¶ 5; 1/19/18 Gauger Decl. ¶ 5); and (2) plans to add locations to third-quarter circuit rides where large SAO populations are ready for interviews (1/19/18 Gauger Decl. ¶ 7; 1/19/18 Higgins Decl. ¶ 7).

1  processing—Plaintiffs' claims concerning the Agency Memo would "soon be moot." (*Id.*

2  at 2.)

3  **E.    Secretary Nielsen's Memorandum**

4       On or about January 29, 2018, DHS Secretary Nielsen issued a memorandum ("the

5  Nielsen Memo") announcing three "determinations" she had made based on the DHS's

6  SAO review as ordered by the Agency Memo. (*See* MTD, Ex. 2 (Dkt. # 145-2) ("Nielsen

7  Memo") at 2-3.) She determined that (1) "[a]dditional screening and vetting" are

8  required for "certain nationals of high-risk countries"; (2) the USRAP "should continue

9  to be administered in a risk-based manner"; and (3) the "SAO list and selection criteria

10 should be reviewed and updated." (*Id.*) The Nielsen Memo also stated that "[t]he 90-day

11 review of SAO countries, as provided in the . . . [Agency Memo], is no longer in effect

12 by its terms, and the prioritization set forth in the Memorandum is not hereby renewed."

13 (*Id.* at 4.)

14      Defendants produced a redacted copy of the Nielsen Memo to Plaintiffs on

15 February 8, 2018. (Keaney Decl. (Dkt. # 122) ¶¶ 3-4, Exs. B-C.) Plaintiffs requested

16 that Defendants reconsider the redaction, and if they refused, to state the basis for the

17 redaction. (*Id.* ¶ 5, Ex. D.) On February 13, 2018, Defendants refused to reconsider the

18 redaction and asserted that the redaction was based on the law enforcement privilege.

19 (*Id.* ¶ 6, Ex. E.)

20 //

21 //

22 //

**F.    Plaintiffs' Evidence of Non-Compliance with the Preliminary Injunction**

    1.  <u>Communications from the DOS</u>

Plaintiffs submit email communications from DOS that they contend contradict Defendants' assertions of compliance with the preliminary injunction.  (*See* Doe MTD Resp. (Dkt. # 147) at 10-11.)  First, on January 8, 2018, Congresswoman Pramila Jayapal's Manager for Constituent Services sent an email to PRM on behalf of a constituent to inquire about the refugee petitions of the constituent's mother and six siblings.  (5/4/18 Mohamed Decl. (Dkt. # 139) ¶ 3.)  On January 12, 2018, the DOS Congressional Liaison responded that the case had been "conditionally approved for refugee resettlement by DHS/USCIS in Nov[ember] 2015," but was now "on temporary hold following the issuance of an Executive Order on October 24, 2017[,] that directed [DOS] and DHS to review the refugee processing procedures for nationals of 11 countries, which includes this case."  (*Id.* ¶ 4, Ex. A.)

Second, on April 4, 2018, the same DOS Congressional Liaison[14] wrote to a staff member of Congressman Mark Vessey's office that the refugee about whom the staff member had inquired had been fully approved in September 2017.  (5/3/18 Doe 1 Decl. (Dkt. # 132) ¶ 3, Ex. A.)[15]  However, the Liaison continued that "USRAP was unable to complete final processing of the case prior to the Oct[ober] 24, 2017[,] Executive Order

---

[14] Defendants represent that the same DOS employee authored both the January 12, 2018, and April 4, 2018, emails.  (Def. 2d MFD Resp. (Dkt. # 142) at 4.)

[15] Mr. Doe 1's declaration contains two paragraphs numbered "3."  (*See* 5/3/18 Doe 1 Decl. at 2.)  The paragraph number three referenced above is the second such paragraph.

directing the temporary suspension of the movement of nationals from eleven countries, including Iraq, until a further review of the procedures for processing these cases was completed." (*Id.*)  The Liaison also stated that the "suspension ended on Jan[uary] 22, 2018" (*id.*), which is the same day Defendants state in their January 31, 2018, notice to the court that they completed the 90-day SAO refugee review (*see* 1/31/18 Notice at 1-2).

Those DOS communications to two different Congressional offices make no reference to the preliminary injunction or any implementation thereof.  (*See id.*; 5/4/18 Mohamed Decl. ¶ 4, Ex. A.)  In response, Defendants submit the declaration of Kelly A. Gauger, the Acting Director of the Admissions Office of PRM of DOS.  (*See* 5/14/18 Gauger Decl. (Dkt. # 142-1).)  She reiterates that "the requirements of the December 23, 2017, [preliminary] injunction . . . were immediately sent to PRM's implementing partners at the [RSCs] overseas so that the RSCs could resume processing . . . applicants within the scope of the injunction at the start of the next business day." (*Id.* ¶ 5.)  She also states that the representations in the DOS Congressional Liaison's emails "are incorrect and the result of inadvertent error." (*Id.* ¶ 6.)  Defendants do not, however, submit a declaration from the DOS Congressional Liaison himself explaining the content of his emails, his sources, or his methods of inquiry.  (*See generally* Dkt.)

### 2. Statistical Evidence

JFS Plaintiffs also submit statistical evidence indicating a precipitous drop in refugee admissions during 2018 despite the court's preliminary injunction and order requiring Defendants to "restore the status quo prior to the issuance of the Agency Memo with respect to the processing of applications from FTJ refugees and refugees from SAO

countries." (*See* 1/19/18 Order at 5; *see generally* PI Order.)  For example, in the first four months following the preliminary injunction, the admission of refugees from SAO countries remained at a standstill.  Although in fiscal years 2016 and 2017 refugees from SAO countries comprised 43.5 percent of the refugee admissions under the USRAP (*see* 1/29/18 Smith Decl. (Dkt. # 118) ¶ 5), between October 1, 2017, and April 1, 2018, only 4.2 percent of the total refugees admitted under the USRAP were from SAO countries (*see* 5/3/18 Smith Decl. (Dkt. # 133) ¶ 4).  Further, between December 23, 2017—the date of the preliminary injunction—and April 1, 2018, the percentage of refugees from SAO countries dropped even further.  (*See id.* ¶ 5).  Following the court's preliminary injunction, the percentage of SAO nationals dropped to just 2.7 percent of all refugee admissions.[16]  (*See id.*)

Defendants do not dispute these statistics but rather attribute them to (1) the effects of the Agency Memo prior to the preliminary injunction and (2) the government's enhanced screening and vetting protocols implemented as a result of the 120-day review authorized by EO2 and the 90-day review authorized by the Agency Memo.  (*See generally* Def. 2d MFD Resp. at 5-6.)

3.  Defendants' Record of Compliance with Prior Preliminary Injunctions

JFS Plaintiffs also point to the government's record of compliance with other preliminary injunctions issued in response to EO1.  (*See* JFS MTD Resp. (Dkt. # 146) at //

---

[16] Doe Plaintiffs represent that there is no publicly available data on FTJ refugee admissions.  (Doe MTD Resp. (Dkt. # 147) at 12.)

12 n.9.)  On January 18, 2018, the Office of the Inspector General ("OIG") of DHS issued a report regarding DHS's implementation of EO1 and CPB's response to various court orders enjoining the implementation of EO1.  *See* Office of the Inspector Gen., Dep't of Homeland Sec., *DHS Implementation of Executive Order # 13769* (Jan. 18, 2018), https://www.oig.dhs.gov/sites/default/files/assets/2018-01/OIG-18-37-Jan18.pdf. The report "highlights" its findings as follows:

> Regarding [CBP's] compliance with multiple federal court orders that were issued between the January 27, 2017 release of [EO1] and the February 3, 2017 nation-wide injunction in *Washington v. Trump*, we found that at the ports of entry, CBP largely complied with court orders, albeit with some delay and confusion as to the scope of some orders.  But while CBP complied with court orders at U.S. ports of entry as to travelers who had already arrived, CBP was aggressive in preventing affected travelers from boarding aircraft bound for the United States.  We believe those actions violated two separate court orders that enjoined CBP from this activity.

*Id.*

Defendants do not dispute the contents of the OIG's report, but instead argue that they are entitled to a presumption that they have discharged their duties properly.  (*See* Def. MTD Reply at 7 n.2.)  Defendants also highlight that the OIG "did not substantiate any claims of misconduct on the part of CPB Officers . . . at the ports of entry," and that "at the port of entry, CPB largely complied with court orders, albeit with some delay and confusion as to the scope of some orders."  (*See id.*)

**G.    Remand from the Ninth Circuit**

On February 6, 2018, following the completion of the 90-day SAO refugee review on January 22, 2018, and the implementation of additional procedures for FTJ refugees on or about February 1, 2018 (*see* 1/31/18 Notice at 1-2), Defendants moved to dismiss

as moot their appeal (and Plaintiffs' cross-appeal) in the Ninth Circuit. *See Doe v. Trump*, No. 18-35026 (9th Cir.), Dkt. # 24 at 2. On March 29, 2018, the Ninth Circuit denied Defendants' motion to dismiss and instead granted Plaintiffs' request to remand the consolidated case so that this court could address the issue of mootness in the first instance. (3/29/18 9th Cir. Ord. (Dkt. # 126); 9th Cir. Mandate (Dkt. # 144).)

While their appeal was pending, Defendants filed a motion to stay the proceedings here. (*See* MTS (Dkt. # 110).) Plaintiffs responded with a motion seeking limited discovery on Defendants' compliance with the preliminary injunction. (*See* 1st MFD.) In response to the Ninth Circuit's remand order, the court indicated that it was likely to deny as moot Defendants' motion to stay and removed both that motion and Plaintiffs' motion for limited discovery from the court's calendar. (4/10/18 Order (Dkt. # 128) at 2.) The court also ordered the parties to file a joint status report proposing how the court should proceed on remand to address the issue of mootness. (*Id.* at 3.) In accordance with their joint status report (JSR (Dkt # 129)), JFS Plaintiffs filed their present motion to reinstate their request for limited discovery on compliance (*see* 2d MFD), in which Doe Plaintiffs joined (*see* 5/7/18 Order), and Defendants filed their motion to dismiss based on mootness (*see* MTD). The court now considers both motions.

### III.    ANALYSIS

#### A.    Legal Standard

A party may move to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A federal court does not have jurisdiction "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law

which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). Thus, mootness deprives federal courts of subject matter jurisdiction because federal courts are empowered to hear only cases and controversies. U.S. Const. art. III § 2; *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974).

"A claim is moot if it has lost its character as a present, live controversy." *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1172-73 (9th Cir. 2009) (quoting *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997)). To determine mootness, "the question is not whether the precise relief sought at the time the application for an injunction was filed is still available. The question is whether there can be *any* effective relief." *NW Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244-45 (9th Cir. 1988) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1403 (9th Cir. 1986)). If a course of action is mostly completed but "changes can still be made to help alleviate any adverse effects," the case is not moot. *Tyler v. Cuomo*, 236 F.3d 1124, 1137 (9th Cir. 2000). A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin v. Chafin*, 133 S.Ct. 1017, 1023 (2013) (citation omitted). The party alleging mootness bears a "heavy" burden to establish that the court can provide no effective relief. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (quoting *Forest Guardians v. Johanns*, 450 F.3d 455, 461 (9th Cir. 2006)).

When a party requests discovery to respond to a motion to dismiss on jurisdictional grounds, the court ordinarily should grant discovery "where pertinent facts

bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (quoting *Butcher's Union Local No. 498 v. SDC Inv., Inc.*, 788 F.2d 535, 540 (9th Cir. 1986)) (discussing discovery in the context of standing). On the other hand, "a refusal to grant discovery to establish jurisdiction is not an abuse of discretion when 'it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.'" *Id.* (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)).

"It is well-established that '[t]he burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists." *Gager v. United States*, 149 F.3d 918, 922 (9th Cir. 1998) (quoting *Conkle v. Jeong*, 73 F.3d 909, 914 (9th Cir. 1995)). However, a plaintiff seeking jurisdictional discovery need not "first make a prima facie showing that jurisdiction actually exists.'" *Hall v. United States*, No. 16-CV-02395-BAS-RBB, 2017 WL 3252240, at *4 (S.D. Cal. July 31, 2017) (quoting *NuboNau, Inc. v. NB Labs, Ltd.*, No. 10-cv-2631-LAB-BGS, 2011 WL 5237566, at *3 (S.D. Cal. Oct. 31, 2011)). "Such a showing is necessary to survive a motion to dismiss, and '[i]t would . . . be counter intuitive to require a plaintiff, *prior* to conducting discovery, to meet the same burden that would be required in order to defeat a motion to dismiss.'" *NuboNau, Inc.*, 2011 WL 5237566, at *3 (quoting *Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 673 (S.D. Cal. 2001)).

//

//

**B.      Preliminary Motion to Strike**

Although Defendants do not agree that limited discovery is warranted, Defendants did not object to Plaintiffs moving to reinstate their prior motion for discovery.  (*See* JSR at 1-2; *see also* Def. 2d MFD Resp. at 1, 3.)  However, Defendants object that Plaintiffs seek "far more than . . . reinstatement," and improperly "attempt to supplement a fully-briefed motion without leave of court."  (Def. 2d MFD Resp. at 1; *see also id.* at 3-4.)  Defendants ask the court to strike Plaintiffs' motion for this reason.  (*Id.* at 1 ("The [c]ourt should strike JFS Plaintiffs' anomalous filing on procedural grounds.").)

The court declines to strike Plaintiffs' motion.  "Motions to strike are disfavored and 'should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.'"  *Harper v. Collection Bureau of Walla Walla, Inc.*, No. C06-1605-JCC, 2007 WL 4287293, at *3 (W.D. Wash. Dec. 4, 2007) (quoting *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal. 1991)).  In their motion, Plaintiffs bring to the court's attention evidence that came to light only after Plaintiffs filed the underlying discovery motion.  (*See* 2d MFD at 3-4 (discussing a recently discovered email from DOS Congressional Liaison and statistical evidence from the first half of 2018).)  As discussed below, that evidence is relevant to the issues before the court.  *See infra* § III.C.  Further, Defendants suffer no prejudice because they have had a full opportunity to respond to the new material in Plaintiffs' motion.  (*See generally* Def. 2d MFD Resp.); *Liberty Mut. Fire Ins. Co. v. City of Seattle*, No. C15-1039-JCC, 2016 WL 5792691, at *1 n.1, 2 n.2 (W.D. Wash. Oct. 4, 2016) (denying the plaintiff's request to strike an argument and "new evidence" on grounds that

there was no prejudice to the plaintiffs in considering either the evidence or the argument).  Accordingly, the court denies Defendants' request to strike Plaintiffs' motion.[17]

**C.      The Parties' Motions**

Defendants argue that the Agency Memo provisions at issue expired while the cross-appeals of the court's preliminary injunction were pending.  (MTD at 1-2.) Accordingly, they argue that the court should dissolve the preliminary injunction and dismiss as moot Plaintiffs' underlying claims concerning the Agency Memo.  (*Id.*) Specifically, Defendants argue that both the 90-day SAO review and the period to implement additional screening procedures for FTJ refugee applicants are over.  (*Id.* at 4.) They also argue that the "temporary guidance that was the subject of the injunction has been superseded by [the Nielsen Memo]."  (*Id.*)

With regard to the SAO provisions, Defendants assert that the Agency Memo "makes plain" that the suspension[18] of SAO refugee applications was only to occur

_____

[17] Doe Plaintiffs also move to strike Defendants' argument that President Trump should be dismissed as a named defendant.  (*See* Doe Surreply (Dkt. # 152); Def. MTD Reply at 16-17.) However, as discussed below, the court declines to reach the substance of Defendants' motion to dismiss until after Plaintiffs conduct limited discovery, *see infra* § III.C, and therefore, the court need not resolve Doe Plaintiffs' motion to strike.

[18] The parties dispute whether the Agency Memo results in a "suspension" or a "de-prioritization" of SAO refugee admissions.  (*Compare* JFS MTD Resp. (Dkt. # 146) at 2 (describing the Agency Memo's effect on SAO refugee admissions as a "de-prioritization"), *with* MTD at 1 ("The Agency Memo . . . directs a process that results in a suspension of the processing and admission of SAO refugees.").)  The Agency Memo states that during DOS and DHS's "detailed threat analysis and review" for nationals from SAO countries, the agencies "will temporarily prioritize refugee applications from other non-SAO countries" and will "take resources that may have been dedicated to processing [SAO refugees] and . . . will reallocate

ORDER - 19

during the SAO review period.  (*Id.* at 9.)  The 90-day review period expired on January 22, 2018—exactly 90 days following the Agency Memo's October 23, 2017, issuing date. (*Id.*)  One week later, DHS Secretary Nielsen issued a memorandum to USCIS setting forth her determinations following the 90-day SAO review, which included "certain screening and vetting enhancements" that USCIS would implement.  (*See* Nielsen Memo at 2-3.)  She also stated that "the prioritization set forth in the [Agency Memo] is not hereby renewed."  (*Id.* at 3.)  Thus, Defendants assert that the passage of the 90-review period, along with the Nielsen Memo, moots JFS Plaintiffs' claims concerning the Agency Memo.  (MTD at 9.)

Defendants also assert that the FTJ implementation period concluded on February 1, 2018.  (*Id.* at 10.)  On that day, "USCIS and [DOS] implemented new procedures to ensure that all individuals admitted as refugees receive similar, thorough vetting—whether they are principal refugees, accompanying family members, or [FTJ] refugees." (*Id.* (quoting *I-730, Refugee/Asylee Relative Petition*, U.S. Citizenship & Immigration Serv., https://www.uscis.gov/i-730 (last updated June 18, 2018)); *see also* 5/14/18 Higgins Decl. (Dkt. # 142-2) ¶ 8).)  Defendants argue that with the enhanced screening mechanisms in place, the processing of FTJ refugee applications and admissions would

_____

them to process applicants from non-SAO countries."  (Agency Memo at 2.)  Further, "[w]hile the review is underway," the DHS Secretary "will admit on a case-by-case basis only [SAO] refugees whose admission is deemed to be in the national interest and poses no threat to the security or welfare of the United States."  (*Id.*)  Whether this action is called a "de-prioritization" or a "suspension" of SAO refugee admissions, the result was the same—a precipitous fall in the number of SAO refugee admissions following the Agency Memo's implementation.  *See supra* § II.F.2.

have resumed by February 1, 2018, even without the court's preliminary injunction.  (*Id.*)

Defendants argue that the Agency Memo expressly states that the government "will

resume admission of [FTJ] refugees once those enhancements have been implemented,"

and accordingly, Doe Plaintiffs' claims are now moot.  (*Id.* at 11 (quoting Agency Memo

at 3).)

JFS and Doe Plaintiffs respond that Defendants fail to carry their burden of

establishing mootness.  (JFS MTD Resp. at 7-13; Doe MTD Resp. (Dkt. # 147) at 7-14.)

Plaintiffs also argue that their claims fall within two well-established exceptions to the

mootness doctrine:  (1) voluntary cessation;[19] and (2) capable of repetition yet evading

review.[20]  (JFS MTD Resp. at 13-17; Doe MTD Resp. at 14-22.)  Finally, both sets of

//

--------

[19] Under the voluntary cessation exception to mootness, a case is not moot if a challenged policy is "abandoned voluntarily and might reasonably recur."  *United States v. Brandau*, 578 F.3d 1064, 1068 (9th Cir. 2009); *see also Knox v. Serv. Emps. Int'l Union Local 1000*, 567 U.S. 298, 307 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.").  The case may nevertheless be moot, however, if the record shows (1) "with assurance that there is no reasonable expectation" that the alleged violation can recur, and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *Brandau*, 578 F.3d at 1068 (quoting *Smith v. Univ. of Wash., Law Sch.*, 233 F.3d 1188, 1194 (9th Cir. 2000)).  "The 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) (quoting *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (alterations omitted)).

[20] This exception to mootness "applies where '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."  *Fed. Election Comm'n v. Wis. Right To Life, Inc.*, 551 U.S. 449, 462 (2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998) (internal quotation marks and brackets omitted)).

Plaintiffs also argue in their responses and in their discovery motion that they are entitled to jurisdictional discovery prior to court considering Defendants' mootness argument. (JFS MTD Resp. at 17-18; Doe MTD Resp. at 22; *see generally* 2d MFD.)

The court addresses the last issue—Plaintiffs' demand for jurisdictional discovery—first. The court does so because if such discovery is warranted, the court should defer considering the substance of Defendants' motion and Plaintiffs' responses thereto until such time as that discovery is complete.[21] Plaintiffs assert that evidence they have uncovered so far "raise[s] serious concerns about Defendants' compliance with th[e] [c]ourt's injunction." (2d MFD at 2-3.) This evidence includes two emails from a DOS Congressional Liaison indicating that the refugee applications, about which two separate Congressional offices had inquired, although "approved," had not been processed due to the suspensions directed by the Agency Memo. (*See* 5/4/18 Mohamed Decl. ¶¶ 3-4, Ex. A; 5/3/18 Doe 1 Decl. ¶ 3, Ex. A); *see supra* § II.F.1. Neither email, sent in January and April, 2018, respectively, refers to the court's preliminary injunction barring enforcement of these provisions of the Agency Memo. (*See id.*) Although the DOS Congressional Liaison had been informed about the October 24, 2017, Agency Memo, he was apparently not informed about the December 23, 2017, preliminary injunction. In

---

[21] Defendants argue that "[a]ny consideration of discovery should . . . be deferred until after this [c]ourt adjudicates whether this case is moot and whether the [c]ourt has jurisdiction. (Def. 2d MFD Resp. at 2.) Defendants' assertion places the proverbial cart before the horse. If Defendants were correct, jurisdictional discovery would never be warranted. The Ninth Circuit's decision in *Laub* forestalls that conclusion. *See* 342 F.3d at 1093 (ruling that a district court should ordinarily grant discovery where relevant jurisdictional facts "are controverted or where a more satisfactory showing of the facts is necessary.").

response, the Acting Director of the Admissions Office of PRM of the DOS attests that the requirements of the December 23, 2017, preliminary injunction were sent promptly to PRM's implementing partners.  (5/4/18 Gauger Decl. ¶ 5.)  However, at a minimum, the emails from the DOS Congressional Liaison raise concerns about the scope and effectiveness of that communication.

Further, although the court does not impugn the testimony of the Acting Director, the declaration nevertheless contains hearsay within hearsay.  *See United States v. Pena-Gutierrez*, 222 F.3d 1080, 1087-88 (9th Cir. 2000) (noting that an alien's statement to an immigration officer was hearsay-within-hearsay when the statement was contained in the immigration officer's report); *see also Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041, 1045 (9th Cir. 1999) (stating that for hearsay-within-hearsay to be admissible, "each layer of hearsay must satisfy an exception to the hearsay rule").  For example, the Acting Director states that she "reviewed the emails" and "confirmed with the [DOS] Congressional Liaison that these responses were not reviewed by anyone else prior to being sent . . . to Congress."  (*Id.* ¶ 3.)  She further attests that the "representations in the emails . . . are incorrect and the result of an inadvertent error by the [DOS] Congressional Liaison."  (*Id.* ¶ 6.)  The court is puzzled why Defendants did not provide a declaration from the Congressional Liaison himself to explain the sources of his information and the apparent error in his emails, rather than rely on inadmissible hearsay testimony.  *See* Fed. R. Evid. 802.  Defendants' reliance on hearsay testimony is even more puzzling because the Acting Director's declaration indicates that she contacted the DOS Congressional Liaison and therefore presumably could have obtained his declaration.

In addition to the emails, Plaintiffs also produce statistical evidence that the admission of SAO refugees actually declined following the preliminary injunction. *See supra* § II.F.2. Defendants do not dispute those statistics, but rather attribute them to the effects of the Agency Memo prior to the preliminary injunction and the government's enhanced screening and vetting protocols. (*See generally* Def. 2d MFD Resp. at 5-6.) Although the court might expect that the processing and admission of FTJ and SAO refugees would not reach the levels that existed prior to the issuance of the Agency Memo on October 24, 2017, the further drop of SAO refugee admissions following the preliminary injunction deserves further inquiry.

Finally, although not singularly dispositive, the court notes Defendants' failure to fully comply with certain injunctions concerning EO1—including the preliminary injunction this court issued in *Washington v. Trump*.[22] *See supra* § II.F.3. The court will not ignore that failure in evaluating Plaintiffs' evidence. Thus, considering all this evidence, the court concludes that Plaintiffs meet their burden of demonstrating that facts bearing on the court's jurisdiction are controverted and a more satisfactory showing of facts is necessary. *See Laub*, 342 F.3d at 1093.

In *Laub*, the Ninth Circuit found the district court improperly denied jurisdictional discovery when the plaintiffs supported their request with documents suggesting their claim was "arguable." *See* 342 F.3d at 1092-93. There, the plaintiffs requested discovery

---

[22] *See Washington v. Trump*, No. C17-0141JLR, 2017 WL 462040, at *1 (W.D. Wash. Feb. 3, 2017), *appeal dismissed*, No. 17-35105, 2017 WL 3774041 (9th Cir. Mar. 8, 2017).

after the government asserted that its land and water acquisitions were independent of a government water management program and thus not subject to an injunction. *See id.* at 1083, 1092-93. The Ninth Circuit found that "public documents offered by [the] [p]laintiffs suggest[ed] that there [wa]s at least an arguable claim that the federal government play[ed] a significant enough role in the [water management] program" to render the government's actions subject to federal requirements. *Id.* at 1093. Though noting that the offered documents might "be insufficient in themselves to establish jurisdiction," the court found that granting the plaintiffs' request for discovery "would create a 'reasonable probability' that the outcome of the factual motion to dismiss would be different." *Id.* (quoting *Martel v. Cty. of L.A.*, 56 F.3d 933, 995 (9th Cir. 1995) (en banc)). Thus, the Ninth Circuit held that the district court erred in denying jurisdictional discovery "[b]ecause additional discovery would be useful to establish federal subject matter jurisdiction, and because the extent of federal involvement in the challenged transactions [wa]s contested." *Id.*

Here, jurisdictional discovery is appropriate because additional facts regarding Defendants' efforts to implement the preliminary injunction and their efforts to restore the status quo following its imposition would be useful to the court's consideration of mootness. (*See* 1/9/18 Order at 6 ("Defendants are required to restore the status quo prior to the issuance of the Agency Memo with respect to the processing of applications from FTJ refugees and refugees from SAO countries.").) Plaintiffs have demonstrated a bona fide factual dispute concerning the existence and effectiveness of Defendants' steps to discontinue the enjoined aspects of the Agency Memo. Until that factual dispute is

resolved, dismissing on mootness grounds would be inappropriate.  As in *Laub*, although the evidence proffered by Plaintiffs at this point might "be insufficient in [itself] to establish jurisdiction," it is sufficient to establish at least a "reasonable probability" that jurisdictional discovery could alter the outcome of the mootness question.  *See* 342 F.3d at 1093.

Defendants argue that the Government is "presume[d] . . . [to] have properly discharged [its] official duties . . . in the absence of clear evidence to the contrary." *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926).  (*See* Def. 2d MFD Resp. at 3.) "Nevertheless, . . . the presumption is not conclusive and can be rebutted." *Hirsch v. Clark*, No. NC 83-0097A, 1984 WL 6209, at *2 (D. Utah Aug. 29, 1984).  There is scant case authority describing the type of "clear evidence" necessary to rebut the presumption. Here, the court concludes that the emails and statistical evidence Plaintiffs submit is sufficient to rebut the presumption.  *See, e.g.*, *McDonough v. Anola Cty.*, 799 F.3d 931, 948 (8th Cir. 2015) (ruling that, whatever weight the presumption that public officers have properly discharged their official duties might have at the motion to dismiss phase, drivers who claimed that government employees had improperly accessed their personal information sufficiently rebutted the presumption by alleging high volumes and suspicious timing of accesses and by pointing to the legislative auditor's report finding that at least half of law enforcement officers in Minnesota were misusing personal information in the database).  The court concludes only that there is a factual dispute about which Plaintiffs are entitled to make further inquiry—not that Defendants failed to properly discharge their duties.

Defendants also argue that they have provided ample discovery to Plaintiffs concerning their compliance with the preliminary injunction, including (1) Defendants' notices of compliance filed with the court (1/19/18 Notice; 1/31/18 Notice); *see supra* § II.D, (2) a partially redacted copy of the Nielsen Memo, *see supra* § II.E, and (3) a declaration from the Associate Director of RAIO at USCIS attesting that the FTJ implementation period concluded as of February 1, 2018 (*see* 5/14/18 Higgins Decl.). (*See* Def. MTD Reply at 14.)  As JFS Plaintiffs point out, however, with the exception of some limited information concerning circuit rides, Defendants have provided only minimal information about the specific actions they took to implement the SAO and FTJ suspensions before they were enjoined and the specific actions they took after the preliminary injunction to return the processing of FTJ and SAO refugee applications to the status quo that existed prior to the Agency Memo.  (*See* JFS MTD Resp. at 4.) Similarly, although Defendants issued guidance to those government offices involved in USRAP to apprise them of the preliminary injunction, Defendants have not produced copies of that guidance.  Moreover, the record reflects that Defendants' guidance was issued prior to January 9, 2018—that is, at a time when Defendants "d[id] not understand the preliminary injunction to require affirmative action to undo any of the steps that were taken to implement the [Agency Memo] prior to" the preliminary injunction.  (*See* MFS at 4.)  In any event, the court "cannot rely on [Defendants'] statement[s] alone" in determining mootness.  *See Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. 1982) (quoting *Concentrated Phosphate*, 393 U.S. at 203) (holding that the defendants' statement that they would not engage in future violations, standing alone, 'cannot suffice

to satisfy the heavy burden of persuasion' resting on those claiming mootness"). In this instance, permitting Plaintiffs to engage in limited jurisdictional discovery is warranted.

For the foregoing reasons, the court concludes that jurisdictional discovery is appropriate.[23] Accordingly, the court denies without prejudice Defendants' motion to dismiss to allow Plaintiffs the opportunity to conduct limited jurisdictional discovery on the issue of mootness. *See, e.g.*, *Nino v. United States*, No. 12-cv-0469-WQH-BGS, 2015 WL 5032644, at *2 (S.D. Cal. Aug. 25, 2015) (denying a motion to dismiss for lack of subject matter jurisdiction after "grant[ing] the parties ninety days of jurisdictional discovery in order to address factual issues relevant to jurisdiction"); *Guerrero v. United States*, No. CV-12-00370-TUC-RCC, 2012 WL 12842348, at *4 (D. Ariz. Dec. 19, 2012) (denying defendant's motion to dismiss plaintiff's claim for lack of subject matter jurisdiction to allow plaintiff "limited . . . discovery on [a] specific jurisdictional issue").

In their original motion for discovery, Plaintiffs sought "document requests . . . limited to the following categories of documents:

- Documents relating to the implementation of the Agency Memo as it relates to follow-to-join refugees and refugees who are nationals of (and stateless persons who last habitually resided in) the SAO countries;

---

[23] Plaintiffs also ask the court to compel Defendants to produce the redacted phrase from the Nielsen Memo. (*See* 1st MFD at 5.) Defendants assert that the phrase is protected under the law enforcement privilege. (*See id.*) "[T]he U.S. Supreme Court and the Ninth Circuit have yet to recognize or reject a 'law enforcement privilege.'" *Shah v. Dep't of Justice*, 714 F. App'x 657, 659 (9th Cir. 2017). The issue is not sufficiently briefed by the parties for the court to rule on the issue—either with respect to Plaintiffs' need for the material or the basis for Defendants' invocation of the privilege. Accordingly, the court denies Plaintiffs' request to compel production of the redacted phrase without prejudice to raising the issue again if warranted after Plaintiffs complete the discovery in this order.

- Documents relating to actions taken by Defendants to comply with this Court's preliminary injunction dated December 23, 2017 and order denying Defendants' motion for stay pending appeal (ECF No. 106);
- Documents relating to actions taken by Defendants as a result of the end of the 90-day review for SAO countries and as a result of the implementation of the additional vetting procedures for follow-to-join refugees; and
- Policy documents and data relating to the processing of refugee applications and admission of refugees to the United States from October 23, 2017 to the date of production.

(1st MTD at 4-5.) The court specifically limits Plaintiffs to requesting document within these four categories. The court further cautions Plaintiffs to narrowly craft their requests so that the requests are "proportional to the needs of the case" in which discovery is limited to issues pertaining to mootness. *See* Fed. R. Civ. P. 26(b)(1) (listing factors for determining proportionality). Plaintiffs also raise the possibility of "additional discovery, such as depositions," if appropriate after the production of documents. (1st MFD at 6.) The court declines to foreclose this possibility, but again cautions Plaintiffs that any such request must be narrowly tailored and proportional in light of the limited purpose of the authorized discovery.

The court grants Plaintiffs 90 days in which to conduct their jurisdictional discovery on mootness. The parties must file any related discovery motions within 60 days of the filing date of this order—30 days prior to the jurisdictional discovery cutoff. Although the court is available to resolve intractable disputes, the court encourages the parties to work cooperatively to implement this order and to expeditiously complete the discovery authorized herein. If, however, discovery disputes arise that require court intervention, the court requires the parties to utilize the procedures set forth in Local Rule

1  LCR7(i) before resorting to formal motions practice. *See* Local Rules W.D. Wash. LCR

2  7(i). After Plaintiffs have conducted limited jurisdictional discovery on mootness,

3  Defendants may renew their motion to dismiss.

### IV.    CONCLUSION

5       For the reasons stated herein, the court DENIES without prejudice Defendants'

6  motion to dismiss and dissolve the preliminary injunction (Dkt. # 145) and GRANTS

7  Plaintiffs' motion to reinstate their motion for limited discovery (Dkt. # 131) and their

8  underlying motion for discovery (Dkt. # 121).

9       Dated this 27th day of July, 2018.


JAMES L. ROBART
United States District Judge

ORDER - 30