THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN DOE, et al., | CASE NO. C17-0178JLR |
| Plaintiffs, | |
| v. | **PLAINTIFFS' JOINT MOTION TO COMPEL** |
| DONALD TRUMP, et al., | **NOTE ON MOTION CALENDAR: November 9, 2018** |
| Defendants. | **ORAL ARGUMENT REQUESTED** |
| JEWISH FAMILY SERVICE, et al., | CASE NO. C17-1707JLR |
| Plaintiffs, | (RELATING TO BOTH CASES) |
| v. | |
| DONALD TRUMP, et al., | |
| Defendants. | |

1    These consolidated cases challenge Defendants' unlawful suspension of portions of

2 refugee admissions and processing, which this Court preliminarily enjoined last December.  In

3 denying without prejudice Defendants' motion to dismiss this case as moot, this Court authorized

4 jurisdictional discovery on whether the case is in fact moot, including on "Defendants' efforts to

5 implement the preliminary injunction and their efforts to restore the status quo" that existed prior

6 to the issuance of the challenged refugee suspensions.  ECF No. 155 at 25.  Since then, Plaintiffs

7 have diligently pursued discovery on those facts from Defendants, who have produced documents

8 and raw data on refugee processing.  Although the parties have worked together in good faith to

9 resolve several disagreements, a few significant disputes remain on which Plaintiffs are, pursuant

10 to Federal Rule of Civil Procedure 37(a), seeking the Court's assistance.

11    First, Plaintiffs seek an order from this Court permitting Plaintiffs to take particular

12 depositions and requiring Defendants to respond to a set of six interrogatories.  The documents

13 produced thus far have revealed several areas of significant concern regarding injunction

14 compliance, and this additional discovery is needed to resolve outstanding questions, including the

15 measures that could now be taken to remedy any noncompliance.  Given the importance of the

16 issues, the need for the discovery to resolve them, and Defendants' exclusive control over the

17 relevant information, Defendants' proportionality objection to this discovery should be overruled.

18    Second, Plaintiffs seek an order compelling Defendants to produce discrete categories of

19 information and documents that they have redacted or withheld as either privileged or as not

20 responsive to Plaintiffs' document requests.  Even assuming the "law enforcement sensitive"

21 privilege that Defendants assert exists, the allegedly privileged information is already widely and

22 publicly known, and so Defendants cannot meet their burden of proof.  The refusal to produce

23 documents and to lift redactions on the grounds of non-responsiveness, meanwhile, is even less

24 justified, as it is premised on Defendants' unilateral decision to substitute their own judgment

25 about what Plaintiffs should have requested, rather than what Plaintiffs did request.

26    Should the Court believe it would be helpful, Plaintiffs' counsel stands ready and willing

27 to appear in person or telephonically to discuss the instant motion.

28

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 1
141657978.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

## PERTINENT FACTUAL & PROCEDURAL BACKGROUND [1]

Shortly after this Court granted jurisdictional discovery, Plaintiffs jointly served a set of three discovery requests, which sought the production of documents reflecting: (1) how Defendants implemented the challenged portions of the Agency Memo, related changes to SAO and FTJ processing, and this Court's orders; (2) the distribution list for those materials; and (3) data concerning the number of SAO, FTJ, and other refugees at various stages of processing. Defendants unilaterally narrowed the first request over Plaintiffs' objections, and then responded to it as they narrowed it.[2]  *See* Keaney Decl. ¶¶ 4-10.  Defendants refused to respond to the third request, claiming it would be unduly burdensome and asserting that it should instead be in the form of interrogatories.  *Id.* ¶ 6.  Plaintiffs therefore served a set of interrogatories requesting a narrowed universe of the same data; and then another, rewritten set when Defendants objected that responding to several of the first set of interrogatories would also be unduly burdensome.  *Id.* ¶¶ 7, 21-26.  The parties' efforts to resolve these disputes themselves is detailed in the attached Declaration of Melissa Keaney.  To date, Defendants have produced 808 pages of documents (approximately 25% of which contain only duplicative material), as well as raw data responsive to the interrogatories.  *Id.* ¶¶ 11-12, 28-31.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 26(b)(1), a party may obtain discovery regarding any nonprivileged matter that is relevant to a claim or defense and "proportional to the needs of the case."  Proportionality "hinges on 'the importance of the issues at stake . . . , the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

---

[1] Plaintiffs assume the Court's familiarity with the facts and procedural history of these consolidated cases—*see generally* Order Granting Prelim. Inj., ECF No. 92 at 5-17; Order Defs.' Den. Emergency Stay Mot., ECF No. 106 at 2-4; Order Granting Mot. for Disc. & Den. Mot. to Dismiss Without Prejudice, ECF No. 155—and seek here only to highlight those issues most relevant to the instant motion.  Unless otherwise noted, all citations are to the docket in *Doe v. Trump*, C17-0178JLR.

[2] Among other things, Defendants insisted they would not search for records of any White House custodians or of "deliberative materials," and that they would produce only what they deem "final, formal guidance documents."  Ex. 22 at 11.  Notwithstanding Plaintiffs' timely and continued objections to the scope of their search, Defendants have represented that the information they produced is sufficient for Plaintiffs to assess injunction compliance, *see* Ex. 31, and that the documents produced "show unequivocally that [Defendants] complied with the injunction," Ex. 26 at 1.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

likely benefit.'" *Hancock v. Aetna Life Ins. Co.*, 321 F.R.D. 383, 390 (W.D. Wash. 2017) (citation omitted). On a motion to compel discovery, "[t]he moving party bears the burden of demonstrating that the information it seeks is relevant and that the responding party's objections lack merit." *Id.*

## ARGUMENT

### I. THE ADDITIONAL DISCOVERY PLAINTIFFS WISH TO TAKE IS TARGETED AT SERIOUS COMPLIANCE CONCERNS IDENTIFIED THUS FAR

Far from indicating that the case is moot, the limited written-only discovery so far has exposed several areas of concern regarding Defendants' compliance with this Court's preliminary injunction.[3] Those concerns, partially detailed below, justify the further limited discovery that Plaintiffs are requesting: leave of the Court to take particular depositions, an order requiring Defendants to respond to the six interrogatories Plaintiffs propounded on October 5, and an accompanying adjustment of the scheduling order.

The discovery produced thus far is concerning in several ways. First, it strongly suggests that Defendants failed to heed this Court's admonition that the preliminary injunction required them "to take actions that are necessary to undo those portions of the Agency Memo that are enjoined," including by "rescind[ing]" and "revers[ing]" the guidance and instructions implementing the enjoined suspensions, and "to restore the status quo prior to the issuance of the Agency Memo with respect to the processing of applications from FTJ refugees and refugees from SAO countries." ECF No. 106 at 6. In fact, the records seem to confirm that the *only* steps Defendants took to restore the status quo ante (as opposed to simply ordering the restarting of processing) were the limited measures relating to circuit rides previously noted, *see* ECF No. 155 at 9 n.13, 27, even though the suspensions were implemented in a variety of other concrete ways that could have been reversed, but seemingly were not.

To give one stark example, guidance the United States Citizenship and Immigration Service (USCIS) issued on November 9, 2017 instructed its officers that, absent a case-by-case

---

[3] Plaintiffs note that intent is irrelevant to injunction compliance. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir. 1998) ("'[T]here is no good faith exception to the requirement of obedience to a court order.'" (citation omitted)).

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 3

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

waiver of the SAO suspension,[4] they could not approve for formal refugee status—or "stamp"—cases that that included SAO nationals. Ex. 7 at 2.  Emails sent later in November instructed particular USCIS officers who were reviewing refugee applications that were pending in USCIS' electronic "stamping queue" that when they encountered a case affected by the Agency Memo's SAO suspension, and in the absence of a waiver, they could not stamp the cases approved, and should instead mark those pending applications, "Unable to Stamp: Evidence documenting a case-by-case determination by DHS and State required for further processing."  *See* Ex. 8; *see also* Keaney Decl. ¶ 47.  Defendants have produced no documents in which these instructions are reversed, for example, by requiring that all the cases so marked be processed, and where appropriate, stamped.  In fact, and inexplicably, the record has two emails sent *after* the injunction issued that continue to instruct USCIS officers to "hold off on stamping" cases with SAO nationals that are in the digital stamp queue. Exs. 9 & 10; *see generally* Ex. 38 (summarizing key documents related to injunction compliance and digital stamping).  The record is silent as to how many cases were marked "Unable to Stamp," and how many individuals were in those cases (a case can have multiple individuals); what has happened to those cases since being so marked; or how many of the affected individuals were protected by this Court's preliminary injunction by virtue of a bona fide relationship with a person or entity in the United States (hereinafter referred to as a "BFR").

The failure to reverse these instructions would be expected to have a particularly long-lasting effect (still felt today) on those SAO nationals whose cases were not stamped—i.e., refugees who were already close to the end of processing, and would have been expected to travel soon after stamping absent the suspensions—given what else the documents reflect: on January 29 of this year, Defendants instituted a new *de facto* SAO suspension, this one targeted at SAO cases that had not yet been stamped approved as of that date.  This previously unknown suspension can be traced to the Memorandum that Secretary Nielsen issued on January 29, following the 90-day

---

[4] Under the Agency Memo, nationals from (or stateless individuals who last habitually resided in) one of the 11 countries on the SAO list (hereinafter referred to as "SAO nationals") could be exempted from the suspension if the Department of Homeland Security and the Department of State made "a case-by-case determination that the travel is in the national interest and the individuals do not pose a threat to the security or welfare of the United States." Ex. 7 at 2.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 4

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

review called for by the Agency Memo.  In it, Secretary Nielsen directs USCIS to "[d]etermine which SAO nationals who have already undergone a USCIS interview will require a re-interview in light of [particular] modifications" to screening of SAO nationals adopted after the 90-day review that concluded on January 22. ECF No. 142-2 at 3.[5]  The re-review does not apply to SAO cases previously stamped approved, *see* Ex. 11 at 3 n.2—which makes the post-injunction failure to reverse the instructions not to stamp SAO cases particularly consequential for those affected.

Notwithstanding Secretary Nielsen's instruction that USCIS *finish* the re-review prior to April 1, the Refugee Affairs Division (RAD) did not announce the procedures for the re-review (which RAD dubbed the "Pipeline DHS Review," or "PDR") until April 2. Ex. 12. The PDR also expanded the review called for by the Nielsen and Higgins memoranda of January 29, to consider not just the impact of the changes to SAO processing made by the 90-day review (as the memoranda directed), but also those made by the Agency Memo, which followed the earlier 120-day review ordered by EO-2. *Id.* at 2.  And whereas the Nielsen and Higgins memoranda ordered a review of cases interviewed prior to January 29, the PDR moved that date to April 1.[6] *Id.* at 1. Each SAO case that meets the PDR criteria is frozen until it has been cleared, which only RAD headquarters can do. *Id.* at 2.  Plaintiffs' counsel does not know how many SAO cases meet these criteria (on which the record is silent), but they believe it to be in the tens of thousands, and that it includes individual Plaintiffs whose cases still have not yet gone through the PDR.  Defendants have produced no records indicating whether PDR is proceeding and how many cases are being processed, but the sum effects of these actions is to manufacture a bottleneck that has a particularly pernicious effect on refugees who were protected by this Court's preliminary injunction.

As another example, the written discovery has failed to resolve questions about Defendants' compliance with the injunction with regard to requesting and completing SAO checks.

[5] That same day, Jennifer Higgins, the Associate Director of the Refugee, Asylum, and International Operations (RAIO) Directorate at USCIS, directed the Refugee Affairs Division (RAD) to "immediately institute a process and issue guidance to evaluate whether . . . . cases already interviewed by a USCIS officer but that are pending final approval[] involving SAO nationals require a re-interview in light of" the new protocols adopted after the 90-day review. Ex. 11 at 3 (footnote omitted).

[6] At least some SAO nationals interviewed between January 29 and April 1 were interviewed under the protection of this Court's injunction, and thus one effect of moving that date was to negate at least some of the benefit (in processing time) that those individuals enjoyed thereunder.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 5

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

During the Agency Memo's SAO suspension, Defendants instructed Resettlement Support Centers (RSCs) not to request *any* SAO checks.[7]  Even after the preliminary injunction issued, the SAO checks (fewer than 40 total) were apparently done manually.  *See* Ingraham Decl., ECF No. 120-1 ¶ 8.  Notwithstanding its dramatic consequences on SAO (and FTJ) nationals, Defendants produced no documents about this manual process or their decision to use it.  Moreover, Defendants have produced limited information about their previously-undisclosed post-injunction decision to impose a monthly quota on the number of SAO checks that RSCs can request: the quotas were announced in an email sent on February 2, 2018,  Ex. 13 at 2, and while the global monthly quota was set initially at 2,010 (allocated amongst seven RSCs[8]), *id.*, that number was cut to just *500* (total, worldwide) on April 30.  Ex. 14 at 2.

Second, the discovery thus far also suggests that Defendants may have exaggerated the pace and scope of their injunction compliance.  For example, while Defendants gave timely *notice* of the injunction to the RSCs,[9] the record suggests that they could not actually restart processing SAO cases protected by the injunction until at least January 11—nearly three weeks after the injunction issued—because it took the State Department that long to make the requisite changes to the Worldwide Refugee Admissions Processing System.  Ex. 17 at 1.  The record is silent as to whether the State Department considered or attempted restoring the BFR information that was collected and verified when the BFR was first made relevant, by the Supreme Court's partial stay of *Hawaii*'s preliminary injunction of the refugee ban in EO-2.  These documents reveal the need to more closely examine what Defendants meant when they represented that the RSCs "processed" cases "in accordance with the injunction, as of the next business day following th[e] injunction," ECF No. 142 at 5; *see also* ECF No. 114 at 2-3; Gauger Decl., ECF No. 114-1 ¶ 2. Gauger Decl.,

---

[7] Defendants' responses to the interrogatories also reflect that, from October 24, 2017 until at least August 18, 2018, no SAO checks were requested *at all* for FTJ refugees outside of the RSCs in Kenya and Thailand, which is difficult to explain.

[8] RSC Cuba and RSC Latin America were not given a maximum number of SAOs they could request, either in February or April, presumably because they request relatively few.

[9] On December 24, 2017, the State Department emailed the RSCs to say that the agency "is aware" of the injunction and that "[t]he RSCs will resume processing of these refugees." Ex. 15.  Four days later, the State Department sent an email explaining the scope of the Court's injunction and informing RSCs that the agency "is in the process of adding the BFR status back into [the Worldwide Refugee Admissions Processing System]." Ex. 16.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 6

1    ECF No. 142-1 ¶ 5; and what steps they took to ensure that full processing restarted promptly.

2    Even Defendants' compliance efforts relating to circuit rides appear to have been more

3    limited than their representations to this Court suggested.  Defendants stated that, to comply with

4    the injunction, "on December 26, 2017, the State Department reached out to the RSCs to inquire

5    whether any SAO nationals might be ready for interviews at locations already included on the

6    second-quarter calendar."  ECF No. 114 at 3.[10]  But, per the documents produced thus far, the State

7    Department instead sought "compelling expedite cases of SAO nationals that should be

8    interviewed due to protection/medical issues," Ex. 18 at 1—a *far* narrower universe than "any

9    SAO nationals" ready for interview.  That undisclosed narrowing, moreover, did not track this

10   Court's injunction, which protected all SAO nationals with a BFR; instead, it seemingly tracked

11   the criteria Defendants used to determine who would get a *waiver* from the SAO suspension.  *See*

12   Ingraham Decl., ECF No. 120-1 ¶ 5 (explaining that cases considered for case-by-case waivers of

13   the SAO suspension "generally involved refugees who required emergency medical treatment in

14   the United States or who faced serious threats to their safety in the host country").  In other words,

15   based on the current record, it appears that Defendants' addition of SAO nationals to the second

16   quarter circuit ride schedule was in fact done in accordance with the Agency Memo, rather than

17   this Court's preliminary injunction thereof.[11]

18   The paper discovery raises still more questions about the effects of the injunction.  For

19   example, Defendants explained in their December 29 Emergency Stay Motion that, pre-injunction,

20   they had scheduled second-quarter circuit ride interviews of some SAO nationals who "met the

21   [Agency Memo's] criteria for continued, case-by-case processing during the 90-day review."  ECF

22   No. 95 at 6 n.3.  Yet, oddly, when the RSCs were finally able to implement the injunction on

23   January 11, they were instructed to "immediately reach out to all SAO nationality cases scheduled

24   for interview in Q2 [quarter two] to confirm whether they have a BFR," Ex. 17, which not only

25

26   [10] *See also* Gauger Decl., ECF No. 114-1 ¶ 5 (same, and explaining that this action was done to implement the
     preliminary injunction); Higgins Decl., ECF No, 114-2 ¶ 5 (same); Higgins Decl., ECF No. 142-2 ¶ 3 (same).

27   [11] Plaintiffs flagged the apparent discrepancy for Defendants' counsel, who stated that the December 24, 2017 email
     in the record "obviously reflects the Court's preliminary injunction Order," and that speculated that there could have
28   been "further communications pursuant to [it]." Ex. 37 at 1.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 7

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1    should have been unnecessary, given that they had reportedly received waivers of the suspension,

2    but also implies that Defendants' implementation of the injunction may have resulted in SAO

3    nationals without BFRs being *removed* from the circuit ride schedule.[12]

4         Finally, the data Defendants produced in response to the interrogatories reveals a shocking

5    lack of movement in SAO and FTJ cases even after this Court's injunction issued.  *See generally*

6    Youssef Decl.  For example, in fiscal years 2016 and 2017, refugees from SAO countries

7    comprised 43.5 percent of USRAP admissions, *see* ECF No. 155 at 13, but between December 23,

8    2017 and August 25, 2018, less than *1 percent* of the refugees admitted to the United States were

9    from SAO countries.[13] *See id.* ¶ 10, Chart B.  Beyond the disturbing overarching picture painted

10   by the data, it presents riddles as well.  For example, Defendants' interrogatory responses reveal

11   that, on the date the Agency Memo issued, 11 FTJ refugees and 231 SAO refugees were 'ready

12   for departure' (to the United States), yet of those individuals, only 4 FTJ refugees and 93 SAO

13   refugees have been admitted as of September 24, 2018.  *See id.* ¶¶ 14-15 & Chart C.  Given the

14   Court's instruction that Defendants restore the status quo, one would have expected all refugees

15   ready to travel to the United States *one year ago* would have been admitted by now.

16        After discovering these and other puzzles in the documents and data produced, Plaintiffs

17   requested additional discovery from Defendants, in two forms.  First, on October 5, 2018, Plaintiffs

18   served a set of six interrogatories, the first five of which requested information about the stamping

19   issue discussed above, and the sixth information on waivers.  *See* Ex. 1.  Plaintiffs requested that

20   Defendants respond by the current October 25, 2018 deadline for the completion of discovery.

21   Defendants subsequently informed Plaintiffs that they would not respond to the interrogatories

22   because they were not served at least 30 days before the discovery deadline, which they would not

23   agree to extend, based in part on their view that the discovery produced to date "should equip

24   Plaintiffs to assess their case in light of our forthcoming renewed Rule 12(b)(1) motion."  Ex. 31.

25

26   [12] Further deepening this mystery is that, by letter dated September 4, 2018, USCIS Director L. Francis Cissna reported to Members of Congress that not a single waiver was issued under the Agency Memo.  Ex. 19.

27   [13] According to data publicly available on wrapsnet.org, in fiscal year 2018, the number of refugees admitted to the United States (22,491) was the lowest ever since passage of the Refugee Act of 1980.  More than 71 percent of those

28   admitted were Christian, and less than 16 percent were Muslim.  In the two prior fiscal years, the ratio of Christian to Muslim refugees was roughly equally, with each group comprising 40 to 45 percent of admitted refugees.

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 8

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1       Second, Plaintiffs informed Defendants that they wanted to take the depositions of the two

2   individuals who have submitted multiple declarations on Defendants' injunction compliance,

3   Jennifer Higgins[14] and Kelly Gauger,[15] as well as a Rule 30(b)(6) deposition directed at USCIS

4   and another directed at the Department of State, *see* Ex. 2 (proposed 30(b)(6) notices), and asked

5   Defendants if they would be willing to produce the deponents voluntarily.  Defendants' counsel

6   objected to the depositions on proportionality grounds, and also complained that Plaintiffs did not

7   articulate the "specific questions" they continue to have.  *See* Exs. 19 & 35.

8       In light of the various issues presented by the discovery already produced, the additional

9   discovery Plaintiffs have requested is amply justified, proportional to the needs of the case, and

10  necessary to resolving the various questions that remain outstanding.  As the record reflects,

11  Plaintiffs have been judicious in the discovery they have sought from Defendants and have

12  consistently worked cooperatively with Defendants' counsel to reduce the burdens associated with

13  discovery, including by re-writing discovery requests to accommodate burden objections and

14  agreeing to Defendants' requests for additional time to respond.  *See* Keaney Decl. ¶¶ 7, 21-26.

15  These additional discovery requests, moreover, are based on information only recently obtained

16  from Defendants; prior to this discovery period, Plaintiffs had only vague and limited information

17  about the steps Defendants took to implement and undo the SAO and FTJ suspensions, *accord*

18  ECF No. 155 at 27, and so virtually everything Defendants have produced has been wholly new

19  information.  When Plaintiffs' counsel received the documents and data, they diligently processed

20  it as expeditiously as possible and requested the additional discovery as soon as was reasonably

21  practicable, and thus, there is good cause for extending the discovery deadline to accommodate

22  this additional discovery.  *See Wealth by Health, Inc. v. Ericson*, No. C09-1444JLR, 2010 WL

23  11566111, at *3 (W.D. Wash. July 12, 2010) (explaining "the focus of the inquiry" of whether to

24  modify scheduling order "is upon the moving party's reasons for seeking modification").

25

26  [14] As noted above, Jennifer Higgins is the Associate Director of the Refugee, Asylum, And International Operations
    (RAIO) Directorate at USCIS.  Defendants have submitted three declarations from Associate Director Higgins in this
    litigation, the latter two concerning injunction compliance. *See* ECF No. 51-1; ECF No. 114-2; ECF No. 142-2.

27  [15] Kelly Gauger is the Acting Director of the Admissions Office of the Bureau of Population, Refugees, and Migration
    (PRM/A) of the Department of State.  Defendants have submitted two declarations from Acting Director Gauger, both
28  concerning injunction compliance.  ECF No. 114-1; ECF No. 142-1.

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

Plaintiffs have described above how the interrogatories are targeted at compliance issues identified in the document production, and the same is true of the Rule 30(b)(6) depositions: the notices (which are identical, save for the agency to which each is directed) propose to question the person(s) most knowledgeable about the specifically listed, concrete steps taken to implement the SAO and FTJ suspensions; the actions taken to undo those specific steps (if any); two actions that have exacerbated any non-compliance (the PDR and the SAO quotas, described above); and a change to FTJ processing made by the Agency Memo that may help shed light on why so few FTJ refugees have been admitted post-injunction.  Finally, Defendants have repeatedly represented that Associate Director Higgins and Acting Director Gauger have personal knowledge of their efforts to comply with the injunction, and have used their multiple declarations to try to carry their burden of proving that this case is moot, *see, e.g.*, Defs.' Mot. to Dismiss, ECF No. 145 at 11-12, and will presumably do so again.  Plaintiffs wish to question Defendants' declarants about their statements, which is abundantly supported by the case law.[16]

## II. DEFENDANTS HAVE FAILED TO JUSTIFY THEIR DECISIONS TO REDACT AND WITHHOLD INFORMATION

In addition to the foregoing, Plaintiffs seek to compel Defendants to produce two types of information that they have thus far redacted and/or withheld entirely.

1.    <u>SAO countries</u>.  First, Plaintiffs challenge Defendants' claim that they can redact from the documents any information that would tend to reveal the names of any of the 11 countries on the SAO list.  Defendants assert that this information is privileged as "law enforcement sensitive," and that revealing it "could compromise the agencies' law enforcement missions, as applicants might not provide information or answer questions evasively" if the information were revealed.  *See* Ex. 3 (privilege log).  As the Court has noted, there is no binding precedent recognizing this privilege.  *See* ECF No. 155 at 28 n.23.  But even assuming the privilege exists,

---

[16] *See, e.g.*, *Dibb v. Allianceone Receivables Mgmt., Inc.*, No. 14-5835 RJB, 2015 WL 9690313, at *1-3 (W.D. Wash. Oct. 19, 2015) (denying motion to quash subpoenas seeking to depose witnesses who had given substantive declarations in support of opposing party); *Palmer v. Stassinos*, No. C. 04 03026 RMW (RS), 2006 WL 2411413, at *1 (N.D. Cal. Aug. 18, 2006) (granting motion to compel, and explaining that "Plaintiffs are not required to accept the information as provided in the crafted form of a declaration, but have the right to test [those statements] at deposition"); *see also United States v. Cty. of Los Angeles*, No. CV 15-05903 DPP (JEMx), 2016 WL 4059712, at *4 (C.D. Cal. July 27, 2016) (rejecting argument that high-ranking government official should not be deposed under the "apex" doctrine, where the official voluntarily discussed the matter with an attorney in the case).

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 10

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1    and that the government can meet the procedural requirements to invoke it,[17] it fails on its merits,

2    for the simple reason that the identities of the 11 countries are already publicly known.  In addition

3    to being widely reported in the media,[18] the names of the countries are contained in the both

4    complaints filed in these consolidated cases, *Doe*, ECF No. 42 ¶ 215; *JFS*, ECF No. 1 ¶ 103; as

5    well as this Court's preliminary injunction opinion, ECF No. 92 at 10, which notes that, at oral

6    argument, Defendants' counsel conceded that the Court could "'rely on Plaintiffs' allegations'"

7    regarding which countries are on that list, *id.* at 10 n.6.  Defendants' suggestion that their law

8    enforcement missions would be compromised by revealing this information does not withstand

9    scrutiny.  *See, e.g.*, *BuzzFeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 364 (D.D.C. 2018)

10   (rejecting law enforcement privilege claim where amount of information "already in the public

11   domain" meant any threat posed by disclosure was "minimal"); *Doe v. City of Phoenix*, No. CV–

12   07–1901–PHX–GMS, 2009 WL 166925, at *2 (D. Ariz. Jan. 26, 2009) (rejecting law enforcement

13   privilege claim where "no significant information in the documents" was "not already known to

14   the parties," including because of the litigation itself).  Redacting this information in the current

15   context is even less justified, as it handicaps Plaintiffs' ability to assess compliance with the

16   preliminary injunction of a *nationality*-based suspension of refugee processing, by obscuring how

17   particular refugees of those nationalities have been treated.  *See Wagafe*, 2017 WL 5990134, at *2

18   (noting that even where it applies, the privilege is qualified, and can be outweighed by the need

19   for the information).

20          2.      Allegedly "non-responsive" information.  Plaintiffs also challenge Defendants'

21   decision to unilaterally deem information about individual refugees as "non-responsive" to

22   Plaintiffs' document request, and to redact or withhold information on that basis, even when that

---

[17] *See Wagafe v. Trump*, No. C17-94 RAJ, 2017 WL 5990134, at *2 (W.D. Wash. Oct. 19, 2017) ("To claim this privilege, the Government must satisfy three requirements: (1) there must be a formal claim of privilege by the head of the department having control over the requested information; (2) assertion of the privilege must be based on actual personal consideration by that official; and (3) the information for which the privilege is claimed must be specified, with an explanation why it properly falls within the scope of the privilege.").

[18] *See, e.g.*, Yeganeh Torbati & Mica Rosenberg, *Under Trump Plan, Refugees from 11 Countries Face Additional U.S. Barriers*, Reuters (Oct. 24, 2017), http://reut.rs/2gRvoDh; Sabrina Siddiqui, *Trump Ends Refugee Ban With Order to Review Program For 11 Countries*, The Guardian (Oct. 24, 2017), http://bit.ly/2llufW9; Ted Hesson, *Trump Targets 11 Nations in Refugee Order*, Politico (Oct. 24, 2017), http://politi.co/2gJQ5NW.

Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1   information unquestionably *is* responsive—such as when it is contained in an attachment to an

2   email that Defendants produced.   *See* Ex. 4 at 5 (instructing that attachments to responsive

3   documents shall be produced).   Defendants have aggressively redacted this information, even

4   when it is not personally identifiable (like the "citizenship" column of a spreadsheet).   Plaintiffs

5   are sensitive to any privacy concerns, but their repeated offers to enter into a protective order

6   covering the information—which is needed to determine who exactly has been hurt by any non-

7   compliance—have been ignored.   With such an order in place, Defendants have no reason for

8   withholding this information.  *See, e.g.*, *United States v. McGraw-Hill Cos., Inc.*, No. CV 13-0779-

9   DOC (JCGx), 2014 WL 8662657, at *4-5 (C.D. Cal. Sept. 25, 2014); *Franco-Gonzalez v. Holder*,

10  No. CV 10-2211-DMG (DTBx), 2013 WL 8116823, at *4-5 (C.D. Cal. May 3, 2013).

11          3.      Allegedly "non-responsive" documents.   Finally, Defendants have improperly

12  withheld as "non-responsive" several policy manuals and/or guidance documents that are either

13  attached to emails they have produced; hyperlinked in emails they have produced; or otherwise

14  expressly incorporated in documents implementing either the Agency Memo or the preliminary

15  injunction thereof.   *See, e.g.*, Keaney Decl. ¶¶ 18, 48; Exs. 8, 27 at 2-3.   Given the express

16  incorporation and Plaintiffs' need for referenced documents to fully understand the instructions

17  given to the officers, Plaintiffs do not believe Defendants' claims of non-responsiveness are

18  justified and request that they be compelled to produce these documents.   Alternatively, if the

19  Court would prefer not to reach this issue on the current posture, but enters an order extending the

20  discovery period, Plaintiffs will simply send a new request for these documents.

## CONCLUSION

22          Plaintiffs respectfully request that the Court grant their motion to compel and enter the

23  enclosed proposed order.

24

25

26

27

28

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1 | Respectfully submitted,

DATED:  October 22, 2018

2 | s/ Justin B. Cox

3 | Linda Evarts, *Pro Hac Vice*
Mariko Hirose, *Pro Hac Vice*

Justin B. Cox, *Pro Hac Vice*
International Refugee Assistance Project

4 | Kathryn C. Meyer, *Pro Hac Vice*
Deepa Alagesan, *Pro Hac Vice*

PO Box 170208
Atlanta, GA  30317

5 | International Refugee Assistance Project
40 Rector Street, 9th Floor

Tel: (678) 404-9119
jcox@refugeerights.org

New York, NY 10006

6 | Tel: (646) 459-3044
levarts@refugeerights.org

Karen C. Tumlin, *Pro Hac Vice*
Melissa S. Keaney, *Pro Hac Vice*

7 | mhirose@refugeerights.org
kmeyer@refugeerights.org

Esther H. Sung, *Pro Hac Vice*
National Immigration Law Center

8 | dalagesan@refugeerights.org

3450 Wilshire Blvd, #108-62
Los Angeles, CA 90010

9 | David Burman, WSBA No. 10611
Lauren Watts Staniar, WSBA No. 48741

Tel: (213) 639-3900
Fax: (213) 639-3911

10 | Tyler Roberts, WSBA No. 52688
Perkins Coie LLP

tumlin@nilc.org
keaney@nilc.org

11 | 1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099

sung@nilc.org

12 | Telephone:  206.359.8000
Facsimile:  206.359.9000

Lauren E. Aguiar, *Pro Hac Vice*
Mollie M. Kornreich, *Pro Hac Vice*

13 | dburman@perkinscoie.com
lstaniar@perkinscoie.com

Abigail E. Davis, *Pro Hac Vice*
Four Times Square

14 | troberts@perkinscoie.com

New York, NY  10036
Tel: (212) 735-3000

15 | Elizabeth Sweet, *Pro Hac Vice*
Mark Hetfield, *Pro Hac Vice*

Fax: (212) 735-2000
lauren.aguiar@probonolaw.com

16 | HIAS, Inc.
1300 Spring Street, Suite 500

mollie.kornreich@probonolaw.com
abigail.sheehan@probonolaw.com

17 | Silver Spring, MD 20910
Tel: 301-844-7300

18 | liz.sweet@hias.org
mark.hetfield@hias.org

*Counsel for Plaintiffs Jewish Family Service,
et al.*

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' JOINT MOTION TO COMPEL
(No. 17-cv-0178-JLR) – 1
141657978.2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

AMERICAN CIVIL LIBERTIES UNION
OF WASHINGTON FOUNDATION

By: /s/ Emily Chiang
    /s/ Lisa Nowlin
Emily Chiang, WSBA # 50517
Lisa Nowlin, WSBA # 51512
901 Fifth Avenue, Suite 630
Seattle, WA 98164
Telephone: (206) 624-2184
Email:    echiang@aclu-wa.org
          lnowlin@aclu-wa.org

*Counsel for Plaintiffs Doe, et al.*

KELLER ROHRBACK L.L.P.

By: /s/ Lynn Lincoln Sarko
By: /s/ Tana Lin
By: /s/ Amy Williams-Derry
By: /s/ Derek W. Loeser
By: /s/ Alison S. Gaffney
Lynn Lincoln Sarko, WSBA # 16569
Tana Lin, WSBA # 35271
Amy Williams-Derry, WSBA # 28711
Derek W. Loeser, WSBA # 24274
Alison S. Gaffney, WSBA # 45565
1201 Third Avenue, Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384
Email:    lsarko@kellerrohrback.com
          tlin@kellerrohrback.com
          awilliams-derry@kellerrohrback.com
          dloeser@kellerrohrback.com
          agaffney@kellerrohrback.com

By: /s/ Laurie B. Ashton
Laurie B. Ashton (admitted pro hac vice)
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012-2600
Telephone: (602) 248-0088
Facsimile: (602) 248-2822
Email:    lashton@kellerrohrback.com

By: /s/ Alison Chase
Alison Chase (admitted pro hac vice)
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497
Email:    achase@kellerrohrback.com

*Attorneys for Plaintiffs Doe, et al./Cooperating
Attorneys for the American Civil Liberties
Union of Washington Foundation*

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

 I hereby certify that on October 22, 2018, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all of the registered CM/ECF users for this case.

 DATED this 22th day of October, 2018.


       /s/ Tyler Roberts_____

CERTIFICATE OF SERVICE
(No. 17-cv-0178-JLR) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
T: 206.359.8000 / F: 206.359.9000