1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   JOHN DOE, et al.,                          CASE NO. C17-0178JLR

11                           Plaintiffs,        ORDER GRANTING IN PART
                                                AND DENYING IN PART
12            v.                                PLAINTIFFS' MOTION TO
                                                COMPEL
        DONALD TRUMP, et al.,
13                                              (RELATING TO BOTH CASES)
                            Defendants.
14                                              CASE NO C17-1707JLR
        JEWISH FAMILY SERVICES, et
15      al.,

16                           Plaintiffs,

17            v.

18      DONALD TRUMP, et al.,

19                            Defendants.

20

21

22

ORDER - 1

# I.   INTRODUCTION

Before the court is Plaintiffs' joint motion[1] to compel discovery from Defendants.[2] (Mot. (Dkt. # 166).)[3]  Defendants oppose the motion.  (Resp. (Dkt. # 169).)  The court has considered the motion, the parties' submissions in favor of and in opposition to the motion, other relevant portions of the record, and the applicable law.  Being fully advised,[4] the court GRANTS in part and DENIES in part the motion.

//

//

//

//

---

[1] This is a consolidated action.  (*See* 11/29/17 Order (Dkt. # 61).)  Plaintiffs from cause number C17-0178JLR include:  Jewish Family Services of Seattle, Jewish Family Services of Silicon Valley, Allen Vaught, Afkab Mohamed Hussein, John Does 1-3 and 7, and Jane Does 4-6's (collectively, "JFS Plaintiffs").  Plaintiffs from cause number C17-1707JLR include:  John Doe, Episcopal Diocese of Olympia, Joseph Doe, James Doe, Council on American Islamic Relations – Washington, Jack Doe, Jason Doe, and Jeffrey Doe (collectively, "Doe Plaintiffs").  Both sets of Plaintiffs bring the present motion.

[2] Defendants include:  President Donald Trump, United States Department of State ("DOS"), Secretary of State Mike Pompeo, United States Department of Homeland Security ("DHS"), DHS Secretary Kirstjen M. Nielsen, United States Customs and Border Protection ("USCBP"), Commissioner of USCBP Kevin McAleenan, Field Director of the Seattle Field Office of USCBP Michele James, Office of the Director of National Intelligence, and Director of National Intelligence ("DNI") Daniel Coats (collectively, "Defendants").

[3] As noted above, the court consolidated cause numbers C17-0178JLR and C17-1707JLR.  (*See* 11/29/17 Order); *see also supra* Note 1.  All references in this order to the docket are to cause number C17-0178JLR unless the docket number is preceded by "17-1707."  For example, if the docket number in the citation appears as "17-1707 Dkt. # 1," then the docket reference is to cause number C17-1707JLR.

[4] Plaintiffs request oral argument.  (*See* Mot. at 1.)  The court, however, determines that oral argument would not be of assistance in deciding the motion.  *See* Local Rules W.D. Wash. LCR 7(b)(4).  Accordingly, the court denies Plaintiffs' request.

## II.    BACKGROUND

**A.    The Case History**

President Trump has issued a series of executive orders concerning immigration and refugees.  (*See* 7/27/18 Order (Dkt. # 155) at 3-7.)  This litigation most recently addressed the fourth such order, Executive Order 13815 ("EO4"), entitled "Resuming the United States Refugee Admissions Program with Enhanced Vetting Capabilities."  82 Fed. Reg. 50,055 (Oct. 24, 2017).  Although EO4's title indicates that the government has resumed refugee admissions, the memorandum that accompanied EO4—known as the "Agency Memo"—imposed another ban on certain categories of refugees.  (*See* Lin Decl. (Dkt. # 46) ¶ 3, Ex. B (attaching a copy of the Agency Memo).)

First, the Agency Memo suspended indefinitely "following-to-join" ("FTJ") derivative refugees.[5]  Every year, approximately 2,500 refugees in the United States are able to reunite with their immediate family members through the FTJ process. (Agency Memo at 2 n.1.)  The Agency Memo stated that most FTJ refugee applicants do not undergo the same security procedures as the principal refugee who has already resettled in the United States.  (*Id.* at 2-3.)  The Secretaries of DOS and DHS and the DNI

---

[5] Under the Immigration and Nationality Act ("INA"), subject to numerical limits that the President sets annually, the Secretary of DHS may admit "any refugee who is not firmly resettled in any foreign country, is determined to be of special humanitarian concern to the United States, and is admissible (except as otherwise provided under ([8 U.S.C. § 1157(c)(3)]) as an immigrant."  8 U.S.C. § 1157(c)(1).  Refugees admitted under this provision are "principal refugees."  *See* 8 C.F.R. § 207.7(a).  "Derivative refugees" are the spouses and unmarried minor children of an admitted principal refugee.  *See id.*  When derivative refugees travel to join a principal refugee more than four months after the principal refugee's admission, they are FTJ derivative refugees, rather than "accompanying" derivative refugees.  *See id.*

1   determined that FTJ refugees should not be admitted to the United States until additional

2   screening procedures were in place.  (*Id.* at 3.)

3        Second, the Agency Memo suspended for at least 90 days the entry of refugees

4   who are "nationals of, and stateless persons who last habitually resided in, 11 particular

5   countries previously identified as posing a higher risk to the United States through their

6   designation on the Security Advisory Opinion (SAO) list."  (*Id*. at 2-3.) The Agency

7   Memo does not identify the countries designated on the SAO list, but they are believed to

8   be Egypt, Iran, Iraq, Libya, Mali, North Korea, Somalia, South Sudan, Sudan, Syria, and

9   Yemen.  (*See* PI Order (Dkt. # 92) at 10-11 n.6; 11/16/17 Smith Decl. (17-1707 Dkt.

10  # 44) ¶ 3.)  The Agency Memo required DOS and DHS to "conduct a review and

11  analysis" of the United States Refugee Admissions Program ("USRAP") for refugees

12  from SAO countries for an additional 90 days—notwithstanding the agencies' previous

13  review of USRAP pursuant to EO1 and EO2.  (*See id*.)  In addition, the Agency Memo

14  diverted resources dedicated to processing refugees who are citizens of (or stateless

15  persons who last resided in) SAO countries and reallocated those resources to processing

16  refugee applicants from non-SAO countries. (*Id*.)

17       JFS Plaintiffs[6] filed suit and Doe Plaintiffs[7] amended their complaint to challenge

18  the Agency Memo's suspension of FTJ and SAO refugee admissions (*see* TAC (Dkt.

19  # 42); Compl. (17-1707 Dkt. # 1)); and both sets of Plaintiffs moved for a preliminary

20

21       [6] *See supra* note 1.

22       [7] *See supra* note 1.

1   injunction blocking those provisions of the Agency Memo (*see* Doe PI Mot. (Dkt. # 45);

2   JFS PI Mot. (17-1707 Dkt. # 42)).  On November 29, 2017, the court consolidated the

3   two actions.  (*See* 11/29/17 Order.)  On December 23, 2017, the court granted both JFS

4   Plaintiffs' and Doe Plaintiffs' motions and enjoined Defendants from enforcing (1)

5   "those provisions of the Agency Memo that suspend the processing of FTJ refugee

6   applications or suspend the admission of FTJ refugees into the United States," and (2)

7   "those provisions . . . that suspend or inhibit, including through the diversion of

8   resources, the processing of applications or the admission into the United States of

9   refugees from SAO countries."  (PI Order at 64-65.)  The court, however, limited its

10  preliminary injunction to refugees "with a bona fide relationship to a person or entity

11  within the United States."  (*Id*. at 65.)

12       Within a few days, Defendants moved for an "emergency" stay of the injunction

13  pending appeal.  (MFS (Dkt. # 95).)  In that motion, Defendants narrowly interpreted the

14  court's injunction.  (*See id*. at 4-6.)  Defendants asserted that they were not required to

15  undo any actions taken or decisions made prior to December 23, 2017, to implement the

16  SAO or FTJ suspensions.  (*See id*.)  On January 9, 2018, the court denied Defendants'

17  motion (1/9/18 Order (Dkt. # 106) at 7-16) and rejected their cramped interpretation of

18  the court's preliminary injunction (*id*. at 5-7).  The court admonished Defendants for

19  attempting "to unilaterally modify the preliminary injunction" and ordered them to

20  "restore the status quo prior to the issuance of the Agency Memo with respect to the

21  processing of applications from FTJ refugees and refugees from SAO countries."  (*Id*. at

22  //

1    5-6.)  On January 4, 2018, Defendants filed a notice of appeal concerning the court's

2    preliminary injunction.  (NOA (Dkt. # 99).)

3            On February 6, 2018, following the completion of the 90-day SAO refugee review

4    on January 22, 2018, and the implementation of additional procedures for FTJ refugees

5    on or about February 1, 2018 (*see* 1/31/18 Notice (Dkt. # 119) at 1-2), Defendants moved

6    to dismiss as moot their appeal (and Plaintiffs' cross-appeal) in the Ninth Circuit.  *See*

7    *Doe v. Trump*, No. 18-35026 (9th Cir.), Dkt. # 24 at 2.  On March 29, 2018, the Ninth

8    Circuit denied Defendants' motion to dismiss and instead granted Plaintiffs' request to

9    remand the consolidated case so that this court could address the issue of mootness in the

10   first instance.  (3/29/18 9th Cir. Order (Dkt. # 126); 9th Cir. Mandate (Dkt. # 144).)

11           On remand, this court ordered the parties to file a joint status report proposing how

12   the court should proceed on remand to address the issue of mootness.  (*Id*. at 3.)  In

13   accordance with their joint status report (JSR (Dkt # 129)), JFS Plaintiffs filed a motion

14   to reinstate a prior request for limited discovery on Defendants' compliance with the

15   preliminary injunction and mootness (*see* 2d MFD (Dkt. # 131)), in which Doe Plaintiffs

16   joined (*see* 5/7/18 Order (Dkt. # 141) (granting Doe Plaintiffs' motion to join)); and

17   Defendants filed a motion to dismiss based on mootness (*see* MTD (Dkt. # 145)).  Based

18   on the parties' submissions, the court found that Plaintiffs had "demonstrated a bona fide

19   factual dispute concerning the existence and effectiveness of Defendants' steps to

20   discontinue the enjoined aspects of the Agency Memo."  (7/27/18 Order at 28.)

21   Accordingly, the court concluded that allowing Plaintiffs to conduct limited jurisdictional

22   discovery into the issues of compliance with the preliminary injunction and mootness was

1    warranted.  (*Id.* at 28.)  The court also denied Defendant's motion to dismiss, but did so

2    without prejudice to renewing the motion after Plaintiffs completed their jurisdictional

3    discovery.  (*Id.*)

4    **B.      The Parties' Conduct of Discovery**

5           The court granted Plaintiffs 90 days to conduct the necessary discovery into

6    mootness.  (*Id.* at 29.)  The following briefly recounts the parties' intricate conduct of

7    jurisdictional discovery during that period.

8           1.    Requests for Production of Documents

9           On August 1, 2018, just two days after receipt of the court's order granting

10   jurisdictional discovery, Plaintiffs served Defendants with a joint request for production

11   of documents that consisted of three requests ("First RFPs").  (Keaney Decl. (Dkt. # 167)

12   ¶ 2.)  On August 7, 2018, Defendants stated that they would provide their objections

13   within 21 days and produce responsive documents within 45 days.  (*Id.* ¶ 6, Ex. 21 at 1.)

14   In addition, Defendants stated that they did "not intend to respond to 'Request for

15   Production No. 3' [("RFP No. 3")] as written."  (*Id.* at 2 (underlining and bolding

16   omitted).)  On August 22, 2018, Defendants served written objections to Plaintiffs' First

17   RFPs.  (*Id.* ¶ 8, Ex. 22.)  Among other objections, Defendants also declined to respond to

18   Request for Production No. 1 ("RFP No. 1") as written and unilaterally narrowed the

19   request to only "final, formal guidance documents," instead of all "policies, directives,

20   instructions, guidelines, guidance, advisals, cables, notices, training, memorand[a]" and

21   similar documents.  (*Id.*)  Counsel for Plaintiffs and Defendants exchanged

22

correspondence in late August and early September, 2018, outlining their respective

positions concerning Defendants' objections.  (*Id.* ¶¶ 9-10, Exs. 23-24.)

Defendants produced 786 pages of records responsive to Plaintiffs' First RFPs on

September 14, 2018—45 days after service of the requests.  (*Id.* ¶ 11.)  Defendants

produced an additional 22 pages on October 12, 2018—73 days after service of the

requests.  In total, Defendants produced 808 pages of documents.  (*Id.*).

2.  Privilege Log

On September 21, 2018, Defendants served Plaintiffs with an admittedly

incomplete privilege log.  (*Id.* ¶ 13.)  Defendants served Plaintiffs with revised privilege

logs on September 25, October 17, and October 22, 2018.  (*Id.* ¶¶ 14 19-20, Ex. 3.)

Defendants withheld certain documents claiming a "law enforcement sensitive privilege."

(*Id.* ¶ 34.)  The parties conducted a telephonic meet and confer conference on October 16,

2018.  (*Id.*)  Although Defendants lifted some of the redactions to the documents they

produced as a result of the October 16, 2018, conference, they also added redactions

based on the parties' Federal Rule of Evidence 502(d) agreement.  (*Id.* ¶ 35; *see also*

502(d) Order (Dkt. # 160).)

3.  Interrogatories

On August 10, 2018, the parties met and conferred about Defendants' objections

to RFP No. 3.  (Keaney Decl. ¶ 7.)  The parties agreed that Plaintiffs should narrow their

request and re-issue RFP No. 3 as a set of interrogatories.  (*Id.*)  On August 17, 2018,

Plaintiffs served Defendants with Plaintiffs first set of interrogatories ("First ROGs").

(*Id.* ¶¶ 7, 21, Ex. 5.)  On September 1, 2018, Defendants sent their objections to the First

ROGs and indicated that six were overly burdensome.  (*Id.* ¶ 24, Ex. 30.)  On September

5, 2018, Defendants indicated that they would need until September 26, 2018, to respond

to Plaintiffs' First ROGs.  (*Id.* ¶ 25.)  Defendants served written responses and objections

to Plaintiffs' First ROGs on September 26, 2018—40 days after service.  (*Id.* ¶ 28.)

On September 6, 2018, Plaintiffs agreed to narrow the six interrogatories that

Defendants identified as overly burdensome and propounded a narrower set of these six

interrogatories ("Third ROGs").[8]  (*Id.* ¶ 26, Ex. 6.)  On October 5, 2018, Defendants

produced their written responses and objections to Plaintiffs' Third ROGs.  (*Id.* ¶ 29.)

Defendants supplemented their responses to Plaintiffs First ROGs on October 10,

2018.  (*Id.* ¶ 30.)  Defendants supplemented their responses to Plaintiffs Third ROGs on

October 11, 2018.  (*Id.* ¶ 30.)

After reviewing Defendants' September 14 and October 12, 2018, document

productions, as well as Defendants' final supplemental responses on October 10 and

October 11, 2018, to Plaintiffs' First ROGs and Third ROGs, respectively, Plaintiffs

determined that six follow-up interrogatories were necessary to aid in Plaintiffs'

assessment of Defendants' compliance with the court's preliminary injunction.  (*Id.* ¶ 32.)

Accordingly, on October 5, 2018, Plaintiffs served Defendants with a fourth set of

interrogatories ("Fourth ROGs").  (*Id.* ¶ 32, Ex. 1.)  On October 9, 2018, Defendants sent

a letter to Plaintiffs refusing to respond to Plaintiffs' Fourth ROGs.  (*Id.* ¶ 33, Ex. 31.)

---

[8] Doe Plaintiffs propounded a single interrogatory related to the FTJ suspension, which was labelled as "Plaintiff Joseph Doe's Second Set of Interrogatories to Defendants."  (Keaney Decl. ¶ 26 n.1.)  This set of interrogatories is not at issue in Plaintiffs' motion.

1   Specifically, Defendants complained that Plaintiffs' Fourth ROGs were "tardy" because

2   the period the court set for jurisdictional discovery was "set to close on [October 25,

3   2018,] less than three weeks from the date Plaintiffs served their [Fourth ROGs]."  (*Id.*)

4   Defendants also complained that Fourth ROGs were burdensome because they seek

5   "week-by-week data" and information about refugee applicants who are not Plaintiffs'

6   attorneys' clients.  (*Id.*; *see also* Gauger Decl. (Dkt. # 169-1) ¶¶ 4, 8-9.)

7          4.  Deposition Requests

8          After reviewing Defendants' document productions and interrogatory responses,

9   Plaintiffs decided that they would like to take the depositions of two employees of

10  Defendant agencies, Kelly Gauger and Jennifer Higgins.  (*Id.* ¶ 38.)  Both of these

11  individuals have submitted multiple declarations to the court during the course of this

12  litigation.[9]  (*See* Dkt. ## 51-1, 114-1, 114-2, 142-1, 142-2, 169-1.)  Plaintiffs also decided

13  to note two Federal Rule of Civil Procedure 30(b)(6) depositions.  (Keaney Decl. ¶ 38.)

14  Plaintiffs first informed Defendants of their intention to request Rule 30(b)(6) depositions

15  on October 4, 2018—more than twenty days prior to the October 25, 2018, discovery

16  cutoff.  (*See* Resp. Ex. H.)  Plaintiffs further notified Defendants of their intentions

17  concerning both the fact witness and Rule 30(b)(6) depositions on October 10, 2018.

18

19         [9] Ms. Higgins is the Associate Director of the Refugee, Asylum, and International

20  Operations ("RAIO") Directorate at the United States Citizenship and Immigration Services
    ("USCIS").  Defendants have submitted three declarations from Ms. Higgins in this litigation,
    the latter two concerning injunction compliance.  (Dkt. ## 51-1, 114-2, 142-2.)  Ms. Gauger is

21  the Acting Director of the Admissions Office of the Bureau of Population, Refugees, and
    Migration ("PRM/A") of DOS.  Defendants have submitted three declarations from Ms. Gauger,

22  the first two concerning injunction compliance.  (Dkt. ## 114-1, 142-1, 169-1.)

1    (Keane Decl. ¶ 38, Ex. 32.)  Defendants responded on the same day stating that "for the

2    proposed depositions, the parties will likely need to ask guidance from the Court," and

3    that it is "doubt[ful] that Defendants will be amenable to your eleventh hour and

4    expansive deposition requests."  (*Id.* ¶ 39, Ex. 33.)

5        Plaintiffs requested a meet and confer conference regarding the deposition

6    requests, which occurred on October 16, 2018.  (*Id.* ¶¶ 41-42.)  At the meet and confer

7    conference, Defendants asked Plaintiffs to serve their Rule 30(b)(6) notices to enable

8    Defendants to determine their position.  (*Id.* ¶ 42.)  On October 17, 2018, Plaintiffs

9    served their Rule 30(b)(6) notices, which are identical except that one notice is directed

10   to DOS and the other is directed to DHS.  (*Id.* ¶ 42, Ex. 2.)  On October 19, 2018,

11   Defendants declined to permit Plaintiffs access to either of the two factual witness or to

12   produce the requested Rule 30(b)(6) deponents.  (*Id.* ¶ 43, Ex. 35.)

13       5.  The Present Motion

14       On October 22, 2018, Plaintiffs filed the present motion to compel.  Plaintiffs seek

15   an order compelling Defendants to respond to Plaintiffs' Fourth ROGs, to produce two

16   Rule 30(b)(6) deponents as requested, and to allow Plaintiffs to depose Ms. Higgins and

17   Ms. Gauger.  (Mot at 10.)  In addition, Plaintiffs seek an order compelling Defendants to

18   produce two types of information that they have previously redacted:  (1) any information

19   that would tend to reveal the names of any of the 11 SAO countries (*id.* at 10-11); and (2)

20   information that Defendants have redacted as non-responsive from previously produced

21   documents, including (a) information about individual refugees and (b) documents, such

22   as policy manuals and/or guidance documents that are attached, hyperlinked, or otherwise

1  expressly incorporated in documents implementing either the Agency Memo or the

2  preliminary injunction (*id.* at 11-12).  Defendants oppose Plaintiffs' motion.  (*See* Resp.)

3  The court now considers Plaintiffs' motion to compel discovery.[10]

4  ### III.   ANALYSIS

5  **A.   The Standard for Obtaining Discovery**

6          Federal Rule of Civil Procedure 26 governs the standard for producing discovery.

7  *See* Fed. R. Civ. P. 26; *Ciuffitelli v. Deloitte & Touche LLP*, No. 3:16-CV-0580-AC,

8  2016 WL 6963039, at *3 (D. Or. Nov. 28, 2016).  In general, "[p]arties may obtain

9  discovery regarding any nonprivileged matter that is relevant to any party's claim or

10 defense and proportional to the needs of the case, considering the importance of the

11 issues at stake in the action, the amount in controversy, the parties' relative access to

12 relevant information, the parties' resources, the importance of the discovery in resolving

13 the issues, and whether the burden or expense of the proposed discovery outweighs its

14 likely benefit."  Fed. R. Civ. P. 26(b)(1).  "The 2015 amendments to Rule 26(b)(1)

15 emphasize the need to impose 'reasonable limits on discovery through increased reliance

16 on the common-sense concept of proportionality.'"  *Roberts v. Clark Cty. Sch. Dist.*, 312

17 F.R.D. 594, 603 (D. Nev. 2016) (internal citation omitted).  Information need not be

18 ─────────────────

19    [10] Defendants argue that Plaintiffs failed to "meaningfully meet and confer with
   Defendants."  (Resp. at 3 (underlining and capitalization omitted).)  *See* Local Rule W.D. Wash.
20 LCR 37(a)(1) (requiring the moving party in a discovery dispute to certify that "the movant has
   in good faith conferred or attempted to confer with the . . . party failing to make disclosure or
21 discovery in an effort to resolve the dispute without court action.").  The court rejects
   Defendants' argument.  As is described above, the parties were in regular contact throughout the
   discovery period, and the Plaintiffs conducted specific meet and confer telephonic conferences
22 on August 10, 2018 and October 16, 2018.  *See supra* § II.B; (*see also* Keaney Decl. ¶ 62.)

1    admissible to be discoverable.  *Id.*  The court has broad discretion in determining

2    relevancy for discovery purposes.  *Surfvivor Media, Inc. v. Survivor Prods*., 406 F.3d

3    625, 635 (9th Cir. 2005).  As noted above, in the present context, relevancy is limited to

4    jurisdictional discovery on mootness.  (*See* 7/27/18 Order at 28-29.)

5         Under Federal Rule of Civil Procedure 37, "a party seeking discovery may move

6    for an order compelling an answer, designation, production, or inspection."  Fed. R. Civ.

7    P. 37(a)(3)(B).  The court may order a party to provide further responses to an "evasive

8    or incomplete disclosure, answer, or response."  *See* Fed. R. Civ. P. 37(a)(4).  Although

9    the party seeking to compel discovery has the burden of establishing that its requests are

10   relevant, *see* Fed. R. Civ. P. 26(b)(1), "[t]he party who resists discovery has the burden to

11   show that discovery should not be allowed, and has the burden of clarifying, explaining,

12   and supporting its objections" with competent evidence, *see Blemaster v. Sabo*, No. 2:16-

13   CV-04557 JWS, 2017 WL 4843241, at *1 (D. Ariz. Oct. 25, 2017) (quoting *DIRECTV,*

14   *Inc. v. Trone*, 209 F.R.D. 455, 458 (C.D. Cal. 2002)); *see also Blankenship v. Hearst*

15   *Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) (holding that the defendants did not meet their

16   burden of showing in their motion for a protective order why discovery was denied).  The

17   party resisting discovery on grounds of privilege also bears the burden to show that the

18   requested discovery is so protected.  *See Everest Indem. Ins. Co. v. QBE Ins. Corp*., 980

19   F. Supp. 2d 1273, 1277 (W.D. Wash. 2013).

20   //

21   //

22   //

ORDER - 13

**B.     The Fourth ROGs**

Defendants object to Plaintiffs' Fourth ROGs on grounds of (1) undue burden, and (2) timeliness.  (Resp. at 5-6.)  As discussed below, the court declines to sustain either objection and grants Plaintiffs' motion to compel with respect to the Fourth ROGs.

1.  Burden

Defendants assert that responding to Plaintiffs' Fourth ROGs would impose an undue burden.  (Resp. at 5-6.)  Although Defendants describe the time spent responding to past discovery requests (*see* Gauger Decl. ¶¶ 4, 8-9), they do not estimate the time needed to respond to the additional six (6) questions contained in Plaintiffs' Fourth ROGs (*see generally id.*).  Instead, Defendants perfunctorily recite that responding to the Fourth ROGs "would impose significant burdens on [the Refugee Processing Center ("RPC")]." (*Id.* ¶ 9.).  Without some indication of why responding to the specific discovery requests at issue here is unduly burdensome, the court cannot sustain Defendants' objection.

Further, the court is unconvinced that Plaintiffs' prior discovery requests imposed an undue burden on Defendants.  For example, Defendants complain that the Office of the Legal Advisor, Human Rights and Refugees ("L/HRR") presently "has the primary responsibility within [DOS] for overseeing the search and production tasks to respond to discovery requests" and "has only one attorney assigned to handle legal matters relating to the USRAP and who was available to perform the review of the documents and data that have been produced to date."  (*Id.* ¶¶ 3, 6.)  Defendants also state that "[t]here are no other personnel in PRM/A specifically assigned to assist in the search and production, and [they] currently lack capacity to assign dedicated personnel to this work" and are

1   "already below regular staffing levels due to [DOS's] hiring freeze."  (*Id.*)  Nevertheless,

2   Defendants state that they assigned a team of RPC contractors to complete the work and

3   that this team, collectively, spent 228 hours gathering the data responsive to Plaintiffs'

4   requests.  (*Id.* ¶ 4.)  Defendants never state how many people comprised the team of RPC

5   contractors; but in any event, a total of 228 hours to respond to jurisdictional discovery

6   requests does not seem unduly burdensome to the court or out of proportion to the needs

7   of this complex case.  *See* Fed. R. Civ. P. 26(b)(1).

8          Further, if there are insufficient legal resources within L/HRR and PRM/A to

9   handle the discovery requests precipitated by President Trump's various executive orders

10  on immigration and refugees, Defendants do not explain why they could not assign

11  additional resources from the United States Department of Justice ("DOJ") to assist in

12  responding to discovery.  Assisting a client in reviewing documents for responsiveness

13  and privilege is a typical responsibility performed by legal counsel in all types of

14  litigation before this court.  DOJ refers to itself as "the world's largest law office,

15  employing more than 10,000 attorneys nationwide."  *See* United States Department of

16  Justice, Office of Attorney Recruitment, https://www.justice.gov/oarm (last visited Dec.

17  17, 2018).  Given these vast DOJ resources, the court is confident that Defendants can

18  handle an additional six interrogatories without experiencing undue burden and,

19  therefore, declines to sustain Defendants' objection on this ground.

20         Finally, the court agrees with Plaintiffs that Defendants cannot avoid their duties

21  to respond to Plaintiffs' otherwise reasonable and targeted discovery requests by failing

22  to dedicate sufficient resources.  (*See* Reply (Dkt. # 170) at 3.)  "In order to adequately

1   respond to discovery in civil litigation all parties incur unwanted burdens and costs."

2   *Costantino v. City of Atl. City*, 152 F. Supp. 3d 311, 328 (D.N.J. 2015) (explaining that a

3   governmental defendant "cannot shirk its responsibilities by failing to dedicate sufficient

4   resources to respond to appropriate and necessary discovery"). What Defendants

5   describe is not "undue" burden, but the ordinary burdens that civil litigants must bear. As

6   noted above, given DOJ's resources, Defendants are in a better positon than most to

7   muster the necessary resources for the limited discovery at issue here. For all of the

8   foregoing reasons, the court rejects Defendants' undue burden objection with respect to

9   Plaintiffs' Fourth ROGs.

10      2.  Timeliness

11      Defendants also object that Plaintiffs served their Fourth ROGs too late because

12   Plaintiffs served them only 20 days prior to the close of the discovery period. (Resp. at

13   6.) Defendants are correct that, to be timely, courts typically require a party to serve

14   interrogatories or requests for production at least 30 days prior to the discovery cutoff.

15   (*See* Resp. at 6 (citing *Reed v. Morgan*, No. 3:16-CV-05993-BHS-DWC, 2017 WL

16   4408076, at *1-2 (W.D. Wash. Oct. 4, 2017).) For example, the *Morgan* court, on which

17   Defendants rely, denied the plaintiff's motion to compel because the defendants'

18   responses would have been due 3 days after the discovery deadline had passed. 2017 WL

19   4408076, at *2. Notably, however, the *Morgan* court still concluded that "the interests of

20   justice dictate that the parties should be allowed additional discovery." *Id.* (citing *Oakes*

21   *v. Halvorsen Marine Ltd.*, 179 F.R.D. 281, 283 (C.D. Cal. 1998) (stating that "the

22   purpose of discovery is to remove surprise from trial preparation so the parties can obtain

ORDER - 16

1  evidence necessary to evaluate and resolve their dispute")).  Thus, the rule that discovery

2  must be served so that a party is capable of responding within the discovery period "is not

3  absolute."  *Bishop v. Potter*, No. 2:08–cv–00726–RLH–GWF, 2010 WL 2775332, at *2

4  (D. Nev. July 14, 2010).

5      Indeed, Defendants complaints about timeliness ignore whether—as Plaintiffs

6  assert—there is good cause to modify the scheduling order to accommodate Defendants'

7  responses to the Fourth ROGs.  (*See* Mot. at 9 (citing *Wealth by Wealth, Inc. v. Ericson*,

8  No. C09-1444JLR, 2010 WL 11566111, at *3 (W.D. Wash. July 12, 2010).)  In

9  determining whether "good cause" exists under Federal Rule of Civil Procedure 16(b) to

10  modify a case schedule, the court "primarily considers the diligence of the party seeking

11  amendment."  *Johnson v. Mammoth Recreations, Inc*., 975 F.2d 604, 609 (9th Cir. 1992).

12  "Although the existence or degree of prejudice to the party opposing the modification

13  might supply additional reasons to deny a motion, the focus of the inquiry is upon the

14  moving party's reasons for seeking modification."  *Id*.  "If that party was not diligent, the

15  inquiry should end."  *Id*.  Good cause exists when the deadline in the scheduling order

16  "cannot reasonably be met despite the diligence of the party seeking the extension."  *Id*.;

17  *see Noyes v. Kelly Servs*., 488 F.3d 1163, 1174 (9th Cir. 2007).  Ultimately, "[w]hat

18  constitutes good cause . . . necessarily varies with the circumstances of each case."  6A

19  Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and*

20  *Procedure: Civi*l § 1522.2 (2d ed. 1990).

21      The court is convinced, based on the record recited above, that Plaintiffs acted

22  diligently here.  *See supra* § II.B.  They issued limited and targeted discovery and

1  attempted in good faith to quickly adjust those requests based on objections articulated by

2  Defendants.  *See id.*  Further, although the court does not find that Defendants acted in a

3  dilatory manner, Defendants' response times consumed large portions of the 90-day

4  discovery period.  For example, although Defendants produced the bulk of their

5  documents (786 pages) within 45 days of service of Plaintiffs' requests, Defendants did

6  not complete their document production (adding an additional 22 pages) until 73 days

7  following service.  (Kearney Decl. ¶ 11.)  Although the number of documents produced

8  does not always reflect the time required to produce them, here, the total number—808

9  pages—is modest, suggesting that less rather than more time should have been required.

10  In addition, Defendants also did not serve written responses to Plaintiffs' First ROGs

11  until September 26, 2018—40 days after service.  (*Id.* ¶ 28.)  However, the response time

12  typically required under the Rules, absent a stipulation of the parties or order of the court,

13  is just 30 days.  *See* Fed. R. Civ. P. 33(b)(2) ("The responding party must serve its

14  answers and any objections within 30 days after being served with the interrogatories.").

15  The court notes the timing of Defendants' responses not to criticize Defendants, but to

16  highlight the fact that both sides have taken more time than the court anticipated to

17  complete the jurisdictional discovery at issue.  Plaintiffs needed to wait for Defendants'

18  responses before they could assess if additional discovery would be required.  Plaintiffs

19  were not dilatory in either reviewing Defendants' responses or issuing follow-up

20  discovery.  *See supra* § II.B.  Finally, Defendants fail to explain why extending the

21  jurisdictional discovery cutoff to accommodate their responses will result in undue

22  prejudice to them.  (*See* Resp. at 6-7.)  Thus, the court finds that there is good cause to

1    extend the discovery cutoff with respect to Plaintiffs' Fourth ROGs, grants Plaintiffs'

2    motion to compel, and orders Defendants to respond to Plaintiffs' Fourth ROGs within 45

3    days of the filing date of this order.[11]

4    **C.    Depositions**

5           Plaintiffs also seek an order compelling Defendants to produce two Rule 30(b)(6)

6    deponents and to allow Plaintiffs to depose Ms. Higgins and Ms. Gauger.  (Mot at 10.)

7    Defendants object that these deposition requests are (1) unduly burdensome, and (2)

8    "troublingly late."  (Resp. at 5-7.)  Again, as discussed below, the court declines to

9    sustain either objection and grants Plaintiffs' motion to compel the requested depositions.

10          1.    Burden

11          Defendants assert that the depositions requested by Plaintiffs are burdensome

12   because they "effectively encompass *all* of their requested discovery."  (*Id.* at 5.)   They

13   also object that taking the depositions of Ms. Higgins and Ms. Gauger would be

14   duplicative of the requested Rule 30(b)(6) depositions.[12]  (*Id.*)

15          A party may "by oral questions, depose any person" and may notice an entity—

16   including a governmental agency—for deposition pursuant to Rule 30(b)(6).  Fed. R. Civ.

17   P. 30(a)(1), (b)(6).  Both fact witness and Rule 30(b)(6) depositions are subject to the

18   _____

19          [11] Although Defendants do not propose a timeline for completing additional discovery,
     they complain that the additional 35 days sought by Plaintiffs is too short.  (*See* Gauger Decl.

20   ¶ 9.)  Accordingly, the court allows 45 days for Defendants to respond.

21          [12] Defendants also object that "fact witness testimony is particularly inappropriate before
     any 30(b)(6) deposition."  (Resp. at 5.)  However, the Federal Rules of Civil Procedure are

22   unambiguous on this point:  Unless the parties so stipulate or the court orders otherwise, the
     "methods of discovery may be used in any sequence."  Fed. R. Civ. P. 26(d)(3)(A).

1    limitations of Rule 26(b)(2)(C), which provides that a court shall limit the frequency or

2    extent of discovery that: (i) is unreasonably cumulative, duplicative, or burdensome; (ii)

3    is dilatory; or (iii) fails a balancing test that weighs the burden or expense of the

4    discovery sought against its benefit, in light of the specific facts of the case.  *See* Fed. R.

5    Civ. P. 26(b)(2)(C)(i)-(iii).  District courts enjoy broad discretion to fashion discovery

6    such that a proper balance between Rule 26's broad discovery mandates and appropriate

7    restrictions on such discovery is achieved.  *See Laub v. U.S. Dep't of Interior*, 342 F.3d

8    1080, 1093 (9th Cir. 2003).

9           First, the court rejects the notion that taking a Rule 30(b)(6) deposition is

10   necessarily duplicative of a fact witness deposition even if the same person is being

11   deposed in both instances.  Rule 30(b)(6) expressly provides that "[t]his paragraph (6)

12   does not preclude a deposition by any other procedure allowed by these rules."  Fed. R.

13   Civ. P. 30(b)(6).  The deposition of an individual and the deposition of the same person

14   as a representative of the organization are two distinct matters and can be utilized as

15   distinct forms of evidence.  *See Taylor v. Shaw*, No. 2:04CV01668LDGLRL, 2007 WL

16   710186, at *2 (D. Nev. Mar. 7, 2007) ("Rule 30 allows depositions of a witness in his

17   individual capacity and in an organizational capacity because the depositions serve

18   distinct purposes and impose different obligations.").  For example, a fact witness is

19   generally limited to his or her own personal knowledge, whereas a Rule 30(b)(6)

20   deponent testifies on behalf of the organization.  *See* Fed. R. Civ. P. 30(b)(6) ("The

21   named organization must then designate one or more officers, directors, or managing

22   agents, or designate other persons who consent to testify on its behalf . . . .").  Thus,

1    Plaintiffs are entitled to seek both types of discovery from Defendants, and the court does

2    not consider these forms of discovery "duplicative" even if they address similar or

3    overlapping subject matters.

4           Further, the court does not consider a fact witness deposition to be generally

5    duplicative of prior written discovery.  Parties are ordinarily entitled to test interrogatory

6    responses and document production through depositions—particularly where, as here, the

7    party seeking discovery argues persuasively that the opposing party's responses to date

8    have raised as many questions as they have answered.[13]  (*See* Mot. at 3-8); *see also*

9    *Taylor*, 2007 WL 710186, at *3 (ruling that the defendant is entitled to take depositions

10   and they are not cumulative where the plaintiff's responses to written discovery requests

11   were inconsistent).  Defendants have not demonstrated that the two fact witness

12   depositions and the two Rule 30(b)(6) depositions that Plaintiffs seek are so burdensome,

13   cumulative, or out of proportion to the needs of the case as to justify a denial of

14   Plaintiffs' request for these depositions.  *See* Fed. R. Civ. P. 26(b)(1).

15   //

16   //

17   //

---

18         [13] In response to Plaintiffs' arguments that Defendants' written discovery responses raise

19   numerous and additional questions about Defendants' compliance with the court's preliminary
     injunction, Defendants submit three declarations in an effort to clarify their earlier responses.

20   (*See* Ingraham Decl. (Dkt. # 169-3); Smith Decl. (Dkt. # 169-4); Ruppel Decl. (Dkt. # 169-5).)
     In the court's view, this simply reinforces Plaintiffs' need to conduct depositions to test and

21   clarify Defendants' written responses.  Depositions are a usual tool for expanding upon and
     clarifying written answers or testimony because the answering party must respond orally to

22   questions that can be modified and refined as the deposition progresses and the answering party
     can also clarify answers and provide more detail as needed in real time.

1    2.  <u>Timeliness</u>

2         Defendants also argue that Plaintiffs' requests for two fact witness depositions and

3    two Rule 30(b)(6) depositions are untimely.  (*See* Resp. at 6-7.)  The court rejects this

4    argument for the same reasons that it rejected Defendants' timeliness objections

5    concerning Plaintiffs' Fourth ROGS.  *See supra* § III.B.2.

6         Further, unlike the 30-day response time allowed for interrogatories and requests

7    for production, which arguably rendered Plaintiffs' Fourth ROGs untimely, *see* Fed. R.

8    Civ. P. 33(b)(2) (allowing 30 days for the responding party to serve its answers and

9    objections to interrogatories), Fed. R. Civ. P. 32(b)(2)(A) (allowing 30 days for the

10   answering party to respond in writing to requests for production), there is no definitive

11   response time with respect to a deposition other than providing reasonable notice, *see*

12   Fed. R. Civ. P. 30(b)(1) (requiring "reasonable written notice" for a deposition).

13   Defendants have not stated that they were unable to reasonably produce the requested

14   witnesses prior to the October 25, 2018, discovery cutoff.  (*See* Resp. at 6-7.)  Defendants

15   only assert that the deposition requests were "troublingly late."  (*Id.* at 6.)  In fact, in

16   Defendants' counsel's correspondence to Plaintiffs' counsel, Defendants' counsel stated

17   that he "doubted that Defendants would be amenable to [Plaintiffs'] eleventh hour and

18   expansive deposition requests."[14]   (Keaney Decl. ¶ 39, Ex. 33.)  Yet, the "eleventh hour"

19   of a discovery period is still within the discovery period, and there is no basis for denying

20   //

21   _____

22   [14] The court does find Plaintiffs' request for two fact and two Rule 30(b)(6) deponents to
     be "expansive."

1    a discovery request simply because it is served toward the end of the designated period.

2    Indeed, it is the court's experience that litigants are often quite productive in the

3    "eleventh hour" of a discovery period.  Accordingly, the court declines to sustain

4    Defendants' timeliness objection to Plaintiffs' fact witness and Rule 30(b)(6) depositions.

5    The court therefore grants Plaintiffs' motion to compel these depositions and orders

6    Defendants to produce these deponents within 45 days of the filing date of this order.

7    **D.     Law Enforcement Privilege**

8            Defendants have redacted from the documents they produced any information that

9    would tend to reveal the names of the SAO countries.  (*See* Mot. at 10; Resp. at 7

10   ("Defendants redacted a handful of documents that contained SAO information.").)

11   Defendants assert that this information is privileged as "law enforcement sensitive."  (*See*

12   Keaney Decl. ¶ 20, Ex. 3 (attaching privilege log).)  Defendants maintain that if the

13   government disclosed or publicly acknowledged this information it "could reasonably be

14   expected to . . . cause harm to law enforcement and counterterrorism investigations," and

15   "undermine [DOS's] security vetting efforts."  (Latta Decl. (Dkt. # 169-2) ¶ 3.)  Plaintiffs

16   argue that Defendants' redactions "handicap[] Plaintiffs' ability to assess compliance

17   with the preliminary injunction of a *nationality*-based suspension of refugee processing,

18   by obscuring how particular refugees of those nationalities have been treated."  (Mot. at

19   11 (italics in original).)

20          The parties dispute both the validity and applicability of this claimed privilege.

21   (*See id.* at 10-11; Resp. at 8.)  In the context of the preliminary injunction, the court did

22   not need to decide the issue because Defendants acknowledged that "the court could 'rely

ORDER - 23

1    on Plaintiffs' allegations [concerning the identity of the SAO countries] for purposes of

2    addressing the issues'" presented there.  (PI Order at 10-11 n.6.)  The court need not

3    decide the issue now either because Plaintiffs offered to accept the production of this

4    material under "an appropriate protective order" (*see* Keaney Decl. ¶ 17, Ex. 27 at 5-6),

5    and Defendants agreed to do so (*see* Resp. at 9; Resp., Ex. O (Dkt. # 169-15) at 3

6    ("Defendants have determined . . . that we will lift the SAO redactions, provided

7    Plaintiffs agree to a protective order prohibiting the dissemination of this information in

8    unredacted form.")).

9         The issue, nevertheless, remains before the court because Plaintiffs subsequently

10   withdrew their prior offer stating that because they had already briefed the issue, they

11   were now "content for the [c]ourt to rule on Defendants' claim of [law enforcement]

12   privilege . . . ."  (Resp., Ex. O at 1.)  Plaintiffs also complain that the "attorneys' eyes

13   only" protective order offered by Defendants is "overly strict."  (*Id.*; *see also* Reply at 5

14   n.8.)  Yet obtaining the SAO information under an "attorneys' eyes only" protective

15   order should suffice if Plaintiffs' need for the information is as stated—to assess

16   Defendants' compliance with a nationality-based suspension of refugee processing.  (*See*

17   Mot. at 11.)  Accordingly, the court will hold Plaintiffs to their prior agreement.  The

18   court therefore grants Plaintiffs' motion to compel Defendants to produce the SAO

19   information and orders Defendants to do so, but Defendants are only required to do so

20   pursuant to a protective order as discussed herein.

21   //

22   //

ORDER - 24

**E.      Information Redacted as Nonresponsive**

   Defendants have redacted information as "nonresponsive" from documents,
including:  (1) refugee applicants' personal information, and (2) several policy manuals
and/or guidance documents concerning the Agency Memo or preliminary injunction that
are either attached to emails or otherwise expressly incorporated in documents but that
Defendants did not deem to be "final" or "formal" manuals or guidance documents.  (*See*
Mot. at 11-12; Resp. at 9-10; Reply at 6.)  Plaintiffs move to compel Defendants to
produce these materials but are agreeable to placing any personally identifiable
information under a protective order.  (*See* Mot. at 11-12.)  Defendants oppose the
production of any of the redacted material.  (Resp. at 9-10.)

   District courts appear to be split on the issue of whether a party may unilaterally
redact material that the party deems to be nonresponsive or irrelevant from an otherwise
responsive document.  *See Bonnell v. Carnival Corp.*, No. 13-22265-CIV, 2014 WL
10979823, at *3 (S.D. Fla. Jan. 31, 2014).  This court, however, agrees with those courts
who generally disapprove of the practice.  Redaction is generally an inappropriate tool for
excluding information that a party considers to be irrelevant or nonresponsive from
documents that are otherwise responsive to a discovery request.  *See Bartholomew v.
Avalon Capital Grp., Inc.*, 278 F.R.D. 441, 451 (D. Minn. 2011) (citing *In re Medeva
Sec. Litig.*, No. 93-4376-KN AJWX, 1995 WL 943468, at *3 (C.D. Cal. May 30, 1995),
*David v. Alphin*, No. 3:07cv11, 2010 WL 1404722, at *7-*8 (W.D.N.C. Mar. 30, 2010),
and *Evon v. Law Offices of Sidney Mickell*, Civ. No. S-09-0760 JAM GGH, 2010 WL
455476, at *2 n.1 (E.D. Cal. Feb. 3, 2010)).  It is a rare document that contains only

1  relevant information; and irrelevant information within an otherwise relevant document

2  may provide context necessary to understand the relevant information.  *See id.*

3  "[U]nilateral redactions are inappropriate if they seek not to protect sensitive or protected

4  information, but merely to keep non-responsive information out of an adversary's hands.

5  *United States v. McGraw-Hill Companies, Inc*., No. CV 13-0779-DOC JCGX, 2014 WL

6  8662657, at *4 (C.D. Cal. Sept. 25, 2014).

7         Further, Rule 34 concerns the discovery of "documents"—not of excerpts of

8  documents or subsets of words within documents.  *See* Fed. R. Civ. P. 34.  Thus, courts

9  generally view "documents" as relevant or irrelevant—not portions thereof—for purposes

10  of Rule 34.[15]  "This is the only interpretation of [Rule] 34 that yields 'just, speedy, and

11  inexpensive determination[s] of every action and proceeding.'"  *Bartholomew*, 278

12  F.R.D. at 452 (quoting Fed. R. Civ. P. 1).

13        Further, the unilateral redaction of irrelevant or nonresponsive material from

14  otherwise responsive documents "gives rise to suspicion that relevant material harmful to

15  the producing party has been obscured" and "tends to make documents confusing or

16  difficult to use."  *In re Medeva Sec. Litig*., 1995 WL 943468, at *3.  "Redaction is, after

17  all, an alteration of potential evidence."  *Evon*, 2010 WL 455476, at *2 n.1.  Parties

18  should not unilaterally decide what nonresponsive portions of a document are necessary

19  for context and what portions are not.  Needless to say, opposing parties are likely to

20

21         ───────────────

22        [15] The court does not rule that a party may never redact a document on grounds of irrelevance, only that such redactions are not the generally accepted or best practice, and there is insufficient justification for departing from the norm here.

1   view this determination differently.  For these reasons, the practice is also likely to result,

2   as it did here, in the litigation of collateral issues and the needless expenditure of

3   resources.  *See In re Medeva Sec. Litig.*, 1995 WL 943468, at *3.  These drawbacks

4   outweigh the minimal harm that may result from disclosure of some irrelevant or

5   nonresponsive material.  *See id.*  Moreover, except for the disclosure of certain refugee

6   applicants' personal information, Defendants have not identified any prejudice that might

7   result from the production of the redacted material here; and the privacy issue can easily

8   be addressed by the entry of an appropriate protective order.  Thus, the court concludes

9   that "the better . . . approach is to not provide litigants with the *carte blanche* right to

10  willy-nilly redact information from otherwise responsive documents in the absence of

11  privilege, merely because the producing party concludes on its own that some words,

12  phrases, or paragraphs are somehow not relevant."[16]  *Bonnell*, 2014 WL 10979823, at *4.

13  Accordingly, the court grants Plaintiffs motion to compel the materials Defendants

14  redacted on grounds of nonresponsiveness or irrelevance, but requires the entry of a

15  protective order with respect to any redacted personal information of refugee applicants.

16  //

17  //

18  _____

19      [16] The court's ruling applies not only to the portions of documents that Defendants
    redacted based on nonresponsiveness or irrelevance, but also to the attachments to responsive

20  documents that Defendants withheld on the same grounds.  *See Virco Mfg. Corp. v. Hertz
    Furniture Sys.*, No. CV 13-2205 JAK(JCX), 2014 WL 12591482, at *5 (C.D. Cal. Jan. 21, 2014)

21  ("This Court agrees with those courts which have held that emails produced in discovery should
    be accompanied by their attachments or that the attachments should be produced along with
    information sufficient to enable a receiving party to identify the email(s) to which the attachment

22  corresponds.").

1

IV.     CONCLUSION

2          Based on the foregoing analysis, the court GRANTS in part and DENIES in part

3 Plaintiffs' joint motion to compel discovery (Dkt. # 166).  The court further ORDERS

4 Defendants to produce the discovery described above and to permit Plaintiffs to conduct

5 the depositions described above within 45 days of the filing date of this order.

6          Dated this 20th day of December, 2018.

7

8

9                                                         _____

10                                                         JAMES L. ROBART
                                                          United States District Judge
11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 28