# EXHIBIT A

```
 1                  UNITED STATES DISTRICT COURT
 2                WESTERN DISTRICT OF WASHINGTON
 3                          AT SEATTLE
 4
     JOHN DOE, et al.,        ) Case No. C17-0178JLR
 5                            )
          Plaintiffs,         )
 6                            )
          v.                  )
 7                            )
     DONALD TRUMP, et al.,    )
 8                            )
          Defendants.         )
 9   ------------------------)
     JEWISH FAMILY SERVICES,  )
10   et al.,                  )
                              )
11        Plaintiffs,         )
                              )
12        v.                  )
                              )
13   DONALD TRUMP, et al.,    )
                              )
14        Defendants.         )
     ------------------------)
15                                - - -
16                    Wednesday, February 13, 2019
17                                - - -
18        Deposition of JENNIFER B. HIGGINS, taken at the
19   offices of Skadden Arps Slate Meagher & Flom, LLP,
20   1440 New York Ave NW, Washington, D.C. beginning at
21   8:59 a.m., before Nancy J. Martin, a Registered Merit
22   Reporter, Certified Shorthand Reporter.
```

Page 8

1      WASHINGTON, D.C., WEDNESDAY, FEBRUARY 13, 2019;

2                          8:59 A.M.

3                           -  -  -

4                    JENNIFER B. HIGGINS,

5            having been first duly sworn/affirmed,

6            was examined and testified as follows:

7

8                        EXAMINATION

9   BY MS. HIROSE:

10      Q.  Good  morning.   Could you please state your

11  name for the record.

12      A.  Jennifer B. Higgins.

13      Q.  And could you state your place of employment.

14      A.  I work at DHS, U.S. Citizenship and

15  Immigration Services.

16      Q.  And what's your position there?

17      A.  I'm the associate director for the refugee

18  asylum and international operations directorate.

19      Q.  Thank you.  So I introduced myself, but my

20  name is Mariko Hirose.  I'm with the International

21  Refugee Assistance Project.  I'm here with my

22  co-counsel here on this side of the room, and at the

```
                                              Page 56
 1    "factual conclusions."

 2    BY MS. HIROSE:

 3         Q.   Let's step back and just talk about what you

 4    know about the Section 6(a) working group process.

 5              MR. SNELL:  Objection.  Calls for a

 6    narrative.

 7              MS. HIROSE:  You can just say, "objection."

 8    Because otherwise it's a speaking objection.

 9              MR. SNELL:  I believe I'm entitled to state

10    the basis for my objection.  I'm affording you the

11    opportunity to correct the mistakes in your questions.

12              MS. HIROSE:  I don't think you are entitled

13    to.

14              MR. SNELL:  Are you aware of any authority

15    not allowing me to state the basis of my objections?

16              MS. HIROSE:  Yeah.  We can talk about that

17    during a break.

18              MR. SNELL:  Okay.

19              THE WITNESS:  I'm sorry.  Can you restate

20    your question.

21    BY MS. HIROSE:

22         Q.   Yeah.  Tell me what you know about the
```

Page 57

1    Section 6(a) working group process.

2             MR. SNELL:  Same objections.

3             THE WITNESS:  It was an interagency working

4    group, as I said, with the parties that I already

5    described, and they were to look at the risks

6    associated with refugee processing and whether there

7    are any enhancements that can be made to ensure the

8    security and integrity of the process.

9    BY MS. HIROSE:

10        Q.  And what was the process to come up with

11   Exhibit 2?

12            MR. SNELL:  Objection.  Vague.

13            THE WITNESS:  I don't know the exact process

14   for everything that went into coming up with

15   Exhibit 2.

16   BY MS. HIROSE:

17        Q.  Do you know anything about it?

18        A.  Yes.  I know that the working group, as I

19   said, conducted the review that I previously described

20   and that they made recommendations for enhancements

21   and that that was provided to the various principals

22   within the agencies.

1       Q.   Who are the principals within the agencies?

2       A.   The ones on the memo.

3       Q.   You mean Rex Tillerson and Elaine Duke and

4    Daniel Coats?

5       A.   That's correct.

6       Q.   Did anyone other than those three receive the

7    Section 6(a) working group recommendations?

8            MR. SNELL:  Objection.  Lacks foundation.

9            THE WITNESS:  I don't know everyone who

10   received those recommendations.

11   BY MS. HIROSE:

12      Q.   Did you receive the recommendations?

13      A.   I saw the report, yes.

14      Q.   On the second page of Exhibit 2 -- withdraw

15   that.

16           Taking a step back, were you involved in the

17   drafting of Exhibit 2?

18      A.   Yes.

19      Q.   On the second page of Exhibit 2 on the first

20   full paragraph, there are two sentences -- at the end

21   of the second paragraph, two sentences that begin with

22   "During this review, the Secretary of State and

1        A.   I don't know exactly what was happening with

2    admissions.   I can tell you that under this guidance

3    we were prioritizing non-SAO nationals.

4        Q.   And was that prioritization based on

5    recommendations in the Section 6(a) working group

6    report that you reviewed?

7        A.   I don't -- sorry.   Say that one more time.

8        Q.   Sure.   Was that prioritization -- was that

9    decision to prioritize grounded in the recommendations

10   of the Section 6(a) working group that you reviewed?

11           MR. SNELL:   I'm going to object and ask the

12   witness to not answer on the ground of deliberative

13   process privilege.   This is the final document.   To

14   the extent there's any delta between recommendation

15   and what's the final product, that would show

16   deliberative process.   In fact, even if there's not

17   you'd have to --

18   BY MS. HIROSE:

19       Q.   Well, are there factual determinations or

20   recommendations within the Section 6(a) working group

21   that you can discuss?   Factual determinations are not

22   within the deliberative process privilege.

Page 74

1           MR. SNELL:  That's not necessarily true.

2    Factual determinations can absolutely be encompassed

3    by the deliberative process privilege to the extent

4    that they reveal the deliberative process.  You're in

5    effect asking what the recommendation of the 6(a)

6    working group was and is it the same here.  That's

7    deliberative process material.

8           MS. HIROSE:  Well, we disagree on that.  We

9    are asking whether there were factual determinations

10   made by the 6(a) working group and whether they

11   supported the recommendations here.  So I don't think

12   it meets the threshold for invoking deliberative

13   process, much less in a balancing test.

14          MR. SNELL:  I guess I'm not clear by what you

15   mean by "factual determinations."

16          MS. HIROSE:  Well, did you understand that

17   deliberative process doesn't apply to facts?

18          MR. SNELL:  We just covered this.  It does.

19          MS. HIROSE:  So are you -- you're saying --

20   you're instructing the witness not to answer at all to

21   the question of -- to the question posed, which we can

22   repeat if you'd like.

```
                                              Page 75
 1          MR. SNELL:  Please repeat it.
 2    BY MS. HIROSE:
 3       Q.  Now, was the decision to prioritize grounded
 4    in the recommendations of the Section 6(a) working
 5    group that you reviewed?
 6          MR. SNELL:  So I would instruct her not to
 7    answer that question.  To the extent you have discrete
 8    factual questions you would like to ask her, you're
 9    welcome to do so.  But to the extent that these
10    factual questions are going to reflect what the
11    recommendation was, we would object.
12    BY MS. HIROSE:
13       Q.  Did the 6(a) working group make a factual
14    determination that applications of non-SAO refugees
15    should be prioritized?
16          MR. SNELL:  Objection.  You're asking for the
17    recommendation and you're just labeling it a factual
18    determination.
19          MS. HIROSE:  Are you instructing her not to
20    answer?
21          MR. SNELL:  Yes.
22    BY MS. HIROSE:
```

```
                                               Page 76
 1        Q.  Did the 6(a) working group make factual
 2    determinations that the agencies should review vetting
 3    processes for the security advisory opinion countries?
 4             MR. SNELL:  Same objection and instruction.
 5             MS. HIROSE:  I'm going to show you what's
 6    been marked as Plaintiff's Exhibit 8.
 7             (Deposition Exhibit 8 was marked for
 8             identification.)
 9    BY MS. HIROSE:
10        Q.  Okay.  Do you recognize what's been handed to
11    you as Exhibit 8?
12        A.  Yes, I'm familiar with it.
13        Q.  Could you identify the document, please.
14        A.  It was interim guidance provided to USCIS
15    staff on handling bona fide relationships.
16        Q.  And how do you know that's what it is?
17        A.  From the title.
18        Q.  Do you know who was involved in drafting this
19    guidance?
20        A.  I believe the refugee affairs division was
21    the primary drafter of the document.
22        Q.  Were you involved in drafting the document?
```

Page 82

1          MS. HIROSE:  Does it make good sense to take

2     a quick break?

3          THE WITNESS:  Sure.

4          MR. SNELL:  That's fine with us.

5          MS. HIROSE:  Thank you.  If we could just

6     take a 5- to 10-minute break.

7          (A recess was taken from 10:38 a.m.

8          to 10:53 a.m.)

9     BY MS. HIROSE:

10        Q.  So we're going to go back to Exhibit 2.  We

11    had started by talking about the second paragraph on

12    the very first page.

13        A.  Uh-huh.

14        Q.  And it said that -- particularly the sentence

15    that said the Section 6(a) working group identified "a

16    number of additional ways to enhance the refugee

17    screening and vetting processes."  So what were those

18    additional ways that the Section 6(a) working group

19    identified?

20        A.  So as I said before, I don't know if there's

21    an exact correlation between what the working group

22    identified with what's in the addendum, but my

1  understanding is what's in the addendum is much of

2  what the working group identified.  I just don't know

3  if it's exact.

4      Q.  So turning to the addendum, which starts on

5  what's marked as Page 10 of 41 at the very top of

6  Exhibit 2 --

7      A.  Uh-huh.

8      Q.  -- did the working group identify the bullet

9  points under "Application Process" under "Additional

10  Procedures for Refugee Applicants Seeking Resettlement

11  in the United States"?

12      A.  Again, I don't know if there's an exact

13  correlation, but I know they identified the basic

14  parameters of what's described there.

15      Q.  Had they identified both the "Increased Data

16  Collection" and the "Enhanced Identity Management"?

17      A.  Yes.

18      Q.  Did the working group identify the bullet

19  point "Fraud Detection and National Security" under

20  "Interview and Adjudication Process"?

21      A.  So, again, I'm a little uncomfortable about

22  going line by line and saying -- because I'm not sure

Page 84

1    if there's an exact correlation.  I can tell you that

2    the working group provided recommendations and that

3    was then incorporated into this document.  Whether

4    there were other things that came into it while this

5    was being drafted, I just don't know.

6         Q.  Okay.  Did they provide generations behind

7    what's listed under "Interview and Adjudication

8    Processes?"

9         A.  As I recall, the group made some

10   recommendations related to the application process,

11   the interview process, and systems checks.  But,

12   again, whether there's an exact match, I don't know.

13   Those were the broad buckets.

14        Q.  Did the Section 6(a) working group identify

15   the section that's labeled "Additional Review Process

16   for Certain Categories of Refugee Applicants"?

17            MR. SNELL:  Objection.  Vague.

18            THE WITNESS:  I don't even know where you

19   are.  Oh.

20   BY MS. HIROSE:

21        Q.  The next page, Page 12 of 41 at the top.

22            (The witness reviewed Exhibit 2.)

```
                                                    Page 90

  1              (The witness reviewed Exhibit 2.)

  2              THE WITNESS:  It refers to the "we continue

  3    to have concerns" in the prior sentence.  So to

  4    address the concerns that they continue to have,

  5    they're conducting a detailed threat analysis.

  6    BY MS. HIROSE:

  7       Q.  Did the 6(a) working group identify these

  8    concerns specific to SAO nationals?

  9              MR. SNELL:  Objection.  Seems to be calling

 10    for deliberative material.

 11              Can you rephrase the question?

 12              MS. HIROSE:  That's a yes or no question.

 13              MR. SNELL:  Well, that doesn't mean that I

 14    can't --

 15    BY MS. HIROSE:

 16       Q.  Did the working group identify concerns

 17    specific to SAO nationals?

 18              MR. SNELL:  You're asking if the working

 19    group identified the same concerns as identified in

 20    the memo?

 21              MS. HIROSE:  I'm asking if the concerns that

 22    the memo talks about are concerns identified by the
```

                                                        Page 91

1    6(a) working group.

2            MR. SNELL:  Yeah.  That seems to be

3    deliberative material.  I would ask the witness not to

4    answer that question.  I would also note for the

5    record that we've spent an inordinate amount of time

6    both on the 6(a) working group and on just the general

7    apparent policy behind this memo, which is not what

8    discovery was authorized for.  So I would like that

9    objection to be reflected in the record.

10           MS. HIROSE:  Sure.  We think that we need to

11   understand what the purpose of the memo was in order

12   to get some understanding how defendants implemented

13   it and whether the same suspension was in place in

14   another form now.  But your objection has been noted.

15           I'm going to ask a few more questions, and if

16   you, you know, object and instruct the witness not to

17   answer --

18           MR. SNELL:  If the questions --

19           MS. HIROSE:  Well --

20           MR. SNELL:  -- you can assume that the

21   objection just stands.

22           MS. HIROSE:  We will make the record, and we

Page 92

```
 1   will try to call the court today if we can.
 2           MR. SNELL:  I'm sorry.  I wasn't instructing
 3   her not to answer on grounds of relevance, just for
 4   the record.  I'm just making it known that I view
 5   these questions wildly outside the bound of discovery
 6   that was authorized in this limited jurisdictional
 7   dispute.
 8   BY MS. HIROSE:
 9       Q.  We were just talking about the "concerns"
10   language in this paragraph.  What were the concerns?
11   In the first sentence of that paragraph you pointed to
12   that language that says, "We continued to have
13   concerns."
14       A.  I can't speak to the specific concerns that
15   the cabinet head may have had.
16       Q.  You don't know what they are?
17       A.  I don't know what their specific concerns
18   were.
19       Q.  Do you know generally what their concerns
20   were?
21       A.  I think, as described in the memo, there was
22   concerns that these were higher risk countries in
```

```
                                          Page 93
 1   which an updated threat assessment had not yet been

 2   conducted and that that needed to be conducted in

 3   order to understand what risk was involved with

 4   continuing to process those cases and whether new

 5   enhancements were needed to address those risks.

 6        Q.  On the last page of Exhibit 2, Page 13 of 41,

 7   there's a section, "Form I-730 Refugee

 8   Following-to-Join Processing."

 9        A.  Do you mean with the addendum of the last

10   page?

11        Q.  Yes.  The last page of the addendum.

12        A.  Okay.  Sorry.

13        Q.  Was that an issue identified by the 6(a)

14   working group?

15        A.  Can you be more specific in terms of what you

16   mean by "issue"?

17        Q.  Sure.  So we've been talking about how the

18   working group identified a number of ways to enhance

19   refugee screening and vetting processes.  So was the

20   form I-730, refugee following-to-join processing, one

21   of the ways that 6(a) working group recommended?

22        A.  As I recall, the 6(a) working group
```

1   identified a misalignment in vetting between I-590

2   applicants and -730 applicants of a risk, yes.

3       Q.  So you've recalled the 6(a) working group

4   identifying the misalignment between I-730 refugees

5   and other refugees, and the topics under system

6   checks, interviews and refugee processes and

7   application processes; right?

8       A.  So as I said before, I recall that they

9   identified recommendations within each of those three

10  headings, but I'm not sure if they match exactly with

11  what is contained within the subheadings.

12      Q.  And you don't remember, one way or another,

13  if the working group identified additional review

14  process?

15      A.  I don't remember if that was part of their

16  final recommendation.

17      Q.  Do you remember anything else that was part

18  of a Section 6(a) working group recommendation?

19      A.  No, I think we covered it.

20      Q.  Earlier, you -- I asked you whether you were

21  ever detailed to the White House, and you said no?

22      A.  Uh-huh.

```
                                          Page 95
 1        Q.  Did you ever work at the White House in some
 2   capacity?
 3        A.  No.
 4        Q.  Did the White House have any involvement in
 5   the drafting of Exhibit 2?
 6        A.  I don't know if they were involved or not.
 7        Q.  Did you ever talk to anyone from the
 8   White House in relation to the issuance of Exhibit 2?
 9        A.  No.  My communications were with the
10   department.
11        Q.  Did you talk with the White House about
12   Exhibit 2 at all?
13        A.  Not that I recall.  My conversations were
14   with the department.
15        Q.  Is that also true prior to the issuance of
16   Exhibit 2?  Did you talk to anyone at the White House
17   about drafts of Exhibit 2?
18        A.  All my conversations related to Exhibit 2
19   were with the department and interagency colleagues,
20   but I don't recall anyone from the White House being
21   involved in those conversations.
22        Q.  Have you heard any suggestions that ██████
```

```
                                              Page 96
 1    refugee applicants were specifically of concern?

 2         A.  Yes, I have heard people describe those

 3    concerns.

 4         Q.  Were those discussions in relation to

 5    Exhibit 2?

 6         A.  Yes, I believe they were.

 7         Q.  Can you tell me about the discussion.

 8              MR. SNELL:  Objection.  No, she cannot.

 9    Again, this is deliberative process material.  You're

10    asking for her to describe discussions regarding a

11    concern.

12              MS. HIROSE:  A concern that's written about

13    in the memo.  We've been discussing various concerns

14    already.

15              MR. SNELL:  Well, I understand that I gave

16    you some leeway for the last set of questions, but now

17    you're asking about who had concerns and what about.

18    I mean this is predecisional deliberative material,

19    and I would ask the witness not to answer it with

20    respect to information -- with respect to divulging

21    information that would reveal predecisional

22    deliberative material.
```

Page 97

1    BY MS. HIROSE:

2        Q.  Was concerns about ▮▮▮▮ one of the concerns

3    that is referenced in the first full paragraph, Page 8

4    of 41, in Exhibit 2?

5        A.  Again, I don't know specifically what the

6    three cabinetists explicitly meant by those concerns,

7    but as I said before, there was a belief that

8    individual threat assessments needed to be done for

9    the SAO countries to determine whether there was a

10   greater risk involved with processing those cases and

11   identifying perhaps additional enhancements beyond

12   what was already contemplated to address those risks.

13       Q.  Did you draft this paragraph, the first full

14   paragraph, on Page 8 of 41?

15       A.  Again, I don't remember if I -- I edited it.

16   I provided input into it.  Absolutely.

17       Q.  Are you aware of the NPR piece in which

18   Barbara Strack talks about the process of drafting and

19   issuing Exhibit 2?

20       A.  I am aware she spoke to NPR, but I have not

21   heard it.

22       Q.  Are you aware of what she said on the NPR

```
                                           Page 98
 1   piece about this?

 2        A.   No.

 3             MR. SNELL:  For the record, is "NPR"

 4   referring to National Public Radio?

 5             MS. HIROSE:  Yes.  Thank you.  Yes.  National

 6   Public Radio.

 7             Could you mark this as Plaintiff's

 8   Exhibit 22.

 9             (Deposition Exhibit 22 was marked for

10             identification.)

11             MS. HIROSE:  We're going to go to Page 46.

12   So I apologize for the poor quality of this.  If you

13   could just read to yourself Page 46, starting with "My

14   impression from Barbara," and then down to the bottom

15   of the page.  And let me know when you're done.

16             (The witness reviewed Exhibit 22.)

17             THE WITNESS:  Okay.

18   BY MS. HIROSE:

19        Q.   Is what Barbara Strack talks about here

20   familiar to you?

21        A.   Yes.

22             MR. SNELL:  Objection.  Lacks foundation.
```

Page 99

1    BY MS. HIROSE:

2        Q.  Can you describe in which ways it's familiar?

3        A.  As I said, there was discussion about concern

4    about the SAO nationalities and whether there should

5    be threat assessments done specific to the countries

6    to determine whether there were any need for

7    additional enhancements beyond what was already being

8    contemplated.

9            From my perspective, that's what she

10   describes herein.

11       Q.  So you agree with what Barbara Strack says

12   here on this page?

13           MR. SNELL:  Objection.  Foundation.

14           THE WITNESS:  I'm not sure it's precise, but

15   it's similar to what I described.

16   BY MS. HIROSE:

17       Q.  Can you explain in what ways you don't think

18   it's precise?

19       A.  The fact that it says, you know, that it's

20   attributing it to the White House is very general.

21   Our conversations were not directly with the White

22   House.  They were through DHS.  So it's difficult for

                                                Page 100

1   me to confirm whether that is accurate or not.

2        Q.  Who at DHS?

3        A.  The DHS policy colleagues.  Senior advisors

4   within the department.  Those were primarily -- chief

5   of staff.  Those were primarily the individuals who

6   were involved.

7        Q.  And did you hear from one of them that they

8   heard from the White House?

9        A.  Yes.

10       Q.  From who?

11       A.  I don't recall who indicated that there had

12  been conversations with the White House.  I mean,

13  again, we're using a nebulous term.  Individuals.

14       Q.  And is it correct that the working group

15  recommended that refugee process restart for all

16  nationalities?

17            MR. SNELL:  Objection to the scope.  We're

18  back to where we were.  I would ask the witness not to

19  answer to the extent that they would reveal what the

20  recommendation of the working group was.

21            MS. HIROSE:  She already said she agreed.

22  It's okay.  I understand your objection to that

1    particular question.

2        Q.  And is it correct -- you said that you know

3    that the White House was in touch with certain people

4    regarding this.  Did you hear that the White House did

5    not like the conclusion of the working group review?

6            MR. SNELL:  Objection.  This is also

7    deliberative process, and now we're also starting to

8    get into Presidential communications privilege because

9    we're talking about, I assume, advisors to the

10   president and what their thoughts were.  So I would

11   ask the witness not to answer that question.

12           MS. HIROSE:  Well, this is the White House

13   influencing a memo that's been issued by the agency.

14   So...

15           MR. SNELL:  I would ask the witness not to

16   answer the question.

17   BY MS. HIROSE:

18       Q.  Did you hear about the White House wanted the

19   conclusion of the review to be changed?

20           MR. SNELL:  Same objection.  Same

21   instruction.

22   BY MS. HIROSE:

```
                                                   Page 102

 1        Q.   Were you told that there's a particular

 2   concern about ██████ nationals from the White House?

 3             MR. SNELL:  Same objection and same

 4   instruction.  And I would also reiterate that we

 5   haven't gotten to implementation of the agency memo,

 6   which is what I understood this was about, as well as

 7   implementation of the PI.

 8   BY MS. HIROSE:

 9        Q.   Do you know of any reasons why there would be

10   concerns about ██████

11             MR. SNELL:  Objection.  Vague.

12             THE WITNESS:  Yes.  There have been instances

13   of ██████ nationals who have been engaged in terrorist

14   activities, and certainly in terms of law enforcement

15   investigations and national security investigations,

16   ██████ nationals are often represented in those

17   investigations.

18   BY MS. HIROSE:

19        Q.   Was this prior to the 120-day review finding?

20        A.   So as part of the 120-day review, that was

21   part of the issue, was the need to be able to do a

22   full-threat assessment of each of the countries and to
```

Page 103

1    take a look at ongoing law enforcement investigations

2    and past law enforcement investigations.

3         Q.   Within the 120-day review?

4         A.   Sorry.  After the -- after the 120-day review

5    in terms of why the 90-day review was pursued was to

6    ensure that those threat assessments were conducted on

7    SAO countries and to ensure that information like

8    ongoing law enforcement investigations were being

9    considered.

10        Q.   But that was not a determination made by a

11   120-day review committee?

12        A.   Right.  What I'm saying is that the 90-day

13   review was put in place to be able to do that

14   assessment and to make sure that information was

15   considered and reviewed.

16        Q.   And what you said just now about the concern

17   about the ███████ refugees in particular, is that an

18   issue that was discussed within the Department of

19   Homeland Security prior to the issuance of Exhibit 2?

20             MR. SNELL:  I would object to that question

21   and ask the witness not to answer on the grounds of

22   deliberative process privilege.

1    BY MS. HIROSE:

2        Q.   If ████████ were the concern, why did they

3    suspend processes of all SAO nationals?

4            MR. SNELL:  Objection.  Lacks foundation.

5            THE WITNESS:  I don't believe that ███████

6    were the only concern.  I believe the concern was that

7    threat assessment hadn't been conducted for all of the

8    SAO nationals and that that was required before a

9    final decision could be made on how to proceed.

10   BY MS. HIROSE:

11       Q.   And what's the basis of your belief?

12       A.   Based on the conversations that I had in

13   terms of developing this memo.

14       Q.   And those were the conversations you had with

15   your DHS colleagues.  Anyone else?

16       A.   As part of the interagency process.  I mean

17   the memo is very clear that the threat assessments

18   need to be done for these countries.  That's the court

19   foundation for why I believe that to be the case.

20       Q.   Did the conclusion come from the White House?

21           MR. SNELL:  Objection.  Instruct her not to

22   answer on the grounds of deliberative process

 1   privilege and the Presidential communications

 2   privilege.

 3   BY MS. HIROSE:

 4        Q.   Other than Exhibit 8, which we talked about,

 5   just the interim guidance, were there other ways in

 6   which you implemented the agency memo?

 7             MR. SNELL:  Objection.  Vague.

 8             THE WITNESS:  I don't know whether there was

 9   additional guidance beyond this that was distributed.

10   BY MS. HIROSE:

11        Q.   Were you involved in drafting any other

12   guidance on the agency memo?

13        A.   Other than Exhibit 8 and the memo itself?

14        Q.   Right.

15        A.   I don't remember.

16        Q.   Did you issue any other instructions

17   regarding implementing that agency memo?

18        A.   I don't believe so.

19        Q.   Did you hold meetings on the implementation

20   of the agency memo?

21        A.    I don't know if we had specific meetings

22   related to the implementation, but I meet with my

1      A.  Talking with the state department about

2  whether there were additional locations where cases

3  could be presented and ready for interview.  Whether

4  we could ensure that we could get Visas to go to those

5  locations in time.  Whether we could ensure officers

6  got vaccinations in order to go to those locations in

7  time.  Whether there were SAO nationals who were part

8  of our circuit rides who were -- had cases ready for

9  interview in the locations we were already going.  So

10  a variety of different things with whom one would have

11  to be discussed.

12      Q.  What were the additional countries that you

13  were contemplating adding in those discussions?

14      A.  I don't know what was being discussed or

15  contemplated in terms of the countries.  The

16  instruction was trying to figure out if there were

17  additional SAO national cases that could be added to

18  the circuit ride.

19      Q.  And also whether there were additional

20  locations that could be added to the second quarter

21  circuit rides?

22      A.  Certainly.