# EXHIBIT B

```
 1                    DRAFT TRANSCRIPT

 2        REALTIME AND INTERACTIVE REALTIME TRANSCRIPT

 3                 ROUGH DRAFT DISCLAIMER

 4   - - - - - - - - - - - - - - - - - - - - - - - - -

 5                    IMPORTANT NOTICE:

 6                    AGREEMENT OF PARTIES

 7        We, the party working with realtime and rough

 8   draft transcripts, understand that if we choose to use

 9   the realtime rough draft screen or the printout, that

10   we are doing so with the understanding that the rough

11   draft is an uncertified copy.

12        We further agree not to share, give, copy, scan,

13   fax or in any way distribute this rough draft in any

14   form (written or computerized) to any party.  However,

15   our own experts, co-counsel, and staff may have

16   LIMITED INTERNAL USE of same with the understanding

17   that we agree to destroy our rough draft and/or any

18   computerized form, if any, and replace it with the

19   final transcript upon its completion.

20

21   WITNESS:   KELLY GAUGER

22   DATE:    FEBRUARY 15, 2019

23

24

25
```

```
 1   rides?
 2        A.   I don't know.
 3        Q.   Skipping down to Paragraph 6 of your
 4   declaration.  I'll give you a second to read it, and
 5   then my question is can you explain to me what this
 6   paragraph refers to.
 7             (The witness reviewed the document.)
 8             THE WITNESS:  It refers to the fact that we
 9   understood that since we needed to start interviewing
10   SAO nationals again, and it wasn't feasible or
11   practical to add very many cases in the second
12   quarter, that we would kind of heavy up the third
13   quarter with SAO nationals.
14   BY MS. KEANEY:
15        Q.   Okay.  And if I'm understanding correctly,
16   the third quarter circuit rides began in April; is
17   that correct?
18        A.   Yes, April.
19        Q.   Okay.  So at the time that you were -- that
20   you submitted this declaration in January 19, had the
21   third quarter circuit ride already been finalized?
22        A.   No.
23        Q.   Okay. So this refers -- this paragraph then
24   refers to requests to add these countries to a circuit
25   ride schedule that was still being considered; is that
```

DRAFT

1   correct?

2        A.   That was being formulated.  I mean in

3   January -- so that's three months in advance -- we

4   would have still been kind of putting it together.  So

5   this says that as we were putting it together, we

6   would be requesting locations such as these listed.

7        Q.   Okay.  And why did PRM plan to request to add

8   these locations?

9             MR. DUGAN:  Objection.  Lacks foundation.

10            THE WITNESS:  Because those are locations

11  where SAO nationals are located, where they're

12  interviewed.

13  BY MS. KEANEY:

14       Q.   Do I understand correctly that it was in

15  order to comply with the injunction in this case?

16       A.   Yes.

17       Q.   Who decided that these were the locations

18  that should be added to the third quarter circuit

19  ride?

20       A.   I don't recall who specifically -- it wasn't

21  just one person.  I'm sure it was a group decision.

22       Q.   Was there any discussion of whether PRM

23  needed to add a certain number of interviews in order

24  to comply with the injunction?

25            MR. DUGAN:  Objection.  And at this point I

DRAFT

1  would interpose an objection on the basis of the
2  deliberative process privilege.  I think a question
3  that goes to internal discussion in PRM about how the
4  circuit ride schedule would be set up, it's clearly
5  predecisional deliberative.  So I would instruct the
6  witness not to answer understanding that we'll be
7  contacting the court shortly to discuss this issue.
8        BY MS. KEANEY:
9           Q.  Did you personally believe that adding Iraq,
10 Jordan, Turkey, and potentially Kenya to the third
11 quarter circuit rides would be sufficient to comply
12 with the injunction in this case?
13              MR. DUGAN:  Objection.  Vague.  Calls for a
14 legal conclusion.  Legal interpretation.
15              You can answer that one.
16              THE WITNESS:  Yes, I did.
17 BY MS. KEANEY:
18       Q.  Based on what?
19              MR. DUGAN:  Same objection.
20              THE WITNESS:  These are just -- these are
21 four of our biggest locations where we had SAO
22 nationals, and where we've just done -- where the
23 percentage of the cases in those locations are SAO
24 nationals, and just the volume of cases is larger.  So
25 those are substantial SAO locations.

1   BY MS. KEANEY:
2       Q.  Did you consider adding other countries aside
3   from the ones listed?
4           MR. DUGAN:  Objection.  Vague.  To the extent
5   the question implicates an internal agency
6   deliberation, I would instruct the witness not to
7   answer.  That being said, if the question is just what
8   she considered, she can answer to the extent she
9   knows.
10  BY MS. KEANEY:
11      Q.  The question is just did you personally
12  consider adding any other countries aside from the
13  ones listed to the third quarter circuit ride?
14      A.  I don't recall.  These are the big ones.
15      Q.  Okay.  In your opinion, did the -- do the
16  agency add enough interviews of SAO nationals to
17  compensate for the agency memo?
18          MR. DUGAN:  Objection.  Vague.  Implicitly
19  calls for a legal conclusion or interpretation.
20          You can answer to the extent you know.
21          THE WITNESS:  In my opinion, yes.
22  BY MS. KEANEY:
23      Q.  Okay.  What's the basis for that conclusion?
24      A.  Because I felt that by adding these locations
25  we would add a substantial number of SAO nationals to