# Exhibit A

---

Page 1

```
 1            UNITED STATES DISTRICT COURT
 2           WESTERN DISTRICT OF WASHINGTON
 3                    AT SEATTLE
 4
   JOHN DOE, et al.,      ) Case No. C17-0178JLR
 5                        )
        Plaintiffs,       )
 6                        )
        v.                )
 7                        )
   DONALD TRUMP, et al.,  )
 8                        )
        Defendants.       )
 9 ------------------------)
   JEWISH FAMILY SERVICES, ) Case No. C17-1707JLR
10 et al.,                )
                          )
11      Plaintiffs,       )
                          )
12      v.                )
                          )
13 DONALD TRUMP, et al.,  )
                          )
14      Defendants.       )
   ------------------------)
15
16          Thursday, February 21, 2019
17
18      30(b)(6) Deposition of JENNIFER B. HIGGINS, taken
19 at the offices of Skadden Arps Slate Meagher & Flom,
20 LLP, 1440 New York Ave NW, Washington, D.C. beginning
21 at 9:01 a.m., before Nancy J. Martin, a Registered
22 Merit Reporter, Certified Shorthand Reporter.
```

*Jewish Family Services v. Trump*, Case No. C17-0178JLR

---

Page 5

```
 1   WASHINGTON, D.C., THURSDAY, FEBRUARY 21, 2019;
 2                   9:01 A.M.
 3
 4             JENNIFER V. HIGGINS,
 5          having been first duly sworn,
 6        was examined and testified as follows:
 7
 8                  EXAMINATION
 9 BY MR. COX:
10   Q.  Good morning, Ms. Higgins.  Welcome back.
11   A.  Thank you.
12   Q.  Can you just state your name and employment
13 for the record.
14   A.  Jennifer V. Higgins, and I am the associate
15 director for refugee asylum international operations
16 at USCIS.
17   Q.  Thank you.  So as you may remember from last
18 week, my name is Justin Cox.  I represent the
19 plaintiffs in the Jewish Family Services vs. Trump
20 case.  With me are three -- first three attorneys here
21 are also counsel for the JFS plaintiffs, and Tana Lin,
22 at the end is counsel for plaintiffs in the Doe v.
```

---

Page 13

```
 1 meet with?
 2   A.  From the refugee affairs division and
 3 international operations division at USCIS.
 4   Q.  Which individuals?
 5   A.  You want their names?
 6   Q.  Uh-huh.
 7   A.  Joanna Ruppel, Mary Margaret Stone, Matt
 8 Lenkowski.  The attorneys were Colleen
 9 Zengotitabengoa.
10      REPORTER MARTIN:  I'm sorry.  Who?  Colleen?
11      THE WITNESS:  Zengotitabengoa.  I can spell
12 it for you.  Z-e-n-g-o-t-i-t-a-b-n-g-o.  It's not
13 quite right, but it's close.
14      Ron Whitney, Ann Shirazi, and there were
15 probably other handful of people on the telephone.  So
16 I'm not remembering their specific names.
17 BY MR. COX:
18   Q.  Who were they with?
19   A.  Refugee affairs division primarily.  Oh,
20 Jennifer Kliska, Bobby Johnson.  Those are the ones I
21 can remember.
22   Q.  Okay.  And did you review any documents in
```

Page 14

1  preparation for today's deposition?
2      A.  I did.
3      Q.  What did you review?
4      A.  I reviewed all of the exhibits from the last
5  deposition and the court documents.  I reviewed
6  answers to questions from the prior deposition.
7      Q.  You said the exhibits from the last
8  deposition.  You mean from your last deposition?
9      A.  From my fact deposition, yes.
10     Q.  Okay.  And which court documents did you
11 review?
12     A.  Basically all of the interrogatories, other
13 declarations from other individuals, Neil Latta,
14 Joanna Ruppel, and, you know, the preliminary
15 injunction itself.  The stay denial.
16     Q.  Did you review the transcripts of Kelly
17 Gauger's deposition?
18     A.  I did not.
19     Q.  Did you review the transcript of Hilary
20 Ingraham's deposition?
21     A.  I did not.
22     Q.  Did you review any other documents that you

Page 15

1  haven't mentioned yet?
2      A.  I reviewed some documents that involved
3  circuit rides that the refugee division had.  That
4  covers it, I think.
5      Q.  What kind of documents?
6      A.  Just charts showing where they went.
7      Q.  Do you know if those have been produced to
8  the plaintiffs in this case?
9      A.  I believe there have been charts related to
10 circuit rides that were produced, yes.
11     Q.  Were the charts that you reviewed ones that
12 were produced?
13     A.  I don't believe that all of the charts that I
14 reviewed were.
15     Q.  Did you review any other documents that you
16 haven't mentioned yet?
17     A.  No.
18     Q.  No one prepared any memos for you, for
19 example?
20     A.  There were no memos.
21     Q.  Okay.  Did you communicate with anyone else
22 that you haven't mentioned yet about today's

Page 105

1      Q.  So to summarize, there was an instruction
2  given not to schedule SAO nationals for circuit ride
3  interviews?
4      A.  So that instruction is really more in line
5  with something that the State Department would provide
6  because they're the ones who actually scheduled the
7  interviews.  Our instruction was really putting on
8  notice that our staff would be deprioritizing.  We
9  wouldn't be doing very many SAO national interviews.
10 But the scheduling of the interview itself is done by
11 the Department of State.
12     Q.  So I understand the distinction.  I'm just
13 wondering if it, practically speaking, makes a
14 difference.  As I understand it, trying to understand
15 what you just said, USCIS told the State Department,
16 "We're not going to be interviewing SAO nationals,"
17 generally speaking.
18     A.  Actually, the way it happened would actually
19 have been in the reverse.  So we had received an
20 original circuit ride scheduled for Q2 prior to the
21 agency memo on October 20, and then on November 20
22 they sent us a revised version of that circuit ride

Page 106

1  schedule, and in that circuit ride schedule State
2  Department had already taken the action to
3  deprioritize some of the SAO locations.
4          So some of the locations that were SAO heavy
5  on the first version were actually taken off on the
6  second version of their ask to us.
7      Q.  Was that -- well, let me back up.
8          So I understand from various depositions in
9  this case that coming up with the circuit ride
10 schedule is a discussion between USCIS and PRM?
11     A.  That's right.
12     Q.  I -- and so USCIS -- I think what you said a
13 minute ago is that USCIS informed PRM that USCIS would
14 be the deprioritizing interviews of SAO nationals?
15     A.  I think that through interagency discussions
16 in the agency memo, all parties were on notice that we
17 would be deprioritizing those at that time.  And what
18 I'm saying is that State Department proactively, when
19 they gave us their second ask for their circuit rides,
20 actually already began deprioritizing when they sent
21 us that second circuit ride list.
22     Q.  Did they do that, at least in part, based on

1  USCIS communications that USCIS' would be
2  deprioritizing the interview of SAO nationals?
3         MR. SNELL:  Objection.  Foundation and
4  speculation.
5         THE WITNESS:  I don't know if that's the case
6  or not.  My understanding, actually, is that there
7  were many SAO heavy locations that even at the start
8  of the discussion, when they gave us that first ask
9  prior to the agency memo, we had some concerns about
10 because we have so many new staff, those locations
11 aren't good for the infield training that they're
12 required to receive when they first go out on their
13 very first circuit ride.
14        They're very complicated locations.  So we
15 try to send them to easier locations.  So my staff had
16 already communicated to PRM that some of those
17 locations wouldn't really work well for the very new
18 refugee core officers that we had that needed to go
19 out on a circuit ride.
20        Then the agency memo happened.  Then I don't
21 know that there were any other discussions on the
22 circuit rides until they gave us that second ask on

1  November 20, which, as I said, already took into
2  consideration the deprioritization, and then
3  additional discussions occurred after that.
4  BY MR. COX:
5     Q.  Okay.  So the -- when was that first list
6  again you mentioned?
7     A.  October 20.
8     Q.  Okay.  So your understanding is that the
9  November 20 list that they provided reflected the
10 deprioritization of SAO nationals ordered by agency
11 memo?
12    A.  In large part, yes.  Because, in fact, they
13 identified particular -- they took some locations off
14 that had heavy SAO populations.  Egypt and Jordan, for
15 example, they took off from their first ask.  That was
16 off their second ask when we got it.  And then they
17 identified locations where they were -- there were
18 non-SAO nationals as a priority.
19    Q.  I'm going to circle back for a second.  We'll
20 talk more about circuit rides in a moment.
21        There was some instruction that DHS gave to
22 deprioritize SAO nationals in circuit ride interviews;

1  were ultimately rejected because of the agency memo;
2  correct?
3     A.  Correct.
4     Q.  And Mary Margaret Stone, for example, would
5  know more about that than you?
6     A.  She would know whether there were circuit
7  ride schedules that were rejected, yes.
8     Q.  On a location-by-location basis?
9     A.  Yes.  Although I'm not sure she would have
10 been able to memorize it.
11    Q.  But she could go back and find out that
12 information?
13    A.  She could.
14    Q.  So on Q2 of fiscal year 2018, when was the
15 circuit ride schedule finalized for that quarter?
16    A.  So as I said, we got the original ask from
17 the Department of State on October 20.  Then we got
18 their second ask on November 20.  And the circuit
19 rides were essentially locked in just prior to the
20 preliminary injunction.  And we know that to be the
21 case because we had already identified the officers
22 who would be going on circuit rides.  We had scheduled

1  the predeparture trainings that they would be
2  receiving January before they rolled out for their
3  circuit rides.
4         So they were finalized, and, again, with the
5  caveat they're never final, right before the
6  preliminary injunction.
7     Q.  Do you know how many refugee officers
8  participated in the circuit rides during the second
9  quarter of fiscal --
10    A.  50.
11    Q.  50 total?
12    A.  Yes.
13    Q.  And that's for Q2?
14    A.  Yes.
15    Q.  Do you know how many for Q1?
16    A.  It was 25.
17    Q.  Why so many fewer?
18    A.  Because most of those officers were going
19 over to the asylum division to assist them with the
20 asylum backlog and reinstituting the last-in/first-out
21 processing so that we could keep up with incoming
22 asylum receipts.

**Page 132**

1 They did a great job. They actually adjudicated
2 15,000 extra cases.
3 In Q1 of FY 19 we sent approximately 60 or
4 so, just to make sure that we were keeping up with
5 receipts on the asylum side. They did another great
6 job.
7 And then this quarter we're going on a
8 volunteer basis and having refugee officers volunteer
9 to go on circuit rides on the asylum side.
10 So it's a much smaller number. You know,
11 less than a dozen for sure. It might even be less --
12 it might be, you know, in the single digits.
13 We are primarily now using our field
14 operations directorate staff. We have just trained 30
15 of them to be able to make up for what the refugee
16 officers won't be doing because we're devoting them to
17 doing refugee processing overseas.
18 Q. What effect did the agency memo have on the
19 fiscal year 2018 Q2 circuit ride schedule?
20 MR. SNELL: Objection. Calls for a
21 narrative.
22 THE WITNESS: So as we discussed, when the

**Page 133**

1 State Department came back with their November 20 ask
2 for Q2, they had already removed some of the countries
3 that were heavy SAO populations based on the agency
4 memo to deprioritize.
5 So, for example -- I think I said this
6 earlier -- Egypt and Jordan were removed from the
7 list. We then again engaged in a dialogue with them
8 about the circuit rides and ultimately determined we
9 would go to locations where there would be very few,
10 virtually none, SAO nationals on the circuit rides.
11 BY MR. COX:
12 Q. In addition to Egypt and Jordan, were any
13 other locations removed from the list?
14 A. There were.
15 Q. Which ones?
16 A. Well, I'm not sure I'm going to remember all
17 of them. But Germany, Moldova, Belarus, Austria.
18 Iraq was ultimately removed. Not in their ask. It
19 was on their ask. It was ultimately removed. And
20 then Turkey, we couldn't go because of security
21 situations. So we ended up not going there in the
22 end.

**Page 134**

1 Q. But you had planned to go?
2 A. It's hard to say. It was on their second
3 quarter ask, but at that point there had been some
4 massive security issues. So we knew we couldn't send
5 our officers there.
6 Q. When did those security issues take place?
7 A. Right around that period of time.
8 Q. Which period are we talking about?
9 A. Q2. So, again, we got that second ask on
10 November 20. So I think it was around that time.
11 They may have even occurred a little bit earlier, and
12 State Department was wondering if we could go back now
13 that the security issues had been resolved, but they
14 had not been resolved. So we did not go for security
15 concerns.
16 Q. Why was Iraq removed?
17 A. Because --
18 MR. SNELL: Objection. Lack of foundation.
19 THE WITNESS: Because, again, most of those
20 cases are SAO nationals, and we were deprioritizing
21 them at the time.
22 MR. COX: Now would be a good time for a

**Page 138**

1 come from? It's not in the agency memo; right?
2 A. No, it's not. That's something that
3 operationally which allowed to occur. I mean once
4 someone has their travel document, as you were talking
5 about earlier, we would have really had to have
6 instructed CBP to turn them around because once they
7 had that travel, document they're essentially able to
8 travel around quite freely. So it just made practical
9 sense to allow them to continue.
10 Q. Was there a process created for this
11 case-by-case determination described in the waiver
12 provision?
13 MR. SNELL: Objection. Vague.
14 THE WITNESS: There was never a process
15 finalized, no.
16 BY MR. COX:
17 Q. Was there a process started?
18 A. There was a dialogue started about it, yes.
19 The Department of State had identified I think
20 approximately 200 or so cases that they sent to us at
21 the end of November saying they thought warranted
22 national interest exception and wanted our views on

1 that case.

2        Our folks started looking at the list and

3 realized that there were a lot of individuals on the

4 list who needed security checks rerun, or new SAOs,

5 for example.  And so around mid-December they went

6 back to state and said they should take another look

7 at the list and let us know which ones were the

8 highest priority, meaning which ones were the most

9 likely to actually be able to travel because maybe

10 they had more completed actions on their case.

11       So the dialogue started at that time.  But

12 then, of course, with the preliminary injunction, that

13 review became sort of moot.

14   Q.   Who was responsible for implementing the

15 waiver provision at DHS?

16   A.   At DHS?

17   Q.   Uh-huh.

18   A.   The refugee affairs division was responsible

19 for being able to conduct those reviews.

20   Q.   So Barbara Strack headed RAD at the time?

21   A.   Barbara was the head of RAD at the time, yes.

22   Q.   So this dialogue that you described, you said

1 that PRM sent USCIS a list of approximately 200?

2   A.   Yes.

3   Q.   And those were 200 cases and not individuals?

4   A.   I mean it was approximately 200 cases.  I

5 understand it was probably around the same number of

6 individuals, but I don't know for sure.

7   Q.   Okay.  And you said that USCIS got back to

8 PRM at some point and asked them to priorities -- to

9 more prioritize the list?  Is that what you said?

10   A.   Yeah.  So they started taking a look at the

11 list.  So State Department had sort of indicated that

12 there was a national interest exception, and our folks

13 were taking a look at the risk element of that waiver

14 process.  And as they were going through the list,

15 they realized the cases were really just a hodgepodge

16 of people who, even if we were to really dig into them

17 and conduct that review, they probably wouldn't be

18 able to travel anyway because they were pending other

19 security checks.

20       So what we did is we went back to state and

21 said, "Why don't you prioritize this list so that

22 we're sure to be working the cases that are most

1 likely to travel first."

2   Q.   In what form did DHS get back with the State

3 Department?

4   A.   I understand from my staff that it was a

5 telephonic communication.

6   Q.   Between who?

7   A.   The desk officer staff.  I know Ann Shirazi

8 was involved in the discussion, and I believe it was

9 Jennifer Smith.  And they followed up in an E-mail in

10 mid-December, Ann Shirazi did, to Jennifer Smith

11 saying, "Hey, based on that discussion that we had the

12 other day, just making sure you guys are going to get

13 back to us with a prioritized list."

14   Q.   Okay.  So if the State Department's testimony

15 was that DHS never got back to them about this list of

16 200, do you know why that would be?

17   A.   I would suspect they are misremembering

18 because I reviewed an E-mail that went back to them

19 and said, "Hey, just checking back that we -- that you

20 guys are going to reprioritize this list."  So to say

21 they never got back to them would not be accurate.

22   Q.   And your testimony is that Ann Shirazi called

1 Jennifer Smith and said, "Reprioritize based on

2 closeness to travel"?

3   A.   So to be clear, Ann Shirazi is the one who

4 wrote the E-mail reminding them of that agreement.  In

5 terms of the direct staff that were involved in that

6 communication, I believe it was Ann Shirazi.  I don't

7 know if it was a group call where other people were on

8 that telephone call or not.

9   Q.   And you just said "remind her of that

10 agreement."  You understood that there was an

11 agreement reached?

12   A.   The agreement that they would go back and

13 give us a prioritized list to work from.

14   Q.   Was the list of 200 too long?

15       MR. SNELL:  Objection.  Vague.

16       THE WITNESS:  What do you mean "too long"?

17 BY MR. COX:

18   Q.   That's what the State Department testified

19 to, that DHS informally let them know that it was too

20 long?

21   A.   I'm not aware of anyone saying that it was

22 too long.  I'm aware of people saying that it made

Page 143

1   sense to prioritize the people who were likely to
2   travel.
3       Q.  Is that in writing anywhere?
4       A.  It's in an E-mail that I just described.
5       Q.  And what does the E-mail say again?
6       A.  It's an E-mail from Ann Shirazi going back to
7   the Department of State saying, "Based on our prior
8   discussion, we understood you all were going to
9   prioritize the list of cases.  Is that -- just making
10  sure you guys are going to do that for us."
11          MR. COX:  Can you guys give us that E-mail,
12  produce it?
13          MR. SNELL:  Yeah.  At the end of this it
14  would be helpful if you make the specific requests in
15  writing, and then we'll review it, just so that we're
16  not keeping a running list.  We're happy to look into
17  it.
18  BY MR. COX:
19      Q.  So looking again at the language here of the
20  agency memo, you said no process was formalized;
21  right?
22      A.  That's right.

Page 179

1   see a distinction between those two.
2       A.  Again, I feel like we're arguing over
3   semantics.  And I'm just trying to be very clear about
4   what I did.  We had conversations with our counsel and
5   our operational staff.  Based on that, we drafted, by
6   consensus, an instruction that I was very comfortable
7   with and sent out to my staff.
8       Q.  Were your instructions based on anything
9   else?
10      A.  No.
11      Q.  All right.  We'll move on.
12          Are you aware that the government asked the
13  Court to stay the preliminary injunction issued by the
14  Court?
15      A.  Yes.
16      Q.  When did you first become aware of that?
17      A.  In early January when it was happening.
18      Q.  Last week you testified that you weren't
19  sure.  Did you -- has your memory been refreshed since
20  then?
21      A.  I read the preliminary injunction and read
22  through some old E-mails about it, yes.

Page 182

1   work out for Q2.
2       Q.  So circling back, is it fair to say then --
3   is it fair to say that DHS did not believe that the
4   order denying the stay required it to do anything that
5   it wasn't already doing by virtue of the preliminary
6   injunction that had been issued a couple weeks prior?
7           MR. SNELL:  Same objections.
8           THE WITNESS:  No.  I think we recognized that
9   we really needed to try to do more, which is why for
10  Q2 we looked at the possibility of sending out a
11  second wave of officers to plus up second quarter
12  circuit rides.  When that didn't work out, we went out
13  of our way to try to really prioritize SAO nationals
14  in Q3 because that was something that we knew we could
15  work toward.
16  BY MR. COX:
17      Q.  Did DHS decide that the order denying the
18  stay motion required it to add interviews of SAO
19  nationals to the third quarter circuit ride?
20          MR. SNELL:  Same objections.
21          THE WITNESS:  I wouldn't say -- again, it's
22  sort of a legal interpretation.  I don't know that we

Page 183

1   would say we required it.  I would say we were kind of
2   going above and beyond to show compliance by
3   prioritizing SAO nationals for Q3 because they had
4   been deprioritized as part of the agency memo.
5   BY MR. COX:
6       Q.  So you did not understand the order denying
7   the stay motion to actually require anything more than
8   the preliminary injunction?
9           MR. SNELL:  Same objections, and asked and
10  answered.
11          THE WITNESS:  I think "require" is a strong
12  word.  I think we went out of our way to do exactly
13  what we said we were doing initially, and then after
14  the stay, to take a step and do even more.
15  BY MR. COX:
16      Q.  Is that a "no"?
17          MR. SNELL:  Same objections.
18          THE WITNESS:  I don't know that I would say
19  it required us to do what we set out to do other than
20  what we had already done, but we were doing more.
21  BY MR. COX:
22      Q.  So it didn't require anything more, but you

Page 184

1  were in -- in order to try to show your good faith,
2  you decided to voluntarily add SAO nationals to the
3  third quarter circuit ride schedule?
4          MR. SNELL:  Same objections.
5          THE WITNESS:  So they were going to be added,
6  but we went out of our way to make sure that they were
7  being prioritized.
8  BY MR. COX:
9      Q.  They were going to be added anyway?
10     A.  Pursuant to the preliminary injunction, yes.
11     Q.  To the third quarter circuit ride schedule?
12     A.  Yes.  The preliminary injunction required us
13  to resume interviews of SAO nationals and required us
14  to resume final decisions.  So that would have been
15  the case in Q3.  When the denial of the state came
16  forward, we knew that we had to continue doing that,
17  but we took the step further by really prioritizing,
18  not just resuming in a general sense, but prioritizing
19  SAO nationals.
20     Q.  So when you say, "resuming interviews," you
21  mean putting together circuit ride schedule as if the
22  agency memo never existed?

Page 185

1      A.  Yes.
2      Q.  I think earlier we were talking about the
3  steps taken to implement the suspensions.  You
4  testified that was in regards to FTJ -- the FTJ
5  suspension.  One step you took was to stop final
6  adjudications; right?
7      A.  Uh-huh.
8      Q.  So in order to implement the Court's orders,
9  is it fair to say that you resumed final
10  adjudications?
11     A.  Yes.
12         MR. SNELL:  Objection.  Calls for a legal
13  conclusion.
14  BY MR. COX:
15     Q.  And then -- you would say that's what you did
16  to reverse the instruction, the prior instruction?
17     A.  We resumed final adjudications in order to
18  comply with the preliminary injunction.
19     Q.  Okay.  Did you do anything other than
20  resuming final adjudications to undo the prior
21  instruction to stop final adjudications?
22         MR. SNELL:  Same objection.